IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

GWENDOLYN P. MCQUIRTER,     )
et al.     )
     )
     Plaintiffs,     )
     )
vs.     )     CASE NO.: 2:07-cv-00234-MEF-WC
     )
CITY OF MONTGOMERY, et al.,     )
     )
     Defendants.     )

## PLAINTIFF GWENDOLYN MCQUIRTER'S  MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY AGAINST DEFENDANTS K.C. BENTLEY AND RON COOK ON COUNTS VII (Violation of Driver Privacy Protection Act), & VIII (42 U.S.C. §1983)

**COMES NOW** the Plaintiff Gwendolyn P. McQuirter, by and through her undersigned

counsel, and moves the Court for the entry of partial summary against Defendants K.C. Bentley

and Ron Cook as to their liability on Counts VII (Violation of Driver Privacy Protection Act) and

VIII (42 U.S.C. §1983) of Plaintiff's Second Amended Complaint. As grounds therefore,

Plaintiff asserts that there are no material issues of fact with respect to these Defendants' liability

on these claims.

This motion is submitted upon the following:

   A.   The pleadings in this cause, including all exhibits to said pleadings;

   B.   Exhibit 1 – Excerpts of deposition testimony of Defendant K.C. Bentley;

   C.   Exhibit 2 – Excerpts of deposition testimony of Defendant Ron Cook;

   D.   Exhibit 3 – Defendant City of Montgomery's responses to Request for Admissions;

   E.   Exhibit 4 – Defendants' Rule 26(a)(1) Initial Disclosures;

   F.   Exhibit 5 – Defendants' Response to Plaintiffs' First Set of Interrogatories and Requests

for Production of Documents; &

    G.  Exhibit 6 – News article appearing in Montgomery Advertiser and on the internet.

## I.  Statement Of The Undisputed Facts

### A. Parties

   1.  Plaintiff Gwendolyn P. McQuirter is over the age of nineteen (19) years and is a resident citizen of Montgomery County, Alabama.  At all times mentioned herein, Plaintiff Gwendolyn McQuirter was a private citizen/individual.  (Doc. 11, ¶1)

   2.  Plaintiff Charles E. McQuirter is over the age of nineteen (19) years and is a resident citizen of Montgomery County, Alabama.  At all times mentioned herein, Plaintiff Charles E. McQuirter was/is the spouse of Plaintiff Gwendolyn McQuirter. (Doc. 11, ¶2)

   3.  Defendant City of Montgomery, Alabama is a body corporate, a municipality, formed and existing under the laws of the State of Alabama located in Montgomery County, State of Alabama. At all times mentioned herein, Defendant maintained a police agency known as the Montgomery Police Department (hereinafter referred to as "MPD") comprised of employees of the City of Montgomery. (Doc. 11, ¶3;  Doc. 14, ¶ 3).

   4.  Defendant K.C. Bentley (hereinafter referred to as "Bentley"), is 33 years old and a resident of a resident of Montgomery County, Alabama. (Ex. 1, p. 4, lines 7-21).  In committing the acts complained of, Defendant Bentley was employed as a Corporal/Investigator with the MPD and was acting within the line and scope of her employment. (Doc. 11, ¶4; Doc. 14, ¶ 4).

     Defendant Bentley began her employment with the Montgomery Police Department ("MPD") in October 1999, serving as a patrol officer from October 1999 until June 2004, when she became a narcotics detective assigned to the narcotics unit. (Ex. 1, p. 7, lines 5-11; p. 8, lines 5-10). As a narcotics officer, Defendant Bentley's duties include investigating vice or narcotics complaints or self-initiated investigations. Vice would consist of things related to prostitution,

gambling, anything other than the drugs but something that would be considered illegal activity that's something other than what the detective division typically handles. (Ex. 1, p. 8, line 22 to p. 9, lines 1-10).

5.    Defendant Ron Cook (hereinafter referred to as "Cook"), is 40 years old and a resident of Montgomery County, State of Alabama. (Ex. 2, p. 4, lines 7-13).  In committing the acts complained of, Defendant Cook was employed as a Lieutenant/Public Information Officer with the MPD and was acting within the line and scope of his employment. (Doc. 11, ¶5; Doc. 14, ¶ 5).

Defendant Cook began his employment with the MPD in 1994, and currently serves as the Bureau Commander for Property in the detective division, a position he has held since June 2006. (Ex. 2, p. 10, line 13 to p. 11, line 9). Defendant Cook's duties include managing case files, assisting in investigations, and personnel management. (Ex. 2, p. 10, line 23 to p. 11, lines 1-7).   Prior to becoming Bureau Commander, Defendant Cook served as a sergeant in the detective division from 2004 to 2006. (Ex. 2, p. 13, lines 3-11); a supervisor sergeant in the patrol division from June 2000 to 2004. (Ex. 2, p. 12, lines 3-11); a corporal from 1996 to 2000 (Ex. 2, p. 27, lines 14-16); and a regular patrol officer from 1994 to 1996. (Ex. 2, p. 11, lines 19-23; p. 27, line 21 to p. 28, line 5).

Defendant Cook also serves as an on-call public information officer for roughly the past two years for the primary public information officer ("PIO") - Capt. Huey Thornton. (Ex. 2, p. 13, line 12-23; p. 14, lines 8-12).  Defendant Cook is one of four rotating on-call PIO's who serves from Friday at 5:00 p.m. to Monday at 8:00 a.m.  (Ex. 2, p. 13, line 20 to p. 14, line 7). One of the primary purposes of a PIO is to disseminate information to local media concerning a serious incident or a detail or specialty operation being conducted by one of the divisions of the MPD. (Ex. 2, p. 20, line 14 to p. 21, line 5).  E-mail is the normal course of dissemination of this information. (Ex. 2, p. 22, line 23 to p. 23, line 7).

**B.  Jurisdiction**

6.    This Court has original jurisdiction over Plaintiff Gwendolyn McQuirter's claims alleging violations of federal law pursuant to 42 U.S.C. §1983, and violation of the Driver Privacy Protection Act, codified at 18 U.S.C. §§ 2721-2725, pursuant to 28 U.S.C. §1331, 42 U.S.C. §1983, & 28 U.S.C. §1343.  This Court further has supplemental jurisdiction over all other state law claims asserted by Plaintiffs pursuant to 28 U.S.C. §1367. (Doc. 11, ¶6; Doc. 14, ¶ 6).

**C.  Factual Allegations**

7.    On or about September 15, 2006, the Special Operations Division of the MPD conducted a prostitution sting in the area of Mobile Highway in Montgomery, Alabama, in which male undercover officers were to go out and pick up prostitutes. (Doc. 11, ¶8; Exhibit 3, ¶1). Prostitutes taken into custody were taken to a pre-determined location where a processing team was located. (Ex. 1, p. 31, line 16 to p. 32, line 7).

8.    Defendant Bentley was assigned to the processing team which normally has 3-4 people assigned to it, although, she is uncertain the exact number of people on the processing team on September 15, 2006. (Ex. 1, p. 35, lines 11-21).  The processing team was located at the Community Policing office on Fairwest Street, located off Mobile Highway. (Ex. 1, p. 31, line 16 to p. 32, line 11; p. 34, lines 15-22).

9.    As a result of the sting, undercover MPD police officers arrested ten (10) women for prostitution for allegedly offering sex for money. (Doc. 11, ¶9; Ex. 3, ¶2-3, respectively).

10.  The names of the women arrested were as follows: (Ex. 4 – Booking Photographs; Ex. 5 – Interrogatory Response 2)

    a)      Maria Lane McElya;[1]

---

[1] According to Defendants' Rule 26(a)(1) Initial Disclosures dated May 29, 2007, Ms. Maria Lane McElya was not photographed in reference to her arrest on September 15, 2006. (see Ex. 4).

     b)      Tawanda Lanise Hubbard;

     c)      Connie Sue Williams;

     d)      Alisha Dawn Gantt;

     e)      Joyce Darlene Herrero;

     f)      Cynthia Ann Andersen;

     g)      Syria Nelson;

     h)      Christy Shannon Lee;

     i)      Ashley Shanda Cason;

     j)      Tiffany Riley.

11.  Each prostitute arrested came through the processing team which was charged with the responsibility of obtaining the person's identity, including name, address, and date of birth; completing an incident/offense report; an arrest report; and preparing an affidavit for the arresting officer. (Ex. 1, p. 36, line 16 to p. 37, line 5; p. 41, lines 3-6; p. 51, lines 5-15).

12.  One of the women arrested for prostitution was Tiffany Riley ("Riley"), who sat in a chair beside Defendant Bentley while Defendant Bentley was sitting in front of a computer getting information from Riley.  (Ex. 1, p. 53, lines 4-14).

13.  Riley told Defendant Bentley her name was Gwendolyn McQuirter, and also provided McQuirter's home address and date of birth. (Ex. 1, p. 53, line 9-14; p. 63, line 12 to p. 64, line 12). Defendant Bentley is uncertain as to whether she asked Riley for any form of identification, although, Bentley concedes that it is fairly common that people give fake names when they are arrested and that it is important to corroborate a person's identity with some other source of information when a person is arrested with no form of identification. (Ex. 1, p. 11, lines 16-21; p. 16, lines 11-17; p. 54, lines 1-20). In-fact, prior to September 2006, Bentley had personally been involved in making arrests where it was later determined that the person arrested had given a fake name. (Ex. 1, p. 14, lines 3-8).

14.  Bentley further does not recall whether Riley's ID card was recovered as a result of a search prior to Bentley speaking with her; whether she inquired of anyone as to whether Riley was searched; whether anyone told her Riley had been searched; or whether she inquired of anyone as to whether any identification had been removed from Riley. (Ex. 1, p. 55, line 11 to p. 57, line 14).

15.  The women arrested were not photographed or fingerprinted at the scene, instead, they were to be transported to an office on Highland Avenue to be photographed and then transported to the city jail. (Ex. 1, p. 38, line 14 to p. 39, line 5).  However, Bentley claims no photographs were taken at the Highland Avenue office because the camera system was not working, instead, the women were transported to the City Jail and Bentley went to the Highland Avenue office to complete the daily activity report which was to be turned in to the captain and major. (Ex. 1, p. 42, lines 5-22; p. 43, lines 15-18). The daily activity report indicates what was done for the day; how many arrests were made; who was arrested; and other activity that occurred for the day. (Ex. 1, p. 42, lines 14-22). The report also contains a mug shot of the person arrested indicating the person's name, the date of arrest, the location of the arrest, the specific charge arrested for, and that person's criminal history. (Ex. 1, p. 42, line 23 to p. 43, line 14).

16.  In addition to the camera system that was supposedly not working, Bentley had access to cameras which she could use to make booking photographs of persons arrested. (Ex. 1, p. 114, lines 6-16).

17.  The ten (10) women arrested were booked into the City Jail, fingerprinted and photographed. (Doc. 11, ¶9; Ex. 3, ¶3; Ex. 4 –  Booking Photographs; Ex. 1, p. 122, line 14 to p. 124, line 9).

18.  While at the Highland Avenue office, Bentley contends that she was waiting for the jail to take the booking photographs, which she intended on pulling up on a computer program called the AS-400, to include with her daily activity report. (Ex. 1, p. 45, line 16 to p. 46, line 21). Bentley contends that she attempted to access the booking photographs via the AS-400 system,

although, she was unable to do so because the system was not working properly. (Ex. 1, p. 99, line 2 to p. 100, line 2). Bentley claims she telephoned an unidentified narcotics officer, not the city jail, and inquired as to when the booking photographs would be put into the system, and was told they would not be. (Ex. 1, p. 100, line 13 to p. 102, line 3).

19.  Defendant Bentley obtained photographs of nine (9) of the women arrested from the AS-400 system, from prior arrests. (Ex. 1, p. 46, lines 17-21; p. 47, line 15 to p. 49, line 20; p. 105, line 16 to p. 106, line 3). She then accessed the Law Enforcement Tactical System ("LETS") to obtain a photograph of Plaintiff Gwendolyn McQuirter, because Bentley thought this was easier to do as opposed to taking an actual photograph of Riley with her camera. (Ex. 1, p. 88, line 19 to p. 89, line 2; p. 103, lines 5-11; p. 115, lines 9-18). LETS permits access to information contained on an individual's drivers license, to include the photograph of the individual. (Ex. 1, p. 88, lines 7-15).  Bentley contends she needed the photograph because she was required to include a copy of photographs of the women arrested with the paperwork turned into the captain and major, and that it was not an option to simply tell the captain and major the booking photographs were not ready. (Ex. 1, p. 103, line 19 to p. 104, line 7).

20.  Upon looking at Plaintiff Gwendolyn McQuiter's driver's license photo, Bentley claims that she did not conclude that this was a different person than Tiffany Riley, despite having seen Tiffany Riley in person earlier that day. (Ex. 1, p. 90, lines 4-15).  In-fact, even after viewing McQuirter's driver's license photo, the thought that Riley and McQuirter were different people never entered Bentley's mind. (Ex. 1, p. 98, lines 14-21).

21.  As the photographs were being printed, someone in Bentley's office was going downstairs to the printer and retrieving the photographs. Bentley requested that this individual retrieve the photographs and turn them over to Lieutenant Crockett by placing them in his box. (Ex. 1, p. 117, lines 2-9). Lt. Crockett in-turn divided the photographs and put one of each in each stack along with the daily activity report, and put one each on the major and the captain's desk. (Ex. 1, p. 117, lines 9-13).  Bentley did not notify either the major or captain that

McQuirter's driver's license photo did not look like the person arrested – Tiffany Riley. (Ex. 1, p. 118, line 5-10).

22.  Lt. Crockett then contacted Defendant Cook, the on-call PIO, by SouthernLINC, and informed him they had had a prostitution sting and that he had all of the arrest photos available to be disseminated. (Ex. 2, p. 40, line 18 to p. 41, line 2; p. 41, lines 22-23). Crockett advised that the photos were at the special ops building. (Ex. 2, p. 42, lines 16-20).

23.  Defendant Cook immediately went and retrieved the photographs at the special ops building on Highland Avenue. (Ex. 2, p. 43, line 12 to p. 44, line 8).  Despite Cook knowing of no reason why a booking photograph of a person would not be sent to him as PIO, and the fact that he normally expects photographs coming to him to be booking photographs, Cook's attention was not drawn to the fact, nor did he think it unusual, that all of the photographs were booking photographs with the exception of McQuirter's. (Ex. 2, p. 54, lines 3-9; p. 55, lines 8-11; p. 66, line 14 to p. 67, line 4).

24.  Defendant Cook then went to headquarters located at 320 North Ripley Street and issued the following press release on September 16, 2006: (Ex. 2, p. 45, lines 14-20; Ex. 5 – Press Release).

> "On Friday September 15, 2006, the Special Operations
> Division conducted a prostitution sting in the area of
> Mobile highway (sic) and the West South Blvd. As a result
> of this operation, ten prostitutes were taken into custody.
> Attached is a photograph of each suspect."

25.  The press release included photographs of: (Ex. 4 – Copy of Material Release to the Media).

a)    Tawanda Hubbard;

b)    Connie Sue Williams;

c)    Alisa Dawn Gantt;

d)      Joyce Darlene Herrero;

e)      Cynthia Ann Anderson;

f)      Syria Nelson;

g)      Christy Shannon Lee;

h)      Maria Lane Mcelya;

i)      Ashley Shanda Cason; &

j)      Gwendolyn McQuirter.

26.  The press release was distributed to the following media outlets: (Ex. 5 - Interrogatory Response 4).

a)      Montgomery Advertiser – 200 Washington Avenue, Montgomery, AL 36104;

b)      Associated Press – 116 South McDonough Street, Montgomery, AL 36104;

c)      WSFA-TV-12- 12 East Delano Avenue, Montgomery, AL 36105;

d)      Alabama Public TV – 1255 Madison Avenue, Montgomery, AL 36107;

e)      Tuskegee Times – 525 Agusta Avenue, Montgomery, AL 36111;

f)      Kevin Elkins – 1440 WLWI-AM 1 Commerce Street, Montgomery, AL 36104;

g)      WNCF-ABC-32- 3251 Harrison Road, Montgomery, AL 36109;

h)      WLWI 92.3 – 1 Commerce Street, Montgomery, AL 36104;

i)      WAKA-TV-8- 3020 Eastern Boulevard, Montgomery, AL 36117.

27.  WAKA and WSFA ran stories concerning the arrests on September 17, 18 & 19, 2006, and showed Plaintiff Gwendolyn McQuirter's photograph as well as identifying her by name as one of the individuals arrested for prostitution. Each of these televised broadcasts were seen by thousands of viewers. (Doc. 11, ¶13).

28.  The Montgomery Advertiser also published a story concerning the arrests on September 17, 2006, and directed readers to view photographs of the suspects, to include Plaintiff

Gwendolyn McQuirter, on its website – montgomeryadvertiser.com.  (Ex. 6).

29.  Two or three days later, Plaintiff Charles McQuirter telephoned Cook and advised that there was no way possible that his wife could have been arrested for prostitution because she was with him. Cook referred Mr. McQuirter to Capt. Huey Thornton. (Ex. 2, p. 55, line 19 to p. 56, line 16).

30.  Capt. Thornton then contacted Defendant Cook and requested the Defendant Cook e-mail him the release sent to the media. (Ex. 2, p. 57, lines 8-13). Cook subsequently sent both the release and photos to Capt. Thornton. (Ex. 2, p. 60, lines 11-19).

31.  Defendant Bentley recalls seeing McQuirter's photograph along with the other females arrested for prostitution on television, and acknowledges that McQuirter was not one of the prostitutes arrested. (Ex. 1, p. 109, lines 1-8).  Bentley does not believe she would be offended if someone put her picture on the nightly news and said she was arrested for prostitution. (Ex. 1, p. 118, lines 14-22). Similarly, Defendant Cook testified that he does not know whether it would be somewhat humiliating to have your picture on TV and be called a prostitute. (Ex. 2, p. 69, lines 14-23).

32.  The words published by Defendant City of Montgomery accusing Plaintiff Gwendolyn McQuirter of engaging in prostitution, were false and untrue. (Ex. 3, ¶13).

33.  It is undisputed that Plaintiff Gwendolyn McQuirter was not one of the ten women arrested for prostitution. (Doc. 11, ¶10; Ex. 3, ¶6; Ex. 1, p. 109, lines 6-8).

34.  It is further undisputed that prostitution is an indictable offense pursuant to §13A-12-210, et seq., *Code of Alabama* (1975). ( Doc. 11, ¶31; Doc. 14, ¶31).

35.  Prior to the filing of this action, Plaintiffs filed itemized and verified claims with Defendant City of Montgomery as dictated by Alabama law. Said claims were denied on January 29, 2007. (Ex. 3, ¶¶16-17, respectively).

36.  On July 3, 2007, Plaintiffs filed their Second Amended Complaint in this cause and has asserted claims for:  a) Negligence; b) Intentional Infliction of Emotional Distress; c) Libel Per Se; d) Slander Per Se; e) Invasion of Privacy; f) Loss of Consortium; g) Violation of Driver Privacy Protection Act; & h) violation of civil rights under 42 U.S.C. § 1983. (Doc. 11).

37.  As a result of Defendants Bentley and Cook's actions, Plaintiff Gwendolyn McQuirter has been injured. (Doc. 11, ¶¶ 25, 29, 33, 37, 41, 44, 50 & 55).

## Argument

## Violation of Driver Privacy Protection Act

Count VII of Plaintiff's Second Amended Complaint asserts a claim for Violation of Driver Privacy Protection Act ("DPPA"). This claim is premised on Plaintiffs' assertion that Defendants Cook and Bentley's wrongful actions in obtaining her drivers license photograph  without her consent or authorization, and releasing the photograph to the media and the general public, was not a permissible use under the DPPA and was violative of the DPPA. (Doc. 11, p. 7 - Count VII, ¶ 48).

The DPPA, codified 18 U.S.C. §§ 2721 - 2725, makes it unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of the statute. 18 U.S.C. § 2722. The statute provides a civil cause of action and remedies as follows:

"**(a)   Cause of action.** -- A person who knowingly obtains, discloses or uses personal information, from a motor vehicle report record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court.

**(b)   Remedies.**-- The court may award—

**(1)** actual damages, but not less that liquidated damages in the amount of $2,500.00

   **(2)**  punitive damages upon proof of willful or reckless disregard of the law;

   **(3)**  reasonable attorneys' fees and other litigation costs reasonably incurred; and

   **(4)**  such other preliminary and equitable relief as the court determines to be appropriate."

18 U.S.C.A. § 2724.

As it pertains to the present matter, the DPPA authorizes the release of personal information and highly restricted personal information, as defined below, for use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a federal, State, or local agency in carrying out its functions, and for use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court. 18 U.S.C.A. §§ 2721 (b)(1) & (b)(4), respectively.

However, 18 U.S.C.A. § 2721(c), prohibits the resale or redisclosure of information as follows:

> **"(c) Resale or redisclosure.** – An authorized recipient of personal information (except a recipient under subsection (b)(11) or (12)) may sell or redisclose the information only for a use permitted under subsection (b) (but not for uses under subsection (b)(11) or (12)). . ." Subsection (b) reads as follows:

> **"(b) Permissible uses.** – Personal information referred to in subsection (a) shall be disclosed for use in connection with matters of motor vehicle or driver safety and theft, motor vehicle emissions, motor vehicle product alterations, recalls, or advisories, performance monitoring of motor vehicles and dealers by motor vehicle manufacturers, and removal of non-owner records from the original owner records of motor vehicle manufacturers to carry out the purpose of titles I and IV of the Anti Car Theft Act of 1992, the Automobile Information Disclosure Act (15 U.S.C. 1231 et seq.), the Clean Air Act (42 U.S.C. 7401 et seq.), and chapters 301, 305, and 321-331 of title 49, and, subject to subsection (a)(2),. . ."

The DPPA contains the following definitions:

(1) "motor vehicle record" means any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles;

(2) "person" means an individual, organization or entity, but does not include a State or agency thereof;

(3) "personal information" means information that identifies an individual, including an individuals' photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status;

(4) "highly restricted personal information" means an individuals' photograph or image, social security number, medical or disability information; and

(5) "express consent" means consent in writing, including consent conveyed electronically that bears an electronic signature as defined in section 106(5) of Public Law 106-229.

In the present matter, it is undisputed that Defendant Bentley obtained Plaintiff Gwendolyn McQuirter's driver's license photograph from her motor vehicle record and that Defendant Cook released the photograph to certain media outlets along with a press release indicating that Plaintiff had been arrested for prostitution. Plaintiff contends that Defendant Bentley's actions in obtaining Plaintiff's driver's license photo and Defendant Cook's subsequent release of the photograph to certain media outlets, were both in direct violation of the DPPA.

<u>Obtaining Photograph</u>

Initially, Plaintiff contends that Defendant Bentley's actions in obtaining Plaintiff's drivers license photo was violative of the DPPA, as obtaining the photo was not for use by the MPD "in carrying out its functions" as required by § 2721(b)(1). In-fact, no law enforcement function was served in obtaining the photograph. At the time the photograph was obtained, Plaintiff was in

custody at the city jail awaiting her booking photograph to be taken.  The evidence undeniably establishes that Defendant Bentley obtained the drivers license photo because Defendant Bentley did not want to await the booking photograph from the jail and further did not want to take Plaintiff's photograph with the camera she had available to her for taking booking photographs. Impatience or convenience simply does not equate to a legitimate basis for obtaining the photograph.

Release of Photo to Media

As shown above, 18 U.S.C.A. § 2721(b) & (c) specifically <u>restricts</u> the release of Plaintiff's drivers license photo for use in connection with matters of motor vehicle or driver safety and theft, motor vehicle emissions, motor vehicle product alterations, recalls, or advisories, performance monitoring of motor vehicles and dealers by motor vehicle manufacturers, and removal of non-owner records from the original owner records of motor vehicle manufacturers to carry out the purpose of Titles I and IV of the Anti Car Theft Act of 1992, the Automobile Information Disclosure Act, and the Clean Air Act.  The release of Plaintiff's photo in the present matter does not fall within any of these criteria, thus, it is without question that the release of the photograph to the media by Defendant Cook was violative of the DPPA, separate and apart from the wrongful conduct of Defendant Bentley in obtaining the photograph.

**42 U.S.C. § 1983**

Count VIII of Plaintiff's Second Amended Complaint asserts a claim pursuant to 42 U.S.C. § 1983. This claim is premised on Plaintiffs' assertion that Defendants Cook and Bentley's violations of the DPPA were committed under the color of state law and deprived Plaintiff Gwendolyn McQuirter of rights secured by federal law and, as such, is actionable under 42 U.S.C. § 1983. (Doc. 11, p. 8, Count VIII, ¶¶ 52-54).

It is well settled that "the § 1983 remedy broadly encompasses violations of federal statutory

as well as constitutional law." *Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). For a federal statute to be enforceable under Section 1983, three conditions must be satisfied. First, Congress must have intended that the enforcement provisions of the statute focus on benefiting the plaintiff individually, rather than focusing on benefiting a group or making system-wide changes. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002); *Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). Second, the right "protected by the statute [must not be] so vague and amorphous that its enforcement  would strain judicial competence." *Blessing*, 520 U.S. at 340-41, 117 S.Ct. 1353 (quotation and citation omitted). Third, the provision giving rise to the right "must unambiguously impose a binding obligation on the States" in that it is "couched in mandatory, rather than precatory, terms." *Id.* at 341, 117 S.Ct. 1353 (citation omitted). If all three conditions are satisfied, there exists a rebuttable presumption that the statute is enforceable under Section 1983. This presumption can only be refuted if Congress expressly or impliedly created "a comprehensive enforcement scheme [in the statute in question] that is incompatible with individual enforcement under § 1983." *Id.*

In *Collier v. Dickinson*, --- F.3d ---, 2007 WL 437370 (C.A.11 (Fla.) 2007), drivers licensees brought a § 1983 action against executive-level officials of the Florida Department of Highway Safety & Motor Vehicles (DHSMV) for selling their personal information to mass marketers in violation of the DPPA. The United Sates District Court for the Southern District of Florida dismissed the complaint, and licensees appealed.  In affirming in part, and reversing and remanding in part, the Court of Appeals, in considering whether the three conditions outlined above were met, held that "[w]e have no hesitancy in finding that the plain language of the DPPA clearly satisfies all three conditions to make it enforceable under Section 1983."

In the present matter, because Plaintiff Gwendolyn McQuirter is entitled to a partial summary judgment as to liability against Defendants Bentley and Cook for violation of the DPPA, she is further entitled to partial summary judgment as to liability on her §1983 claim as the violation of

the DPPA also constitutes a violation of her civil rights.

## <u>CONCLUSION</u>

Based upon the undisputed evidence in this cause, partial summary judgment is due to be granted in favor of Plaintiff Gwendolyn McQuirter as to Defendants Bentley and Cook's liability on Counts VII (violation of the DPPA) & VIII (42 U.S.C. §1983) of the Amended Complaint, for the reasons set forth herein.

/s/ Jerry M. Blevins
JERRY M. BLEVINS (BLE003)
Counsel for Plaintiffs

OF COUNSEL:
Law Office of Jerry M. Blevins
Hillwood Office Center
2800 Zelda Road, Suite 200-3
Montgomery, Alabama 36106
(334) 262-7600 (Voice)
(334) 262-7644 (Fax)
E-Mail: ATTYJMBlev@aol.com

<u>CERTIFICATE OF SERVICE</u>

    I hereby certify that on the 16th day of October, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following parties or counsel:

            Kimberly O. Fehl, Esq.
            Legal Department
            City of Montgomery           .
            P.O. Box 1111
            Montgomery, Alabama 36101-1111

                        <u>/s/ Jerry M. Blevins</u>
                        Jerry M. Blevins

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4

5   GWENDOLYN P. MCQUIRTER,
   et al.,

6

          Plaintiffs,

7                    CASE NUMBER
   vs.             2:07-cv-00234-MEF-WC

8

   CITY OF MONTGOMERY, et cet.,

9   et al.,

10         Defendants.

11

12

13

14         * * * * * * * * * *

15      DEPOSITION OF KRISTEN CAROLINE BENTLEY,

16   taken pursuant to stipulation and agreement

17   before Heather Barnett, Court Reporter and

18   Commissioner for the State of Alabama at Large,

19   in the Offices of Dunn, King & Associates, 2800

20   Zelda Road, Suite 100-2, Montgomery, Alabama, on

21   Friday, June 29, 2007, commencing at

22   approximately 10:40 a.m.

23         * * * * * * * * * *

4

1          KRISTEN CAROLINE BENTLEY

2          The witness, having first been sworn to

3    speak the truth, the whole truth and nothing but

4    the truth, testified as follows:

5                    EXAMINATION

6    BY MR. BLEVINS:

7    Q.   Would you state your full name for me,

8         please?

9    A.   Corporal Kristen Bentley.

10   Q.   What's your middle name?

11   A.   Caroline.

12   Q.   Kristen Caroline Bentley?

13   A.   Kristen Caroline Bentley, yes, sir.

14   Q.   And what is your home address?

15   A.   516 Sandfield Court, Montgomery Alabama.

16   Q.   How long have you lived at that address?

17   A.   Since October of 2002.

18   Q.   Okay.  And what is your date of birth?

19   A.   11-14-73.

20   Q.   And that makes you how old?

21   A.   33.

22   Q.   Are you married?

23   A.   No, sir.

```
 1    A.   No, sir.

 2    Q.   Any kind of vocational training or anything

 3         like that?

 4    A.   No, sir.

 5    Q.   All right.  And where are you employed?

 6    A.   Montgomery Police Department.

 7    Q.   All right.  How long have you been employed

 8         there?

 9    A.   Since October of '99.

10    Q.   And what is your current job title?

11    A.   Narcotics detective.

12    Q.   All right.  And have you held other positions

13         at the Montgomery Police Department?

14    A.   Yes, sir.

15    Q.   And I guess let me start from the beginning.

16         When you started there in October '99, what

17         was your position?

18    A.   I was police officer trainee; and then when I

19         completed the academy, I was a police

20         officer.

21    Q.   And you became a police officer when?

22    A.   February of 2000, if I'm not mistaken.

23    Q.   Okay.  And what was your next position after
```

8

```
 1        police officer?
 2   A.   Narcotics detective.   I spent 14 months in
 3        Iraq in the interim.
 4   Q.   All right.   So let's see.
 5   A.   From October of '99 until March of 2003, I
 6        was in patrol.   I left in March of 2003, went
 7        to Iraq, returned in May of 2004.   Returned
 8        to the police department to work in June of
 9        2004 and was assigned to narcotics at that
10        point.
11   Q.   Okay.   So what I'm trying to figure out, in
12        September 2006?
13   A.   I was in narcotics.   Been in narcotics since
14        June of 2004.
15   Q.   Okay.   And are those the only positions
16        you've held at the Montgomery Police
17        Department?
18   A.   Yes, sir.
19   Q.   I'm going to call the Montgomery Police
20        Department MPD just to make it short.
21   A.   Okay.
22   Q.   All right.   As a narcotics detective, what
23        are your duties?
```

9

```
 1    A.   I have various duties.  You have the duties

 2         to investigate vice or narcotics complaints

 3         or self-initiated investigations.

 4    Q.   And what is vice?

 5    A.   It would be something maybe related to

 6         prostitution, gambling, anything other than

 7         the drugs but something that would be

 8         considered illegal activity that's something

 9         other than what the detective division

10         typically handles.

11    Q.   Okay.

12    A.   There's many different things that could be

13         encompassed in vice.

14    Q.   But one of the things for certain under the

15         heading vice is prostitution?

16    A.   Yes, sir.

17    Q.   Okay.  Do you have any prior law enforcement

18         experience before your involvement with the

19         MPD?

20    A.   When I was in college at Auburn, I worked for

21         Opelika PD as a dispatcher.  When I left

22         there, I went to Prattville PD and worked

23         there as a dispatcher as well.
```

11

1           year and a half at Prattville.

2      Q.   Okay.   Any other law enforcement experience?

3      A.   No, sir.

4      Q.   Okay.   I asked Lieutenant Cook about this as

5           well, and I want to ask you.   I've heard --

6           I've never been in law enforcement per se as

7           an officer, but I've heard that a lot of

8           times, especially when you're talking about

9           vice like prostitution, that when you make

10          arrests, a lot of times people give you fake

11          names.   Is that true based on your

12          experience?

13     A.   That when you make arrests for vice

14          investigations that people give you fake

15          names or prostitution specifically or --

16     Q.   Well, let's just talk about in general.   In

17          general, arresting people on a daily basis as

18          a police officer, would you say it's fairly

19          common that people give you fake names when

20          they're arrested?

21     A.   Yes, sir.

22     Q.   Would you say it's particularly true when it

23          comes to arrests you've made in the past for

14

1   some point; but that's not really their last

2   name legally.

3   Q.   Well, let me ask this question.  Prior to

4   September of 2006, do you recall being

5   involved in an arrest where you later

6   determined the person you had arrested had

7   given a fake name?

8   A.   Yes, sir.

9   Q.   Okay.  Can you estimate for me about how many

10   times that may have occurred before September

11   of '06?

12   A.   I wouldn't have a clue how many times.

13   Q.   Can you estimate whether it would be more or

14   less than 10?

15   A.   I would say more than 10 times that -- that

16   somebody has given me a false name.  Now, as

17   far as me arresting them and putting them in

18   jail -- putting them in under a false name,

19   that wouldn't be true.

20   Q.   But would you say it would be more or less

21   than 50?

22   A.   I really don't know number-wise.  I couldn't

23   tell you.

16

1   A.   If I had reason to believe that that wasn't

2        who they said they were maybe -- there are

3        people that actually carry an ID card or a

4        driver's license.  So therefore, you can look

5        at the picture on that and determine that

6        that is, in fact, them or not.  In that

7        situation, you don't really have much of a

8        conflict.  It's, you know, the people that

9        you run across that don't have

10       identification.

11  Q.   And those people who don't have

12       identification and they give you name,

13       address and so on, I take it you would agree

14       it would be important to go corroborate the

15       person's identity with some other source of

16       information, correct?

17  A.   Correct.

18  Q.   Okay.  You wouldn't want to just take a

19       person's word for who they say they are, I

20       assume; is that true?

21  A.   That I wouldn't want to take a person's word

22       for who they say they are?

23  Q.   Right, without any ID of some sort.

31

```
 1            would have been after Major Murphy, but

 2            currently those two would be in the middle.

 3     Q.     Okay.  All right.  Now, I take it you realize

 4            that we're here today to take your deposition

 5            in a lawsuit filed by Gwendolyn Charles

 6            McQuirter.  You're aware of that, correct?

 7     A.     Yes, sir.

 8     Q.     You're aware that the McQuirters have sued

 9            the City of Montgomery over an incident that

10            you were involved in, correct?

11     A.     Yes, sir.

12     Q.     I'm going to refer to the McQuirter lawsuit

13            and the events that led to the lawsuit as the

14            McQuirter matter, okay?

15     A.     Yes, sir.

16     Q.     Can you tell me how you got involved with the

17            McQuirter matter?

18     A.     We had scheduled a prostitution detail for

19            September the 15th, and I was assigned to the

20            processing team.  When we schedule a

21            prostitution detail, we'll have the male

22            undercover officers go out and pick up the

23            prostitutes.  When they pick them up, they'll
```

1      bring them to whatever the location is that

2      we determine; which typically, when we do a

3      larger detail that involves everybody or, you

4      know, whoever is working at the time that's

5      in narcotics -- when we do a larger detail,

6      we'll have a processing team at the Community

7      Policing office on Fairwest.

8   Q.  Let me stop you right there if I could and

9      make sure I'm following you.  In September

10     '06, you were in the narcotics unit, correct?

11  A.  Yes, sir.

12  Q.  And this sting -- was it this thing called a

13     thing in September '06?

14  A.  I guess you could call it that.  We call it a

15     detail, but you can call it a sting if you

16     want to.

17  Q.  I'll call it a detail if that's what y'all

18     call it.  This detail that was put together

19     was put together by whom?  Do you know?

20  A.  I can't say for certain.  I really don't

21     remember.  Usually, one narcotics officer is

22     assigned to coordinate everything, and

23     they're not necessarily in charge of

34

```
1        Best you can recall, Sergeant Wright told you

2        about this detail, correct?

3    A.  Yes, sir.

4    Q.  Where did he tell you it was going to take

5        place?

6    A.  She.

7    Q.  I'm sorry.  Where did she tell you it was

8        going to take place?

9    A.  That we would have the processing team at

10       Community Policing, but the guys that -- the

11       narcotics officers that are undercover will

12       go pick up the girls on the Western Boulevard

13       or Mobile Highway or somewhere in that

14       general vicinity.

15   Q.  And you said the process team was going to be

16       located where?

17   A.  The processing team was at Community Policing

18       office is Fairwest.

19   Q.  Is Fairwest a street?

20   A.  Yes, sir.

21   Q.  Where is that located in the city?

22   A.  Off Mobile Highway.

23   Q.  About how far from the area where the detail
```

35

```
 1              was going to be conducted is the processing

 2              location?

 3      A.      There might be a prostitute 200 yards up

 4              Mobile Highway from where it is.  So it's --

 5      Q.      Right there in the immediate area?

 6      A.      Right.  I mean, you could go down Mobile

 7              Highway and turn onto the boulevard and they

 8              might pick up somebody down there; but they

 9              could also go 200 yards from the Community

10              Policing building and pick up a prostitute.

11      Q.      Were you the only person on the process -- is

12              it the process team or processing team?

13      A.      Processing team.

14      Q.      Were you the only person on the processing

15              team?

16      A.      No.

17      Q.      How many others were on there?

18      A.      I couldn't tell you.  I don't remember.

19      Q.      More than --

20      A.      It would be several people.  Maybe three to

21              four.

22      Q.      And were all the people on the processing

23              team a member of the narcotics unit?
```

36

```
 1    A.    That I couldn't tell you, because we also
 2          have SWAT that's in our office.  So it's all
 3          Special Operations Division.  There would be
 4          either SWAT or narcotics, one of the two.
 5          But most of the time -- well, I don't know.
 6          It could be either one from SWAT or
 7          narcotics.
 8    Q.    All right.  And being on the processing team,
 9          did that mean you were going to be out there
10          on location during the entire detail or were
11          you just there at certain times?
12    A.    I would be there at the Community Policing
13          office until the guys finished picking up
14          girls and somebody determined that we were
15          through.
16    Q.    Okay.  And what were you to do on the
17          processing team?  Let's suppose the
18          undercover officer goes out, picks up a
19          female, charges her with prostitution.  Did
20          the officer bring that person to the
21          processing team?
22    A.    That's correct.
23    Q.    And what occurred once that person was
```

37

1        received at the processing team?

2    A.   An incident/offense report was completed, an

3         arrest report was completed, warrants checks

4         were conducted; and we would prep the

5         affidavit for that officer.

6    Q.   Would you photograph the person there at the

7         scene?

8    A.   No, sir.

9    Q.   Okay.  Did you fingerprint them?

10   A.   No, sir.

11   Q.   Okay.  And what would occur next after you

12        did the things you just mentioned?

13   A.   Somebody would also search that person and

14        put all their belongings into an envelope or

15        a bag or whatever the case may be if they had

16        items that were going to be impounded.  From

17        there, they were transported -- typically, we

18        transport them to our office on Highland

19        Avenue.

20   Q.   When you say our office, is that the

21        narcotics office?

22   A.   It's the Special Operations Division.

23   Q.   All right.  On Highland Avenue?

38

```
 1    A.   Yes, sir.

 2    Q.   And do you recall these ladies that were

 3         arrested over the weekend of -- I believe it

 4         was September 15th, '06 -- being taken to

 5         that office?

 6    A.   I'm not certain if they were taken there or

 7         not.  I know that the camera system at our

 8         office didn't work.  I don't know if they

 9         were taken to our office and it was

10         determined that the camera system didn't

11         work or if they -- whoever was doing the

12         transporting already knew that it didn't

13         work, so they transported them to the jail.

14    Q.   So the customary thing would have been the

15         females would have been transported to the

16         Highland Avenue office and been photographed

17         there?

18    A.   Yes, sir.

19    Q.   Would anything else have taken place there?

20    A.   No, sir.

21    Q.   All right.  And in the normal course of

22         things, after the ladies would have been

23         photographed at Highland Avenue, what would
```

39

```
 1            have happened next?

 2    A.    They would have been transported to the jail.

 3    Q.    All right.

 4    A.    To the -- they would all go to the city

 5          jail.

 6    Q.    Okay.  Why -- and, now, this is curious.  Why

 7          would the ladies be taken to Highland Avenue

 8          simply to be photographed and then taken to

 9          the jail as opposed to simply being taken

10          from the scene to the jail and be

11          photographed?

12    A.    That's just the policy that they've laid out

13          for us, and I don't know the answer to that.

14          They've done that every time.  That's just

15          the way they've explained to us to do it

16          and -- I'm not certain, because they will be

17          photographed again when they get to the jail.

18    Q.    And the best you can recall this detail

19          around September 15th of '06, the ladies that

20          were arrested were not taken to the Highland

21          Avenue office because the camera wasn't

22          working?

23    A.    No, sir.  I told you I didn't know if they
```

1        this detail?

2   A.   No, sir.

3   Q.   Okay.  Every person that was arrested during

4        this detail I assume came through the

5        processing team; is that right?

6   A.   Yes.  As far as the prostitutes, yes, sir.

7   Q.   Okay.  Do you recall whether it was light or

8        dark when the detail concluded?

9   A.   When we finished -- when the guys finished

10       picking up the prostitutes, it was daylight;

11       by the time we actually finished doing all

12       the paperwork and going home, it could have

13       been dark.  I'm not certain.

14   Q.   So, now, after you performed your duties on

15       the processing team and the detail concluded,

16       did you have any further involvement with the

17       arrest of the prostitutes, or was that the

18       end of it?

19   A.   What are you referring as the detail

20       concluding?

21   Q.   Well, after y'all shut down shop and went

22       home, closed down the little Mobile Highway.

23       Y'all had made the arrest, everybody left.

42

1  A.  Went back to the office.

2  Q.  Did you have any further involvement with the

3      prostitution arrest that had occurred or was

4      that the end of your involvement?

5  A.  When we finished the processing over at

6      Fairwest and the girls were transported and

7      they ended up at the city jail -- like I

8      said, I don't know if they went to our office

9      first or not.  Once they ended up at the city

10     jail, we had gone back to the office on

11     Highland Avenue and were completing the

12     paperwork that's required for us to do that's

13     turned in to the captain and the major.

14 Q.  And what paperwork is that?

15 A.  Everybody -- there is what they call the

16     daily activity report.  When you do the daily

17     activity report, it indicates what was done

18     for the day, which would indicate that we

19     conducted a prostitution detail and, you

20     know, how ever many arrests were made and who

21     they were and any other activity that

22     occurred for the day.

23 Q.  Any other paperwork?

A.    Yes, sir.  There's also -- I guess they refer
      to it by the major's last name.  So it's
      whoever the current major is -- they call it
      a King's mug, a Davis mug, whatever the case
      may be.  With it being Major Davis, it's a
      Davis mug now.  And it's that person's mug
      shot, the photo that was taken of them.
      Underneath that it will indicate -- it has
      the person's name; it will also have the date
      of arrest, the location of arrest, what they
      were arrested for as far as the specific
      charges, and then their criminal history,
      whatever comes from an actual criminal
      history that's printed through NCIC.

Q.    Let me make sure I understood.  I think you
      lost me there.  The camera wasn't working at
      Highland Avenue, right?

A.    Correct.

Q.    But y'all completed a form concerning mug
      shots?

A.    When they were taken over to -- the girls
      that were arrested, when they were taken over
      to the city to the jail, typically they would

```
 1           transported.  And I don't remember the exact
 2           time frame, but it had been a while.  It
 3           would have been enough time that at least one
 4           of the girls should have been in the -- had a
 5           booking photograph taken by that point if the
 6           system would have been working properly.
 7    Q.     So let me just make sure I understand.  You
 8           left the area of Mobile Highway?
 9    A.     Right.
10    Q.     And went to the Highland Avenue office over
11           there?
12    A.     Right.
13    Q.     Okay.  The females who were arrested,
14           meanwhile, went to the city jail?
15    A.     Correct.
16    Q.     You were at Highland Avenue waiting on
17           photographs to be taken, booking photographs
18           to be taken at the city jail?
19    A.     Yes, sir.
20    Q.     All right.  And you were waiting for those
21           photographs at Highland Avenue; is that
22           right?
23    A.     I was waiting for the jail to take them, and
```

46

1          I should have been able to bring up the

2          screen on my computer and pull up that

3          photograph.

4    Q.  Because there's some kind of computer program

5          where if they take booking photographs at the

6          jail, you can view those photographs on a

7          computer at Highland Avenue?

8    A.  Right.  It's in the network.

9    Q.  And does the network have a name?

10   A.  AS-400.

11   Q.  So if I say I need to look at some

12         photographs on AS-400, then you can --

13   A.  Somebody would know what you were talking

14         about and they would pull it up, and it's

15         the -- that's what is used as the police

16         department's in-house system.

17   Q.  And the AS-400 shows booking photographs

18         taken at the city jail?

19   A.  Not just booking photographs.  It will show

20         any photograph that's been taken of that

21         person that's been put into that system.

22   Q.  Who put photographs in the AS-400 system

23         other than the police department through

47

1          booking photographs?

2     A.   Well, who specifically, I don't know.

3     Q.   Well, no, not who specifically.  Who other

4          than the police department?

5     A.   It would have to be somebody that worked for

6          the police department that put a photograph

7          in there.  You wouldn't go to another place

8          in the city that had a camera system to where

9          they would take photographs that would be in

10         that system -- it should be somebody with

11         police department, but there's various

12         reasons why you might have a photograph in

13         there; and just the fact that it's a booking

14         photograph is not the reason.

15    Q.   Okay.  So you're at Highland Avenue, and you

16         wait for several hours; and you check the

17         AS-400, and there are no booking photographs

18         of these ladies, correct?

19    A.   They've already been transported.  Like I

20         said, I don't know the exact time frame.  I

21         know that they had been transported, and at

22         that point, I felt like that they should have

23         already had photographs in the system of at

1   there.

2       So when I'm going through this, I'm

3   going through the list of the names of girls

4   that we've arrested that day and putting

5   those names in there and trying to determine

6   if there's a photograph of any one of those

7   girls that's been taken on that date.  I'm

8   also having to get the information on each of

9   these girls so that a criminal history could

10  be run through NCIC so that I could put that

11  information on this paper for the major and

12  the captain when I get done.

13  Q.  Why were you needing the photographs?

14  A.  Because I'm required to turn in a photograph

15      -- or any of us, when there's an arrest made

16      for the day, you turn in the photograph of

17      that person and, like I said, the

18      information, the date of arrest, location of

19      arrest, the charges and their criminal

20      history.

21  Q.  All right.  Okay.  You turn that in to who?

22  A.  There's copies of those items that go on the

23      major's desk and copies of those items that

51

```
 1              mean, the processing team works as team;

 2              therefore, they work together.  So there's

 3              nobody in particular that's --

 4        Q.    I mean, was it -- I guess that was a bad

 5              question.  Was it the processing team's job

 6              to obtain the identities of the people who

 7              were arrested?

 8        A.    Yes, sir.

 9        Q.    I take it the identity including the person's

10              name; is that right?

11        A.    Yes, sir.

12        Q.    Address?

13        A.    Yes, sir.

14        Q.    Date of birth?

15        A.    Yes, sir.

16        Q.    Anything else?

17        A.    Typically, you would ask them for their

18              Social Security number and phone number and

19              anything of that sort.

20        Q.    Okay.  Would you -- back on the scene of the

21              detail in September '06, would it have been

22              the processing team's responsibility to also

23              check for identification of some means like a
```

53

1              has been arrested multiple times, I wouldn't

2              need to look at a picture, because I already

3              know what her name is.

4     Q.    Let's talk about Tiffany Riley, then.

5     A.    I did not know her name.

6     Q.    She was sitting there with you on the

7              processing team, wasn't she, as being one of

8              the people arrested?

9     A.    I was sitting in front of a computer, and I

10             had Ms. Riley sit in a chair beside me.  I

11             was getting the information from her and

12             asked her for her name, and she told me her

13             name was Gwendolyn McQuirter.  Obviously, I

14             did not know how that was spelled.

15    Q.    You didn't know her at that time, did you, by

16             her true name?

17    A.    No, sir.

18    Q.    You had never had any dealings with her

19             before that?

20    A.    Not that I'm aware of unless it's been some

21             years back and I just don't really remember

22             her.

23    Q.    Did you ask her for her identification?

54

A.    Most of the time, I would ask them if they
      had their identification, but I would still
      use -- even if they had an identification,
      which typically, they do not -- but if they
      did, I would still verify.  There could be an
      old address on there or -- well, typically,
      that's going to be the only thing that's
      wrong, so I would verify that.  But it would
      have a birth date and a social security
      number and stuff like that.  But I don't
      believe anybody had any identification on
      them that day, if I'm not mistaken.

Q.    Sitting here today, do you recall asking
      Tiffany Riley for her identification?

A.    Do I remember specifically what I said, no,
      sir.  Would I have asked her, do you have any
      ID, I'm fairly certain that that's something
      that I would ask, that I would typically
      ask.  So I would say that I probably asked
      her do you have any ID.

Q.    Can you think of any reason, since you didn't
      know her, hadn't had any contact with her
      before this, that you would not have asked

55

```
 1          for her identification?

 2              MS. HIGHLEY:  Object to the form.

 3   A.   Any reason why I wouldn't have?

 4   Q.   Yeah.

 5   A.   No, sir.

 6   Q.   Can't think of any reason you would not have?

 7   A.   No, sir.

 8   Q.   Okay.  Did anybody else on the processing

 9        team indicate to you that they had had prior

10        dealings with Tiffany Riley?

11   A.   No, sir.  Back to your question that you

12        asked me about can I think of any reason why

13        I wouldn't have asked her, the only reason

14        why I wouldn't have asked her would be if she

15        was searched -- they're all going to be

16        searched because they are under arrest.  The

17        only reason I wouldn't have asked her for

18        identification would have been if she was

19        searched prior to me trying to obtain her

20        information.  And in that case, somebody that

21        searched her would know if she had an ID card

22        on her or not.

23   Q.   Was she searched prior to you having contact
```

56

1      with her?

2   A.  That I don't remember, because I don't

3       remember how many girls there were exactly

4       that were arrested that day, but there were

5       several.  And it's meant to be an efficient

6       thing for them to come in and -- you know,

7       that's why you have a team to do the

8       processing to get everything done in a timely

9       manner and not take forever.  So if we were

10      speaking to one girl when she came in,

11      somebody could have searched her first, and

12      then after she was searched, then we started

13      obtaining her information; or it could have

14      been that we obtained her information and

15      then she was searched.  I couldn't tell you

16      for a fact which way that occurred.  But if

17      she was already searched, then I might have

18      known she didn't have an identification

19      card.  But that would be the only reason.

20  Q.  Do you recall anybody telling you that she

21      had been searched?

22  A.  I don't remember.

23  Q.  Do you recall asking any if she had been

```
 1            searched?

 2     A.     I don't remember.

 3     Q.     Do you recall asking anybody if they had

 4            recovered any type of identification off

 5            Ms. Riley?

 6     A.     Like I said, I don't remember if she was

 7            searched prior to that or not.  But you asked

 8            me if there was any reason why I wouldn't

 9            have asked her for identification; that's the

10            only reason I wouldn't have asked her.

11     Q.     My question now is, though, do you recall

12            asking anybody if they had removed

13            identification from Ms. Riley?

14     A.     No, sir.  I don't remember.  I don't know how

15            it occurred if she was -- if they searched

16            her and she had identification, then they

17            would have handed me her identification.

18     Q.     Who would have handed it to you?

19     A.     Whoever did the search would have handed me

20            the identification.

21     Q.     And who would have been the person to most

22            likely have done the search?

23     A.     More than likely, the one who does it is
```

```
 1              arrest or whatnot; just because you called
 2              the police, it's not going to be in there.
 3      Q.      All right.  So Ms. Riley gave you
 4              Ms. McQuirter's name, you put that in the
 5              computer?
 6      A.      That's correct.
 7      Q.      And what came up?
 8      A.      Mrs. McQuirter's information.
 9      Q.      What information?
10      A.      It had -- it said Gwendolyn McQuirter.  It
11              had the address, which I believe was 4418
12              Lowell Street.  When I asked Ms. Riley for
13              the address, that's the address she gave me;
14              and I was not familiar with that street.
15      Q.      What other information came up?
16      A.      Birth date, Social Security number, height
17              and weight, eye color and hair color.  And
18              that's all I can remember right now.  I don't
19              know what else was on there, but that's --
20              maybe a phone number if they've given a phone
21              number in the past.
22      Q.      What else would normally be on there other
23              than what you've told me?
```

64

1    A.    Work phone number, if they've ever one.  I'm

2          trying to think what else is there.

3          Sometimes the age is inputted; sometimes it's

4          not.  It depends on if somebody has put it in

5          there previously.  That's all that I can

6          think of that's on there.

7    Q.    All right.  Do you recall Ms. Riley giving

8          Mrs. McQuirter's correct address?

9    A.    Yes.

10   Q.    Do you recall Ms. Riley giving

11         Ms. McQuirter's correct date of birth?

12   A.    Yes.

13   Q.    All right.  I think you already said on the

14         Social Security number, you don't recall if

15         she gave one or not?

16   A.    If I'm not mistaken, she told me that she did

17         not know the -- didn't remember the Social

18         Security number.  I want to say she didn't

19         say she didn't know it.  She said she didn't

20         remember it.

21   Q.    Did Ms. Riley give the correct height?

22   A.    I don't know that I asked her for her height.

23   Q.    Do you recall what Ms. McQuirter's height was

```
 1              there's a photograph in there.  See, there's
 2              not some magical fail-proof way to say that
 3              somebody couldn't use somebody else's name.
 4         Q.   Well isn't there a fail-proof way?  I take it
 5              you're familiar with LETS, aren't you?
 6         A.   Yes, sir.
 7         Q.   What is LETS?
 8         A.   It is what is the Law Enforcement Tactical
 9              System, I believe the name of it is.
10         Q.   And through LETS, you can access people's
11              driver's license photograph, can't you?
12         A.   Yes, sir.
13         Q.   You can access other information on a
14              person's driver's license, can't you?
15         A.   Yes, sir.
16         Q.   That information is provided to MPD through
17              the Department of Public Safety, isn't it?
18         A.   I would assume so.
19         Q.   So when we talk about the McQuirter matter,
20              you had the means to go through LETS and pull
21              up Gwendolyn McQuirter's photograph off her
22              driver's license, didn't you?
23         A.   Correct.
```

1    Q.   And in fact, you did that, didn't you?

2    A.   Yes, sir.

3    Q.   And that photograph on Gwendolyn McQuirter's

4         driver's license clearly shows that Tiffany

5         Riley was not Gwendolyn McQuirter, didn't it?

6              MS. HIGHLEY:  Object to the form.

7    A.   Not to me, no, sir.

8    Q.   What do you mean not to you?  They look like

9         they're the same?

10          MS. HIGHLEY:  Object to the form.

11   A.   I can't -- to determine that that was or was

12       not her, I couldn't tell you that that wasn't

13       her.  I'm not saying that they look exactly

14       alike by any stretch of the imagination, but

15       they're not so far off that I did not -- in

16       Gwendolyn McQuirter's driver's license

17       photograph, obviously, the hair is not the

18       same; but hair is something that can be

19       changed.  You can look at her facial features

20       and look at what the picture looks like from

21       the driver's license photograph, and then

22       look at the photograph that we've taken.

23       When you look at the way that ours print out,

90

```
1              they're not always looking at it on a

2              computer screen; may not look the same way

3              that it does when you print it out.

4       Q.     Let me make sure I understand your testimony,

5              now.  Your testimony is when you looked at

6              Gwendolyn McQuirter's driver's license

7              photo --

8       A.     Yes, sir.

9       Q.     -- and you considered that photo in

10             conjunction with seeing Tiffany Riley in

11             person --

12      A.     Yes, sir.

13      Q.     -- you did not conclude they were different

14             people?

15      A.     Correct.

16      Q.     Okay.  You recognize this lady right here?

17             I'm going to mark this as an Exhibit #3.

18      A.     Yes, sir.

19      Q.     Who is that?

20      A.     That's Tiffany Riley.

21      Q.     You're certain of that?

22      A.     Yes, sir.

23      Q.     Do they look the same because they're both
```

98

1    A.   Typically, there would be some indication

2          they might not know the birth date

3          correctly.  They might be off by a year or

4          something of that sort.  You know, it would

5          not be so common that I'm going to be able to

6          give you a name, birth date and address that

7          is somebody else's and spit it out to you

8          like it's my own.  I can't think of anybody

9          off the top of my head right now that I could

10         give that information on; like that I could

11         tell you that I'm so and so, give you the

12         name, give you the address is give you their

13         birth date.

14    Q.   And I don't think you answered my question,

15         so let me ask it again.  Did the thought ever

16         enter your mind after you received Gwendolyn

17         McQuirter's picture through the LETS system,

18         that these people may not be the same people?

19    A.   No, sir.

20    Q.   Did that thought ever enter your mind?

21    A.   No, sir.

22    Q.   Okay.  All right.  And what was the reason

23         you went to the LETS system to retrieve

99

```
 1            Ms. McQuirter's photograph?

 2    A.    Like I said, I believe the computer -- the

 3          camera system wasn't operating correctly and

 4          we did not have the photos taken from our

 5          office because it wasn't working and,

 6          therefore, I intended to use the booking

 7          photos to turn in to the captain and the

 8          major.  The booking photos were not in there

 9          either.  So once I could not get booking

10          photos that were taken that date -- the ones

11          that were used to all of the girls except for

12          Mrs. McQuirter's photograph, which actually

13          would have been Ms. Riley -- should have been

14          Ms. Rileys, the ones that were used were from

15          previous arrests.

16    Q.    Did you call downtown and ask them when are

17          the booking photographers going to be put on

18          the computer?

19    A.    I want to say that there was male officers

20          that had taken the girls over there and that

21          they had -- I might have contacted them via

22          the SouthernLINC, and they indicated to me

23          that they weren't able to put the photos in
```

100

```
 1        the system because the system wasn't working
 2        properly.
 3    Q.  Now, you just said "I might have" and then
 4        you made statements like somebody said
 5        something to you.  I mean did this actually
 6        happen or are you just making it up?
 7             MS. HIGHLEY:  Object to the form.
 8    A.  No, sir, I'm not making it up.
 9    Q.  So let me ask you this, because a lot of
10        times when you answer, you say I might have,
11        and you indicate you're uncertain.  But then
12        you act like you're certain as to what
13        happened later in your comments.  Let me just
14        ask you, and it's real simple.  Did you
15        contact anybody at the city jail and ask them
16        when the booking photographs were going to be
17        ready?  Yes or no?
18    A.  Are you referring to somebody who works in
19        the city jail or somebody who might have been
20        in the city jail?
21    Q.  Anybody you contacted at the city jail about
22        these photographs.
23    A.  I don't remember contacting the city jail
```

1    specifically.  That I don't remember.  I

2    don't remember if I called the jail or if I

3    called another narcotics officer that took

4    the girls to the jail.

5  Q.  Do you recall contacting anybody to find out

6    when the booking photographs would be ready?

7    Yes or no?

8  A.  No, sir, I didn't ask anybody when the

9    booking photographs would be ready.  I asked

10    them were they able to put the booking

11    photographs in the system, and they were not.

12  Q.  Who did you ask that to?

13  A.  That I don't remember.

14  Q.  Where was this person that you asked that to?

15  A.  A narcotics officer that would have taken the

16    girls to the jail, but which officer it was I

17    don't remember.

18  Q.  So you called a narcotics officer from the

19    Highland Avenue office and asked them when

20    the booking photographs would be ready; is

21    that right?

22  A.  No, sir.  I didn't ask then when they would

23    be ready.  I asked them were they able to put

102

1      them in the system.

2   Q.   All right.  And this --

3   A.   And they indicated to me that they were not.

4   Q.   All right.  Ask then you went and got

5        Mrs. McQuirter's photograph from the LETS

6        system?

7   A.   I finished doing the other photographs -- I

8        don't remember if somebody else was doing

9        photographs, doing the pages like I explained

10       to you that we are supposed to do for the

11       captain and the major.  I don't remember if I

12       was the only one doing them or if somebody

13       else was doing it, but seems like there might

14       have been one other person doing them,

15       because our printer upstairs did not work,

16       the color printer did not work.  And we do

17       these in color; therefore, somebody else may

18       have been assisting me, but it probably was

19       one other person, which might have been

20       Detective Edwards, because most people do not

21       have the printer downstairs that's linked to

22       their computer.

23   Q.   Are you saying that somebody else got the

103

```
 1          photograph from the LETS system?

 2     A.   No, sir.

 3     Q.   All right.  Let me try --

 4     A.   I'm saying that --

 5     Q.   Hang on just a minute, because I'm trying to

 6          ask real simple questions.  After you spoke

 7          with the narcotics officer that we just

 8          talked about -- after that, did you get

 9          Mrs. McQuirter's photograph off the LETS

10          system?

11     A.   Yes, sir.

12     Q.   Okay.  How long after?

13     A.   I'm not certain the exact time frame.

14     Q.   Would it have been hours later, minutes

15          later, days later?

16     A.   It was not hours or days.  It probably would

17          have been within -- after speaking to them,

18          maybe within an hour.

19     Q.   Okay.  And what was the urgency in obtaining

20          Mrs. McQuirter's photograph?

21     A.   We were completing all the paperwork that we

22          had to do for the evening in order to turn in

23          to the captain and the major.  And we had to
```

104

1           have that done before we could leave.

2    Q.    You couldn't just tell the captain and major

3           the booking photographers aren't ready, so we

4           don't have them?

5    A.    No, sir.

6    Q.    That wasn't an option?

7    A.    No, sir.

8    Q.    Why not?

9    A.    Because every day any arrest that's made that

10          involves us, we are supposed to print off the

11          photograph with the information as I

12          explained to you and turn that in to the

13          captain and the major.  Typically, they go in

14          the supervisor's box, which would be

15          Lieutenant Crockett's box; and then he will

16          put them on the captain and the major's desk

17          unless he's not there at the moment and

18          somebody else might put them on there.

19   Q.    Had you done this before where you didn't

20          have booking photographs, so you went and

21          pulled up all the photographs and used them?

22   A.    Yes, sir.

23   Q.    You had done that before?

105

| | | |
|---|---|---|
| 1 | A. | Only if the camera system was down. |
| 2 | Q. | Okay.  And as far as you know, that was okay |
| 3 | | with your supervisors for you to do that? |
| 4 | A. | Yes, sir. |
| 5 | Q. | To your knowledge, were they aware that you |
| 6 | | did that? |
| 7 | A. | I'm not certain.  I know that Lieutenant |
| 8 | | Crockett was there.  Lieutenant Crockett was |
| 9 | | aware that we did not have the photos taken |
| 10 | | from that day because the system was not |
| 11 | | working.  Whether or not he explained that to |
| 12 | | the captain and the major, I'm uncertain. |
| 13 | Q. | You're talking about Ms. McQuirter when you |
| 14 | | said Lieutenant Crockett was aware of it or |
| 15 | | are you talking about the other times? |
| 16 | A. | No, sir.  What you were asking me was about |
| 17 | | using the previous photographs. |
| 18 | | Mrs. McQuirter's was a LETS photograph |
| 19 | | because that -- all of the other girls had |
| 20 | | been arrested previously, so all of their |
| 21 | | photographs were photographs that were taken |
| 22 | | previously.  Lieutenant Crockett was aware of |
| 23 | | that.  Lieutenant Crockett also would have |

106

```
 1          been aware of the fact that Mrs. McQuirter's

 2          photograph from LETS was used because she

 3          didn't have a photograph in the system.

 4   Q.   Why would Lieutenant Crockett have been aware

 5          of it or how was he aware of it?

 6   A.   I believe he was standing over by my desk,

 7          and I explained to him that I did not have a

 8          photograph of what I thought was

 9          Ms. McQuirter at the time and that I was

10          going to have to use a LETS photograph.

11   Q.   So you just said I believe he was standing at

12          my desk, and then you went through a

13          conversation y'all had.  Did y'all have the

14          conversation or not?

15              MS. HIGHLEY:  Object to the form.

16   Q.   Did y'all have that conversation?

17   A.   Yes, sir.

18   Q.   Did you remember him standing by your desk

19          when you had that conversation?

20   A.   Yes, sir.

21   Q.   All right.  And you remember him standing

22          there near your desk as you accessed the LETS

23          system and retrieved Mrs. McQuirter's
```

109

```
1    Q.   Do you remember seeing Mrs. McQuirter's

2         picture on TV?

3    A.   Yes, sir.  They had photographs of all the

4         prostitutes that were arrested that day that

5         they showed.

6    Q.   But Mrs. McQuirter wasn't one of the

7         prostitutes arrested, was she?

8    A.   No, sir.

9    Q.   Somebody messed up, didn't they?

10             MS. HIGHLEY:  Object to the form of the

11                  question.

12   Q.   Did somebody mess up or was she a prostitute

13        that was arrested?

14   A.   No.  Ms. Riley provided her information;

15        therefore, that's what brought Mrs. McQuirter

16        into the situation.

17   Q.   So Ms. Riley messed up?

18   A.   Yes, sir.

19   Q.   Did you mess up?

20   A.   No, sir.

21   Q.   You didn't do anything wrong?

22   A.   No, sir.

23   Q.   Okay.  Is there a policy at the MPD as to
```

114

```
1        use it, it works, but there are times when it

2        doesn't.  Our computer system in our office,

3        sometimes it doesn't work.  It could, you

4        know, just be the fact that ours at our

5        office does not work.

6    Q.  And y'all don't have just a little camera you

7        can pull out and take a picture of somebody

8        for a booking photograph?  Just a normal

9        little camera?

10   A.  As far as like a digital camera just to take

11       a photograph that way?  Is that what you're

12       talking about?

13   Q.  Yes.

14   A.  Yes, sir, we have those now.

15   Q.  You didn't have them in September '06?

16   A.  We had cameras.

17   Q.  All right.  Well, why didn't y'all just pull

18       out a camera and take a picture of them?

19   A.  Because the assumption at the time was that

20       when they got to the city jail that their

21       booking photographs would be taken anyway.

22       We didn't know at the time that the entire

23       camera system was down, so we would have
```

```
 1        assumed that they were going to be

 2        photographed when they got to jail.  There

 3        would have been no reason why we didn't

 4        believe that until we found out that it

 5        wasn't just our system that didn't work; it

 6        was the system as a whole that didn't work.

 7        So we wouldn't have taken a picture with a

 8        digital camera like that.

 9   Q.   Any particular reason why you didn't go down

10        to the police department when you discovered

11        there was a problem and take photographs with

12        this little digital camera you had?

13   A.   I didn't feel like there was a need to do

14        that at the time.

15   Q.   You thought it would be easier to pull

16        Mrs. McQuirter's photograph off the LETS

17        system; is that right?

18   A.   Right.

19   Q.   Okay.  Has any supervisor or anybody really

20        at the MPD told you in the past that if

21        there's trouble getting a booking photograph

22        to feel free to go on the LETS system to get

23        the photograph?  Has anybody ever told you
```

117

```
 1           or did you leave it for them?
 2     A.    Well, I believe I gave the photographs -- as
 3           they were being printed, somebody was going
 4           downstairs in our office to the printer that
 5           was working and retrieving the photographs.
 6           And I asked whoever retrieved the photographs
 7           to turn them over to Lieutenant Crockett.
 8           They were putting them in Lieutenant
 9           Crockett's box.  Lieutenant Crockett divided
10           the photographs and put one of each in each
11           stack along with the daily activity report,
12           and put one each on the major and the
13           captain's desk would be my assumption.
14           That's what we do every day where we work.
15     Q.    Do you didn't hand it to either one of them?
16     A.    To the major or captain no, sir.
17     Q.    All right.  So I take it you didn't attach to
18           the photographs when you left them any
19           writing that says anything?
20     A.    No, sir.  No, sir.
21     Q.    And you didn't leave them any kind of message
22           saying anything when the photographs were
23           left by any means?
```

118

```
 1    A.   No, sir.

 2    Q.   All right.  And since you didn't tell them

 3         anything, obviously, you didn't tell them

 4         this.  But I want to ask this specific

 5         question.  You didn't tell either the major

 6         or the captain that Mrs. McQuirter's driver's

 7         license photo did not appear to be the same

 8         person as Tiffany Riley; they didn't look the

 9         same.  You didn't tell them that, did you?

10    A.   No, sir.

11    Q.   Can you understand why Ms. McQuirter is upset

12         about being call a prostitute?

13    A.   Yes, sir.

14    Q.   Would that be offending to you if somebody

15         put you on the nightly news with your

16         photograph and said you were arrested for

17         prostitution?

18            MS. HIGHLEY:  Object to the form.

19    A.   Not necessarily anybody that knows me

20         wouldn't believe it.

21    Q.   So you wouldn't be offended by it?

22    A.   Probably not.

23    Q.   Okay.  Have you been disciplined or
```

122

```
 1          was a prostitute?
 2     A.   No, sir.
 3     Q.   Have you contacted any media outlets and
 4          requested that they retract the accusation
 5          that Mrs. McQuirter was a prostitute?
 6     A.   No, sir.
 7     Q.   And you had no discussion with anybody about
 8          retracting that accusation; is that right?
 9     A.   Correct.
10     Q.   Okay.
11               MR. BLEVINS:  All right.  Give me just
12                    a second and let me just look at
13                    my notes real quick.
14     Q.   Just a few more questions.  Let me show you
15          what I've marked as Plaintiffs' Exhibit #3,
16          and I'll represent to you that during the
17          course of discovery the attorneys for the
18          City of Montgomery turned that over to me as
19          being booking photographs of the individuals
20          who were arrested for prostitution back in
21          September '06 during this prostitution detail
22          we talked about out on Mobile Highway.  My
23          question to you is do you recognize the
```

123

```
1          photographs in Exhibit #3 as being the
2          booking photographs of the 10 women that were
3          arrested?
4     A.   Yes, sir.  Oh, I don't know there are 10.
5          I'm only counting nine pages.  You've got
6          nine, but these are the photographs of the
7          women that were arrested.
8     Q.   Right.  And attached to Exhibit #3 numbered
9          pages 1 through 9 are the individual
10         photographs of the women who were arrested,
11         correct?
12    A.   Correct.
13    Q.   And there's no question in your mind that
14         those are the booking photographs of those
15         nine women; is that correct?
16    A.   That's correct.
17    Q.   Okay.  And those booking photographs would
18         have been taken shortly after these women's
19         arrest, I assume; is that correct?
20    A.   Arrest on a previous date -- well, actually,
21         the first eight are booking photographs that
22         were taken from previous arrests.  The one in
23         number, which is Ms. Riley, was taken on the
```

124

```
 1        19th of September.

 2    Q.  All right.  Well, now, counsel for the city

 3        turned over that information as being the

 4        booking photographs of the ladies that were

 5        arrested for prostitution in September '06.

 6        Are those the booking photographs of those

 7        ladies that were arrested or not?

 8    A.  Yes.  These are booking photographs of those

 9        ladies that were arrested.

10            MR. BLEVINS:  Okay.  Nothing further.

11                Thank you.

12                    (The deposition concluded

13                    at 12:49 p.m.)

14            *  *  *  *  *  *  *  *  *  *

15            FURTHER DEPONENT SAITH NOT

16            *  *  *  *  *  *  *  *  *  *

17

18

19

20

21

22

23
```

1

ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


GWENDOLYN P. MCQUIRTER,
et al.,

       Plaintiffs,

                      CASE NUMBER
vs.                 2:07-cv-00234-MEF-WC

CITY OF MONTGOMERY, et cet.,
et al.,

       Defendants.




* * * * * * * * * * *


DEPOSITION OF RONALD COOK, JR., taken
pursuant to stipulation and agreement before
Heather Barnett, Court Reporter and Commissioner
for the State of Alabama at Large, in the Offices
of Dunn, King & Associates, 2800 Zelda Road,
Suite 100-2, Montgomery, Alabama, on Friday, June
29, 2007, commencing at approximately 9:21 a.m.


* * * * * * * * * * *

*DUNN, KING & ASSOCIATES*
*Montgomery, Alabama*
*(334) 263-0261 or (800) 359-8001*

4

RONALD COOK, JR.

The witness, having first been sworn to speak the truth, the whole truth and nothing but the truth, testified as follows:

EXAMINATION

BY MR. BLEVINS:

1  Q.   Would you state your full name, please, sir?

2  A.   Ronald Cook, Jr.

3  Q.   Mr. Cook, what is your home address?

4  A.   2061 Shortline Drive, Montgomery, Alabama, 36116.

5  Q.   And what is your age?

6  A.   40.

7  Q.   And what is your date of the birth?

8  A.   4/10 of '67.

9  Q.   And are you married?

10  A.   Yes, sir.

11  Q.   And what is your wife's name?

12  A.   Vyvyan, V-Y-V-Y-A-N, Cook.

13  Q.   And she lives with you here in Montgomery?

14  A.   Correct.

15  Q.   Does she work?

16  A.   Yes.

9

```
 1   Q.   Okay.  All right.  Where is Livingston
 2        exactly?
 3   A.   It's in West Alabama.  Are you familiar with
 4        the University of West Alabama?
 5   Q.   Not really.  What's a major city that it's
 6        near?
 7   A.   Meridian, Mississippi.
 8             MS. FEHL:  None in Alabama.
 9   Q.   And Chickasaw, Alabama, where is that?
10   A.   That's going into Mobile, just north of
11        Mobile.
12   Q.   Okay.  I was trying to narrow down which one
13        looked like it was in the Eleventh Circuit.
14        Looks like only Prattville probably is.
15   A.   Right.
16   Q.   Now, your involvement with the National
17        Guard, was that tied to your ROTC involvement
18        at AUM?
19   A.   Correct.
20   Q.   All right.  Any other education you haven't
21        told me about?
22   A.   No.
23   Q.   All right.  And where are you employed?
```

10

1   A.   Montgomery Police Department.

2   Q.   Okay.  And do you have an actual physical

3        office somewhere?

4   A.   Yes.

5   Q.   Where's your office located?

6   A.   320 North Ripley Street.

7   Q.   And I didn't say this earlier.  You'll see

8        she's typing down stuff.  I'm going to let

9        you finish answering if you'll let me finish

10       my question so we don't drive her crazy both

11       talking at the same time.

12  A.   Understood.

13  Q.   What is your present job title?

14  A.   I am Bureau Commander for Property, which is

15       in the detective division.

16  Q.   Okay.  And are you a detective?

17  A.   Yes.

18  Q.   All right.  Do you also carry a rank?

19  A.   Yes.

20  Q.   What is the rank?

21  A.   Lieutenant.

22  Q.   Okay.  And what are your duties right now?

23  A.   My duties as the bureau commander is to

11

1       manage case files.  As the guys put together

2       case files to be sent over to the court

3       system, we manage those case files.  We

4       assist in any investigations that may run

5       into a wall and also personnel management,

6       you know, the off days, taking schools into

7       account.

8  Q.   Okay.  How long have you held that position?

9  A.   Since June of '06.

10  Q.   Okay.  And who would be your immediate

11      supervisor?

12  A.   Captain A.J. Hardy.

13  Q.   Can you go up the chain for me, up to the

14      chief?  Who would be next in line?

15  A.   Major David Warren.

16  Q.   Okay.  Who would be next?

17  A.   Lieutenant Colonel W.S. Thompson, and, of

18      course, Chief of Police Baylor.

19  Q.   Did I ask you when you started working for

20      the Montgomery Police Department?

21  A.   No, you didn't.

22  Q.   When did you start there?

23  A.   1994.

13

Q.  Detects, right?

A.  Right.

Q.  All right.  So you were with the detective division from '04 to June of '06?

A.  Correct.

Q.  All right.  And did you have a job title in the detective division other than detective?

A.  I was a sergeant.  Did basically the same thing as a sergeant, except once I got promoted to lieutenant, I became a bureau commander.

Q.  All right.  Have you held any other positions other than what we've gone over since you've been employed with the Montgomery Police Department?

A.  As an additional duty, I do on-call public information officer.

Q.  What does that mean, on-call public information officer?

A.  On weekends -- Captain Thornton is the primary; and on weekends, we have call between he and myself and three other guys, that being Keith Barnett, Mark Drinkard and

14

1      William Perkins.  On Friday afternoons at

2      five o'clock, we will assume the duties of

3      disseminating any information that needs to

4      be given to the media from the police

5      department.

6  Q.  Okay.

7  A.  Until Monday morning at 08.

8  Q.  So I'm going to make sure I understand.

9      Well, before I ask if I understand, how long

10     have you been doing that, the on-call public

11     information officer?

12 A.  Roughly two years.

13 Q.  So since around June of '05 or so?

14 A.  I can't be specific.  I don't know

15     specifically the dates, but I know it's been

16     about two years.

17 Q.  Okay.  And so as an on-call public

18     information officer for the last two years,

19     you and four other people serve as the

20     on-call public information officer; is that

21     right?

22 A.  Myself and three other people.  Huey is the

23     primary.

20

```
 1        weekend.
 2   Q.   Okay and the reason that they would be
 3        contacting you would be why?
 4   A.   For information dissemination from the
 5        department.
 6   Q.   Okay.  Would that contact generally be made
 7        for you to disseminate information to the
 8        media or for you to be able to respond to
 9        inquiries from the media?
10   A.   Well, if I'm going to respond to inquiries,
11        I'm generally going to send out a --
12   Q.   Press release?
13   A.   Press release to the media.
14   Q.   Here's what I'm trying to get to make sure I
15        don't misunderstand.  If you're contacted
16        while you're on call, is the primary purpose
17        of that for you to put out information to the
18        media in the form of press release?
19   A.   Right, I mean, if it's a serious incident.
20        Okay.  Things just like just a normal arrest
21        from Eastdale Mall or something, I don't get
22        called on that, anyway.  But if it's a
23        serious incident, or one of the divisions
```

21

1      might have a detail, I'm going to be

2      notified.

3    Q.   A detail like a specially operation or

4         something?

5    A.   Correct.

6    Q.   Okay.  And, again, I'm just trying to make

7         sure I understand.  If you're contacted about

8         a special operation detail that has taken

9         place, would the point of that contact be for

10        you to put out a press release?

11   A.   Rephrase our question.  I don't understand

12        your question.

13   Q.   Let's suppose when you're on call you're

14        contacted, and you're told we did a special

15        operation, here's the information about it.

16        Is the point of that contact to you as a

17        public information officer to put out that

18        information to the media?

19   A.   Yes.

20   Q.   Okay.  And when you're provided with

21        information that you're going to disseminate

22        to the media, do you rely on the person who

23        gives you the information to provide accurate

22

| | | |
|---|---|---|
| 1 | | information, or do you also go look into it |
| 2 | | to make sure what you're releasing to the |
| 3 | | media is accurate? |
| 4 | A. | We'll rely on that division that's having the |
| 5 | | detail to bring the information. |
| 6 | Q. | And how, generally, would that information be |
| 7 | | given to you?  Would it be orally, in |
| 8 | | writing, or how? |
| 9 | A. | Generally, it's in writing. |
| 10 | Q. | In a certain format or how? |
| 11 | A. | Well, specific as to what, now? |
| 12 | Q. | Was it like a format memo?  Is it a format |
| 13 | | letter, or does each person giving you the |
| 14 | | information just decide in what form they're |
| 15 | | going to present it to you? |
| 16 | A. | They generally decide the form, but I would |
| 17 | | go back and look at their daily entry and see |
| 18 | | what it has.  And that's how I draw my |
| 19 | | conclusion as to what I'm going to put on my |
| 20 | | press release. |
| 21 | Q. | Okay. |
| 22 | A. | The who, what, where, whens, and whys. |
| 23 | Q. | And, then, in your capacity as on-call public |

23

```
1              information officer, you would take that
2              information and disseminate it to the media
3              somehow, right?
4    A.        Correct.
5    Q.        And what is the normal course of
6              dissemination?
7    A.        By e-mail.
8    Q.        To which media outlets?
9    A.        Multiple.  I have a media listing of about
10             40, 50 people.
11   Q.        Okay.  Would those 40 or 50 people be here in
12             Montgomery County or outside Montgomery as
13             well?
14   A.        Some of them are outside Montgomery as well.
15   Q.        And when you distribute these press releases,
16             do you always distribute them to the same
17             media outlets or do you choose which media
18             outlets?
19   A.        Well, if it's local and I'm sending pictures
20             with it and it's right at news time, I send
21             it to our video agencies here in the city and
22             also The Advertiser.  But I have a mass
23             listing where I have AP, Tuskegee Times,
```

27

| | |
|---|---|
| 1 | at -- I'm going to refer to the Montgomery |
| 2 | Police Department as MPD to make it shorter |
| 3 | -- held any other positions at the MPD other |
| 4 | than what we talked about? |
| 5 | A. I mean, what do you mean? |
| 6 | Q. Well, other than you told me you were a |
| 7 | supervisor in the patrol division. You told |
| 8 | me your current position. You told me about |
| 9 | being on-call public information officer. |
| 10 | Have you held any other positions other than |
| 11 | those? |
| 12 | A. No, just from the inception I came in as a |
| 13 | police officer. |
| 14 | Q. And would you have been a police officer from |
| 15 | 1994 until 2004? |
| 16 | A. No I made corporal if 1996. |
| 17 | Q. So you would have been what I'm going to call |
| 18 | just a regular police officer from 2004 to |
| 19 | 1996? |
| 20 | A. Repeat your question. |
| 21 | Q. What dates would you have been just a police |
| 22 | officer? |
| 23 | A. From 1994 to 1996. |

28

1    Q.    Okay.  And as a police officer during that

2          time period, what type duties did you

3          perform?

4    A.    Regular patrol street duties, answering

5          calls, calls for assistance.

6    Q.    Okay.  From '94 to '96 as a police officer

7          did you ever have an occasion to arrest

8          prostitutes?

9    A.    I can't recollect my arrests specifically

10         then.  I'm sure I came in contact with them.

11   Q.    Have you made arrests since 1996?

12   A.    Have I made arrests since '96?

13   Q.    Yes.

14   A.    Yes.

15   Q.    Okay.  So as a sergeant and lieutenant,

16         you've made arrests in both of those

17         capacities?

18   A.    I didn't make sergeant until 2000.

19   Q.    I mean as a corporal, sergeant and

20         lieutenant, do you also go out and arrest

21         people?  Is that part of your duties?

22   A.    As a sergeant, you really don't arrest

23         people; because I was in patrol for some of

40

| | | |
|---|---|---|
| 1 | Q. | Well, if somebody commits a crime across the |
| 2 | | street there today, can you go arrest them? |
| 3 | A. | Yes. |
| 4 | Q. | And if you go over there and arrest somebody |
| 5 | | today, how are you going to confirm the |
| 6 | | identity according to the policy that's in |
| 7 | | place today? |
| 8 | A. | Just I like I told you right here, that I'm |
| 9 | | going to get the name, date of birth, |
| 10 | | possibly the Social Security number. |
| 11 | Q. | Okay.  I gotcha.  You know that we're here |
| 12 | | today about a lawsuit that's been filed by |
| 13 | | Gwendolyn and Charles McQuirter, correct? |
| 14 | A. | Correct. |
| 15 | Q. | I want to ask you a few questions about the |
| 16 | | McQuirters' lawsuit and the events that |
| 17 | | brought us here today. |
| 18 | | How did you get involved in what I'm |
| 19 | | going to refer to as the McQuirter matter, |
| 20 | | okay?  How did you get involved in that? |
| 21 | A. | Well, I was the on-call PIO that weekend. |
| 22 | | And Lieutenant Pat Crockett call me and |
| 23 | | stated they had a prostitution sting and that |

                    he had all of the arrest photos available to

                    be disseminated.

Q.   Do you remember what date that was?

A.   No, I don't.

Q.   Do you recall it as being back in September
     of 2006?

A.   Specifically, I don't know which date, but I
     know it should have been around that time.

Q.   Now, just so the record is clear, when you
     say PI, is that what you're using as the
     abbreviation for public information officer?

A.   Correct.  PIO.

Q.   PIO.  Okay.  So when you received this
     information, it would have been some time on
     the weekend between 5 p.m. on Friday and
     8 a.m. on a Monday?

A.   Correct.

Q.   And who Pat Crockett?

A.   He's Bentley's supervisor.

Q.   And who is Bentley?

A.   K.C. Bentley.  Corporal K.C. Bentley.

Q.   And how did Pat Crockett contact you?

A.   By SouthernLINC.

42

1    Q.  And you were not on duty when you were
2          contacted, correct?

3    A.  No.

4    Q.  Okay.  Do you remember what you were doing?

5    A.  No.

6    Q.  Doing something not work-related, I assume?

7    A.  Right.

8    Q.  Okay.  All right.  And Pat Crockett -- tell
9          me if I misunderstood what you told me.  Pat
10         Crockett called you and said there had been
11         prostitution sting, and he had photographs of
12         people that were arrested?

13    A.  Correct.

14    Q.  All right.  Is Pat a male or female?

15    A.  Male.

16    Q.  Did Pat tell you anything else?

17    A.  Yes, that he had them over at the special ops
18         building.

19    Q.  The photos?

20    A.  Correct.

21    Q.  All right.  And what did you say to him or
22         what else was said?

23    A.  I asked him was he still going to be there.

1    He said he would be around.  If not, he would

2    leave them with someone upstairs.  And I told

3    him that I was en route, so I put myself on

4    duty status, proceeded over to the special

5    ops building to get the photographs.

6  Q.  Now, was this one of those contacts we talked

7    about earlier where it was your understanding

8    Pat Crockett had contacted you to give you

9    the information so you could release it to

10   the media?

11  A.  Right.

12  Q.  And, so, did you immediately go over to the

13   where the photos were?

14  A.  Yes.

15  Q.  All right.  And you don't remember what day

16   of the week this was?

17  A.  It had to be between Friday or Monday from

18   seven o'clock Friday until 08 Monday.

19  Q.  Okay.  And where exactly did you go after

20   receiving Mr. Crockett's call?

21  A.  To the special ops building on Highland

22   Avenue.

23  Q.  And your purpose in going there was to do

44

1          what?

2     A.   Pick up the arrest photographs.

3     Q.   To do anything else?

4     A.   No.

5     Q.   And after you arrived at the special ops

6          building, what did you do?

7     A.   I went upstairs and got the arrest

8          photographs.

9     Q.   Did you do anything else?

10    A.   No.

11    Q.   While you were at the building?

12    A.   No.

13    Q.   Did you speak with Mr. Crockett?

14    A.   No.

15    Q.   Was he there?

16    A.   No.

17    Q.   Did you speak with anybody?

18    A.   I spoke to one of his investigators.  I said,

19         did Lieutenant Crockett leave the

20         photographs?  He left them in the inbox; and

21         I went to the inbox and got the photographs.

22    Q.   You didn't receive anything in writing from

23         anybody at the special ops building.  You

45

1       just received the photographs; is that right?

2  A.   Correct.

3  Q.   Now, earlier when Mr. Crockett spoke to you,

4       did he give you any details about the

5       prostitution sting, or did he just say we did

6       a prostitution sting, and I have some

7       photographs?

8  A.   Just told me they had a prostitution sting on

9       the West South Boulevard, and he had the

10      arrest photographs.

11  Q.   Do you recall him saying anything else about

12      the details of the arrest?

13  A.   No.

14  Q.   Okay.  After you got the photographs from the

15      special ops building, what did you do next?

16  A.   I went to headquarters, 320 North Ripley

17      Street.

18  Q.   And did what there?

19  A.   Did my press release and sent the photographs

20      out to the media.

21  Q.   Did you speak with anybody in between leaving

22      the special ops building and doing the press

23      release and releasing it to the media?

54

```
1          a booking photograph?

2     A.   It doesn't appear to be.

3     Q.   Okay.  Now, when you received these

4          photographs from the special ops building,

5          was your attention drawn to page 13 of

6          Exhibit #1 as not being a booking photograph?

7     A.   No.

8     Q.   Didn't catch your attention at all?

9     A.   No.

10    Q.   Did you ever think anything about that

11         between the time you received the photos at

12         the special ops building to when you issued

13         the press release?

14    A.   No.

15    Q.   And this is a curious question.  If, as a

16         public information officer, you get 10 or so

17         photographs, nine of which are booking photos

18         and one that is not, why wouldn't that catch

19         your attention?

20    A.   Because you get photographs off any kind of

21         system that you use for a law enforcement

22         investigative tool.

23    Q.   So that's something you've seen before?  This
```

55

1       is not unusual?

2  A.   No.

3  Q.   Okay.  That was a compound question.  Have

4       you seen that before where a photograph might

5       be released to the media that's not a booking

6       photograph?

7  A.   Right.

8  Q.   So you didn't find this at all unusual that

9       page 13 of Exhibit #1 was not a booking

10      photograph?

11  A.   No.

12  Q.   Okay.  After you issued the press release to

13      the media, which is shown there on page 2 of

14      Exhibit #1, did you have any further

15      involvement with the McQuirter matter?

16  A.   Yes.

17  Q.   All right.  And what further involvement did

18      you have?

19  A.   Mrs. McQuirter's husband called my office.

20  Q.   And do you know what date that would have

21      been?

22  A.   No, I don't.

23  Q.   Can you estimate for me how long it was after

56

| | | |
|---|---|---|
| 1 | | you issued the press release that he ticketed |
| 2 | | you? |
| 3 | A. | Couple or two or three day. |
| 4 | Q. | Okay.  And did he call you at the MPD at your |
| 5 | | office? |
| 6 | A. | Correct. |
| 7 | Q. | And tell me about that discussion. |
| 8 | A. | Answered the phone, and he identified himself |
| 9 | | and told me that there was no way possible |
| 10 | | that the McQuirter picture -- that was his |
| 11 | | wife, and there was no way possible she could |
| 12 | | have been out there because she was with |
| 13 | | him.  At that time, I told him, well, sir, I |
| 14 | | have to put you in touch with the primary |
| 15 | | PIO, which was Huey Thornton, and that's when |
| 16 | | the call was transferred. |
| 17 | Q. | Do you recall anything else being said during |
| 18 | | that discussion with Mrs. McQuirter? |
| 19 | A. | No. |
| 20 | Q. | Do you recall about how long that discussion |
| 21 | | lasted? |
| 22 | A. | It was less than five minutes. |
| 23 | Q. | Did Mrs. McQuirter appear to be angry during |

57

```
 1          that discussion?
 2    A.    He didn't appear to be angry.
 3    Q.    Okay.  All right.  Did you have any further
 4          involvement with the McQuirter matter after
 5          that?
 6    A.    As to what?
 7    Q.    In any respects.
 8    A.    Well, I sent -- I guess Captain Thornton
 9          talked to them, and he wanted me to e-mail
10          him my release, my specific release from
11          September 16th.
12    Q.    Captain Thornton asked you to do that?
13    A.    Right.
14    Q.    All right.  Now, I was thinking while you
15          were talking.  Did you say Captain Thornton
16          wanted you to e-mail him, meaning Captain
17          Thornton, a release?  Or what did you just
18          tell me?
19    A.    Captain Thornton called me after he talked to
20          Mr. McQuirter, after I transferred the call,
21          and asked me to send him the release that I
22          sent to the media.
23    Q.    And the release being page 2 of Exhibit #1?
```

60

```
 1    Q.   Okay.  What did you do with the photos?

 2    A.   Which photos?

 3    Q.   The ones we're talking about, the ones you

 4         released to media.

 5    A.   What do you mean what did I do with them?

 6    Q.   Well, it was my understanding you got them

 7         from the special ops building and took them

 8         to your office, did the media e-mailing; and

 9         you still had the photos, right?

10    A.   Correct.

11    Q.   What happened with the photos?

12    A.   They were forwarded to Huey.

13    Q.   At the same time you sent them the press

14         release?

15    A.   Maybe a couple of days thereafter.

16    Q.   And why were they forwarded to Captain

17         Thornton?

18    A.   Because he requested all the information on

19         the press release.

20    Q.   So when he contacted you after speaking to

21         Mr. McQuirter, he requested the press release

22         and the photos?

23    A.   I told him that I still had the hard copies,
```

66

1     a person was arrested right here on the

2     street, and they were taken down to the

3     police department and a booking photo was

4     made of them.  Can you think of any reason a

5     person relaying information to you about that

6     arrest would not simply provide you with a

7     booking photograph of that individual?

8          MS. FEHL:  Object to the form.

9  A.  Repeat your question.

10 Q.  Was there something about it that I need to

11     clarify?

12 A.  I just need you to repeat the question.  I

13     didn't understand your question.

14 Q.  If a person is arrested by MPD, brought to

15     the police station and a booking photograph

16     is done, do you know of any reason that the

17     person providing you as the PIO wouldn't

18     simply send you the booking photograph?

19 A.  Do I know of any other reason that they

20     wouldn't send me the booking photograph?

21 Q.  Right.

22 A.  No, I don't.

23 Q.  When information is given to you as the PIO

67

| | |
|---|---|
| 1 | with a company, photographs, do you normally |
| 2 | anticipate it's going to be a booking |
| 3 | photograph? |
| 4 | A.  Yes. |
| 5 | Q.  And if a booking photograph existed, could |
| 6 | you think of any reason as to why an officer |
| 7 | might go pull up a photograph off of LETS as |
| 8 | opposed to simply giving you the booking |
| 9 | photograph? |
| 10 | A.  I can't say that.  That's totally up to that |
| 11 | officer.  That's their investigative |
| 12 | technique. |
| 13 | Q.  Because you know in this case, |
| 14 | Mrs. McQuirter's photograph was taken off |
| 15 | LETS, and it was released with an allegation |
| 16 | she had been arrested for prostitution. |
| 17 | You're aware of that, aren't you? |
| 18 | A.  Yes. |
| 19 | Q.  Okay.  Have you ever seen anything like that |
| 20 | happen before at MPD? |
| 21 | A.  I haven't. |
| 22 | Q.  Ever heard of anything happening like that |
| 23 | before at MPD? |

69

| | | |
|---|---|---|
| 1 | A. | I don't know, sir. |
| 2 | Q. | Well, who told you to release the photos? |
| 3 | A. | I released the photo because I know it's an |
| 4 | | incident, and it's supposed to be released. |
| 5 | | It came down from Huey that if we have stings |
| 6 | | and all, that photos would be released.  So. |
| 7 | Q. | Is the release of the photographs intended in |
| 8 | | part to humiliate and embarrass the people |
| 9 | | that were arrested for prostitution? |
| 10 | A. | No.  It's for public information. |
| 11 | Q. | So it's not meant in any way to humiliate the |
| 12 | | people by showing their photograph? |
| 13 | A. | It's for public information. |
| 14 | Q. | Do you acknowledge that it would be somewhat |
| 15 | | humiliating to have your picture on TV and be |
| 16 | | called a prostitute? |
| 17 | | MS. FEHL:  Object to the form |
| 18 | | MS. HIGHLEY:  Object to the form. |
| 19 | Q. | And do you acknowledge that? |
| 20 | A. | I can't answer that. |
| 21 | Q. | You don't know if that would be the |
| 22 | | humiliating or not? |
| 23 | A. | I don't. |

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| GWENDOLYN P. MCQUIRTER, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No.:  2:07-cv-00234-MEF-WC ) |
| CITY OF MONTGOMERY, et al., | ) ) |
| Defendants. | ) |

## FIRST REQUEST FOR ADMISSION OF FACTS  TO DEFENDANT CITY OF MONTGOMERY, ALABAMA

Comes now the Plaintiffs, Gwendolyn & Charles McQuirter, by and through their undersigned counsel, and propounds their First Request for Admission of Facts to Defendant City of Montgomery, as follows:

1. On or about September 15, 2006, the Special Operations Division of the Montgomery Police Department conducted a prostitution sting in the area of Mobile Highway in Montgomery, Alabama.

**ANSWER:  Admitted.**

2. As a result of the sting referenced at ¶1 above, ten (10) women for arrested for prostitution for offering sex for money.

**ANSWER:  Admitted.**

3. The ten women referenced at ¶2 above, were booked into the City Jail for Montgomery, Alabama, and were fingerprinted and photographed.

**ANSWER:  Admitted.**

4. On or about September 16, 2006, employees of the City of Montgomery provided photos and criminal histories of the women arrested in the prostitution sting referenced at ¶2 above, to the Montgomery Advertiser; Channel 8 - WAKA television; and Channel 12 – WSFA television, and, in some form, either orally and/or in writing, reported to these media outlets that each of

1

these ten (10) women had been arrested and charged with the crime of prostitution.

> **ANSWER: Denied.**

5. One of the photos released to the media by the Montgomery Police Department, as referenced at ¶4 above, was that of Plaintiff Gwendolyn McQuirter.

> **ANSWER: Admitted.**

6. Plaintiff Gwendolyn McQuirter was not one of the ten (10) women arrested for prostitution.

> **ANSWER: Admitted.**

7. The photograph of Plaintiff Gwendolyn McQuirter which was released to the media, as referenced at ¶4 above, was obtained by an employee of the City of Montgomery from Plaintiff Gwendolyn McQuirter's motor vehicle record.

> **ANSWER: Denied.**

8. WAKA – Channel 8 television and WSFA – Channel 12 television each ran stories on the nightly news concerning the arrests referenced at ¶2 above, and each showed Plaintiff Gwendolyn McQuirter's photograph as well as identifying her by name as one of the individuals arrested for prostitution.

> **ANSWER: Denied.**

9. Each of these televised broadcasts referenced at ¶8 above, were seen by thousands of viewers.

> **ANSWER: Denied.**

10. The Montgomery Advertiser also published a story concerning the arrests referenced at ¶2 above, on or about September 17, 2006, and directed readers to view photographs of the suspects, to include Plaintiff Gwendolyn McQuirter, on its website – montgomeryadvertiser.com.

> **ANSWER: Denied.**

11. Thousands of persons viewed the story published by The Montgomery Advertiser referenced at ¶10 above.

> **ANSWER: Denied.**

12. Thousands of persons viewed Plaintiff Gwendolyn McQuirter's photograph published on montgomeryadvertiser.com, as referenced at ¶10 above.

**ANSWER: Denied.**

13. The words published by Defendant City of Montgomery accusing Plaintiff Gwendolyn McQuirter of engaging in prostitution, were false and untrue.

**ANSWER: Admitted.**

14. That over five days before the commencement of this action Plaintiff Gwendolyn McQuirter made a written demand upon Defendant City of Montgomery, its employees/agents, for a public correction and retraction of the defamatory accusations as set forth herein.

**ANSWER: Denied.**

15. Defendant City of Montgomery, its employees/agents, failed or refused to correct and retract in as prominent and public place or manner a full and fair retraction of the false allegations, within the time and manner provided by §§ 6-5-184 to 6-5-186, *Code of Alabama* (1975).

**ANSWER: Denied.**

16. Prior to the filing of this action, Plaintiffs filed itemized and verified claims with Defendant City of Montgomery as dictated by Alabama law.

**ANSWER: Admitted.**

17. The verified claims referenced at ¶16, were denied on January 29, 2007.

**ANSWER: Admitted.**

_____
Kimberly O. Fehl (FEH001)
Attorney for Defendant

3

OF COUNSEL:
City of Montgomery
Legal Department
P.O. Box 1111
Montgomery, AL  36101-1111
(334) 241-2050
(334) 241-2310 - FAX

## CERTIFICATE OF SERVICE

I hereby certify that foregoing has been served upon the following by electronic filing or

by U. S. Mail, postage prepaid on this 25th day of May, 2007:

        Jerry M. Blevins, Esq.
        Law Office of Jerry M. Blevins
        Hillwood Office Center
        2800 Zelda Road, Suite 200-3
        Montgomery, Alabama 36106

_____
Of Counsel

4

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| GWENDOLYN P. MCQUIRTER, et al., | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | Civil Action No.:  2:07-cv-00234-MEF-WC |
| CITY OF MONTGOMERY, et al., | ) ) ) | |
| Defendants. | ) | |

## DEFENDANT'S RULE 26(a)(1) INITIAL DISCLOSURES

Come now the Defendants, in the above-styled action, and submit the following information as initial disclosures pursuant to Rule 26(a)(1) of the *Federal Rules of Civil Procedure*:

1.    (A)    The following witnesses are likely to have discoverable information regarding Plaintiff's allegations:

    1.    Captain Huey Thornton
         Montgomery Police Department
         320 North Ripley Street
         Montgomery, AL  36104
         (334) 241-2050

    2.    Lt. Ron Cook
         Montgomery Police Department
         320 North Ripley Street
         Montgomery, AL  36104
         (334) 241-2050

    3.    Corporal K.C. Bentley
         Montgomery Police Department
         320 North Ripley Street
         Montgomery, AL  36104
         (334) 241-2050

(B)     The following documents may be introduced at trial:

1.     Booking photographs for prostitution sting conducted September 15, 2006, by the Special Operations Division of the Montgomery Police Department.

2.     Photographs of women released to the media on September 16, 2006, as a result of the prostitution sting conducted by the Special Operations Division of the Montgomery Police Department on September 15, 2006.

3.     Press Release dated September 16, 2006, regarding prostitution sting conducted September 15, 2006.

4.     Press Release dated September 20, 2006 regarding Tiffany Riley reporting false information to a law enforcement officer.

5.     Defendant reserves the right to supplement initial disclosures with additional names and documents if necessary.

(C)     N/A

(D)     See attached.

Dated this the 29th day of May, 2007.

/s/ Kimberly O. Fehl
KIMBERLY O. FEHL (FEH001)
Assistant City Attorney

CITY OF MONTGOMERY
Legal Department
Post Office Box 1111
Montgomery, Alabama  36101-1111
(334) 241-2050
(334) 241-2310 – facsimile

## **CERTIFICATE OF SERVICE**

I hereby certify that foregoing has been served upon the following by electronic filing or by U. S. Mail, postage prepaid on this 29th day of May, 2007:

Jerry M. Blevins, Esq.
Law Office of Jerry M. Blevins
Hillwood Office Center
2800 Zelda Road, Suite 200-3
Montgomery, Alabama 36106

/s/ Kimberly O. Fehl
Of Counsel

# BOOKING
# PHOTOGRAPHS

Apparently Ms Maria Lane McElya was not photographed in reference to her arrest on
September 15, 2006.



| | Name : HUBBARD, TAWANDA, LANISE, | |
|---|---|---|
| SSN: ████ | DOB: 10/26/1978 | ████ |
| SEX: FEMALE | ████ | ████ |
| ████ | ████ | ████ |



| ▬▬▬▬▬ | Name : WILLIAMS, CONNIE, SUE, | |
|---|---|---|
| ▬▬▬▬▬ | DOB: 08/30/1963 | ▬▬▬▬ |
| SEX: FEMALE | ▬▬▬▬ | ▬▬▬▬ |
| LICENSE: | STATE: | ▬▬▬▬ |



|  | Name : GANTT, ALISHA, DAWN, |  |
|---|---|---|
|  | DOB: 09/07/1980 |  |
| SEX: FEMALE |  |  |
|  |  |  |



| | Name : HERRERO, JOYCE, DARLENE, | |
|---|---|---|
| | DOB: 12/05/1973 | |
| SEX: FEMALE | | |
| | | |



| | Name : ANDERSEN, CYNTHIA, ANN, | |
| --- | --- | --- |
| ▓▓▓▓▓▓▓ | DOB: 01/24/1974 | ▓▓▓▓▓▓▓ |
| SEX: FEMALE | ▓▓▓▓▓▓▓ | ▓▓▓▓▓▓▓ |
| ▓▓▓▓▓▓▓ | ▓▓▓▓▓▓▓ | ▓▓▓▓▓▓▓ |



| | Name : NELSON, SYRIA, , | |
| ▮▮▮▮▮▮▮ | DOB: 02/10/1979 | ▮▮▮▮▮▮▮ |
| SEX: FEMALE | ▮▮▮▮▮▮▮ | ▮▮▮▮▮▮▮ |
| ▮▮▮▮▮▮▮ | ▮▮▮▮▮▮▮ | ▮▮▮▮▮▮▮ |



| | Name : LEE, CHRISTY, SHANNON, | |
|---|---|---|
| | DOB: 01/06/1975 | |
| SEX: FEMALE | | |
| | | |



| | Name : CASON, ASHLEY, SHANDA, | |
| | DOB: 12/20/1982 | |
| SEX: FEMALE | | |
| | | |



|  |  | Name : RILEY, TIFFANY, , |  |
|---|---|---|---|
|  |  | DOB: 02/27/1972 |  |
| SEX: FEMALE |  |  |  |
|  |  |  |  |

# COPY OF MATERIAL RELEASED TO THE MEDIA

Montgomery Police Department

Page 1 of 2

# Thornton, Huey

| | |
|---|---|
| **From:** | Cook, Ron |
| **Sent:** | Wednesday, September 20, 2006 3:06 PM |
| **To:** | Thornton, Huey |
| **Subject:** | FW: press release |
| **Attachments:** | CASE_FIL (3).pdf; image002.gif; image004.gif; oledata.mso |

**From:** Cook, Ron
**Sent:** Saturday, September 16, 2006 8:34 PM
**To:** 'Advertiser'; 'Allen, M'; 'AP #1'; 'AP #2'; 'Barnes, K'; 'Bonvillian, Crystal'; 'Bullock, Mark'; 'Chandler, Kim'; 'Channel 8'; 'Cheatham, Mary Ellen'; 'Dixon, Al'; 'Elkins, Kevin'; 'Gilmer, Cubie Rae'; 'Goettel, Bryan'; 'Grander, Amanda'; 'Henry, Bryan'; 'Hodges, Vince'; 'Holmes, Chris'; 'Hoyt, Becky'; 'Hyles, Marcus'; 'Kent, John'; 'Kitchen, S'; 'Konz, Toni'; 'Lowery, Bob'; 'Merlini, J'; 'Pippins, Erica'; 'Pitts, Sally'; 'Robinson, T'; 'Sanders, Christopher'; 'Scott, Randy'; 'Sellers, Rick'; 'Singleton, George'; 'Stovall, Darrian'; 'Thomas, Adam'; 'Vickers, Denise'; 'Wales, Bethany'; 'White, Dave'; 'Williams, Randy'; 'Wingard, Desmond'; 'WSFA #1'; 'WSFA #2'; 'WSFA #3'; 'WSFA #4'; 'WSFA #5'; 'WSFA #6'; 'WSFA TV'
**Subject:** press release

## Montgomery Police Department

 



### For Immediate Release
September 16, 2006

On Friday September 15, 2006, the Special Operations Division conducted a prostitution sting in the area of Mobile highway and the West South Blvd. As a result of this operation, ten prostitutes were taken into custody. Attached is a photograph of each suspect.

Lieutenant Ron Cook is the point of contact for questions regarding this press

release (241-2816).





| | Name : HUBBARD, TAWANDA, , | |
| | DOB: 10/26/1978 | |
| SEX:FEMALE | | |
| | | |

ADDRESS:  4132 Ione Oak Drive, Montgomery, Alabama





| | Name: WILLIAMS, CONNIE, SUE, | |
| | DOB: 08/30/1963 | |
| SEX:FEMALE | | |
| | | |

ADDRESS:  Homeless







| | Name : GANTT, ALISA, DAWN, | |
| --- | --- | --- |
| | DOB: 09/07/1980 | ████████ |
| SEX:FEMALE | ████████ | ████████ |
| ████████ | ████████ | |

ADDRESS: 4220 River Oaks Road, Millbrook, Alabama







| | Name : HERRERO, JOYCE, DARLENE, | |
|---|---|---|
| | DOB : 12/05/1973 | ████████ |
| SEX:FEMALE | ████████ | |

ADDRESS: Homeless





|  | Name : ANDERSEN, CYNTHIA, ANN, | |
|---|---|---|
| | DOB: 01/24/1974 | |
| SEX: FEMALE | | |









| | Name : NELSON, SYRIA, , |
|---|---|
| | DOB: 02/10/1979 |
| SEX:FEMALE | |

ADDRESS:  2047 Amos Street, Montgomery, Alabama





| | Name : LEE, CHRISTY, SHANNON, | |
| --- | --- | --- |
| | DOB: 01/06/1975 |  |
| EX:FEMALE | | |
| | | |

ADDRESS: 3680 Richard Road, Montgomery, Alabama





| ▮▮▮▮▮▮ | Name : MCELYA, MARIA, LANE, | |
| ▮▮▮▮▮▮ | DOB: 02/14/1983 | ▮▮▮▮▮▮ |
| SEX:FEMALE | ▮▮▮▮▮▮ | ▮▮▮▮▮▮ |
| ▮▮▮▮▮▮ | ▮▮▮▮▮▮ | |

ADDRESS:  2722 Spann Place, Montgomery, Alabama







| | Name : CASON, ASHLEY, SHANDA, |
|---|---|
| | DOB: 12/20/1982 |
| SEX: FEMALE | |

ADDRESS:  7342 Wimberly Lane, Montgomery, Alabama







| | Name : MCQUIRTER, GWENDOLYN | |
| | DOB: 02/27/1972 | |
| SEX:FEMALE | | |

ADDRESS: 4418 Lowell Road, Montgomery, Alabama



# COPY OF RETRACTION PRESS RELEASE

Montgomery Police Department



## For Immediate Release
September 20, 2006

On September 15, 2006, the Special Operations Division of the Montgomery Police Department conducted a prostitution sting in the area of Mobile Highway and West South Boulevard. During this detail ten subjects were arrested for crimes in relation to prostitution. One of the subjects arrested gave officers false information in reference to her identity. This female advised officers her name was Gwendolyn McQuirter when she was arrested and she made bond under the same name. Inadvertently, Ms. McQuirter's name and photograph were released to the local media. Given the afore-mentioned circumstances, the Montgomery Police Department is asking local media not the continue disseminating Ms. McQuirter's photograph to the public.

The person who identified herself as Ms. McQuirter was located on September 19, 2006 and charged with providing false information to a law enforcement officer. This person is Tiffany Riley, DOB: 02/27/72 of 846 Corbett Street, Montgomery, Alabama. Attached is a photograph of Ms. Riley.

Captain Huey Thornton is the point of contact for questions pertaining to this press release (241-2816).



### STATES SELF-INSURERS RISK RETENTION GROUP, INC.
### PUBLIC ENTITY EXCESS LIABILITY INSURANCE POLICY

<u>DECLARATIONS</u>

POLICY # <u>SEL 30084 08</u>
Replaces Policy # <u>SEL 30084 07</u>

---

THIS DECLARATIONS PAGE AND THE ATTACHED PUBLIC ENTITY EXCESS LIABILITY INSURANCE POLICY AND APPLICATION FOR INSURANCE COMPLETE THIS *OCCURRENCE* FORM POLICY.

---

THIS POLICY IS ISSUED BY YOUR RISK RETENTION GROUP. YOUR RISK RETENTION GROUP MAY NOT BE SUBJECT TO ALL OF THE INSURANCE LAWS AND REGULATIONS OF YOUR STATE. STATE INSURANCE INSOLVENCY GUARANTY FUNDS ARE NOT AVAILABLE FOR YOUR RISK RETENTION GROUP.

---

Item 1.  *Named Insured* and Principal Address:

City of Montgomery, Alabama
PO Box 1111
Montgomery, AL 36101

---

Item 2.  *Policy Period*:

..s Policy takes effect at 12:01 A.M., October 1, 2006 and expires at 12:01 A.M., October 1, 2007.

These effective and expiration times are based upon the local times at the principal address of the first named insured stated in Item 1. above.

---

Item 3.  Limits of Liability:

A.  $5,000,000 limit of liability for *damages* for any one *occurrence* covered under this Policy.

IN EXCESS OF a $250,000 *Self-Insured Retention* applicable to each *occurrence*, regardless of the number of *claims* for *damages* to which Coverage Part I, Coverage Part II, or both Coverage Part I and Coverage Part II apply.

B.  $9,000,000 maximum limit of liability for *damages* for all *occurrences* covered under this Policy, regardless of the number of *claims* for *damages* to which Coverage Part I, Coverage Part II, or both Coverage Part I and Coverage Part II apply.

---

Item 4.  Endorsements: 1, 2, 3, 4, 5, 6, 7, and 8

---

Item 5.  Premiums:      The Premium for this Policy shall be:

|  | EXCESS | END. # | TOTALS |
|---|---|---|---|
| Basic Policy Premium | $524,772. | $ | $524,772. |

---

OCPOLICY (4/96, 7/00, 7/04)

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

GWENDOLYN P. MCQUIRTER,          )
et al.,                          )
                                 )
            Plaintiffs,          )
                                 )
v.                               )    Civil Action No.:  2:07-cv-00234-MEF-WC
                                 )
CITY OF MONTGOMERY, et al.,      )
                                 )
            Defendants.          )

**DEFENDANTS' RESPONSE TO PLAINTIFFS' FIRST
SET OF INTERROGATORIES AND
REQUESTS FOR PRODUCTION OF DOCUMENTS**

COME NOW the Defendants, by and through undersigned counsel, and as response to

Plaintiff's First Interrogatories and Requests for Production of Documents state the following:

1.      With respect to the photograph released to the media, as referenced at ¶9 of

Plaintiffs' First Amended Complaint, please state the following:

      a)      the name and job title of the person(s) who obtained the photograph(s);

      b)      identify where the photograph(s) came from and how the photograph(s)
was obtained;

      c)      the purpose for which the photograph(s) was obtained;

      d)      the name and job title of the person(s) who released the photograph(s) to
the media; &

      e)      the name and job title of the person(s) who authorized the release of the
photograph(s) to the media.

**RESPONSE:**

      **a)      Cpl. K. C. Bentley – Investigator**

      **b)      The photograph was obtained through the Law Enforcement Tactical**

1

System (LETS).  The picture was taken from a Department of Public Safety photograph.

c)　　　The photograph was obtained and placed together with the charges for each individual to turn over to the Major for the morning meeting. One package with all pictures was also forwarded to the Public Information Officer for dissemination to the local media.

d)　　　Lt. R.E. Cook released the photograph to the media.  Lt. Cook was the Public Information Officer on duty at the time of the release of the photograph.

e)　　　Lt. R.E. Cook released the photographs in accordance to a standard practice regarding prostitution sting operations by the Montgomery Police Department.

2.  With respect to the prostitution sting conducted by the Special Operations Division of the Montgomery Police Department ("MPD") on or about September 15, 2006, as alleged at ¶6 of Plaintiffs' First Amended Complaint, were any persons arrested. If so, please state the following:

a)　　　the name, address and telephone number of each person arrested; &

b)　　　please produce the original or legible copy of each person's booking photograph.

**RESPONSE:**

a)　　　**Tawanda Hubbard**
**4132 Lone Oak Drive**
**Montgomery, AL**
**Telephone#  Unknown**

**Connie Sue Williams**
**Homeless**
**Telephone#  Unknown**

**Alisa Dawn Gantt**
**4220 River Oaks Road**
**Millbrook, AL**

2

Telephone#  Unknown

Joyce Darlene Herrero
Homeless
Telephone#  Unknown

Cynthia Ann Andersen
Address Unknown
Telephone#  Unknown

Syria Nelson
2047 Amos Street
Montgomery, AL
Telephone#  Unknown

Christy Shannon Lee
3680 Richard Road
Montgomery, AL
Telephone#  Unknown

Maria Lane Mcelya
2722 Spann Place
Montgomery, AL
Telephone#  Unknown

Ashley Shanda Cason
7342 Wimberly Lane
Montgomery, AL
Telephone#  Unknown

Tiffany Michelle Riley
546 Corbett Street
Montgomery, AL
Telephone#  Unknown

   b)      See attached.

3.  To your knowledge has Plaintiff Gwendolyn McQuirter ever been arrested in any
jurisdiction for offering sex for money or prostitution? If your answer is in the
affirmative, please provide any and all written documentation in your possession which
corroborates your response.

RESPONSE:  No.

3

4.  With respect to the release of Plaintiff Gwendolyn McQuirter's photograph to the media, as referenced at ¶9 of Plaintiffs' First Amended Complaint, please state the following:

    a)  the name and address of each media outlet who received the photograph;

    b)  the manner in which the photograph was disseminated to each of the identified media outlets; &

    c)  please produce the original or legible copy of all written materials and/or photographs released to the media.

**RESPONSE:**

    **a)** **Montgomery Advertiser – 200 Washington Avenue, Montgomery, Alabama 36104.**

    **Associated Press – 116 South McDonough Street, Montgomery, AL 36104.**

    **WSFA-TV-12 – 12 East Delano Avenue, Montgomery, AL 36105**

    **Alabama Public TV – 1255 Madison Avenue, Montgomery, AL 36107**

    **Tuskegee Times – 525 Agusta Avenue, Montgomery, AL 36111**

    **Kevin Elkins – 1440 WLWI-AM 1 Commerce Street, Montgomery, AL 36104**

    **WNCF-ABC-32-3251 Harrison Road Montgomery, AL 36109**

    **WLWI 92.3-1 Commerce Street, Montgomery, AL 36104**

    **WAKA-TV-8-3020 Eastern Boulevard, Montgomery, AL 36117**

    **b)** **Email**

    **c)** **See attached.**

5.  Did a policy or practice exist within the Montgomery Police Department in September 2006, as to when a photograph or other information could be obtained from a persons motor vehicle record information, as defined by The Driver Privacy Protection Act,

codified at 18 U.S.C. § 2721-2725? If so, please produce a copy of the written policy. If no writing exists, please state the substance of the policy or practice.

**RESPONSE: Officers are only allowed to retrieve photographs from LETS for official law enforcement usage.**

6. Does the City of Montgomery, Alabama acknowledge that Plaintiff Gwendolyn McQuirter has undergone emotional suffering and mental anguish as a result of the false allegation that she was engaged in prostitution? If your answer is in the negative, please state each and every basis for your belief that she has not undergone emotional suffering and mental anguish.

**RESPONSE: Negative. The City of Montgomery Police Department retracted the statement regarding Mrs. McQuirter immediately upon notification that Mrs. McQuirter was not present during the prostitution sting.**

7. Was Plaintiff Gwendolyn McQuirter's photograph intentionally released to the media or was the release of the photograph a result of neglect, carelessness or unskillfulness on the part of an employee(s) of the City of Montgomery?

**RESPONSE: No. At the time the photograph was released, the Montgomery Police Department had reason to believe that Mrs. McQuirter had been arrested in a prostitution sting.**

8. Please produce the original or legible copy of each and every insurance agreement, along with the declarations page, under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.

**RESPONSE: See attached.**

9. You state at ¶12 of your Answer of Defendant, City of Montgomery, that: ". . . employees of the Montgomery Police Department were contacted and the photograph of Gwendolyn McQuirter was retracted by MPD." With regard to this assertion, please state the following:

5

a)    the name and job title of the employees who were contacted;

b)    the name(s) of the person(s) who contacted "employees of the
      Montgomery   Police Department";

c)    the substance of the communications of each contact;

d)    the actions taken by the Montgomery Police Department to retract the
      photograph of Gwendolyn McQuirter; &

e)    please produce the original or legible copy of any and all written materials
      distributed to media outlets seeking to retract the allegation that Plaintiff
      Gwendolyn McQuirter had been arrested for offering sex for money.

RESPONSE:

a)    **Captain Huey Thornton – Public Information Officer**

b)    **A subject who stated he was Mrs. McQuirter's husband.**

c)    **The subject stated that he was Mrs. McQuirter's husband.  Charles
      McQuirter contacted Captain Huey Thornton and stated that he had
      gained knowledge of Mrs. McQuirter's photograph and name being
      aired in the local media in reference to a prostitution arrest.  The
      subject stated that Mrs. McQuirter was at home with him at the time
      the prostitution sting was conducted; therefore, she could not have
      been the person who was arrested during the sting operation.**

d)    **A press release was sent to local media requesting that Mrs.
      McQuirter's photograph and name not be aired again.**

e)    **See attached.**

Huey Thornton    # 493

SWORN to and SUBSCRIBED before me this the 15th day of May, 2007.

Notary Public

My commission expires  10 | 16 | 09

6

_(signature)_

_____
Kimberly O. Fehl (FEH001)
Attorney for Defendant

OF COUNSEL:
City of Montgomery
Legal Department
P.O. Box 1111
Montgomery, AL  36101-1111
(334) 241-2050
(334) 241-2310 - FAX

## CERTIFICATE OF SERVICE

I hereby certify that foregoing has been served upon the following by electronic filing or

by U. S. Mail, postage prepaid on this 25th day of May, 2007:

Jerry M. Blevins, Esq.
Law Office of Jerry M. Blevins
Hillwood Office Center
2800 Zelda Road, Suite 200-3
Montgomery, Alabama 36106

_(signature)_

_____
Of Counsel

# BOOKING PHOTOGRAPHS



















13

# COPY OF MATERIAL RELEASED TO THE MEDIA

**Montgomery Police Department**

**Thornton, Huey**

| | |
|---|---|
| **From:** | Cook, Ron |
| **Sent:** | Wednesday, September 20, 2006 3:06 PM |
| **To:** | Thornton, Huey |
| **Subject:** | FW: press release |
| **Attachments:** | CASE_FIL (3).pdf; image002.gif; image004.gif; oledata.mso |

**From:** Cook, Ron
**Sent:** Saturday, September 16, 2006 8:34 PM
**To:** 'Advertiser'; 'Allen, M'; 'AP #1'; 'AP #2'; 'Barnes, K'; 'Bonvillian, Crystal'; 'Bullock, Mark'; 'Chandler, Kim'; 'Channel 8'; 'Cheatham, Mary Ellen'; 'Dixon, Al'; 'Elkins, Kevin'; 'Gilmer, Cubie Rae'; 'Goettel, Bryan'; 'Grander, Amanda'; 'Henry, Bryan'; 'Hodges, Vince'; 'Holmes, Chris'; 'Hoyt, Becky'; 'Hyles, Marcus'; 'Kent, John'; 'Kitchen, S'; 'Konz, Toni'; 'Lowery, Bob'; 'Merlini, J'; 'Pippins, Erica'; 'Pitts, Sally'; 'Robinson, T'; 'Sanders, Christopher'; 'Scott, Randy'; 'Sellers, Rick'; 'Singleton, George'; 'Stovall, Darrian'; 'Thomas, Adam'; 'Vickers, Denise'; 'Wales, Bethany'; 'White, Dave'; 'Williams, Randy'; 'Wingard, Desmond'; 'WSFA #1'; 'WSFA #2'; 'WSFA #3'; 'WSFA #4'; 'WSFA #5'; 'WSFA #6'; 'WSFA TV'
**Subject:** press release

# Montgomery Police Department

 



## For Immediate Release
### September 16, 2006

On Friday September 15, 2006, the Special Operations Division conducted a prostitution sting in the area of Mobile highway and the West South Blvd. As a result of this operation, ten prostitutes were taken into custody. Attached is a photograph of each suspect.

Lieutenant Ron Cook is the point of contact for questions regarding this press

9/20/2006

release (241-2810).

9/20/2006



4



5











10







# COPY OF RETRACTION PRESS RELEASE

## Montgomery Police Department

  

## For Immediate Release
### September 20, 2006

On September 15, 2006, the Special Operations Division of the Montgomery Police Department conducted a prostitution sting in the area of Mobile Highway and West South Boulevard. During this detail ten subjects were arrested for crimes in relation to prostitution. One of the subjects arrested gave officers false information in reference to her identity. This female advised officers her name was Gwendolyn McQuirter when she was arrested and she made bond under the same name. Inadvertently, Ms. McQuirter's name and photograph were released to the local media. Given the afore-mentioned circumstances, the Montgomery Police Department is asking local media not the continue disseminating Ms. McQuirter's photograph to the public.

The person who identified herself as Ms. McQuirter was located on September 19, 2006 and charged with providing false information to a law enforcement officer. This person is Tiffany Riley, DOB: 02/27/72 of 846 Corbett Street, Montgomery, Alabama. Attached is a photograph of Ms. Riley.

Captain Huey Thornton is the point of contact for questions pertaining to this press release (241-2816).



## STATES SELF-INSURERS RISK RETENTION GROUP, INC.
## PUBLIC ENTITY EXCESS LIABILITY INSURANCE POLICY

### DECLARATIONS

POLICY # SEL 30084 08
Replaces Policy # SEL 30084 07

---

THIS DECLARATIONS PAGE AND THE ATTACHED PUBLIC ENTITY EXCESS LIABILITY INSURANCE POLICY AND APPLICATION FOR INSURANCE COMPLETE THIS *OCCURRENCE* FORM POLICY.

THIS POLICY IS ISSUED BY YOUR RISK RETENTION GROUP. YOUR RISK RETENTION GROUP MAY NOT BE SUBJECT TO ALL OF THE INSURANCE LAWS AND REGULATIONS OF YOUR STATE. STATE INSURANCE INSOLVENCY GUARANTY FUNDS ARE NOT AVAILABLE FOR YOUR RISK RETENTION GROUP.

---

Item 1. *Named Insured* and Principal Address:

City of Montgomery, Alabama
PO Box 1111
Montgomery, AL 36101

---

Item 2. *Policy Period*:

...s Policy takes effect at 12:01 A.M., October 1, 2006 and expires at 12:01 A.M., October 1, 2007.

These effective and expiration times are based upon the local times at the principal address of the first named insured stated in Item 1. above.

---

Item 3. Limits of Liability:

A. $5,000,000 limit of liability for *damages* for any one *occurrence* covered under this Policy.

   IN EXCESS OF a $250,000 *Self-Insured Retention* applicable to each *occurrence*, regardless of the number of *claims* for *damages* to which Coverage Part I, Coverage Part II, or both Coverage Part I and Coverage Part II apply.

B. $9,000,000 maximum limit of liability for *damages* for all *occurrences* covered under this Policy, regardless of the number of *claims* for *damages* to which Coverage Part I, Coverage Part II, or both Coverage Part I and Coverage Part II apply.

---

Item 4. Endorsements: 1, 2, 3, 4, 5, 6, 7, and 8

---

Item 5. Premiums:    The Premium for this Policy shall be:

|                      | EXCESS    | END. # | TOTALS    |
|----------------------|-----------|--------|-----------|
| Basic Policy Premium | $524,772. | $      | $524,772. |

---

OCPOLICY (4/96; 7/00; 7/04)

September 18, 2006

<< First | < Previous | Picture no. 1 of 10 | Next > |
Last >>

**Homepage**

**News**
>Alabama
>Archives
>Business
>Columnists
>Elections
>Faith & Values
>Forums
>Games and Comics
>Lifestyle
>Local
>National
>Obituaries
>Opinion
>Photo Galleries
>Teacher Resources
>Technology
>Weddings

**go! Entertainment**

**Sports**

**Classifieds**
>Cars
>Homes
>Jobs
>Place an ad

**Customer Service**
>Contact Us
>Subscribe

**Communities**

**Prostitution Sting Arrests**



Gwendolyn McQuirter

MPD

**CLICK HERE TO BUY PHOTOS**
Some photos may be available for reprint. Click the above link to purchase photos framed, unframed, on mugs, puzzles, tiles, greeting cards, mousepads or t-shirts. Some restrictions apply.

<< First | < Previous | Picture no. 1 of 10 | Next > |
Last >>



**C** Sunday
Sept. 17, 2006

**Ten arrested in prostitution sting**

Undercover officers arrested 10 women Friday for allegedly offering sex for money, according to the Montgomery Police Department.

The Special Operations Division of the Montgomery Police Department set up the prostitution sting in the area of Mobile Highway. The operation was a continuation of previous stings in that area.

View photos of the sting's suspects online at montgomeryadvertiser.com.

**COMING MONDAY**

**Related Links**
Ten arrested in prostitution sting

Advertisement



EASTDALE M

**Photo Galleries**

 Hank Williams Birthday Co

 Puppies go to school

 Prostitution Sting Arrests

 MDA Executive Lock Up

 Alabama vs LA-Monroe

 ASU vs. Arkansas Pine-Blu

 LSU @ Auburn