**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **GWENDOLYN P. MCQUIRTER**, and **CHARLES E. MCQUIRTER**, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| **CITY OF MONTGOMERY**, **K.C. BENTLEY**, and **RON COOK**, | ) ) ) |
| Defendants and Third-Party Plaintiffs, | ) ) |
| v. | ) Case No. **2:07-cv-234-MEF-WC** ) |
| **TIFFANY MICHELE RILEY**, and **ROOSEVELT PERKINS**, | ) ) ) |
| Third-Party Defendants. | ) ) |

**RESPONSE OF DEFENDANTS TO PLAINTIFF GWENDOLYN MCQUIRTER'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT AND**
**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants, City of Montgomery, K.C. Bentley and Ron Cook submit the following

Response to Plaintiff Gwendolyn McQuirter's Motion for Summary Judgment and Memorandum of

Law in Support of Defendants' Motion for Summary Judgment, stating unto the Court the following:

**I.**
**PROCEDURAL BACKGROUND**

This case was removed from the Circuit Court of Montgomery County, Alabama to the

United States District Court, Middle District, Northern Division on March 15, 2007. *(Doc. 1).* The

lawsuit arises from an incident that occurred on Friday, September 15, 2006, wherein the Special

Operations Division of the Montgomery Police Department conducted a prostitution sting in the area

of Mobile Highway and the West South Boulevard. *(DX 1, Bentley Depo.p. 31, lines 18-19; p. 34, lines 12-14).* One of the women arrested, Tiffany Riley, lied about her identification and gave the false name and date of birth of Plaintiff Gwendolyn McQuirter. *(DX 1, Bentley Depo. p. 60, lines 6 - 11 and (¶ 1, Plaintiff Gwendolyn McQuirter's Response to Defendants' First Set of Interrogatories and Request for Production of Documents).* As a result of the sting, the names and photos of the women were released to the media on September 16, 2006, including a photo of Gwendolyn McQuirter, although she was never taken into custody.

On September 19, 2006, Plaintiff Charles McQuirter contacted Lt. Ron Cook with the Montgomery Police Department in reference to his wife's photo being released. *(DX 2, Cook Depo. p. 55, lines 19 to p. 56, line 13 and DX 3, Thornton Affidavit).* On September 20, 2006, a retraction was sent by the Montgomery Police Department to the media. *(DX 3, Thornton Affidavit).*

Gwendolyn McQuirter and Charles McQuirter filed a Claim with the City Clerk on November 16, 2006. *(DX 4, Verified Claims of Gwendolyn McQuirter and Charles McQuirter).* Plaintiffs, Gwendolyn McQuirter and Charles McQuirter filed a Complaint against the City of Montgomery, multiple media Defendants and Fictitious Parties A-Z on February 8, 2007. *(Doc 1, Attachment 1, State Court Pleadings).* Before Defendant City of Montgomery answered the Complaint, Plaintiff filed an Amended Complaint which named as Defendants, City of Montgomery and fictitious parties A-Z, as employees and former employees of the City of Montgomery. *(Doc 1, Attachment 1, State Court Pleadings).*

The First Amended Complaint no longer named the numerous media Defendants. The Amended Complaint contained the following seven counts: Count I - Intentional Infliction of Emotional Distress; Count II - Libel Per Se; Count III - Slander Per Se; Count IV - Invasion of Privacy; Count V - Loss of Consortium; Count VI - Violation of the Driver Privacy Protection Act,

18 U.S.C. §§ 2721-2725 and Count VII - 42 U.S.C. § 1983.   Defendants removed the case to the United States District Court on March 15, 2007.

Plaintiffs filed a Motion for Default Judgment on March 27, 2007.  *(Doc. 2)*.  Defendants filed an Answer and Response to Plaintiffs' Motion for Default on Mach 28, 2007.  *(Docs. 3 & 4)*.  The Motion for Default was denied on March 28, 2007.  *(Doc. 5)*.

On July 3, 2007, Plaintiffs filed a Motion for Leave to File a Second Amended Complaint and Second Amended Complaint which added as Defendants, K.C. Bentley ("Bentley") and Ron Cook ("Cook").  *(Docs. 11 & 12)*.  The Motion to Amend was granted on July 10, 2007.  Defendants filed an Answer to the Second Amended Complaint on July 16, 2007. *(Doc. 14)*.

Additionally, on July 16, 2007, Defendants filed a Motion for Leave to File a Third Party Complaint *(Doc. 15)* which was granted on July 31, 2007.  *(Doc. 24)*.  The Third Party Complaint was filed on July 31, 2007, naming as third party defendants, Tiffany Riley ("Riley") and Roosevelt Perkins ("Perkins"). *( Doc. 25)*.  Riley and Perkins were served with the complaint however neither has filed an Answer.

The case is set for trial on March 3, 2008.

## II.

### NARRATIVE STATEMENT OF FACTS

On Friday, September 15, 2006, the Special Operations Division of the Montgomery Police Department conducted a prostitution sting in the area of Mobile Highway and the West South Boulevard.  *(DX 1, Bentley Depo.p. 31, lines 18-19;  p. 34, lines 12-14)*.  Bentley was on the detail and assigned to the processing team.  *(DX 1, Bentley Depo. p. 31, lines 18-19)*.   The male undercover officers pick up the women and then take them to a designated processing location.  *(DX*

*1, Bentley Depo. p. 34, lines 9-14; p. 36. lines 16-22).* The processing location on September 15 was at Community Policing on Fairwest. *(DX 1, Bentley Depo. p.34, line 17, 18).* At the processing location, an incident/offense report was completed, warrant checks were conducted and affidavit prepared for the officer to sign for charging the women. *(DX 1, Bentley Depo. p. 36, line 23 to p. 37, line 5).* The women were then searched and their personal belongings impounded and then transported. *(DX 1, Bentley Depo. p. 37, lines 13-16).*

Normally, the women were taken to the Special Operations Division on Highland Avenue for a photograph before they were taken to the city jail. *(DX 1, Bentley Depo. p. 37, line 17 to p. 39, line 17).* However, the camera system at Special Operations had not been working. *(DX 1, Bentley Depo. p. 38, lines 7-8).* Therefore, Bentley is not sure whether the person that transported the women that night knew the camera system was not working and took them straight to jail or took them to Special Operations before finding out that the camera system was not working. *(DX 1, Bentley Depo. p. 38, line 7-13; p. 39, line 23 to p. 40, line 5).*

After Bentley finished processing at Fairwest, she returned to her division on Highland Avenue to complete paperwork for the daily activity report that had to be provided to her captain and major. *(DX 1, Bentley Depo. p. 42, lines 5 - 22).* Part of the paperwork required for Bentley to provide was a mug shot of the person arrested with the name, date of arrest, location of arrest, the specific charge and person's criminal history from NCIC. *(DX 1, Bentley Depo. p. 42, line 23 to p. 43, line 14).* This information is required to be provided to the major and captain for any arrest every day. *(DX 1, Bentley Depo. p. 49, line 21 to p.50, line 19)*

Typically, the mug shot would be from the booking photograph made when the person was booked into jail. *(DX 1, Bentley Depo. p. 43, line 23 to p. 45, line 21).* Booking photographs and other photographs of persons arrested are stored on a computer network for the City called the AS-

4

400. *(DX 1, Bentley Depo. p. 46, line 4 to p. 46, line 21).* While at Highland Avenue, Bentley continued to try to pull booking photographs from the jail on the AS-400. *(DX 1, Bentley Depo. p. 44, line 1 to p. 49, line 1).* However, it appeared that the camera system was still not working properly so the jail was not able to take the booking photographs of the women when they were booked into jail. *(DX 1, Bentley Depo. p. 44, line 1 to p. 49, line 1).*

Bentley usually asks for identification when processing an individual but typically they do not have one. *(DX 1, Bentley Depo. p. 54, lines 1-5).* The only reason that she might not ask someone for identification is if the individual has been searched. *(DX 1, Bentley Depo. p. 55, lines 11 - 22).* Bentley does not recall if Riley had been searched prior to Bentley interviewing her. *(DX 1, Bentley Depo. p. 56, line 23 to p. 57, line 15).*

Bentley was sitting in front of the computer with Riley sitting beside her. *(DX 1, Bentley Depo. p. 60, lines 4 - 6).* Bentley was pulling information from the AS-400 while talking to Riley. *(DX 1, Bentley Depo. p. 61, lines 13 - 18).* As well as photographs, the AS-400 has data stored from documented occurrences between individuals and the Montgomery Police Department . *(DX 1, Bentley Depo. p. 61, line 21 to p. 63, line 2 ).* Bentley asked Riley her name and she responded Gwendolyn McQuirter and informed Bentley how to correctly spell McQuirter. *(DX 1, Bentley Depo. p. 60, lines 6 - 10).* Bentley asked Riley for her date of birth and social security number. *(DX 1, Bentley Depo. p. 60, lines 11 - 14).* Riley responded with McQuirter's correct date of birth, but Bentley thought that Riley said that she could not recall her social security number. *(DX 1, Bentley Depo. p. 60, line 11 – p. 61, line 6).* Bentley asked for the address and Riley gave McQuirter's correct address. *(DX 1, Bentley Depo. p. 61, lines 6 - 10).* Riley responded without hesitation or pauses or anything that would indicate that she was being untruthful. *(DX 1, Bentley Depo. p. 61, lines 8 – 12; p. 97, lines 7 - 17).*

Typically, the mug shot would be from the booking photograph made when the person was booked into jail. *(DX 1, Bentley Depo.  p. 43, line 23 to p. 45, line 21).* Bentley could not use the booking photos from that night to complete her paperwork because the camera system was not working. *(DX 1, Bentley Depo.  p. 44, line 1 -21;  p. 98, line 22 to p. 99, line 9 and Doc. 14, ¶ 9 ).* All of the women that were arrested that day except for Tiffany Riley (that falsely identified herself as Gwendolyn McQuirter) had been arrested before. *(DX 1, Bentley Depo.  p. 52, lines 11 - 16).* Therefore, Bentley used booking photos from their previous arrests. *(DX 1, Bentley Depo.  p. 99, lines 2 – 15;  p. 105, lines 19-22 and Doc. 14, ¶ 9).*  Bentley had to use the Law Enforcement Tactical System ("LETS") at MPD to get the photo of Gwendolyn McQuirter. *(DX 1, Bentley Depo.  p. 88, lines 19 – 23;  p.  98, line 22 to p. 99, line 15; p. 103, lines 5 – 11; p. 105, lines 16- 22).* Bentley assumes that LETS contains information from the Department of Public Safety. *(DX 1, Bentley Depo.  p. 88, line 7 - 18).*

Bentley never concluded at the time that she pulled the photo of Gwendolyn McQuirter that Tiffany Riley and Gwendolyn McQuirter were not the same people. *(DX 1, Bentley Depo.  p. 89, lines 8 to p. 90, line 15;  p. 92, line 8  to p. 93, line 5; p. 96, line 22 to p. 97, line 17; p. 98, lines 14 - 21 ).* Prior to September 2006, Bentley did not know Tiffany Riley or Gwendolyn McQuirter. *(DX 1, Bentley Depo. p. 53, lines 4 – 22;  p. 70, lines 5- ).*

Ron Cook is a Lieutenant in the detective division and Bureau Commander for Property. *(DX 2, Cook Depo.  p. 10, lines 14 - 21).* As an additional duty, Cook does on-call public information officer ("PIO") responsibilities. *(DX 2, Cook Depo.  p. 13, line 12 - 17).*  Cook and three other officers rotate on-call weekends to assist the primary public information officer, Captain Huey Thornton. *(DX 2, Cook Depo.  p. 13, line 18 to p. 14, line 23).*

Cook is normally contacted by either the detective division supervisor, patrol supervisor of

the weekend deputy chief for information dissemination from MPD through a press release. *(DX 2, Cook Depo. p. 19, lines 20 to p. 20, line 1).* Typical situations in which Cook is normally contacted to disseminate information to the media are situations that may involve a serious incident or if one of the divisions have a detail. *(DX 2, Cook Depo. p. 19, lines 12-20; p. 20, line 19 to p. 21, line 19 ).* The PIO's release information contained on the blotter, also known as the incident/offense reports, are available to the public and kept in the front lobby on the first floor of the Public Affairs Building. *(DX 2, Cook Depo.  p. 16, line 21 to p. 19, line 6).*

Cook was the PIO on duty the weekend of the prostitution sting. *(DX 2, Cook Depo. p. 40, line 21).* Cook was contacted by Bentley's supervisor and advised that the arrest photos from the sting were available to be disseminated. *(DX 2, Cook Depo. p. 40, line 21 to p. 41, line 2; p. 42 lines 8 - 20).* Cook put himself on duty status and went to special ops building to get the photos and then went to headquarters to do a written press release and send the photos to the media. *(DX 2, Cook Depo. p. 43, lines 3 – 5; p. 43, line 23 to p. 45, line 20; p. 46, lines 7 – 14; p. 47, lines 8 - 17 ).* The photos and press release were sent to the media on September 16, 2006. *(DX 2, Cook Depo. p. 57, lines 8-11).*

Cook did not pay attention to the fact that one of the photos was different than the others because it is not unusual for the photos to be different. *(DX 2, Cook Depo. p. 54, lines 3 - 14).* Photographs are retrieved from any kind of system that is used for a law enforcement investigative tool. *(DX 2, Cook Depo. p. 54, line 15 to p. 55, line 11).*

LETS is a network system provided by Alabama Criminal Justice Information Center (ACJIC) to the Montgomery Police Department and has data from the records of several different agencies. *(DX 5, Drinkard Affidavit).* LETS is used by Bentley and Cook as a law enforcement investigative tool or any other law enforcement purposes. *(DX 1, Bentley Depo.  p. 88, lines 7 – 23;*

*p. 103, lines 5 – 11; p. 105, line 16 to p. 108, line 15; p. 109, line 23 to p. 110, line 17; p. 112, line 14 to p. 113, line 7; p. 115 to p. 116, line 11 and DX 2, Cook Depo. pp. 61 - 65).*

On September 19, 2006, Plaintiff Charles McQuirter contacted the Montgomery Police Department in reference to his wife, Gwendolyn McQuirter's, photo being released. *(DX 2, Cook Depo. p. 55, lines 19 to p. 56, line 13 and DX 3, Thornton Affidavit).*    Mr. McQuirter stated that there was no way possible that his wife could have been out there because she was with him. *(DX 2, Cook Depo. p. 56, lines 8 - 22 and DX 3, Thornton Affidavit).* Captain Thornton contacted Cook and asked Cook to mail him the specific press release from September 16. *(DX 2, Cook Depo. p. 57, lines 8 – 22 and DX 3, Thornton Affidavit).*  Cook emailed the release to Capt. Thornton. *(DX 2, Cook Depo. p. 58, lines 12 – 14).*

Mr. McQuirter was advised that the Montgomery Advertiser was the only news agency that MPD knew had his wife's picture on their website and that Capt. Thornton had contacted them on September 19, 2006 to have the information removed. *(DX 3, Thornton Affidavit).*   Mr. McQuirter was also advised that MPD would send a press release with the proper information and photo to all media. *(DX 3, Thornton Affidavit).*  The press release with the retraction and proper information was sent to the media on September 20, 2006. *(DX 3, Thornton Affidavit).*

Bentley was informed when she returned to work on the following Tuesday that Mr. McQuirter had called MPD and it was not Gwendolyn McQuirter that was arrested and that the true identity of the person arrested needed to be determined. *(DX 1, Bentley Depo. p. 71, line 15 to p. 71, line 21).*   Someone contacted the city jail and found out a guy named Roosevelt Perkins bonded out the person booked under the name of Gwendolyn McQuirter. *(DX 1, Bentley Depo. p. 72, lines 3 – 10).*    Bentley and others on duty went to Perkins residence first and talked to his wife and she said he was at work. *(DX 1, Bentley Depo. p. 72, lines 11 – 16).*  Other officers went to Carquest to try to

8

locate him at work and he was not there. *(DX 1, Bentley Depo. p. 72, lines 20 – 22).* There were still narcotics officers at Perkins residence with his wife. *(DX 1, Bentley Depo. p. 73, lines 21 – 23).*

Perkins provided the information on the identification and address of Tiffany Riley. *(DX 1, Bentley Depo. p. 74, lines 3 – 12).* Riley did not answer the door. *(DX 1, Bentley Depo. p. 74, lines 16 – 18).* Perkins was then asked to go over to the residence and get Riley to get the truck with him under the pretenses of going somewhere and once they pulled away, MPD would stop them and arrest her. *(DX 1, Bentley Depo. p. 74, line 23 to p. 75, line 7).* Riley was arrested and Bentley took a statement from her. *(DX 1, Bentley Depo. p. 75, lines 8 – 17).* Riley indicated to Bentley that she lied because she knew that she had two capias warrants against her. *(DX 1, Bentley Depo. p. 75, line 19 to p. 76, line 8).* Riley also told Bentley that McQuirter was like a sister to her and she had lived with her off and on and that is how she was able to give McQuirter's information. *(DX 1, Bentley Depo. p. 76, lines 9 – 14).*

On September 20, 2006, Riley pled guilty to prostitution. *(DX 6, Murphy Affidavit).* Riley was charged and pled guilty on September 20, 2006 to giving a false name to a law enforcement officer. *(DX 6, Murphy Affidavit).*

Riley has also talked to Gwendolyn McQuirter since September 2006 and apologized to her for using her name when she was arrested for prostitution. *(¶ 1, Plaintiff Gwendolyn McQuirter's Response to Defendants' First Set of Interrogatories and Request for Production of Documents).*

### III.
### SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

9

party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of genuine issue of material fact.'" *Id.* at 323. The movant can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing, or pointing out to, the district court that the non-moving party has failed to present evidence in support of some element of the case on which it bears the ultimate burden of proof. *Id.* at 322-324.

Once the non-moving party has met its burden, Rule 56(e) "requires the non-moving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file 'designate' specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the non-moving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

After the non-moving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), FRCP. Similarly, the moving party is entitled to summary judgment if the non-moving party has failed to prove the elements of her case or there is the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. *Fitzpatrick v. City of Atlanta,* 2 F. 3d 1112, 1115-16 (11th Cir. 1993).

Additionally, conclusory allegations cannot interpose genuine issues of material fact into the litigation so as to preclude entry of summary judgment. *Fed.Rules Civ.Proc.* Rule 56 (c).

**IV.**
**ARGUMENT**

I.    **THE DRIVERS PRIVACY PROTECTION ACT OF 1994 ("DPPA") AND 42 U.S.C. §1983**

A.  *CORPORAL K. C. BENTLEY AND LIEUTENANT RON COOK DID NOT VIOLATE DPPA*

Corporal K. C. Bentley and Lieutenant Ron Cook are named as defendants employed with the Montgomery Police Department and acting within the line and scope of her/his employment. *(Doc. 11, ¶¶ 4 & 5).*  At all times relevant to the claims against defendants, Bentley and Cook were acting in the line and scope of their duties as police officers with the City of Montgomery.

Congress passed the Driver's Privacy Protection Act of 1994 (18 *U.S.C.A.* §§ 2721-2725) to limit the release of a motorist's personal information from state motor vehicle records.  *Kehoe v. Fidelity Federal Bank & Trust,* 421 F.3d 1209, 1210 (11th Cir.2005).   There are, however, specific exceptions set out in the Act.  Use by law enforcement is one of the permissible uses found in § 2721(b)(1) which states, "For use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions."

Although the Act broadly defines "carrying out its functions" to allow law enforcement agencies to access and use motor vehicle record information, it does not specify exactly what activities by law enforcement are "carrying out its functions".

11

In *Parus v. Kroeplin,* 402 F. Supp. 2d 999 (W.D. Wis. 2006), a case of first impression, the Court in the Western District of Wisconsin addressed a similar query. The plaintiff in *Parus* sued the town dispatcher for allegedly violating DPPA by relaying plaintiff's motor vehicle record information for a non-law enforcement purpose to a Department of Natural Resources warden who had requested the information. *Id.* at 1005. The Court reviewed Congressional hearing transcripts to try to determine the breadth of access under the Act that Congress intended to give law enforcement. The Court stated:

> "The legislation was introduced in response to growing concern over crimes committed by individuals who used Department of Motor Vehicle records to identify and locate their victims. Deborah F. Buchman, Annotation, *Validity, Construction, and Application of Federal Driver's Privacy Protection Act, 18 U.S.C.A. §§ 2721 to 2725,* 183 A.L.R. Fed. 37 at § 2 (2005). The most notable of these crimes was the murder of actress Rebecca Schaeffer, who was killed when a stalker obtained her address from the California Department of Motor Vehicles. *See, e.g., Margan v. Niles,* 250 F.Supp.2d 63, 68-69 (N.D.N.Y.2003); 139 Cong. Rec. S15766 (Nov. 16, 1993) (remarks of Sen. Harkin); 140 Cong. Rec. H2527 (Apr. 20, 1994) (statement of Rep. Goss).

> Although the Act was intended to "prevent stalkers, harassers, would-be criminals and other unauthorized individuals from obtaining and using personal information from motor vehicle records," it was not intended to impede the ability of law enforcement officers to carry out their duties. *Margan,* 250 F.Supp.2d at 68 (citing 140 Cong. Rec. H2527 (Apr. 20, 1994) (statement of Rep. Goss) ("[T]he intent of this bill is simple and straightforward: We want to stop stalkers from obtaining the name and address of their prey before another tragedy occurs ... [T]he Driver's Privacy Protection Act ... is a reasonable and practical crime fighting measure.")). Congressional hearing transcripts indicate that lawmakers discussed the breadth of access law enforcement officers should be given under the Act. Senator Harkin, who supported the bill, made the following statement:

> Mr. President, I want to clarify my understanding of the provisions of the Driver's Privacy Protection Act concerning law enforcement

> access to driver's personal information. Under section 2720(b)(2)[1], law enforcement agencies have unrestricted access to this information in carrying out its [sic] functions.
>
> 139 Cong. Rec. S15962 (Nov. 17, 1993) (remarks of Sen. Harkin). Senator Harkin went on to suggest that, "with respect to law enforcement agencies, [section 2721(b)(1) ] **should be interpreted so as not to in any way restrict or hinder law enforcement and crime prevention strategies," even when those strategies might include releasing personal information to the general public.** *Id.* (Emphasis added.)

Bentley used the LETS system, which is one of the data bases provided to law enforcement, to get the photo of Gwendolyn McQuirter. *(DX 1, Bentley Depo.  p. 88, lines 19 – 23;  p.  98, line 22 to p. 99, line 15; p. 103, lines 5 – 11; p. 105, lines 16- 22).*  LETS contains data from several different agencies and not just from the Department of Public Safety.  *(DX 5, Drinkard Affidavit).*  Bentley is an authorized user on LETS.  *(DX 5, Drinkard Affidavit).*  Bentley did not feel that there was a need to leave and drive down to police headquarters with a digital camera and take a photo of Riley because it was easier to pull it off the LETS system.  *(DX 1, Bentley Depo. p. 114, line 6 to p. 115, line 18).*

Bentley did not violate DPPA.  Plaintiffs have submitted nothing to support that Bentley retrieved the photo maliciously or even with the specific purpose of publishing it to the media. Bentley retrieved the photo as part of the process to complete a routine job assignment. *(DX 1, Bentley Depo. p. 49, line 21 to p.50, line 19).*    Bentley was required to retrieve several forms of information to complete paperwork for the daily activity report that had to be provided to her captain and major.  *(DX 1, Bentley Depo. p. 42, lines 5 - 22 ).*  Part of the paperwork required was a photo of

---

[1] This provision was renumbered in the final version of the Driver's Privacy Protection Act as <u>section 2721(b)(1)</u>.

the person arrested with the name, date of arrest, location of arrest, the specific charge and person's criminal history from NCIC. *(DX 1, Bentley Depo. p. 42, line 23 to p. 43, line 14).* This information is required to be provided to the major and captain for any arrest every day. *(DX 1, Bentley Depo. p. 49, line 21 to p.50, line 19).* Therefore Bentley was involved in the "carrying out" of "law enforcement functions" as permitted in § 2721(b)(1) of the DPPA.

Cook, likewise, did not violate the DPPA. Cook was the PIO on duty the weekend of the prostitution sting. *(DX 2, Cook Depo. p. 40, line 21).* Cook was contacted by Bentley's supervisor and advised that the arrest photos from the sting were available to be disseminated. *(DX 2, Cook Depo. p. 40, line 21 to p. 41, line 2; p. 42 lines 8 - 20).* This detail was a typical situation for Cook, as PIO on duty, to be contacted to disseminate information to the media. *(DX 2, Cook Depo. p. 19, lines 12-20; p. 20, line 19 to p. 21, line 19 ).* Cook put himself on duty status and went to special ops building to get the photos that had already been collected and then went to headquarters to do a written press release and send the photos to the media. *(DX 2, Cook Depo. p. 43, lines 3 – 5; p. 43, line 23 to p. 45, line 20; p. 46, lines 7 – 14; p. 47, lines 8 - 17 ).* It was not unusual for the photographs of all those arrested to be different because the photos are usually retrieved off any kind of system that is used for a law enforcement investigative tool. *(DX 2, Cook Depo. p. 54, line 15 to p. 55, line 11).*

The fact that Bentley did not go down to headquarters and take a photo of Riley with a digital camera or wait until the camera system was working but rather chose to retrieve the photo from LETS of was an exercise in judgment acting within her discretionary authority. Plaintiff makes only conclusory allegations that no law enforcement function was served in obtaining and releasing the photograph. Bentley was required to retrieve photos as part of her paperwork on every arrest every

14

day. Cook's actions of submitting selected public information and photographs to the media regarding incidents of public interest of a law enforcement special detail or to expose a public safety issue is a legitimate law enforcement function and crime prevention strategy and a routine duty for the public information officer.  The actions of  both Bentley and Cook are permitted under section 2721(b)(1), "...so as not to in any way restrict or hinder law enforcement and crime prevention strategies," even when those strategies might include releasing personal information to the general public."  *Id.* Conclusory allegations cannot interpose genuine issues of material fact into the litigation so as to preclude entry of summary judgment. *Fed.Rules Civ.Proc.* Rule 56 (c).

Plaintiff Gwendolyn McQuirter's Motion for Partial Summary Judgment is due to be denied and Defendants Motion for Summary Judgment is due to be granted.

### B.    BENTLEY AND COOK ARE ENTITLED TO QUALIFIED IMMUNITY.

 The defense of qualified immunity is an affirmative defense that shields governmental officials performing discretionary functions from civil liability if their conduct violates no clearly established statutory or constitutional right of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 817-19 (1982); *Spivey v. Elliott*, 29 F. 3d 1522, 1524 (11th Cir. 1994).    As previously stated, the conduct of Bentley and Cook have not violated any clearly established statutory right under DPPA.

To be entitled to qualified immunity, a defendant must prove that he was "acting within the scope of his discretionary authority" when the allegedly wrongful acts occurred. *Gray ex rel. Alexander v. Bostic,* 458 F.3d 1295, 1303 (11th Cir. 2006). In assessing whether a defendant's challenged actions are within the scope of his discretionary authority, courts examine "whether the government employee was (a) pursuing a legitimate job-related function (that is, pursuing a job-

related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1265 (11th Cir. 2004).

The discretionary authority criterion is clearly satisfied here. Both Bentley and Cook were performing job related functions. She did not retrieve the photo specifically to be released to the media. Bentley was required to retrieve several forms of information to complete paperwork for the daily activity report that had to be provided to her captain and major. *(DX 1, Bentley Depo. p. 42, lines 5 - 22 ).* Part of the paperwork required was a photo of the person arrested with the name, date of arrest, location of arrest, the specific charge and person's criminal history from NCIC. *(DX 1, Bentley Depo. p. 42, line 23 to p. 43, line 14).* She did not retrieve the photo specifically to be released to the media. This information is required to be provided to the major and captain for any arrest every day. *(DX 1, Bentley Depo. p. 49, line 21 to p.50, line 19).* Cook was contacted by Bentley's supervisor and advised that the arrest photos from the sting were available to be disseminated. *(DX 2, Cook Depo. p. 40, line 21 to p. 41, line 2; p. 42 lines 8 - 20).* This detail was a typical situation for Cook, as PIO on duty, to be contacted to disseminate information to the media. *(DX 2, Cook Depo. p. 19, lines 12-20; p. 20, line 19 to p. 21, line 19 ).* Cook, in his capacity as the PIO on duty, prepared and sent the press release to the media. *(DX 2, Cook Depo. p. 43, lines 3 – 5; p. 43, line 23 to p. 45, line 20; p. 46, lines 7 – 14; p. 47, lines 8 - 17 ).* Such routine law enforcement functions are clearly discretionary functions for qualified immunity purposes.

"Once the official has established that he was engaged in a discretionary function, the plaintiff bears the burden of demonstrating that the official is not entitled to qualified immunity." *Crosby v. Monroe County,* 394 F.3d at 1328, 1332 (11th Cir. 2004). The plaintiff then must demonstrate that a reasonable jury could find from record evidence that the defendant "violated a

clearly established constitutional right" of which a "reasonable government official would have been aware." *Chesser v. Sparks,* 248 F.3d 1117, 1122 (11th Cir. 2001). This inquiry is two-pronged, as a court must first ask whether, viewing the evidence in the light most favorable to the plaintiff, the official's conduct violated a constitutional right. *See Harris v. Coweta County, Ga.,* 433 F.3d 807, 811 (11th Cir. 2005). Or as in the allegations of this case, if there has been a violation of a federal statute.  If not, as is in this case, the analysis ends and Defendants are entitled to qualified immunity.

In determining whether a right is clearly established, the "relevant, dispositive inquiry ... is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Bashir v. Rockdale County, Ga.,* 445 F .3d 1323, 1330 (11th Cir. 2006).  In that regard, "[a] constitutional right is clearly established if controlling precedent has recognized the right in a concrete and factually defined context." *Chesser,* 248 F.3d at 1122. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Bashir,* 445 F.3d at 1330.

As previously stated, Bentley and Cook were performing daily discretionary functions.  The fact that Bentley retrieved a photo from LETS rather than wait on a booking photo and that Cook sent the photo to the media does not disqualify them from entitlement to qualified immunity.  Considering the undisputed facts and applicable law, it is clear that if Defendants did violate DPPA, they are entitled to qualified immunity.

### C.     *42 U.S.C.A. §1983 MUNICIPAL LIABILITY*

For liability pursuant to 42 U.S.C. § 1983 to attach to a municipality, it must be shown that the municipal official or employee caused the deprivation of one's statutory or constitutional rights by acting pursuant to official governmental policy.  McQuirter has alleged a § 1983 claim for

violation of the Driver Privacy Protection Act ("DPPA"), codified at 18 U.S.C. §2721 - 2725. However, there is nothing to support such a claim that Defendant officers violated said statute. Bentley and Cook were acting in the line and scope of their duties as police officers carrying out law enforcement functions.

A governing entity cannot be held liable in an action brought pursuant to 42 U.S.C.A. § 1983 under a theory of respondeat superior. *Monell v. Department of Social Services of New York City,* 436 U.S. 658, 694 (1978).

In *Monell*, the Supreme Court held that municipalities cannot be liable under §1983 on the theory of respondeat superior, but rather, can be liable under that statute only if they maintain unconstitutional or illegal policies or customs; absent unconstitutional or illegal policies or customs, municipalities and their officials may not be sued for the acts of their employees. Moreover, a plaintiff must show that an official policy was the reason behind the alleged constitutional deprivation. *Farred v. Hicks,* 915 F. 2d 1530 (11th Cir. 1990).

In the present case, McQuirter cannot succeed on claims that would make the City of Montgomery liable under 42 U.S.C. § 1983. Indeed, Bentley and Cook were compliant with DPPA.

## II.    STATE LAW CLAIMS

### A. DEFENDANTS ARE ENTITLED TO STATE AGENT IMMUNITY IN PERFORMANCE OF DISCRETIONARY FUNCTION

Corporal K. C. Bentley and Lieutenant Ron Cook are named as defendants employed with the Montgomery Police Department and acting within the line and scope of her/his employment. *(Doc. 11, ¶¶ 4 & 5).* As set out above, Bentley and Cook were exercising judgment in performing discretionary functions as police officers with the City of Montgomery and as such are entitled to

state agent immunity as to Plaintiffs' state law claims.  Section 6-5-338, *Code of Alabama*, 1975

statutorily provides law enforcement officers with immunity from state law tort claims arising out of

acts committed while the law enforcement officers engage in the performance of discretionary

functions.  The performance of the discretionary functions must be within the scope of the officer's

law enforcement duties.  Section 6-5-338(a) states as follows:

> [E]very peace officer, except constables, who is employed or
> appointed pursuant to the Constitution or statutes of this state,
> whether appointed or employed as such peace officer by the state or a
> county or a municipality thereof, or by an agency or institution,
> corporate or otherwise, created pursuant to the Constitution or laws
> of this state and authorized by the Constitution or laws to appoint or
> employ police officers or other peace officers, and whose duties are
> prescribed by the law, or by the lawful terms of their employment or
> appointment include the enforcement of, or the investigation or
> reporting of violations of, the criminal laws of this state, and who is
> empowered by the laws of this state to execute warrants, to arrest and
> to take into custody persons who violate, or who are lawfully charged
> by warrant, indictment or other lawful process with violations of, the
> criminal laws of this state shall at all times be deemed to be officers
> of this state, and as **such shall have immunity from tort liability**
> arising out of his or her conduct in the performance of any
> discretionary function within the line and scope of his or her
> enforcement duties. (Emphasis supplied).

Since *Ex parte Cranman,* 792 So.2d 392 (Ala.2000), the Alabama Supreme Court examines

peace officer immunity pursuant to § 6-5-338 as state-agent immunity rather than the classification

of ministerial versus discretionary functions.  *See Swan v. Hueytown,* 920 So.2d 1075 (Ala. 2005). In

*Cranman,* the Court held:

> "A State agent shall be immune from civil liability in his or her personal capacity
> when the conduct made the basis of the claim against the agent is based upon the
> agent's
>
> (1)  formulating plans, policies, or designs; or
>
> (2)  exercising his or her judgment in the administration of a department or agency

19

of government, including, but not limited to, examples such as:

    (a)   making administrative adjudications;
    (b)   allocating resources;
    (c)   negotiating contracts;
    (d)   hiring, firing, transferring, assigning, or supervising personnel;
           or

(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or

(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or

(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students."

In *Swan v. City of Hueytown*, 920 So.2d 1075 (Ala. 2005), a police officer for the City of Hueytown stopped a vehicle in which the plaintiff, Michael Swan, was a passenger. During the stop, the officer radioed a police dispatcher and asked the dispatcher to check the National Crime Information Center ("NCIC") database to determine whether the driver or Swan had any outstanding warrants. The dispatcher informed the officer that the City of Birmingham had a possible outstanding warrant on Swan. After the existence of the warrant was confirmed by the City of Birmingham, the officer arrested Swan. The evidence later indicated that the outstanding warrants were for a "Michael Swann" rather than the plaintiff, "Michael Swan."

Swan sued the City of Hueytown claiming that he had suffered harm as a result of the officer's failure to determine his true identity. The City of Hueytown argued that it was entitled to immunity under § 6-5-338. In affirming the summary judgment for the City of Hueytown, the Alabama Supreme Court held that under both § 6-5-338 and the standard set out in *Cranman,* the

officer was engaged in a "discretionary function" requiring an "exercise in judgment" when he arrested Swan and, therefore, was entitled to immunity.

It cannot be disputed that Bentley and Cook were "engaged in the performance of discretionary functions at the time the alleged torts occurred". Their acts are in the exercise of judgment and involved choosing what was just and proper under the circumstances. *See Ex parte City of Gadsden*, 781 So. 2d 936, 938 (Ala. 2000).

*Cranman* also expresses an exception and states that a state agent shall not be immune from civil liability in his or her personal capacity:

(1) when the Constitution or laws of the untied States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or

(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

*Cranman*, 792, So. 2d 405.

Plaintiffs have not produced any evidence that would show, or even allow an inference that Defendants in any way willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law. Prior to September 2006, Bentley did not know Tiffany Riley or Gwendolyn McQuirter. *(DX 1, Bentley Depo. p. 53, lines 4 – 22; p. 70, lines 5 ).* Because Bentley chose to use other resources available to MPD, rather than waiting on the camera system to be repaired and booking photos to be made at the jail, does not mean that she violated any law or policy. The photo of McQuirter was not the only photo released. Bentley and Cook treated the arrests the same with the exception of having to obtain a photo on McQuirter (Riley). It is not uncommon to use LETS to retrieve photographs if the system is inoperable or a photo is not on file.

DPPA permits the release of records to law enforcement for carrying out law enforcement functions.

According to *Alabama Pattern Jury Instruction*, 29.01 "willfulness" is the "conscious doing of some act or omission of some duty under knowledge of existing conditions accompanied with a design or purpose to inflict injury." The charge distinguishes between "wanton conduct" and "wanton injury" because purpose and intent or design to injure is not necessary for wantonness. Additionally, the charge states:

> But in 'willful conduct' and 'willful injury' a purpose or intent or design to injure is an ingredient; where a person with knowledge of the danger or peril to another consciously pursues a course of conduct with design, intent, and purpose of inflicting injury then he is guilty of willfulness.

*Id.*

There is no evidence of such intent by Defendants in the present case.

Nor are Defendants guilty of malice toward Plaintiff. *Black's Law Dictionary*, 862 (5th ed. 1979), defines malice as the "intentional doing of a wrongful act without just cause or excuse, with intent to inflict injury under circumstances that the law will imply an evil intent.... A condition of mind which prompts a person to do a wrongful act willfully, that is, on purpose to the injury of another, or to do intentionally a wrongful act toward another without justification or excuse." Elsewhere § 6-11-20, *Code of Alabama*, 1975, defines malice "as the intentional doing of a wrongful act without just cause or excuse either with an intent to injure the person or property of another person. . . or under such circumstances that the law will imply an evil intent." Again, there is not evidence of such intent by Defendants in the present case.

Section 6-5-338(b), *Code of Alabama*, 1975 provides "immunity not only to peace officers but governmental units and agencies authorized to appoint peace officers." The statute is explicit that liability will not attach unless a police officer acts willfully or maliciously. As there is no

22

evidence of such intent or actions by Defendants Bentley or Cook in the present case, they are entitled to immunity. Additionally, a municipality cannot be deemed to act with malice. *Neighbors v. City of Birmingham,* 384 So.2d 113 (Ala. 1980). Accordingly, the City of Montgomery is also entitled to immunity from those causes of action. After all, "if a municipal police officer is immune pursuant to § 6-5-338(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune." *City of Crossville v. Haynes,* 925 So.2d 944, 955 (Ala.2005). Therefore, Defendants City of Montgomery, Bentley and Cook are entitled to summary judgment on all of Plaintiffs' state law claims.

### C.     § 13A-11-161   PUBLICATION OF CERTAIN DOCUMENTS CONSIDERED PRIVILEGED

Alabama has an explicit statutory privilege protecting reports of criminal charges and investigations. ALA. Code §  13A-11-161 provides:

> The publication of a fair and impartial report of the return of any indictment, the issuance of any warrant, the arrest of any person for any cause or the filing of any affidavit, pleading or other document in any criminal or civil proceeding in any court, or of a fair and impartial report of the contents thereof, or of any charge of crime made to any judicial officer or body, or of any report of any grand jury, or of any investigation made by any legislative committee, or other public body or officer, shall be privileged, unless it be proved that the same was published with actual malice, or that the defendant has refused or neglected to publish in the same manner in which the publication complained of appeared, a reasonable explanation or contradiction thereof by the plaintiff, or that the publisher has refused upon the written request of the plaintiff to publish the subsequent determination of such suit, action or investigation.

In *Wilson v. Birmingham Post Company,* 482 So. 2d 1209 (Ala. 1986), the Supreme Court of Alabama reviewed the statute and numerous cases that have been decided on the basis of this privilege. Plaintiff Andrew Wilson sued the newspaper and reporter and others for publishing a front page article in the Post Herald regarding his treatment of Cuban refugees. The defendants moved for summary judgment based on privilege of § 13A-11-161 which was affirmed by the

Supreme Court.

The Court in reviewing §13A-11-161 recognized that the statute is a codification of the common law in the *Restatement (Second) of Torts,* § 611 (1977): "The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgment of the occurrence reported."

The Alabama Supreme Court in *Wilson* examined cases from other federal districts and state courts in reviewing the application of §13A-11-161: *Mathis v. Philadelphia Newspapers, Inc.,* 455 F.Supp. 406 (E.D.Pa.1978) (privilege applied on the ground that what the newspapers had published was "in effect a report of an informal governmental report" concerning release photographs of persons they reported had been arrested in connection with a particular crime although one of the photographs was of someone unconnected with the crime); *Porter v. Guam Publications, Inc.,* 643 F.2d 615, 616 (9th Cir.), *cert. denied,* 454 U.S. 940, 102 S.Ct. 475, 70 L.Ed.2d 247 (1981) (the accurate report of a police investigation as reflected in a "daily police bulletin" of criminal complaints and arrest reports has been held privileged, even when the "police bulletin" was based on false charges made by the complainant); *Mark v. Seattle Times, Inc.,* 96 Wash.2d 473, 635 P.2d 1081 (1981)*, cert. denied,* 457 U.S. 1124, 102 S.Ct. 2942, 73 L.Ed.2d 1339 (1982) (the privilege has also been extended to press reports of investigations summarized in the form of allegations contained in a prosecutor's affidavit of probable cause); *Mathis v. Philadelphia Newspapers, Inc.,* 455 F.Supp. 406 (E.D.Pa.1978) (police arrest reports); *Piracci v. Hearst Corp.,* 263 F.Supp. 511, 515 (D.Md.1966), *aff'd,* 371 F.2d 1016 (4th Cir.1967) (privilege applies to article based on police department records kept "as part of ... daily routine" and as "the only official record of arrests" in the city); *Francois v.*

*Capital City Press,* 166 So.2d 84 (La.Ct.App.1964) (state police log book is "public record" within meaning of Louisiana statute, upon which press may rely).

The publication of the information released by Defendants was a fair and impartial report of an official investigation and prostitution detail by MPD and subject to the privilege provided by § 13A-11-161. Primarily, MPD releases information on incidents of significant public interest, or if seeking to expose a public safety issue via the media or if actively seeking a criminal suspect. *(DX 3, Thornton Affidavit).* As a practice, press releases are sent to the media on high profile arrests or crimes (murders, murder arrests, robbery arrests, serious assault arrests) and large scale special operations (large scale drug arrests, prostitution stings, neighborhood take down operations). *(DX 3, Thornton Affidavit).* The information on the incident/offense report, also known as the blotter, is available to the public and kept in the front lobby on the first floor of the Public Affairs Building. *(DX 2, Cook Depo. p. 16, line 21 to p. 19, line 6).*

*Banks, Finley, White & Co. v. Wright,* 864 So. 2d 324 (Ala. Civ. App. 2001) held:

> The test for determining whether a conditional or qualified privilege is available under such circumstances has been expressed as follows.
>
> " 'Where a party makes a communication, and such communication is prompted by duty either to the public or to a third party, or the communication is one in which the party has an interest, and it is made to another having a corresponding interest, the communication is privileged, if made in good faith and without actual malice.... The duty under which the party is privileged to make the communication need not be one having the force of legal obligation, but it is sufficient if it is social or moral in its nature and defendant in good faith believes he is acting in pursuance thereof, although, in fact he is mistaken.' "*Willis v. Demopolis Nursing Home, Inc.,* 336 So.2d 1117 (Ala.1976)(quoting *Berry v. City of New York Ins. Co.,* 210 Ala. 369, 98 So. 290 (1923), cited in *Browning v. Birmingham News,* 348 So.2d 455 (Ala.1977)).

The publication at issue is conditionally privileged because it accurately reports statements made during an official police investigation, as reflected in the official police incident report.

"Statements made subject to a qualified privilege are not actionable unless the plaintiff can prove that the defendant acted with [actual] malice." *Atkins Ford Sales, Inc. v. Royster,* 560 So.2d 197, 200 (Ala.1990). McQuirter was not singled out or treated any differently than the others arrested on September 15, 2006. Bentley did not know Tiffany Riley or Gwendolyn McQuirter prior to this incident. "In Alabama, where a communication concerning a private person is protected by a qualified or conditional privilege, such a person cannot recover in a defamation action unless that person can show that the communication was made with actual or common law malice (shown by evidence of previous ill will, hostility, threats, other actions, former libels or slanders, and the like, emanating from the defendant, or by the violence of the defendant's language, the mode and extent of the publication, and the like)." *Wilson v. Birmingham Post Company citing Mead Corp. v. Hicks,* 448 So.2d 308 (Ala.1983); *Fulton v. Advertiser Co.,* 388 So.2d 533 (Ala.1980), *cert. denied,* 449 U.S. 1125, 101 S.Ct. 942, 67 L.Ed.2d 111 (1981); *Kenney v. Gurley,* 208 Ala. 623, 95 So. 34 (1923).

As previously set out above, Plaintiffs do not have any evidence or any inference of evidence to support Defendants acted with malice. Defendants are entitled to summary judgment as a matter of law.

D. **INTENTIONAL TORT CLAIMS AGAINST THE CITY OF MONTGOMERY**

*ALA. Code* § 11-47-190 (1975), which states, in part:

"No city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, unless such injury or wrong was done or suffered through the neglect, carelessness or unskillfulness of some agent, officer or employee of the municipality engaged in work therefor and while acting in the line of his or her duty, or unless the said injury or wrong was done or suffered through the neglect or carelessness or failure to remedy some defect in the streets, alleys, public ways or buildings after the same had been called to the attention of the council or other governing body or after the same had existed for such an unreasonable length of time as to raise a presumption of knowledge of such defect on the part of the council or other governing body and whenever the city or town shall be made liable for

26

damages by reason of the unauthorized or wrongful acts or negligence, carelessness or unskillfulness of any person or corporation, then such person or corporation shall be liable to an action on the same account by the party so injured. ..."

*ALA. Code* §11-47-190 (1975) provides that an action against a municipality may only lie for the "neglect, carelessness, or unskillfulness" of its agents. The City may claim immunity and not be held liable for wanton and intentional acts of its agents in accordance with both statutory and case law. *Hilliard v. City of Huntsville*, 585 So. 2d 889 (Ala. 1991).

Additionally, as previously stated Section 6-5-338(b), *Code of Alabama*, 1975 provides "immunity not only to peace officers but governmental units and agencies authorized to appoint peace officers." The statute is explicit that liability will not attach unless a police officer acts willfully or maliciously. As there is no evidence of such intent or actions by Defendants Bentley or Cook in the present case, they are entitled to immunity. A corollary to that finding is that the City of Montgomery is also immune from such causes of action. After all, "if a municipal police officer is immune pursuant to § 6-5-338(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune." *City of Crossville v. Haynes,* 925 So.2d 944, 955 (Ala.2005); *see also City of Tuskegee,* 932 So.2d at 910 (same); ALA Code § 6-5-338(b) (statute extends immunity "to peace officers and governmental units or agencies authorized to appoint peace officers").

Therefore, Defendant City of Montgomery, is also entitled to summary judgment on all of Plaintiffs' state law claims.

## V.
### CONCLUSION

All of Plaintiffs' claims against Defendants City of Montgomery, Cpl. K.C. Bentley and Lt. Ron Cook are due to be dismissed. Plaintiffs' Motion for Partial Summary Judgment is due to be denied and Defendants' Motion for Summary Judgment is due to be granted.

27

### A.    BENTLEY AND COOK

Defendants Bentley and Cook did not violate the Driver's Privacy Protection Act, 18 U.S.C.

§§ 2721 - 2725.   The actions of Bentley and Cook were within their discretionary authority in the

line and scope of their law enforcement duties.   Plaintiff makes only conclusory allegations that no

law enforcement function was served in obtaining and releasing the photograph.   Bentley was

required to retrieve photos as part of her paperwork on every arrest every day. Cook's actions of

submitting selected public information and photographs to the media regarding incidents of public

interest of a law enforcement special detail or to expose a public safety issue is a legitimate law

enforcement function and crime prevention strategy and a routine duty for the public information

officer.  The actions of both Bentley and Cook are permitted under section 2721(b)(1).   Conclusory

allegations cannot interpose genuine issues of material fact into the litigation so as to preclude entry

of summary judgment. *Fed.Rules Civ.Proc.* Rule 56 (c).

Defendants Bentley and Cook are entitled to qualified immunity.   To be entitled to qualified

immunity, a defendant must prove that he was "acting within the scope of his discretionary

authority" when the allegedly wrongful acts occurred. *Gray ex rel. Alexander v. Bostic,* 458 F.3d

1295, 1303 (11th Cir. 2006). In assessing whether a defendant's challenged actions are within the

scope of his discretionary authority, courts examine "whether the government employee was (a)

pursuing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means

that were within his power to utilize." *Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1265

(11th Cir. 2004).

Bentley and Cook are also entitled to state-agent immunity pursuant to section 6-5-338, *Code

of Alabama*, 1975 which statutorily provides law enforcement officers with immunity from state law

tort claims arising out of acts committed while the law enforcement officers engage in the performance of discretionary functions.

The event at issue in this case is precisely the situation for which discretionary function immunity under § 6-5-338 and qualified immunity under § 1983 were designed. Those statutes protect police and municipal officials from tort liability when acting within the line and scope of their duties.

The publication of the information released by Defendants was a fair and impartial report of an official investigation and prostitution detail by MPD and subject to the privilege provided by § 13A-11-161.

## B. CITY OF MONTGOMERY

For liability pursuant to 42 U.S.C. § 1983 to attach to a municipality, it must be shown that the municipal official or employee caused the deprivation of one's statutory or constitutional rights by acting pursuant to official governmental policy. McQuirter has alleged a § 1983 claim for violation of the Driver Privacy Protection Act ("DPPA"), codified at 18 U.S.C. §2721 - 2725. However, there is nothing to support such a claim that Defendant officers violated said statute. Bentley and Cook were acting in the line and scope of their duties as police officers carrying out law enforcement functions.

*ALA. Code* §11-47-190 (1975) provides that an action against a municipality may only lie for the "neglect, carelessness, or unskillfulness" of its agents. The City may claim immunity and not be held liable for wanton and intentional acts of its agents in accordance with both statutory and case law. *Hilliard v. City of Huntsville*, 585 So. 2d 889 (Ala. 1991). Additionally, Section 6-5-338(b), *Code of Alabama*, 1975 provides "immunity not only to peace officers but governmental units and

agencies authorized to appoint peace officers."

Summary Judgment in favor of Defendants City of Montgomery, K.C. Bentley and Ron

Cook is proper and all claims against them should be dismissed.

Respectfully submitted this the 31st day of October, 2007.


/s/ Kimberly O. Fehl
Kimberly O Fehl (FEH001)

**OF COUNSEL:**
Legal Department
City of Montgomery
Post Office Box 1111
Montgomery, Alabama  36101-1111
(334) 241-2050
(334) 241-2310 (fax)



## CERTIFICATE OF SERVICE

I hereby certify that foregoing has been served upon the following by PACER/electronic

filing or by U. S. Mail, postage prepaid on this 31st day of October, 2007:

Jerry M. Blevins, Esq.
Law Office of Jerry M. Blevins
Hillwood Office Center
2800 Zelda Road, Suite 200-3
Montgomery, Alabama 36106

Tiffany Michele Riley
846 Corbett Street
Montgomery, Alabama 36108

Roosevelt Perkins
3430 Gaston Avenue
Montgomery, Alabama 36105


/s/ Kimberly O. Fehl
Of Counsel

30

COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


GWENDOLYN P. MCQUIRTER,
et al.,

      Plaintiffs,

                          CASE NUMBER
vs.                    2:07-cv-00234-MEF-WC

CITY OF MONTGOMERY, et cet.,
et al.,

      Defendants.




* * * * * * * * * *

     DEPOSITION OF KRISTEN CAROLINE BENTLEY,

taken pursuant to stipulation and agreement

before Heather Barnett, Court Reporter and

Commissioner for the State of Alabama at Large,

in the Offices of Dunn, King & Associates, 2800

Zelda Road, Suite 100-2, Montgomery, Alabama, on

Friday, June 29, 2007, commencing at

approximately 10:40 a.m.

       * * * * * * * * * *



DEFENDANT'S
EXHIBIT
"1"

4

```
 1                  KRISTEN CAROLINE BENTLEY
 2              The witness, having first been sworn to
 3      speak the truth, the whole truth and nothing but
 4      the truth, testified as follows:
 5                         EXAMINATION
 6      BY MR. BLEVINS:
 7      Q.   Would you state your full name for me,
 8           please?
 9      A.   Corporal Kristen Bentley.
10      Q.   What's your middle name?
11      A.   Caroline.
12      Q.   Kristen Caroline Bentley?
13      A.   Kristen Caroline Bentley, yes, sir.
14      Q.   And what is your home address?
15      A.   516 Sandfield Court, Montgomery Alabama.
16      Q.   How long have you lived at that address?
17      A.   Since October of 2002.
18      Q.   Okay.  And what is your date of birth?
19      A.   11-14-73.
20      Q.   And that makes you how old?
21      A.   33.
22      Q.   Are you married?
23      A.   No, sir.
```

```
 1         would have been after Major Murphy, but
 2         currently those two would be in the middle.
 3    Q.   Okay.  All right.  Now, I take it you realize
 4         that we're here today to take your deposition
 5         in a lawsuit filed by Gwendolyn Charles
 6         McQuirter.  You're aware of that, correct?
 7    A.   Yes, sir.
 8    Q.   You're aware that the McQuirters have sued
 9         the City of Montgomery over an incident that
10         you were involved in, correct?
11    A.   Yes, sir.
12    Q.   I'm going to refer to the McQuirter lawsuit
13         and the events that led to the lawsuit as the
14         McQuirter matter, okay?
15    A.   Yes, sir.
16    Q.   Can you tell me how you got involved with the
17         McQuirter matter?
18    A.   We had scheduled a prostitution detail for
19         September the 15th, and I was assigned to the
20         processing team.  When we schedule a
21         prostitution detail, we'll have the male
22         undercover officers go out and pick up the
23         prostitutes.  When they pick them up, they'll
```

1        Best you can recall, Sergeant Wright told you

2        about this detail, correct?

3  A.  Yes, sir.

4  Q.  Where did he tell you it was going to take

5        place?

6  A.  She.

7  Q.  I'm sorry.  Where did she tell you it was

8        going to take place?

9  A.  That we would have the processing team at

10       Community Policing, but the guys that -- the

11       narcotics officers that are undercover will

12       go pick up the girls on the Western Boulevard

13       or Mobile Highway or somewhere in that

14       general vicinity.

15  Q.  And you said the process team was going to be

16       located where?

17  A.  The processing team was at Community Policing

18       office is Fairwest.

19  Q.  Is Fairwest a street?

20  A.  Yes, sir.

21  Q.  Where is that located in the city?

22  A.  Off Mobile Highway.

23  Q.  About how far from the area where the detail

A.   That I couldn't tell you, because we also
     have SWAT that's in our office.  So it's all
     Special Operations Division.  There would be
     either SWAT or narcotics, one of the two.
     But most of the time -- well, I don't know.
     It could be either one from SWAT or
     narcotics.

Q.   All right.  And being on the processing team,
     did that mean you were going to be out there
     on location during the entire detail or were
     you just there at certain times?

A.   I would be there at the Community Policing
     office until the guys finished picking up
     girls and somebody determined that we were
     through.

Q.   Okay.  And what were you to do on the
     processing team?  Let's suppose the
     undercover officer goes out, picks up a
     female, charges her with prostitution.  Did
     the officer bring that person to the
     processing team?

A.   That's correct.

Q.   And what occurred once that person was

```
 1              received at the processing team?

 2     A.    An incident/offense report was completed, an

 3           arrest report was completed, warrants checks

 4           were conducted; and we would prep the

 5           affidavit for that officer.

 6     Q.    Would you photograph the person there at the

 7           scene?

 8     A.    No, sir.

 9     Q.    Okay.  Did you fingerprint them?

10     A.    No, sir.

11     Q.    Okay.  And what would occur next after you

12           did the things you just mentioned?

13     A.    Somebody would also search that person and

14           put all their belongings into an envelope or

15           a bag or whatever the case may be if they had

16           items that were going to be impounded.  From

17           there, they were transported -- typically, we

18           transport them to our office on Highland

19           Avenue.

20     Q.    When you say our office, is that the

21           narcotics office?

22     A.    It's the Special Operations Division.

23     Q.    All right.  On Highland Avenue?
```

1   A.   Yes, sir.

2   Q.   And do you recall these ladies that were

3        arrested over the weekend of -- I believe it

4        was September 15th, '06 -- being taken to

5        that office?

6   A.   I'm not certain if they were taken there or

7        not.  I know that the camera system at our

8        office didn't work.  I don't know if they

9        were taken to our office and it was

10       determined that the camera system didn't

11       work or if they -- whoever was doing the

12       transporting already knew that it didn't

13       work, so they transported them to the jail.

14  Q.   So the customary thing would have been the

15       females would have been transported to the

16       Highland Avenue office and been photographed

17       there?

18  A.   Yes, sir.

19  Q.   Would anything else have taken place there?

20  A.   No, sir.

21  Q.   All right.  And in the normal course of

22       things, after the ladies would have been

23       photographed at Highland Avenue, what would

1       have happened next?

2    A.    They would have been transported to the jail.

3    Q.    All right.

4    A.    To the -- they would all go to the city

5          jail.

6    Q.    Okay.  Why -- and, now, this is curious.  Why

7          would the ladies be taken to Highland Avenue

8          simply to be photographed and then taken to

9          the jail as opposed to simply being taken

10         from the scene to the jail and be

11         photographed?

12   A.    That's just the policy that they've laid out

13         for us, and I don't know the answer to that.

14         They've done that every time.  That's just

15         the way they've explained to us to do it

16         and -- I'm not certain, because they will be

17         photographed again when they get to the jail.

18   Q.    And the best you can recall this detail

19         around September 15th of '06, the ladies that

20         were arrested were not taken to the Highland

21         Avenue office because the camera wasn't

22         working?

23   A.    No, sir.  I told you I didn't know if they

1    were or not.  I didn't know if they took them

2    there and determined that the camera wasn't

3    working or if they knew the camera wasn't

4    working, so they took them directly to the

5    jail.  I don't know the answer to that.

6    Q.   But you do recall the camera wasn't working

7         when this detail was done?

8    A.   Correct.

9    Q.   Correct?

10   A.   Yes, sir, or the camera system, I should

11        say.  I don't necessarily believe that it was

12        the camera itself.

13   Q.   Okay.  Do you recall how long this detail

14        lasted?  Was it days?

15   A.   Oh, no, sir.

16   Q.   Was it just one day?

17   A.   It didn't last the entire day, but it was

18        finished within a day.

19   Q.   Do you recall approximately how many hours

20        the detail went on?

21   A.   No, sir.

22   Q.   Okay.  Do you recall how many females or how

23        many individuals were arrested as part of

42

1    A.   Went back to the office.

2    Q.   Did you have any further involvement with the

3         prostitution arrest that had occurred or was

4         that the end of your involvement?

5    A.   When we finished the processing over at

6         Fairwest and the girls were transported and

7         they ended up at the city jail -- like I

8         said, I don't know if they went to our office

9         first or not.  Once they ended up at the city

10       jail, we had gone back to the office on

11       Highland Avenue and were completing the

12       paperwork that's required for us to do that's

13       turned in to the captain and the major.

14    Q.  And what paperwork is that?

15    A.  Everybody -- there is what they call the

16       daily activity report.  When you do the daily

17       activity report, it indicates what was done

18       for the day, which would indicate that we

19       conducted a prostitution detail and, you

20       know, how ever many arrests were made and who

21       they were and any other activity that

22       occurred for the day.

23    Q.  Any other paperwork?

1   A.   Yes, sir.  There's also -- I guess they refer

2        to it by the major's last name.  So it's

3        whoever the current major is -- they call it

4        a King's mug, a Davis mug, whatever the case

5        may be.  With it being Major Davis, it's a

6        Davis mug now.  And it's that person's mug

7        shot, the photo that was taken of them.

8        Underneath that it will indicate -- it has

9        the person's name; it will also have the date

10       of arrest, the location of arrest, what they

11       were arrested for as far as the specific

12       charges, and then their criminal history,

13       whatever comes from an actual criminal

14       history that's printed through NCIC.

15   Q.   Let me make sure I understood.  I think you

16       lost me there.  The camera wasn't working at

17       Highland Avenue, right?

18   A.   Correct.

19   Q.   But y'all completed a form concerning mug

20       shots?

21   A.   When they were taken over to -- the girls

22       that were arrested, when they were taken over

23       to the city to the jail, typically they would

```
1        have a booking photo.  We intended on using

2        the booking photo because our camera system

3        wasn't working.  Therefore, when they were

4        taken over to the city, we were waiting for

5        the jail to get them processed and get their

6        booking photos and intended on using the

7        photos that were taken by the jail.  However,

8        like I said, it wasn't our camera that was

9        the problem; there was the possibility that

10       it's the camera system in general.  If the

11       system isn't working, then nobody can use it.

12       Sometimes it might be a failure on our end;

13       sometimes it might be a failure of the whole

14       system.  So I continuously attempted to log

15       into the system and pull up pictures of these

16       girls and could not find any pictures that

17       were taken that day of the these girls.

18       Therefore, it would be my assumption that the

19       camera system as a whole was not working at

20       the time.  So the jail was not able to take

21       their booking photographs at the time.

22   Q.  All right.

23   A.  This was some hours after they had been
```

```
 1          transported.  And I don't remember the exact
 2          time frame, but it had been a while.  It
 3          would have been enough time that at least one
 4          of the girls should have been in the -- had a
 5          booking photograph taken by that point if the
 6          system would have been working properly.
 7     Q.   So let me just make sure I understand.  You
 8          left the area of Mobile Highway?
 9     A.   Right.
10     Q.   And went to the Highland Avenue office over
11          there?
12     A.   Right.
13     Q.   Okay.  The females who were arrested,
14          meanwhile, went to the city jail?
15     A.   Correct.
16     Q.   You were at Highland Avenue waiting on
17          photographs to be taken, booking photographs
18          to be taken at the city jail?
19     A.   Yes, sir.
20     Q.   All right.  And you were waiting for those
21          photographs at Highland Avenue; is that
22          right?
23     A.   I was waiting for the jail to take them, and
```

```
 1            I should have been able to bring up the

 2            screen on my computer and pull up that

 3            photograph.

 4    Q.      Because there's some kind of computer program

 5            where if they take booking photographs at the

 6            jail, you can view those photographs on a

 7            computer at Highland Avenue?

 8    A.      Right.  It's in the network.

 9    Q.      And does the network have a name?

10    A.      AS-400.

11    Q.      So if I say I need to look at some

12            photographs on AS-400, then you can --

13    A.      Somebody would know what you were talking

14            about and they would pull it up, and it's

15            the -- that's what is used as the police

16            department's in-house system.

17    Q.      And the AS-400 shows booking photographs

18            taken at the city jail?

19    A.      Not just booking photographs.  It will show

20            any photograph that's been taken of that

21            person that's been put into that system.

22    Q.      Who put photographs in the AS-400 system

23            other than the police department through
```

1        booking photographs?

2    A.   Well, who specifically, I don't know.

3    Q.   Well, no, not who specifically.  Who other

4        than the police department?

5    A.   It would have to be somebody that worked for

6        the police department that put a photograph

7        in there.  You wouldn't go to another place

8        in the city that had a camera system to where

9        they would take photographs that would be in

10        that system -- it should be somebody with

11        police department, but there's various

12        reasons why you might have a photograph in

13        there; and just the fact that it's a booking

14        photograph is not the reason.

15    Q.   Okay.  So you're at Highland Avenue, and you

16        wait for several hours; and you check the

17        AS-400, and there are no booking photographs

18        of these ladies, correct?

19    A.   They've already been transported.  Like I

20        said, I don't know the exact time frame.  I

21        know that they had been transported, and at

22        that point, I felt like that they should have

23        already had photographs in the system of at

1           least one of the girls.

2       Q.  Let me --

3       A.  I have --

4       Q.  I'm just trying to make sure I understand

5           what you're telling me.  I thought earlier

6           you said you were at the Highland Avenue

7           office and had waited several hours and

8           checked the computer -- I assume the

9           AS-400 -- and there were no booking

10          photographs of these woman.  Is that true?

11      A.  I don't know that I indicated it was several

12          hours.  I know that there was a time frame.

13          And I like I told you before, I don't know

14          the exact time frame, but I know that they

15          left and had been transported to the city.  I

16          went to the office.  I waited, and it was --

17          during the time frame that I waited, there

18          should have been enough time that they should

19          have started taking booking photographs of

20          these girls.  Not knowing which one was being

21          processed first, I would have to check each

22          individual by the name, and then check the

23          photographs to see if they had put one in

1      there.

2              So when I'm going through this, I'm

3      going through the list of the names of girls

4      that we've arrested that day and putting

5      those names in there and trying to determine

6      if there's a photograph of any one of those

7      girls that's been taken on that date.  I'm

8      also having to get the information on each of

9      these girls so that a criminal history could

10     be run through NCIC so that I could put that

11     information on this paper for the major and

12     the captain when I get done.

13  Q.  Why were you needing the photographs?

14  A.  Because I'm required to turn in a photograph

15     -- or any of us, when there's an arrest made

16     for the day, you turn in the photograph of

17     that person and, like I said, the

18     information, the date of arrest, location of

19     arrest, the charges and their criminal

20     history.

21  Q.  All right.  Okay.  You turn that in to who?

22  A.  There's copies of those items that go on the

23     major's desk and copies of those items that

1          go on the captain's desk.

2     Q.   Major who?

3     A.   Major Davis and Captain Hughes.

4     Q.   So it's just standard practice that this

5          information would go to Major Davis and

6          Captain Hughes.  I mean, that's in every

7          case?

8     A.   Any arrest every day.  Every day.  Like if

9          you arrest somebody for unlawful distribution

10         of controlled substance, that person's

11         photograph with the information that I

12         indicated is on one piece of paper.  And,

13         then, you know, if you've arrested somebody

14         for a possession charge where they've been in

15         possession of drugs, then a picture of the

16         drugs would go with that.  If it's a

17         distribution, obviously you're not going to

18         have a picture of the drugs because they were

19         sold.

20    Q.   Now, back at the scene of the prostitution

21         detail, whose job was it to get the

22         individuals' identities that were arrested?

23    A.   There's nobody specified that's going to -- I

52

1          driver's a license?

2    A.   Would you check to see if the person had a

3          driver's license.

4    Q.   Yes.

5    A.   Not necessarily.

6    Q.   What do you mean not necessarily?  I mean

7          might you do it or might you -- it's up to

8          the people on the processing team to decide

9          if you do it or not?

10              MS. HIGHLEY:  Object to the form.

11   A.   When you have -- like I said, most of the --

12         well, actually, all of the girls that were

13         arrest that day except for Tiffany Riley had

14         been arrested before, most of them for

15         prostitution, but all of them had been

16         arrested before.

17              So, therefore, when you have a girl

18         that's sitting there telling you her name,

19         and you look up her name and find that

20         there's her name and here's photograph of her

21         where she's been arrested before, then you're

22         looking at a picture and you are getting the

23         name from her; or even if it were a girl that

53

| | | |
|---|---|---|
| 1 | | has been arrested multiple times, I wouldn't |
| 2 | | need to look at a picture, because I already |
| 3 | | know what her name is. |
| 4 | Q. | Let's talk about Tiffany Riley, then. |
| 5 | A. | I did not know her name. |
| 6 | Q. | She was sitting there with you on the |
| 7 | | processing team, wasn't she, as being one of |
| 8 | | the people arrested? |
| 9 | A. | I was sitting in front of a computer, and I |
| 10 | | had Ms. Riley sit in a chair beside me.  I |
| 11 | | was getting the information from her and |
| 12 | | asked her for her name, and she told me her |
| 13 | | name was Gwendolyn McQuirter.  Obviously, I |
| 14 | | did not know how that was spelled. |
| 15 | Q. | You didn't know her at that time, did you, by |
| 16 | | her true name? |
| 17 | A. | No, sir. |
| 18 | Q. | You had never had any dealings with her |
| 19 | | before that? |
| 20 | A. | Not that I'm aware of unless it's been some |
| 21 | | years back and I just don't really remember |
| 22 | | her. |
| 23 | Q. | Did you ask her for her identification? |

54

|   |    |                                                          |
|---|----|----------------------------------------------------------|
| 1 | A. | Most of the time, I would ask them if they               |
| 2 |    | had their identification, but I would still              |
| 3 |    | use -- even if they had an identification,               |
| 4 |    | which typically, they do not -- but if they              |
| 5 |    | did, I would still verify.  There could be an            |
| 6 |    | old address on there or -- well, typically,              |
| 7 |    | that's going to be the only thing that's                 |
| 8 |    | wrong, so I would verify that.  But it would             |
| 9 |    | have a birth date and a social security                  |
| 10 |    | number and stuff like that.  But I don't                 |
| 11 |    | believe anybody had any identification on                |
| 12 |    | them that day, if I'm not mistaken.                      |
| 13 | Q. | Sitting here today, do you recall asking                 |
| 14 |    | Tiffany Riley for her identification?                    |
| 15 | A. | Do I remember specifically what I said, no,              |
| 16 |    | sir.  Would I have asked her, do you have any            |
| 17 |    | ID, I'm fairly certain that that's something             |
| 18 |    | that I would ask, that I would typically                 |
| 19 |    | ask.  So I would say that I probably asked               |
| 20 |    | her do you have any ID.                                  |
| 21 | Q. | Can you think of any reason, since you didn't            |
| 22 |    | know her, hadn't had any contact with her                |
| 23 |    | before this, that you would not have asked               |

55

1         for her identification?

2              MS. HIGHLEY:  Object to the form.

3   A.   Any reason why I wouldn't have?

4   Q.   Yeah.

5   A.   No, sir.

6   Q.   Can't think of any reason you would not have?

7   A.   No, sir.

8   Q.   Okay.  Did anybody else on the processing

9        team indicate to you that they had had prior

10       dealings with Tiffany Riley?

11  A.   No, sir.  Back to your question that you

12       asked me about can I think of any reason why

13       I wouldn't have asked her, the only reason

14       why I wouldn't have asked her would be if she

15       was searched -- they're all going to be

16       searched because they are under arrest.  The

17       only reason I wouldn't have asked her for

18       identification would have been if she was

19       searched prior to me trying to obtain her

20       information.  And in that case, somebody that

21       searched her would know if she had an ID card

22       on her or not.

23   Q.   Was she searched prior to you having contact

1          with her?

2     A.   That I don't remember, because I don't

3          remember how many girls there were exactly

4          that were arrested that day, but there were

5          several.  And it's meant to be an efficient

6          thing for them to come in and -- you know,

7          that's why you have a team to do the

8          processing to get everything done in a timely

9          manner and not take forever.  So if we were

10         speaking to one girl when she came in,

11         somebody could have searched her first, and

12         then after she was searched, then we started

13         obtaining her information; or it could have

14         been that we obtained her information and

15         then she was searched.  I couldn't tell you

16         for a fact which way that occurred.  But if

17         she was already searched, then I might have

18         known she didn't have an identification

19         card.  But that would be the only reason.

20    Q.   Do you recall anybody telling you that she

21         had been searched?

22    A.   I don't remember.

23    Q.   Do you recall asking any if she had been

57

1        searched?

2    A.    I don't remember.

3    Q.    Do you recall asking anybody if they had

4          recovered any type of identification off

5          Ms. Riley?

6    A.    Like I said, I don't remember if she was

7          searched prior to that or not.  But you asked

8          me if there was any reason why I wouldn't

9          have asked her for identification; that's the

10         only reason I wouldn't have asked her.

11   Q.    My question now is, though, do you recall

12         asking anybody if they had removed

13         identification from Ms. Riley?

14   A.    No, sir.  I don't remember.  I don't know how

15         it occurred if she was -- if they searched

16         her and she had identification, then they

17         would have handed me her identification.

18   Q.    Who would have handed it to you?

19   A.    Whoever did the search would have handed me

20         the identification.

21   Q.    And who would have been the person to most

22         likely have done the search?

23   A.    More than likely, the one who does it is

```
 1          location where you were on the processing
 2          team, tell me what you recall about your
 3          interaction with her.
 4     A.   I remember Ms. Riley sitting beside me.  Like
 5          I said, I was sitting in front of the
 6          computer; and I asked her her name, and she
 7          told me Gwendolyn McQuirter.  Obviously, I
 8          didn't know how to spell that last name, how
 9          it was intended for her spell it.  And I'm
10          certain that I asked her how to spell it.
11          And she told me -- asked her her birth date;
12          she gave me Mrs. McQuirter's birth date.  I'm
13          certain that I asked her -- certain that I
14          asked her her Social Security number, and I
15          don't recall exactly what she told me.  As
16          best I can remember, I think that she told me
17          that she didn't know her -- couldn't remember
18          her Social Security number.  I know she
19          didn't give me one.  Had she given me one, I
20          would have known that that wasn't the correct
21          identity because the Social Security number
22          of Mrs. McQuirter is in the computer system.
23          So when she told me her name was Gwendolyn
```

1   McQuirter and I asked her how to spell it and

2   I pull up Mrs. McQuirter's information, she

3   gives me the correct spelling, the correct

4   birth date. And as far as I know, she -- as

5   far as I remember, she didn't recall the

6   social security number. And I asked her the

7   address, and she gave me the address, which

8   was the same address as what Mrs. McQuirter's

9   is, and gave me the information as if it were

10   her own. No hesitation, no pauses, no --

11   nothing that lead me to believe that she was

12   being untruthful.

13   Q.   So while you're talking with Ms. Riley,

14        you're pulling up information on a computer?

15   A.   Correct.

16   Q.   And was this on what computer system?

17   A.   AS-400, the in-house computer system of the

18        police department.

19   Q.   The one that shows photographs?

20   A.   If there's a photograph that's been taken.

21   Q.   All right. And I assume since you just now

22        testified you were inputting information and

23        information such as Social Security numbers

62

1        and all that could come up, that there's

2        other things that come up other than just

3        pictures, right?

4   A.   Right.  It's not just a computer system.

5        This is the in-house system for the police

6        department that would have -- anytime that

7        you make a report, whether it be your car

8        getting broken into or your house getting

9        broken into or, you know, if you're arrested

10       for something, then if there was a report

11       done relating to the arrest, it would be in

12       there.  If you had received a traffic

13       citation, it would indicate that.  I don't

14       know how far it goes back as far as year-

15       wise.  I would say that there's probably --

16       if I had to guess, there's not anything from

17       the '80s in there, but from then on, the

18       information is in the computer system, and it

19       shows that anytime that you've ever -- not

20       you specifically, but that anybody that would

21       have come into contact with the police as far

22       as it being a documented occurrence, whether

23       it was a traffic citation or a report or an

1    arrest or whatnot; just because you called

2    the police, it's not going to be in there.

3  Q.  All right.  So Ms. Riley gave you

4    Ms. McQuirter's name, you put that in the

5    computer?

6  A.  That's correct.

7  Q.  And what came up?

8  A.  Mrs. McQuirter's information.

9  Q.  What information?

10  A.  It had -- it said Gwendolyn McQuirter.  It

11    had the address, which I believe was 4418

12    Lowell Street.  When I asked Ms. Riley for

13    the address, that's the address she gave me;

14    and I was not familiar with that street.

15  Q.  What other information came up?

16  A.  Birth date, Social Security number, height

17    and weight, eye color and hair color.  And

18    that's all I can remember right now.  I don't

19    know what else was on there, but that's --

20    maybe a phone number if they've given a phone

21    number in the past.

22  Q.  What else would normally be on there other

23    than what you've told me?

```
 1          birth date I know because I was reading it

 2          when she told it to me.  How I remember

 3          certain things and not others, I couldn't

 4          explain that to you.

 5     Q.   Did you know Gwendolyn McQuirter before

 6          September of '06?

 7     A.   No, sir.

 8     Q.   Ever had any contact with her?

 9     A.   Not that I'm aware of.

10     Q.   All right.  Anything else that you recall

11          about your contact with Tiffany Riley other

12          than what we've gone over?

13     A.   As far as on that date or later on?

14     Q.   Ever.

15     A.   That was on Friday.  When I returned to work

16          on Tuesday -- and I don't remember who was

17          the first person that indicated to me that

18          that was not her correct name, but somebody

19          indicated that Mrs. McQuirter's husband had

20          called and was complaining because his wife's

21          picture was on the news.  And he had seen

22          that and said that that wasn't -- that his

23          wife wasn't arrested for prostitution; that
```

71

1       her picture was on there, but she wasn't

2       arrested for prostitution.

3   Q.   Who was telling you this, now?

4   A.   I said I don't remember.

5   Q.   I mean, was it somebody employed with MPD --

6   A.   Right.

7   Q.   -- or was it somebody on the street?

8   A.   Somebody in my office.

9   Q.   Do you recall it being one of your

10      supervisors?

11  A.   No, sir, I don't remember who it was.

12  Q.   Just somebody passing you in the hallway

13      mentioned it to you?

14  A.   I don't remember who it was.  It was somebody

15      in my office, but I don't remember exactly

16      what they were -- there was a discussion in

17      the office about the fact that that was not

18      Mrs. McQuirter that was arrested; that this

19      person who was arrested had used

20      Mrs. McQuirter's name and that we needed to

21      determine her true identity.

22  Q.   And you don't remember who told you you

23      needed to determine her true identity?

1    A.    No, sir.

2    Q.    What was your involvement after that?

3    A.    I'm going to say we, referring to the

4          narcotics officers that were on duty at the

5          time, because I don't remember who exactly

6          did what.  Apparently, somebody contacted the

7          jail, and we found out that this guy by the

8          name of Roosevelt Perkins was the one that

9          bonded Ms. Riley out under the name of

10         Gwendolyn McQuirter.

11              So we obtained information from

12         Mr. Perkins and went to his -- if I'm not

13         mistaken, the chain of events was the fact

14         that we went to his residence first.  His

15         wife was at the residence.  His wife stated

16         that he was not there, that he was at work.

17         He should be coming home shortly.  I believe

18         that they said that he worked at Carquest and

19         gave us the location of the Carquest that he

20         worked at.  Some narcotics officers went to

21         that location to try to locate him.  He had

22         already left and was not at work at the time.

23    Q.    Why were y'all trying to locate him?

A.    To try to determine who it was that used
      Mrs. McQuirter's name.  We did not know who
      the female was.  We still didn't know her
      name?

Q.    Don't y'all have some photographs at the
      police department where you can do like a
      photo line-up, old photographs you can flip
      through to see if people's photographs are in
      there to try to identify somebody?

A.    If you were to flip through the photographs,
      it would take you some because there's quite
      a few -- I mean any time -- we're talking
      about any time somebody has been arrested,
      that their photograph has been taken.  So
      you're talking about a considerable amount of
      photographs that you would need to try to go
      through to try to determine who it was.

Q.    So let's get back to y'all went to Carquest
      to look for Mr. Perkins?

A.    Right.  He was not at Carquest.  He had
      already left.  We left some narcotics
      officers at the residence where he lived with
      his wife.  When he came -- I'm assuming home

1        from work because he's not at Carquest -- he

2        left there and showed up at his house.  When

3        he showed up at has house, the narcotics

4        officers spoke with him and asked him about

5        the fact that he had made bond for Ms. Riley,

6        who we still didn't know was Ms. Riley at the

7        time; therefore, they asked him who she was,

8        and he provided that information.

9    Q.   And what happened next?

10   A.   We obtained an address for Ms. Riley from

11       Mr. Perkins and attempted to look at her --

12       the address.  I want to say it was on Bragg

13       Street, if I'm not mistaken.  We tried to get

14       her with -- we were obviously going to arrest

15       her for giving the false name, but she didn't

16       answer the door.  Nobody answered the door at

17       this residence where he told us that she

18       lived.  We asked him anywhere else that she

19       might be, and we were not able to determine

20       anywhere else that she might be.

21          Then we had him to -- I don't remember

22       if he called her or if he went to her

23       residence without calling her first, but we

1        had Mr. Perkins to go over there and get

2        Ms. Riley in the truck with him under the

3        pretenses that they were going somewhere, and

4        had explained to Mr. Perkins that as soon as

5        he pulled away from the house with her in the

6        vehicle, that we were going to stop him and

7        arrest her.

8    Q.   Is that what y'all did?

9    A.   Yes, sir.

10   Q.   Was Ms. Riley arrested?

11   A.   Yes, sir.

12   Q.   Did you have any further involvement with the

13        McQuirter matter after that?

14   A.   I took a statement from -- Ms. Riley was

15        arrested at that point and taken to our

16        office. When she was taken to our office, I

17        took a statement from Ms. Riley. During her

18        statement to me, she indicated that she lied

19        about her name because she had two Capias

20        warrants. She knew that she had two Capias

21        warrants because she had taken Mrs. McQuirter

22        to the hospital on a previous occasion. When

23        she was en route to the hospital, she was

1  stopped by the police officers -- or a police

2  officer.  When she was stopped, the police

3  officer advised her that she had two Capias

4  warrants and advised her to take care of the

5  matter.  She indicated to me that she did not

6  take care of the matter, so therefore, she

7  knew she had two capias warrants.  And that's

8  why she lied about her name.

9       She also indicated that Mrs. McQuirter

10  was just like a sister to her and she had

11  known her for approximately four years and

12  lived with her on and off, and that's how she

13  was able to give her Mrs. McQuirter's

14  information.

15  Q.  Okay.  Did y'all discuss anything else?

16  A.  She indicated that she contacted Mr. Perkins

17  to bond her out of jail and that she told

18  Mr. Perkins -- obviously, she had to have

19  told him that she was in there under

20  Mrs. McQuirter's name, and he bonded her

21  out.  As far as I know, that's about the

22  extent of the interview with Ms. Riley, the

23  statement that she gave me.

88

```
 1              there's a photograph in there.  See, there's
 2              not some magical fail-proof way to say that
 3              somebody couldn't use somebody else's name.
 4        Q.    Well isn't there a fail-proof way?  I take it
 5              you're familiar with LETS, aren't you?
 6        A.    Yes, sir.
 7        Q.    What is LETS?
 8        A.    It is what is the Law Enforcement Tactical
 9              System, I believe the name of it is.
10        Q.    And through LETS, you can access people's
11              driver's license photograph, can't you?
12        A.    Yes, sir.
13        Q.    You can access other information on a
14              person's driver's license, can't you?
15        A.    Yes, sir.
16        Q.    That information is provided to MPD through
17              the Department of Public Safety, isn't it?
18        A.    I would assume so.
19        Q.    So when we talk about the McQuirter matter,
20              you had the means to go through LETS and pull
21              up Gwendolyn McQuirter's photograph off her
22              driver's license, didn't you?
23        A.    Correct.
```

1    Q.   And in fact, you did that, didn't you?

2    A.   Yes, sir.

3    Q.   And that photograph on Gwendolyn McQuirter's

4         driver's license clearly shows that Tiffany

5         Riley was not Gwendolyn McQuirter, didn't it?

6              MS. HIGHLEY:  Object to the form.

7    A.   Not to me, no, sir.

8    Q.   What do you mean not to you?  They look like

9         they're the same?

10             MS. HIGHLEY:  Object to the form.

11   A.   I can't -- to determine that that was or was

12        not her, I couldn't tell you that that wasn't

13        her.  I'm not saying that they look exactly

14        alike by any stretch of the imagination, but

15        they're not so far off that I did not -- in

16        Gwendolyn McQuirter's driver's license

17        photograph, obviously, the hair is not the

18        same; but hair is something that can be

19        changed.  You can look at her facial features

20        and look at what the picture looks like from

21        the driver's license photograph, and then

22        look at the photograph that we've taken.

23        When you look at the way that ours print out,

1    they're not always looking at it on a

2    computer screen; may not look the same way

3    that it does when you print it out.

4    Q.    Let me make sure I understand your testimony,

5          now.  Your testimony is when you looked at

6          Gwendolyn McQuirter's driver's license

7          photo --

8    A.    Yes, sir.

9    Q.    -- and you considered that photo in

10         conjunction with seeing Tiffany Riley in

11         person --

12   A.    Yes, sir.

13   Q.    -- you did not conclude they were different

14         people?

15   A.    Correct.

16   Q.    Okay.  You recognize this lady right here?

17         I'm going to mark this as an Exhibit #3.

18   A.    Yes, sir.

19   Q.    Who is that?

20   A.    That's Tiffany Riley.

21   Q.    You're certain of that?

22   A.    Yes, sir.

23   Q.    Do they look the same because they're both

92

A.   No, sir.

Q.   Okay.  All right.  Let me show you Exhibit
     #1, page 13 to Ron Cook's deposition.  Do you
     recognize that lady?

A.   I recognize that as the photograph that was
     on the driver's license on Gwendolyn
     McQuirter.

Q.   And just so I'm clear, your testimony is page
     13 of Exhibit #1 and page 9 of Exhibit #3,
     you can't tell those are different people?
     Is that your testimony?

A.   I couldn't at the time.  I wasn't certain
     that the -- that Ms. Riley couldn't have --
     that that couldn't have been Ms. Riley who
     had a photograph taken at some point and
     didn't necessarily look exactly the same.  A
     driver's license is good for four years, an
     ID card is good for longer.  And I'm not
     exactly certain how long.  So I could take my
     driver's license photo today and still have
     that same driver's license four years from
     now, and I may not look the same four years
     from now.  So that's -- you know, when

1        exactly it was taken, I don't know that I

2        ever necessarily looked at that.  But I

3        wasn't under the impression at the time that

4        that wasn't the same person.  I was under the

5        impression that it was the same person.

6   Q.  Because the date the driver's license photo

7        was issued to Mrs. McQuirter was information

8        you received off the LETS system, wasn't it?

9   A.  It is on there somewhere, but I don't -- like

10       I said, I don't remember what that date was.

11  Q.  You just don't remember --

12        MS. HIGHLEY:  Object to the form.

13  A.  I don't remember looking at it.

14  Q.  And looking at page 13 and page 9, what can

15       you identify in these photographs that even

16       looks anywhere similar as far as being the

17       same person?  Can you point to anything?

18  A.  They're similar that I see.

19  Q.  What are the similarities you see?

20  A.  First, notice that both of them have a rather

21       high forehead.

22  Q.  Okay.  What else?

23  A.  The shape of the face is kind of more of a

96

1          more defined, I should say.

2     Q.   Which photograph are the features more

3          defined?

4     A.   In Ms. Riley's.

5     Q.   Ms. Riley looks like she's sort of heavy.  Is

6          she heavy?

7     A.   She's a pretty good size.

8     Q.   She doesn't look like your typical crack

9          smoker, does she?

10    A.   Not typically, no, sir.  It wasn't certain to

11         me that she might not -- because she had not

12         been arrested for prostitution before, that

13         she might have started to possibly smoke

14         crack cocaine and hadn't been doing it for a

15         long time.  The other girls will tell you

16         that they've been doing it for a long time,

17         and you know this because you've gotten into

18         contact with them for a long time; but most

19         of them did not start out the size that they

20         are now and did not look the same when they

21         originally started as a prostitute.

22    Q.   Okay.  So just so I'm clear, when you

23         received Mrs. McQuirter's photograph through

1        the LETS system and you considered Tiffany

2        Riley's appearance, did you actually stop and

3        pause and say, I'm not sure this is the same

4        person, or did that thought ever enter your

5        mind?

6   A.   I didn't believe that it wasn't the same

7        person at that point.  I believed that

8        Ms. Riley was giving me the correct

9        information.  When she provided the

10       information, she provided it to me rather

11       matter of factly.  And in the manner that she

12       provided it to me, I believed what she was

13       saying because, like I said, she didn't

14       hesitate.  She said I'm Gwendolyn McQuirter,

15       and can you spell that, and she spits it out

16       and gives me this information as a matter of

17       fact, not with any hesitation.

18   Q.   That's the way people that lie normally do

19        it, isn't it?

20   A.   No, sir.

21           MS. HIGHLEY:  Object to the form.

22   Q.   People from your experience that lie normally

23        hesitate, and it's obvious they're lying?

A.   Typically, there would be some indication
     they might not know the birth date
     correctly.  They might be off by a year or
     something of that sort.  You know, it would
     not be so common that I'm going to be able to
     give you a name, birth date and address that
     is somebody else's and spit it out to you
     like it's my own.  I can't think of anybody
     off the top of my head right now that I could
     give that information on; like that I could
     tell you that I'm so and so, give you the
     name, give you the address is give you their
     birth date.

Q.   And I don't think you answered my question,
     so let me ask it again.  Did the thought ever
     enter your mind after you received Gwendolyn
     McQuirter's picture through the LETS system,
     that these people may not be the same people?

A.   No, sir.

Q.   Did that thought ever enter your mind?

A.   No, sir.

Q.   Okay.  All right.  And what was the reason
     you went to the LETS system to retrieve

1          Ms. McQuirter's photograph?

2     A.   Like I said, I believe the computer -- the

3          camera system wasn't operating correctly and

4          we did not have the photos taken from our

5          office because it wasn't working and,

6          therefore, I intended to use the booking

7          photos to turn in to the captain and the

8          major.  The booking photos were not in there

9          either.  So once I could not get booking

10         photos that were taken that date -- the ones

11         that were used to all of the girls except for

12         Mrs. McQuirter's photograph, which actually

13         would have been Ms. Riley -- should have been

14         Ms. Rileys, the ones that were used were from

15         previous arrests.

16    Q.   Did you call downtown and ask them when are

17         the booking photographers going to be put on

18         the computer?

19    A.   I want to say that there was male officers

20         that had taken the girls over there and that

21         they had -- I might have contacted them via

22         the SouthernLINC, and they indicated to me

23         that they weren't able to put the photos in

1         photograph from the LETS system?

2   A.   No, sir.

3   Q.   All right.  Let me try --

4   A.   I'm saying that --

5   Q.   Hang on just a minute, because I'm trying to

6         ask real simple questions.  After you spoke

7         with the narcotics officer that we just

8         talked about -- after that, did you get

9         Mrs. McQuirter's photograph off the LETS

10        system?

11   A.   Yes, sir.

12   Q.   Okay.  How long after?

13   A.   I'm not certain the exact time frame.

14   Q.   Would it have been hours later, minutes

15        later, days later?

16   A.   It was not hours or days.  It probably would

17        have been within -- after speaking to them,

18        maybe within an hour.

19   Q.   Okay.  And what was the urgency in obtaining

20        Mrs. McQuirter's photograph?

21   A.   We were completing all the paperwork that we

22        had to do for the evening in order to turn in

23        to the captain and the major.  And we had to

```
 1   A.   Only if the camera system was down.

 2   Q.   Okay.  And as far as you know, that was okay

 3        with your supervisors for you to do that?

 4   A.   Yes, sir.

 5   Q.   To your knowledge, were they aware that you

 6        did that?

 7   A.   I'm not certain.  I know that Lieutenant

 8        Crockett was there.  Lieutenant Crockett was

 9        aware that we did not have the photos taken

10        from that day because the system was not

11        working.  Whether or not he explained that to

12        the captain and the major, I'm uncertain.

13   Q.   You're talking about Ms. McQuirter when you

14        said Lieutenant Crockett was aware of it or

15        are you talking about the other times?

16   A.   No, sir.  What you were asking me was about

17        using the previous photographs.

18        Mrs. McQuirter's was a LETS photograph

19        because that -- all of the other girls had

20        been arrested previously, so all of their

21        photographs were photographs that were taken

22        previously.  Lieutenant Crockett was aware of

23        that.  Lieutenant Crockett also would have
```

106

1    been aware of the fact that Mrs. McQuirter's

2    photograph from LETS was used because she

3    didn't have a photograph in the system.

4    Q.    Why would Lieutenant Crockett have been aware

5          of it or how was he aware of it?

6    A.    I believe he was standing over by my desk,

7          and I explained to him that I did not have a

8          photograph of what I thought was

9          Ms. McQuirter at the time and that I was

10         going to have to use a LETS photograph.

11   Q.    So you just said I believe he was standing at

12         my desk, and then you went through a

13         conversation y'all had.  Did y'all have the

14         conversation or not?

15               MS. HIGHLEY:  Object to the form.

16   Q.    Did y'all have that conversation?

17   A.    Yes, sir.

18   Q.    Did you remember him standing by your desk

19         when you had that conversation?

20   A.    Yes, sir.

21   Q.    All right.  And you remember him standing

22         there near your desk as you accessed the LETS

23         system and retrieved Mrs. McQuirter's

```
 1              photograph; is that right?
 2    A.   I'm not certain that he was still standing
 3         there at the point where I retrieved it.  He
 4         was standing there when I expressed to him
 5         that I did not have a photograph of
 6         Mrs. McQuirter and that I was going to have
 7         to try to see if there was one on LETS.
 8    Q.   Did he tell you it was okay to go ahead or
 9         what was his response?
10    A.   He just says okay.
11    Q.   And you took that to mean it was okay for you
12         to do that?
13    A.   Certainly.
14    Q.   Okay.  Now, are there only certain people
15         that can access the LETS system or can
16         anybody use it?
17    A.   You would have to be law enforcement and you
18         would have to be registered with LETS.
19    Q.   Were you registered when you accessed it?
20    A.   Yes, sir.
21    Q.   And you had accessed it before you did it in
22         Mrs. McQuirter's case?
23    A.   Yes, sir.
```

Q.  Okay.  And for what law enforcement purpose
    were you accessing the LETS system?

A.  In order to complete my duties for the day
    and take the photograph and put it on the
    paper to turn in to the captain and the
    major.

Q.  Okay.  And in your opinion, that was a
    legitimate law enforcement purpose to access
    Mrs. McQuirter's driver's license photo?

A.  Yes, sir.  I'm required to do that and turn
    it in at the end of day; or anybody that has
    an arrest is required to do that, not
    necessarily from LETS but to turn in the
    photograph whether it be from LETS or from
    the AS-400 system.

Q.  Okay.  And you also wanted to forward that
    out to be distributed to the media, didn't
    you, or was that --

A.  No, sir, that's not anything that involves
    me.

Q.  Okay.  You're aware the photographs were
    released to the media, aren't you?

A.  When I saw it on TV, yes, sir.

109

1    Q.   Do you remember seeing Mrs. McQuirter's

2         picture on TV?

3    A.   Yes, sir.  They had photographs of all the

4         prostitutes that were arrested that day that

5         they showed.

6    Q.   But Mrs. McQuirter wasn't one of the

7         prostitutes arrested, was she?

8    A.   No, sir.

9    Q.   Somebody messed up, didn't they?

10            MS. HIGHLEY:  Object to the form of the

11               question.

12   Q.   Did somebody mess up or was she a prostitute

13        that was arrested?

14   A.   No.  Ms. Riley provided her information;

15        therefore, that's what brought Mrs. McQuirter

16        into the situation.

17   Q.   So Ms. Riley messed up?

18   A.   Yes, sir.

19   Q.   Did you mess up?

20   A.   No, sir.

21   Q.   You didn't do anything wrong?

22   A.   No, sir.

23   Q.   Okay.  Is there a policy at the MPD as to

1       when you can use the LETS system and for what

2       purpose?

3    A.  You would have to use it for a law

4       enforcement purpose.  Like you wouldn't --

5       let's say I met Allison out somewhere.  I

6       wouldn't obviously say, you know, I met this

7       girl Allison, let me show you her picture,

8       and pull up her picture from LETS to show

9       somebody, because that would not be for any

10      purpose law enforcement-related.  If it's

11      something that's required by me -- if I'm

12      required to pull up a photograph of somebody

13      to put on a piece of paper for my major and

14      my captain and turn that in at the end of the

15      evening, and I pull up a LETS photograph and

16      put it on there, then that's legitimate for

17      me to do that.

18   Q.  Did you tell Lieutenant Crockett -- is that

19      the correct name?  I just had a flashback of

20      Miami Vice.  Was his name Lieutenant

21      Crockett?

22   A.  It is.

23   Q.  Did you tell Lieutenant Crockett as he stood

112

```
 1    Q.   Where did that come from?

 2    A.   That was taken on the 19th when she was

 3         arrested for giving a false name.

 4    Q.   So y'all never got a booking photograph when

 5         these 10 people were arrested for

 6         prostitution?  There was never a booking

 7         photograph taken of any of them; is that

 8         right?

 9    A.   Not that I'm aware of.  I don't believe

10         there's any of them in there.  There's only

11         previous booking photographs, but I don't

12         believe there's any that were from that

13         date.

14    Q.   All right.  And did you tell me that you had

15         utilized the LETS system prior to

16         Mrs. McQuirter's case in retrieving

17         photographs of people?

18    A.   Yes, sir.

19    Q.   About how many times had you done that?

20    A.   I'm not certain.

21    Q.   More than 10?

22    A.   Yes, sir.

23    Q.   More that 50?
```

113

1    A.    It's possible.  I really don't know how many.

2    Q.    What would be the normal circumstance that

3          you would pull a photograph off the LETS

4          system?

5    A.    If we didn't have a photograph -- if I needed

6          to obtain a photograph of that person and

7          there was not one in the AS-400 system.

8    Q.    Why wouldn't you just use the booking

9          photograph?

10   A.    If the booking photograph was in the AS-400

11         system, I would use it; but if it's not in

12         there, I can't use it.

13   Q.    So there's been a lot of times when the

14         cameras don't work at the jail?  Is that what

15         you're saying?

16   A.    I wouldn't be able to quantify how many

17         times.  I don't know that it's a lot or not a

18         lot or -- there are times when the camera

19         system as a whole throughout the city -- I

20         mean throughout the police department --

21         there are times when that camera system does

22         not work.  How many times, I cannot tell

23         you.  The majority of the time when we try to

114

1       use it, it works, but there are times when it

2       doesn't.  Our computer system in our office,

3       sometimes it doesn't work.  It could, you

4       know, just be the fact that ours at our

5       office does not work.

6   Q.  And y'all don't have just a little camera you

7       can pull out and take a picture of somebody

8       for a booking photograph?  Just a normal

9       little camera?

10  A.  As far as like a digital camera just to take

11      a photograph that way?  Is that what you're

12      talking about?

13  Q.  Yes.

14  A.  Yes, sir, we have those now.

15  Q.  You didn't have them in September '06?

16  A.  We had cameras.

17  Q.  All right.  Well, why didn't y'all just pull

18      out a camera and take a picture of them?

19  A.  Because the assumption at the time was that

20      when they got to the city jail that their

21      booking photographs would be taken anyway.

22      We didn't know at the time that the entire

23      camera system was down, so we would have

1    assumed that they were going to be

2    photographed when they got to jail.  There

3    would have been no reason why we didn't

4    believe that until we found out that it

5    wasn't just our system that didn't work; it

6    was the system as a whole that didn't work.

7    So we wouldn't have taken a picture with a

8    digital camera like that.

9  Q.  Any particular reason why you didn't go down

10    to the police department when you discovered

11    there was a problem and take photographs with

12    this little digital camera you had?

13  A.  I didn't feel like there was a need to do

14    that at the time.

15  Q.  You thought it would be easier to pull

16    Mrs. McQuirter's photograph off the LETS

17    system; is that right?

18  A.  Right.

19  Q.  Okay.  Has any supervisor or anybody really

20    at the MPD told you in the past that if

21    there's trouble getting a booking photograph

22    to feel free to go on the LETS system to get

23    the photograph?  Has anybody ever told you

1      that?

2  A.  I wouldn't necessarily say they said it in

3      those exact words, but they have indicated

4      that they required that when I turned in this

5      paperwork that's required of me at the end of

6      the evening, that I turn in a photograph of

7      that person whether it be something that was

8      taken from the AS-400 system, something that

9      was taken from LETS, something that was taken

10     off a digital camera.  Whatever the case may

11     be, there's going to be a photograph turned

12     in at the end of the evening.

13  Q.  Okay.  Were you at all involved in the

14     release of Mrs. McQuirter's photograph to the

15     media?

16  A.  No, sir.

17  Q.  Were you consulted about that before it was

18     released?

19  A.  No, sir.

20  Q.  You delivered the photograph to the major and

21     the captain, right?

22  A.  Yes, sir.

23  Q.  All right.  Did you personally give it to him

1

COPY

1           IN THE UNITED STATES DISTRICT COURT

2         FOR THE MIDDLE DISTRICT OF ALABAMA

3                    NORTHERN DIVISION

4

5    GWENDOLYN P. MCQUIRTER,
     et al.,

6
              Plaintiffs,

7                                    CASE NUMBER
     vs.                        2:07-cv-00234-MEF-WC

8
     CITY OF MONTGOMERY, et cet.,

9    et al.,

10            Defendants.

11

12

13           * * * * * * * * * * *

14

15        DEPOSITION OF RONALD COOK, JR., taken

16   pursuant to stipulation and agreement before

17   Heather Barnett, Court Reporter and Commissioner

18   for the State of Alabama at Large, in the Offices

19   of Dunn, King & Associates, 2800 Zelda Road,

20   Suite 100-2, Montgomery, Alabama, on Friday, June

21   29, 2007, commencing at approximately 9:21 a.m.

22

23           * * * * * * * * * * *

DEFENDANT'S
EXHIBIT
"2"

4

| | |
|---|---|
| 1 | RONALD COOK, JR. |
| 2 | The witness, having first been sworn to |
| 3 | speak the truth, the whole truth and nothing but |
| 4 | the truth, testified as follows: |
| 5 | EXAMINATION |
| 6 | BY MR. BLEVINS: |
| 7 | Q.   Would you state your full name, please, sir? |
| 8 | A.   Ronald Cook, Jr. |
| 9 | Q.   Mr. Cook, what is your home address? |
| 10 | A.   2061 Shortline Drive, Montgomery, Alabama, |
| 11 | 36116. |
| 12 | Q.   And what is your age? |
| 13 | A.   40. |
| 14 | Q.   And what is your date of the birth? |
| 15 | A.   4/10 of '67. |
| 16 | Q.   And are you married? |
| 17 | A.   Yes, sir. |
| 18 | Q.   And what is your wife's name? |
| 19 | A.   Vyvyan, V-Y-V-Y-A-N, Cook. |
| 20 | Q.   And she lives with you here in Montgomery? |
| 21 | A.   Correct. |
| 22 | Q.   Does she work? |
| 23 | A.   Yes. |

10

1    A.    Montgomery Police Department.

2    Q.    Okay.  And do you have an actual physical

3          office somewhere?

4    A.    Yes.

5    Q.    Where's your office located?

6    A.    320 North Ripley Street.

7    Q.    And I didn't say this earlier.  You'll see

8          she's typing down stuff.  I'm going to let

9          you finish answering if you'll let me finish

10         my question so we don't drive her crazy both

11         talking at the same time.

12   A.    Understood.

13   Q.    What is your present job title?

14   A.    I am Bureau Commander for Property, which is

15         in the detective division.

16   Q.    Okay.  And are you a detective?

17   A.    Yes.

18   Q.    All right.  Do you also carry a rank?

19   A.    Yes.

20   Q.    What is the rank?

21   A.    Lieutenant.

22   Q.    Okay.  And what are your duties right now?

23   A.    My duties as the bureau commander is to

13

1    Q.  Detects, right?

2    A.  Right.

3    Q.  All right.  So you were with the detective

4         division from '04 to June of '06?

5    A.  Correct.

6    Q.  All right.  And did you have a job title in

7         the detective division other than detective?

8    A.  I was a sergeant.  Did basically the same

9         thing as a sergeant, except once I got

10        promoted to lieutenant, I became a bureau

11        commander.

12   Q.  All right.  Have you held any other positions

13        other than what we've gone over since you've

14        been employed with the Montgomery Police

15        Department?

16   A.  As an additional duty, I do on-call public

17        information officer.

18   Q.  What does that mean, on-call public

19        information officer?

20   A.  On weekends -- Captain Thornton is the

21        primary; and on weekends, we have call

22        between he and myself and three other guys,

23        that being Keith Barnett, Mark Drinkard and

14

|    |    |    |
|----|----|----|
| 1  |    | William Perkins.  On Friday afternoons at |
| 2  |    | five o'clock, we will assume the duties of |
| 3  |    | disseminating any information that needs to |
| 4  |    | be given to the media from the police |
| 5  |    | department. |
| 6  | Q. | Okay. |
| 7  | A. | Until Monday morning at 08. |
| 8  | Q. | So I'm going to make sure I understand. |
| 9  |    | Well, before I ask if I understand, how long |
| 10 |    | have you been doing that, the on-call public |
| 11 |    | information officer? |
| 12 | A. | Roughly two years. |
| 13 | Q. | So since around June of '05 or so? |
| 14 | A. | I can't be specific.  I don't know |
| 15 |    | specifically the dates, but I know it's been |
| 16 |    | about two years. |
| 17 | Q. | Okay.  And so as an on-call public |
| 18 |    | information officer for the last two years, |
| 19 |    | you and four other people serve as the |
| 20 |    | on-call public information officer; is that |
| 21 |    | right? |
| 22 | A. | Myself and three other people.  Huey is the |
| 23 |    | primary. |

16

| | | |
|---|---|---|
| 1 | | y'all rotate or how is that determined? |
| 2 | A. | Right, we rotate. |
| 3 | Q. | All right.  So it looks like with you and |
| 4 | | three others, you would be on call one |
| 5 | | weekend a month? |
| 6 | A. | Correct. |
| 7 | Q. | All right.  And has that practice been in |
| 8 | | place for roughly the last two years? |
| 9 | A. | Can't say always.  Keith Barnett has just |
| 10 | | come on.  He's been doing it about nine |
| 11 | | months now.  So before he came on, it was a |
| 12 | | little different. |
| 13 | Q. | Okay.  Was it different in any other respects |
| 14 | | other than it was just you and two other |
| 15 | | people? |
| 16 | A. | That's the only way. |
| 17 | Q. | Okay.  And you had to do a little bit more |
| 18 | | work because there was only three as opposed |
| 19 | | to four? |
| 20 | A. | Might catch it a little sooner. |
| 21 | Q. | Now, when we talk about public information, |
| 22 | | what type stuff would you generally be |
| 23 | | involved in?  What does that entail? |

17

```
 1    A.   Anything that's down on the blotter that your
 2         media outlets might have questions about
 3         that's not specific on the report, we can go
 4         into the specifics of it.
 5    Q.   What is a blotter?
 6    A.   That's the clipboard that's kept downstairs,
 7         first floor, Public Affairs Building, where
 8         you have all your generated incident/offense
 9         report.
10    Q.   Okay.  So if somebody was arrested, it would
11         appear on the blotter?
12    A.   Right.
13    Q.   If there was an incident with no arrests,
14         would that appear on the blotter?
15    A.   It would appear on there, also.
16    Q.   Would any call that an officer with the MPD
17         responded to appear on the blotter?
18    A.   If a report was generated.
19    Q.   So everything would appear on the blotter
20         that resulted in a report being filed by a
21         police officer?
22    A.   Correct.
23    Q.   And if no written report was filed, it
```

18

| | | |
|---|---|---|
| 1 | | wouldn't be on the blotter? |
| 2 | A. | No. |
| 3 | Q. | All right.  And what type information |
| 4 | | generally appears on a blotter? |
| 5 | A. | Any arrests -- robberies, burglaries.  Any |
| 6 | | arrests. |
| 7 | Q. | Does the name of the people involved in the |
| 8 | | incident appear? |
| 9 | A. | It's going to be on the 55.  It's public |
| 10 | | information. |
| 11 | Q. | And what is a 55? |
| 12 | A. | An incident/offense report. |
| 13 | Q. | And is that what most people know as a police |
| 14 | | report? |
| 15 | A. | Right. |
| 16 | Q. | And is the police report itself included in |
| 17 | | the blotter? |
| 18 | A. | The police report itself is the blotter.  We |
| 19 | | call it a blotter, but it's actually the |
| 20 | | incident/offense report sitting downstairs. |
| 21 | Q. | Okay.  So if a person came in and said, I |
| 22 | | want to see the blotter, what they would |
| 23 | | actually see would be the actual written |

19

```
 1          police report submitted by the police

 2          officer?

 3    A.    Right.

 4    Q.    Okay.  And that blotter is kept where?

 5    A.    First floor, 320 North Ripley Street, police

 6          headquarters, front lobby.

 7    Q.    And who is responsible for looking after the

 8          blotter?

 9    A.    That's going to fall up under the

10          administrative division, and I don't know who

11          actually does that.

12    Q.    Okay.  So how would it normally work -- if

13          you're on call on a weekend, what would be

14          like a typical situation where you would be

15          contacted about an incident?

16    A.    Any serious incident; details, if we're

17          running details in neighborhoods, I'll be

18          contacted about the number of arrests and

19          things of that nature.

20    Q.    And who would normally contact you?

21    A.    Either the detective division supervisor who

22          is on call or the patrol supervisor or it

23          could have been the deputy chief for that
```

20

```
1        weekend.

2    Q.  Okay and the reason that they would be

3        contacting you would be why?

4    A.  For information dissemination from the

5        department.

6    Q.  Okay.  Would that contact generally be made

7        for you to disseminate information to the

8        media or for you to be able to respond to

9        inquiries from the media?

10   A.  Well, if I'm going to respond to inquiries,

11       I'm generally going to send out a --

12   Q.  Press release?

13   A.  Press release to the media.

14   Q.  Here's what I'm trying to get to make sure I

15       don't misunderstand.  If you're contacted

16       while you're on call, is the primary purpose

17       of that for you to put out information to the

18       media in the form of press release?

19   A.  Right, I mean, if it's a serious incident.

20       Okay.  Things just like just a normal arrest

21       from Eastdale Mall or something, I don't get

22       called on that, anyway.  But if it's a

23       serious incident, or one of the divisions
```

```
 1        might have a detail, I'm going to be

 2        notified.

 3   Q.   A detail like a specially operation or

 4        something?

 5   A.   Correct.

 6   Q.   Okay.  And, again, I'm just trying to make

 7        sure I understand.  If you're contacted about

 8        a special operation detail that has taken

 9        place, would the point of that contact be for

10        you to put out a press release?

11   A.   Rephrase our question.  I don't understand

12        your question.

13   Q.   Let's suppose when you're on call you're

14        contacted, and you're told we did a special

15        operation, here's the information about it.

16        Is the point of that contact to you as a

17        public information officer to put out that

18        information to the media?

19   A.   Yes.

20   Q.   Okay.  And when you're provided with

21        information that you're going to disseminate

22        to the media, do you rely on the person who

23        gives you the information to provide accurate
```

40

1    Q.   Well, if somebody commits a crime across the

2          street there today, can you go arrest them?

3    A.   Yes.

4    Q.   And if you go over there and arrest somebody

5          today, how are you going to confirm the

6          identity according to the policy that's in

7          place today?

8    A.   Just I like I told you right here, that I'm

9          going to get the name, date of birth,

10         possibly the Social Security number.

11   Q.   Okay.  I gotcha.  You know that we're here

12        today about a lawsuit that's been filed by

13        Gwendolyn and Charles McQuirter, correct?

14   A.   Correct.

15   Q.   I want to ask you a few questions about the

16        McQuirters' lawsuit and the events that

17        brought us here today.

18           How did you get involved in what I'm

19        going to refer to as the McQuirter matter,

20        okay?  How did you get involved in that?

21   A.   Well, I was the on-call PIO that weekend.

22        And Lieutenant Pat Crockett call me and

23        stated they had a prostitution sting and that

1      he had all of the arrest photos available to

2      be disseminated.

3   Q.   Do you remember what date that was?

4   A.   No, I don't.

5   Q.   Do you recall it as being back in September

6      of 2006?

7   A.   Specifically, I don't know which date, but I

8      know it should have been around that time.

9   Q.   Now, just so the record is clear, when you

10     say PI, is that what you're using as the

11     abbreviation for public information officer?

12  A.   Correct.  PIO.

13  Q.   PIO.  Okay.  So when you received this

14     information, it would have been some time on

15     the weekend between 5 p.m. on Friday and

16     8 a.m. on a Monday?

17  A.   Correct.

18  Q.   And who Pat Crockett?

19  A.   He's Bentley's supervisor.

20  Q.   And who is Bentley?

21  A.   K.C. Bentley.  Corporal K.C. Bentley.

22  Q.   And how did Pat Crockett contact you?

23  A.   By SouthernLINC.

42

| | | |
|---|---|---|
| 1 | Q. | And you were not on duty when you were |
| 2 | | contacted, correct? |
| 3 | A. | No. |
| 4 | Q. | Okay.  Do you remember what you were doing? |
| 5 | A. | No. |
| 6 | Q. | Doing something not work-related, I assume? |
| 7 | A. | Right. |
| 8 | Q. | Okay.  All right.  And Pat Crockett -- tell |
| 9 | | me if I misunderstood what you told me.  Pat |
| 10 | | Crockett called you and said there had been |
| 11 | | prostitution sting, and he had photographs of |
| 12 | | people that were arrested? |
| 13 | A. | Correct. |
| 14 | Q. | All right.  Is Pat a male or female? |
| 15 | A. | Male. |
| 16 | Q. | Did Pat tell you anything else? |
| 17 | A. | Yes, that he had them over at the special ops |
| 18 | | building. |
| 19 | Q. | The photos? |
| 20 | A. | Correct. |
| 21 | Q. | All right.  And what did you say to him or |
| 22 | | what else was said? |
| 23 | A. | I asked him was he still going to be there. |

43

1    He said he would be around.  If not, he would

2    leave them with someone upstairs.  And I told

3    him that I was en route, so I put myself on

4    duty status, proceeded over to the special

5    ops building to get the photographs.

6    Q.  Now, was this one of those contacts we talked

7        about earlier where it was your understanding

8        Pat Crockett had contacted you to give you

9        the information so you could release it to

10       the media?

11   A.  Right.

12   Q.  And, so, did you immediately go over to the

13       where the photos were?

14   A.  Yes.

15   Q.  All right.  And you don't remember what day

16       of the week this was?

17   A.  It had to be between Friday or Monday from

18       seven o'clock Friday until 08 Monday.

19   Q.  Okay.  And where exactly did you go after

20       receiving Mr. Crockett's call?

21   A.  To the special ops building on Highland

22       Avenue.

23   Q.  And your purpose in going there was to do

44

1        what?

2    A.   Pick up the arrest photographs.

3    Q.   To do anything else?

4    A.   No.

5    Q.   And after you arrived at the special ops

6        building, what did you do?

7    A.   I went upstairs and got the arrest

8        photographs.

9    Q.   Did you do anything else?

10   A.   No.

11   Q.   While you were at the building?

12   A.   No.

13   Q.   Did you speak with Mr. Crockett?

14   A.   No.

15   Q.   Was he there?

16   A.   No.

17   Q.   Did you speak with anybody?

18   A.   I spoke to one of his investigators.  I said,

19       did Lieutenant Crockett leave the

20       photographs?  He left them in the inbox; and

21       I went to the inbox and got the photographs.

22   Q.   You didn't receive anything in writing from

23       anybody at the special ops building.  You

1      just received the photographs; is that right?

2   A.  Correct.

3   Q.  Now, earlier when Mr. Crockett spoke to you,

4      did he give you any details about the

5      prostitution sting, or did he just say we did

6      a prostitution sting, and I have some

7      photographs?

8   A.  Just told me they had a prostitution sting on

9      the West South Boulevard, and he had the

10     arrest photographs.

11  Q.  Do you recall him saying anything else about

12     the details of the arrest?

13  A.  No.

14  Q.  Okay.  After you got the photographs from the

15     special ops building, what did you do next?

16  A.  I went to headquarters, 320 North Ripley

17     Street.

18  Q.  And did what there?

19  A.  Did my press release and sent the photographs

20     out to the media.

21  Q.  Did you speak with anybody in between leaving

22     the special ops building and doing the press

23     release and releasing it to the media?

1    A.   No.

2    Q.   Did you receive anything in writing from

3          anybody between the time you left the special

4          ops building to when you did the press

5          release and released it to the media?

6    A.   No.

7    Q.   Did the press release that you put out have

8          photographs with it?  Correct?

9    A.   Yes, they were attached.

10   Q.   And did you also send a written -- well, let

11         me ask it this way.  The press release, did

12         it include a written statement as to the

13         details of what the photographs related to?

14   A.   Yes, it did.

15   Q.   All right.  Let me organize, and I'm going to

16         show you an exhibit.  Let me show you what

17         I've marked as Plaintiffs' Exhibit #1, which

18         consists of 13 pages.  Can you tell me if you

19         recognize page 2 of that exhibit?

20   A.   Yes.

21   Q.   Okay.  What is page 2 of Exhibit #1?

22   A.   Page 2 of Exhibit #1 is my actual press

23         release that I released.

47

1    Q.   And if you look up near the top of the

2          Exhibit #1 -- I'm sorry, the second page to

3          Exhibit #1 where it says two, and beside the

4          word two, it has certain names.  Is that the

5          identities, or the media outlets, that this

6          press release was sent to?

7    A.   Correct.

8    Q.   Now, it appears to me that the press release

9          was sent to more media outlets than simply

10         Channel 8, Channel 12, and The Montgomery

11         Advertiser.  Is that correct?

12    A.   Correct.

13    Q.   Was there any particular reason, based on

14         what you told me earlier, why this was

15         distributed to other media outlets other than

16         those three entities?

17    A.   That's just -- that's my mass media list.

18    Q.   Is this the entire list?

19    A.   This would be -- I can't say for sure that

20         this is the entire list that's shown right

21         here.

22    Q.   Okay.  How did you learn that 10 prostitutes

23         were taken into custody?

54

1       a booking photograph?

2   A.   It doesn't appear to be.

3   Q.   Okay.  Now, when you received these

4       photographs from the special ops building,

5       was your attention drawn to page 13 of

6       Exhibit #1 as not being a booking photograph?

7   A.   No.

8   Q.   Didn't catch your attention at all?

9   A.   No.

10  Q.   Did you ever think anything about that

11      between the time you received the photos at

12      the special ops building to when you issued

13      the press release?

14  A.   No.

15  Q.   And this is a curious question.  If, as a

16      public information officer, you get 10 or so

17      photographs, nine of which are booking photos

18      and one that is not, why wouldn't that catch

19      your attention?

20  A.   Because you get photographs off any kind of

21      system that you use for a law enforcement

22      investigative tool.

23  Q.   So that's something you've seen before?  This

| | | |
|---|---|---|
| 1 | | is not unusual? |
| 2 | A. | No. |
| 3 | Q. | Okay.  That was a compound question.  Have |
| 4 | | you seen that before where a photograph might |
| 5 | | be released to the media that's not a booking |
| 6 | | photograph? |
| 7 | A. | Right. |
| 8 | Q. | So you didn't find this at all unusual that |
| 9 | | page 13 of Exhibit #1 was not a booking |
| 10 | | photograph? |
| 11 | A. | No. |
| 12 | Q. | Okay.  After you issued the press release to |
| 13 | | the media, which is shown there on page 2 of |
| 14 | | Exhibit #1, did you have any further |
| 15 | | involvement with the McQuirter matter? |
| 16 | A. | Yes. |
| 17 | Q. | All right.  And what further involvement did |
| 18 | | you have? |
| 19 | A. | Mrs. McQuirter's husband called my office. |
| 20 | Q. | And do you know what date that would have |
| 21 | | been? |
| 22 | A. | No, I don't. |
| 23 | Q. | Can you estimate for me how long it was after |

56

```
1              you issued the press release that he ticketed
2              you?
3    A.   Couple or two or three day.
4    Q.   Okay.  And did he call you at the MPD at your
5              office?
6    A.   Correct.
7    Q.   And tell me about that discussion.
8    A.   Answered the phone, and he identified himself
9              and told me that there was no way possible
10             that the McQuirter picture -- that was his
11             wife, and there was no way possible she could
12             have been out there because she was with
13             him.  At that time, I told him, well, sir, I
14             have to put you in touch with the primary
15             PIO, which was Huey Thornton, and that's when
16             the call was transferred.
17   Q.   Do you recall anything else being said during
18             that discussion with Mrs. McQuirter?
19   A.   No.
20   Q.   Do you recall about how long that discussion
21             lasted?
22   A.   It was less than five minutes.
23   Q.   Did Mrs. McQuirter appear to be angry during
```

| | | |
|---|---|---|
| 1 | | that discussion? |
| 2 | A. | He didn't appear to be angry. |
| 3 | Q. | Okay.  All right.  Did you have any further |
| 4 | | involvement with the McQuirter matter after |
| 5 | | that? |
| 6 | A. | As to what? |
| 7 | Q. | In any respects. |
| 8 | A. | Well, I sent -- I guess Captain Thornton |
| 9 | | talked to them, and he wanted me to e-mail |
| 10 | | him my release, my specific release from |
| 11 | | September 16th. |
| 12 | Q. | Captain Thornton asked you to do that? |
| 13 | A. | Right. |
| 14 | Q. | All right.  Now, I was thinking while you |
| 15 | | were talking.  Did you say Captain Thornton |
| 16 | | wanted you to e-mail him, meaning Captain |
| 17 | | Thornton, a release?  Or what did you just |
| 18 | | tell me? |
| 19 | A. | Captain Thornton called me after he talked to |
| 20 | | Mr. McQuirter, after I transferred the call, |
| 21 | | and asked me to send him the release that I |
| 22 | | sent to the media. |
| 23 | Q. | And the release being page 2 of Exhibit #1? |

58

1      A.    Correct.

2      Q.    Did you send that to Captain Thornton?

3      A.    Right here on page 2.  Shows where I sent it

4            to him.

5      Q.    Where is the release that you actually

6            distributed to the media?

7      A.    This was still in my computer, in my

8            terminal.  I keep all my releases.  So once I

9            have a release send out, I put it in a

10           folder.  And when he called and asked for

11           this release, I just e-mailed it to him.

12     Q.    So you just pulled it up on the computer and

13           then sent it by e-mail to Captain Thornton?

14     A.    Right.

15     Q.    And after you e-mailed Captain Thornton the

16           release, what happened?

17     A.    That's it.

18     Q.    Did you have any further involvement with the

19           McQuirter matter after that?

20     A.    No.

21     Q.    Never spoke with anybody about it again?

22     A.    No.

23     Q.    Never wrote to anybody about it again?

61

```
 1              and that's when he wanted them.
 2      Q.     Okay.  All right.  Are you familiar with the
 3              Law Enforcement Tactical System?
 4      A.     Yes, I'm familiar with it.
 5      Q.     Is that known as LETS?
 6      A.     Correct.
 7      Q.     What is LETS?
 8      A.     Law Enforcement Tactical System.
 9      Q.     Right.  But a little bit more specific,
10              what's its purpose?
11      A.     It's an investigative tool.  We go in the
12              LETS, and we can pull up detailed information
13              on persons.  And we use it as an
14              investigative tool.
15      Q.     Is there a policy at the MPD as to when LETS
16              can be used?
17      A.     You can use it as an investigative tool.  I
18              haven't seen anything in writing as to when
19              you can use LETS.  You might have a
20              disclaimer with LETS when LETS can be used.
21      Q.     And LETS accesses, I assume -- and let me ask
22              you this.  I assume LETS accesses some
23              information somewhere where this information
```

1          is retrieved; is that right?

2                    MS. FEHL:  Object to the form.

3     A.   Repeat your question.

4     Q.   Yeah.  Okay.  The information that LETS

5          retrieves comes from where?

6     A.   I have no idea, sir.  You'd have to get with

7          LETS and see where they ascertain that

8          information.

9     Q.   So you don't have any idea where their

10         information is coming from?

11    A.   That's in the LETS system.

12    Q.   Right.

13    A.   No, I don't know where they get their

14         information from, but I know it's there.

15    Q.   It's not hooked into the Department of Public

16         Safety's drivers records information?

17    A.   Specifically, I don't know where they get

18         their information from.  I could be telling

19         you something wrong if I start to assume

20         where they got it from.  So I just take the

21         system as what it's worth, and I use the

22         information that we have on it.

23    Q.   Is there like a main computer where you can

63

1      access LETS or can everybody access it

2      through their individual computers?

3   A.   If you're in an investigative division, I

4      think you should be able to get it through

5      your terminal; but you have to be given

6      access to it.

7   Q.   And who is given access to it?

8   A.   It should be someone in computer information

9      or planning and technology division.

10  Q.   Can you access LETS?

11  A.   Can I access it?

12  Q.   Yes.

13  A.   Yes.

14  Q.   Can a police officer, if he's needing

15      information, go in and access LETS?

16  A.   Not necessarily because he has to have a

17      password to get in it.

18  Q.   Is there a certain rank where you're given a

19      password, or how are passwords determined as

20      far as who can access LETS?

21  A.   Generally, if you're in an investigative

22      field, you'll be given access.  As far as

23      just general officers, I can't answer that

64

1        question.

2    Q.   Okay.  You got any idea how long LETS has

3        been used at the MPD?

4    A.   No, I don't.

5    Q.   Has it been used the entire time you've been

6        there?

7    A.   I don't know if it was used in '94 or not.

8    Q.   How far back do you recall it being used?

9    A.   When I came to the detective division in '04,

10       I still can't recollect whether it was being

11       used or not then.

12   Q.   And as far as the use of LETS, have you been

13       trained or given guidelines on when you can

14       using the system?

15   A.   Yes.

16   Q.   And how was that relayed to you?

17   A.   Through a person that trained me.  This is

18       when we use LETS.  When you need to find out

19       additional information on a person that we

20       might not have in our data base at the PD, we

21       log on to LETS.

22   Q.   Were there any limitations on retrieving

23       information such as did the person have to be

65

```
 1              arrested or charged with a certain type

 2              crime, or were there any limitations placed

 3              on the use of the system?

 4     A.   Specifically, the limitations, I can't say if

 5              it was arrested, because we might just be

 6              investigating a case, and they haven't been

 7              arrested; and they just might be a person of

 8              interest.  You have to get some type of

 9              intelligence on them.

10     Q.   Have you ever retrieved photographs through

11              the LETS system?

12     A.   Yes.

13     Q.   Do you know where those photographs come

14              from?

15     A.   LETS system.

16     Q.   I mean do you know where they're coming from,

17              the source of the photograph, other than

18              coming through the LETS system?

19     A.   Well, it has Department of Motor Vehicles on

20              it, but it's a LETS system.  I just can't sit

21              here and tell you exactly where they come

22              from.

23     Q.   Can you think of any reason -- if we suppose
```

## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **GWENDOLYN P. MCQUIRTER**, and<br>**CHARLES E. MCQUIRTER**, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **CITY OF MONTGOMERY**, | ) | |
| **K.C. BENTLEY**, and **RON COOK**, | ) | |
| | ) | |
| Defendants and Third-Party Plaintiffs, | ) | |
| | ) | |
| v. | ) Case No. **2:07-CV-234-MEF-WC** | |
| | ) | |
| **TIFFANY MICHELE RILEY**, and | ) | |
| **ROOSEVELT PERKINS**, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

### AFFIDAVIT OF CAPTAIN HUEY THORNTON

Before me, the undersigned authority, personally appeared Huey Thornton, who is known to me and who, being first duly sworn, deposed on oath, and says as follows:

My name is Huey Thornton and I am over nineteen (19) years of age. I am currently employed for the City of Montgomery as a Captain with the Montgomery Police Department ("MPD"). I am the Public Information Officer in Public and Media Relation and responsible for the flow of information from the Police Department to the media and general public. It is in that capacity that I state the following:

1.      Written new releases are prepared by the public information officer or other personnel at the discretion of the chief of police. Primarily, we release information when we feel an incident is of significant public interest, if we are seeking to expose a public safety issue via the media or if we are actively seeking a criminal suspect. As a

1

DEFENDANT'S
EXHIBIT
"3"
tabbies'

practice we always send press releases to the media on high profile arrests or crimes (murders, murder arrests, robbery arrests, serious assault arrests) and large scale special operations (large scale drug arrests, prostitution stings, neighborhood take down operations). These are just a few cases of when we send out press releases.

2.     On September 19, 2006, I was advised that a Mr. Charles McQuirter had contacted MPD in reference to his wife, Gwendolyn McQuirter's, photograph being shown in the local media with nine other subjects who were arrested in connection with prostitution.

3.     I contacted Lt. Ron Cook and asked him to look into the matter due to the fact that he was the public information officer on duty and released the photographs he received from Special Operations to the media.

4.     Later that day, Lt. Cook contacted me and advised me that one of the women arrested assumed the identity of Gwendolyn McQuirter and was subsequently bonded out of jail under the assumed identity.   Lt. Cook further advised that the photograph he received from Special Operations for Gwendolyn McQuirter was a photograph from LETS rather than a booking photograph from the night of the arrest.

5.     On September 20, 2006, at approximately 10:45, I contacted Mr. Charles McQuirter.  I advised Mr. McQuirter of the following: That on Friday, September 15, 2006 there was a prostitution sting conducted by the Montgomery Police Department in the area of Mobile Highway and the West South Boulevard.  During the operation a female was arrested who assumed the identity of his wife.  This person also bonded out of the city jail under the false identity.  As a result of the person assuming his wife's identity, officers inadvertently released the wrong photograph and information to the media.  I told him that officers from our Special Operations Division were able to identify

2

and take into custody the person who assumed his wife's identity. The person was identified as Tiffany Riley and she stated that she was an old friend of Gwendolyn McQuirter.

6.     I then advised Mr. McQuirter that I would send a press release with the proper information and photograph to all of the media. I further advised Mr. McQuirter that the Montgomery Advertiser was the only news agency with his wife's photograph on their website and that I had contacted them on September 19, 2006 and had that information removed. Attached to my affidavit is a copy of the original press release of September 16, 2006 and the corrected press release of September 20, 2006.

7.     It is not uncommon to release photographs to the media from various sources. In some cases, our system becomes inoperable and we are unable take or access photographs through our internal resources; therefore we rely on alternate sources such as LETS or other agencies. It is not uncommon to use LETS if an individual does not have a photograph in our internal files. Another example would be for use in police bulletins (lookouts) where we are seeking individuals who have never been arrested and photographed by the Montgomery Police Department.

I have read the above and foregoing affidavit consisting in total of three (3) pages and state that it is true and correct to my present knowledge and information.

H. J. Thornton    # 493
Capt. Huey Thornton

**SWORN to and SUBSCRIBED before me this the** 29th **day of October,** 2007.

Susan W. Grant
Notary Public
My Commission Expires 07/11/11

3



JERRY M. BLEVINS
ATTORNEY AT LAW
HILLWOOD OFFICE CENTER
2800 ZELDA ROAD, SUITE 200-3
MONTGOMERY, ALABAMA 36106
E-MAIL: ATTYJMBLEV@AOL.COM

TELEFAX: 334-262-7644

November 14, 2006

TELEPHONE: 334-262-7600

Mrs. Brenda Gale Blalock
City Clerk
103 North Perry Street
Montgomery, Alabama 36104

RE:   *Notice of claims of Mrs. Gwendolyn P. McQuirter &*
      *Mr. Charles E. McQuirter, wife and husband*

Dear Mrs. Blalock:

As counsel for Mrs. Gwendolyn P. McQuirter and her spouse Mr. Charles E. McQuirter, of 4418 Lowell Road, Montgomery, Alabama (334) 280-3302, I hereby present these itemized and verified claims against the City of Montgomery, State of Alabama, pursuant to §§ 11-47-23 & 11-47-192, *Code of Alabama* (1975), in the total sum of $200,000.00. These claims are itemized as follows:

1)   $100,000 for humiliation, shame, embarrassment, disgrace and damage to reputation of Mrs. Gwendolyn P. McQuirter; &

2)   $100,000 for loss of consortium for Mr. Charles E. McQuirter.

The following is a recounting of the factual background upon which these claims rest:

On or about September 15, 2006, the Special Operations Division of the Montgomery Police Department ("MPD") conducted a prostitution sting in the area of Mobile Highway in Montgomery, Alabama. The operation was a continuation of previous stings in that area. As a result of the sting, undercover police officers arrested ten (10) women for allegedly offering sex for money. These ten women were booked into the City Jail, fingerprinted and photographed.

On or about September 16, 2006, the Montgomery Police Department provided photos and criminal histories of the women arrested to the Montgomery Advertiser, WAKA – Channel 8, and WSFA – Channel 11. Reports indicate that WAKA and WSFA ran stories about the arrests on September 17, 18 & 19, showing photographs of each of the women during each broadcast. The Montgomery Advertiser also published a story concerning the arrests on September 17, 2006, and directed readers to view photos of the suspects on its website –



DEFENDANT'S EXHIBIT "4"

JERRY M. BLEVINS
ATTORNEY AT LAW
HILLWOOD OFFICE CENTER
2800 ZELDA ROAD, SUITE 200-3
MONTGOMERY, ALABAMA 36106
E-MAIL: ATTYJMBLEV@AOL.COM

TELEFAX: 334-262-7644

November 14, 2006

RECEIVED
NOV 14 2006
CITY CLERK
MONTGOMERY
ALA.

TELEPHONE: 334-262-7600

Mrs. Brenda Gale Blalock
City Clerk
103 North Perry Street
Montgomery, Alabama 36104

RE:   *Notice of claims of Mrs. Gwendolyn P. McQuirter &*
      *Mr. Charles E. McQuirter, wife and husband*

Dear Mrs. Blalock:

As counsel for Mrs. Gwendolyn P. McQuirter and her spouse Mr. Charles E. McQuirter, of 4418 Lowell Road, Montgomery, Alabama (334) 280-3302, I hereby present these itemized and verified claims against the City of Montgomery, State of Alabama, pursuant to §§ 11-47-23 & 11-47-192, *Code of Alabama* (1975), in the total sum of $200,000.00. These claims are itemized as follows:

1)   $100,000 for humiliation, shame, embarrassment, disgrace and damage to reputation of Mrs. Gwendolyn P. McQuirter; &

2)   $100,000 for loss of consortium for Mr. Charles E. McQuirter.

The following is a recounting of the factual background upon which these claims rest:

On or about September 15, 2006, the Special Operations Division of the Montgomery Police Department ("MPD") conducted a prostitution sting in the area of Mobile Highway in Montgomery, Alabama. The operation was a continuation of previous stings in that area. As a result of the sting, undercover police officers arrested ten (10) women for allegedly offering sex for money. These ten women were booked into the City Jail, fingerprinted and photographed.

On or about September 16, 2006, the Montgomery Police Department provided photos and criminal histories of the women arrested to the Montgomery Advertiser, WAKA – Channel 8, and WSFA – Channel 11. Reports indicate that WAKA and WSFA ran stories about the arrests on September 17, 18 & 19, showing photographs of each of the women during each broadcast. The Montgomery Advertiser also published a story concerning the arrests on September 17, 2006, and directed readers to view photos of the suspects on its website –

Mrs. Brenda Gale Blalock
November 14, 2006
Page 2 of 4

montgomeryadvertiser.com. (see enclosure).

One of the photographs appearing on the news broadcasts of WAKA and WSFA, and on the Advertiser's website, was that of Gwendolyn McQuirter. (see enclosure). However, Ms. McQuirter was not one of the ten women arrested for prostitution. Instead, apparently one of the females arrested, Tiffany Riley, gave Mrs. McQuirter's name at the time of her arrest to conceal her true identity. It appears that the MPD made no effort to confirm Riley's identity before releasing the names and photographs to the media, and did so blindly. It further appears that instead of releasing Riley's booking photo to the media, law enforcement, for some unknown reason, obtained Mrs. McQuirter's driver's license photo and released that to the media.

Once the McQuirter's learned of the media reports from friends and neighbor's immediate contact was made with the MPD concerning the error. As a result, Mrs. McQuirter's photograph was pulled from the Advertiser's website on September 20, 2006.

The Municipality of Montgomery, Alabama is liable in this matter on the basis that the City is responsible for the wrongful acts of its police officers and any other City employees involved in the commission of the acts described herein. All indications reveal that certain law enforcement officers or other City employees recklessly failed to ensure the accuracy of the information released to the media.

As a result of the foregoing, Mrs. McQuirter has suffered severe emotional distress, embarrassment and shame and her positive reputation in the community has been severely damaged. The emotional scars are expected to last indefinitely. As a result of Mrs. McQuirter's injuries, Mr. McQuirter has also been injured in that he has been deprived of the love, affection and companionship of his wife in their normal daily activities.

Mrs. McQuirter is seeking the sum of $100,000 as compensatory damages, as itemized above. Mr. McQuirter is seeking the sum of $100,000 as compensatory damages, for the loss of his wife's services past, present and future.

Sincerely,

Jerry M. Blevins

JMB/cas

Enclosure

Mrs. Brenda Gale Blalock
November 14, 2006
Page 3 of 4

_Gwendolyn P. McQuirter_
Gwendolyn P. McQuirter
Claimant

STATE OF ALABAMA     )
                            )
MONTGOMERY COUNTY   )

    I, Jerry M. Blevins, a Notary Public, in and for said County and State, hereby certify that **GWENDOLYN P. MCQUIRTER**, whose name is signed to the foregoing Notice of Claim, and who is known to me, acknowledged before me on this day the truthfulness and correctness of the information set forth herein and that she executed the same voluntarily on the day the same bears date.

    Given under my hand and seal this 14th day of November, 2006.

_____
NOTARY PUBLIC
My Commission Expires: _3/13/2010_

Mrs. Brenda Gale Blalock
November 14, 2006
Page 4 of 4

_Charles E. mcQuirter_

Mr. Charles E. McQuirter
Claimant

STATE OF ALABAMA                )
                                )
MONTGOMERY COUNTY               )

I, Jerry M. Blevins, a Notary Public, in and for said County and State, hereby certify that **CHARLES E. MCQUIRTER**, whose name is signed to the foregoing Presentment of Claims, and who is known to me, acknowledged before me on this day the truthfulness and correctness of the information set forth herein and that he executed the same voluntarily on the day the same bears date.

Given under my hand and seal this __14th__ day of November, 2006.

NOTARY PUBLIC
My Commission Expires: _3/13/2010_

September 18, 2006

<< First | < Previous | Picture no. 1 of 10 | Next > | Last >>

**Prostitution Sting Arrests**



Gwendolyn McQuirter

**CLICK HERE TO BUY PHOTOS**
Some photos may be available for reprint. Click the above link to purchase photos framed, unframed, on mugs, puzzles, tiles, greeting cards, mousepads or t-shirts. Some restrictions apply.

<< First | < Previous | Picture no. 1 of 10 | Next > | Last >>

- Homepage
- News
  - Alabama
  - Archives
  - Business
  - Columnists
  - Elections
  - Faith & Values
  - Forums
  - Games and Comics
  - Lifestyle
  - Local
  - National
  - Obituaries
  - Opinion
  - Photo Galleries
  - Teacher Resources
  - Technology
  - Weddings
- go! Entertainment
- Sports
- Classifieds
  - Cars
  - Homes
  - Jobs
  - Place an ad
- Customer Service
  - Contact Us
  - Subscribe
- Communities

Related Links
Ten arrested in prostitution sting

Advertisement



EASTDALE M

**Photo Galleries**

 Hank Williams Birthday Ce

 Puppies go to school

 Prostitution Sting Arrests

 MDA Executive Lock Up

 Alabama vs LA-Monroe

 ASU vs. Arkansas Pine-Bl

 LSU @ Auburn



**Ten arrested in prostitution sting**

Sunday:
Sept. 17, 2006

Undercover officers arrested 10 women Friday for allegedly offering sex for money, according to the Montgomery Police Department.

The Special Operations Division of the Montgomery Police Department set up the prostitution sting in the area of Mobile Highway. The operation was a continuation of previous stings in that area.

View photos of the sting's suspects online at montgomeryadvertiser.com.

**COMING MONDAY**

**montgomeryadvertiser.com**

*Montgomery Advertiser*

This is a printer friendly version of an article from the The Montgomery Advertiser
To print this article open the file menu and choose Print.

◄ Back

## Ten arrested in prostitution sting

**Montgomery Advertiser**

September 17, 2006

Undercover police officers arrested 10 women Friday for allegedly offering sex for money, according to the Montgomery Police Department.

The Special Operations Division of the Montgomery Police Department set up the prostitution sting in the area of Mobile Highway. The operation was a continuation of former stings in that area.

Police provided photos and criminal histories for all 10 women arrested.

## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| **GWENDOLYN P. MCQUIRTER, and**<br>**CHARLES E. MCQUIRTER,** | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| **CITY OF MONTGOMERY,** | ) |
| **K.C. BENTLEY, and RON COOK,** | ) |
| Defendants and Third-Party Plaintiffs, | ) |
| | ) |
| v. | ) Case No. **2:07-CV-234-MEF-WC** |
| | ) |
| **TIFFANY MICHELE RILEY, and** | ) |
| **ROOSEVELT PERKINS,** | ) |
| | ) |
| Third-Party Defendants. | ) |

## AFFIDAVIT OF MARK DRINKARD

Before me, the undersigned authority, personally appeared Mark Drinkard, who is known to me and who, being first duly sworn, deposed on oath, and says as follows:

My name is Mark Drinkard and I am over nineteen (19) years of age. I am currently employed as a Lieutenant with the Planning and Technology Bureau of the Montgomery Police Department which is assigned to the Administrative Division. It is in that capacity that I state the following:

1.    I am the Agency Information Security Officer "AISO" for Law Enforcement Tactical Systems "LETS" which is provided by the Alabama Criminal Justice Information Center "ACJIC" and used by the Montgomery Police Department.



**DEFENDANT'S EXHIBIT**<br>"5"<br>tabbies'

2.    LETS provides a database obtained from many different agency records such as records from the Bureau of Vital Statistics, the Administrative Office of the Courts, the Department of Public Safety, and the Department of Revenue.

3.    In order for someone to receive LETS access they must sign up and request admission from AlaCop. This site will then send me an email showing the requestors name and departmental information.

4.    Once I have granted admittance to LETS, the requestor can choose their password to activate the system. All access to the system is then tracked by the Alabama Criminal Justice Information Center "ACJIC".

5.    Our records indicate Lieutenant Ron Cook and Corporal Kristen Bentley have been granted access to use LETS.

I have read the above and foregoing affidavit consisting in total of two (2) pages and state that it is true and correct to my present knowledge and information.

LT Mark Drinkard 086

Lt. Mark Drinkard

**SWORN to and SUBSCRIBED** before me this the _30th_ day of October, **2007.**

Betty S. Ruffin

Notary Public
My Commission Expires _10-15-08_

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| GWENDOLYN P. MCQUIRTER, and CHARLES E. MCQUIRTER,<br><br>  Plaintiffs,<br><br>v.<br><br>CITY OF MONTGOMERY, K.C. BENTLEY, and RON COOK,<br><br>  Defendants and Third-Party Plaintiffs,<br><br>v.<br><br>TIFFANY MICHELE RILEY, and ROOSEVELT PERKINS,<br><br>  Third-Party Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. **2:07-CV-234-MEF-WC**<br>)<br>)<br>)<br>)<br>)<br>) |

### AFFIDAVIT OF PATRICK MURPHY

Before me, the undersigned authority, personally appeared Patrick Murphy, who is known to me and who, being first duly sworn, deposed on oath, and says as follows:

My name is Patrick Murphy. I am over nineteen years of age. I am employed with the City of Montgomery as the Montgomery Municipal Court Administrator. It is in that capacity that I state the following:

1. I am the custodian of records for the Municipal Court of Montgomery, Alabama. Attached to my affidavit are Certified Copies of the following cases from Municipal Court:

  *a.*   *Municipality of Montgomery v. Gwendolyn McQuirter (AKA Tiffany Riley),* Case Number 2006CRA006010A in which the case action

1



summary indicates that the defendant pled guilty as charged to Prostitution on September 20, 2006.

b.    *Municipality of Montgomery v. Tiffany Michele Riley),* Case Number 2006CRA006097A in which the case action summary indicates that the defendant pled guilty as charged to Giving False Statement to Law Enforcement Officer on September 20, 2006.

2.    These records are a true and complete copy of the Montgomery Municipal Court Records pertaining to the aforementioned cases.

I have read the above and foregoing affidavit consisting in total of two (2) pages and state that it is true and correct to my present knowledge and information.

Patrick Murphy, Court Administrator

**SWORN to and SUBSCRIBED before me this the** 29th **day of October, 2007.**

Notary Public
My Commission Expires

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Mar 28, 2011
BONDED THRU NOTARY PUBLIC UNDERWRITERS

| State of Alabama<br>City of Montgomery<br><br>Form MMC-1010      Rev. 10/03 | COURT RECORD<br>CASE ACTION SUMMARY | Case Number<br>**2006CRA006010A**<br>PAGE 1 OF 4 |

# IN THE MUNICIPAL COURT OF _____ MONTGOMERY _____ , ALABAMA
*(Name of Municipality)*

## MUNICIPALITY OF ___ MONTGOMERY ___ v. ___ GWENDOLYN MCQUIRTER ___ *AKA*
Defendant *(Tiffany Riley)*

### DEFENDANT IDENTIFICATION AND INFORMATION

| Social Security Number<br>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 | Date of Birth<br>02/27/1972 | Home Address<br>4418 LOWELL ROAD | | |
|---|---|---|---|---|
| Race<br>B | Sex<br>F | City<br>MONTGOMERY | State<br>AL | Zip Code |
| Height | Weight | Home Telephone Number | | |
| Eye Color | Hair Color | Employer Name & Address | | |
| Driver License State | Driver License Number | City | State | Zip Code |
| Other / Distinguishing Features | | Employer Telephone Number | | |

Offense / Charge:   **(20E) PROSTITUTION**

Complainant - Victim / Arresting Officer:   TERRANCE JAMES   1170 JAMES

Bondsman / Surety:   BOND JAMES BOND,,,        Bond Amount:   500.00

| Date of Offense<br>09/15/2006 | Date Warrant Issued | Date Committed to Jail | Date Released on Bond | Arraignment Date<br>10/11/2006 | Trial Date |
|---|---|---|---|---|---|

**PROSECUTOR NAME:**   **DEFENSE COUNSEL NAME:**

ARRAIGNMENT:   *Dexter Russell*        ARRAIGNMENT:   *Thed*

TRIAL: _____        TRIAL: _____

PLEA OF DEFENDANT:   ☑ GUILTY AS CHARGED   ☐ NOT GUILTY   ☐ GUILTY OF:

*No Explained Rights — Her real name is Tiffany Riley. — △ voluntarily Waives*

### ADJUDICATION

☒ GUILTY AS CHARGED   ☐ NOT GUILTY   ☐ NOL-PROSSED   ☐ DISMISSED

☐ GUILTY OF: _____

SEP 2 0 2006        *(W.M signature)*

DATE        JUDGE, CITY OF MONTGOMERY

### ACTIONS, JUDGMENTS, CASE NOTES

SENTENCED TO _____ DAYS IN JAIL, SUSPEND _____ DAYS.

FINE: $ 150        COURT COST: $ 9.00        SUBPOENA / ALIAS WARRANT FEES: $

TOTAL: $ 34.00        PAYMENT DUE DATE: 12/19/06

**EXHIBIT**

*a.*

I HEREBY CERTIFY THAT THIS IS A TRUE AND
CORRECT COPY OF THE ORIGINAL DOCUMENT ON
FILE IN THE MONTGOMERY MUNICIPAL COURT.

PATRICK J. MURPHY
CLERK OF
MONTGOMERY MUNICIPAL COURT

DATE: 10-29-2007

| State of Alabama<br>Unified Judicial System<br>Form C-64(a)(front) Rev. 11/92 | **DEPOSITION** | Warrant Number<br>2006M03548<br>Case Number |
|---|---|---|

**IN THE** **MUNICIPAL** **COURT OF** **MONTGOMERY,** **ALABAMA**

(Circuit, District or Municipal) — (Name of Municipality or County)

☐ STATE OF ALABAMA        ☒ MUNICIPALITY OF **MONTGOMERY**

v.    Gwendolyn McQuirter _____ , Defendant

---

### INSTRUCTIONS: COMPLETE THE FOLLOWING INFORMATION ON THE ACCUSED

Name of Accused (or Alias)
Gwendolyn McQuirter            AKA            Telephone Number ( ) -

| Social Security Number<br>409 - 71 - 8696 | Driver's License Number | Date of Birth<br>02 /27 / 1972 | Age<br>34 | Race<br>**Black** | Sex<br>F |
|---|---|---|---|---|---|

| Height<br>5' 00" | Weight<br>145 | Hair<br>Blk | Eyes<br>Bro | Complexion<br>med | | |

Address of Accused
4418 Lowell Rd        City Montgomery        State AL        Zip

Name of Employer
Unemployed        Employer's Telephone Number ( ) -

Address of Employer        City Montgomery        State AL        Zip

---

### INSTRUCTIONS: COMPLETE THE FOLLOWING INFORMATION ON THE OFFENSE

Offense:    Prostitution

Date and Time of Offense: 09 /15 / 2006  ⦿ At  ◯ Between        and 2015    hours

Place of Occurrence:    3300 Blk. Mobile hwy.Montgomery, Al

Person Attacked or Property Damaged: _____

How Attacked: _____

Did Accused Possess or Use a Weapon?   ☐ Yes   ⦿ No    Type:

Damage Done or Injuries Received: _____

Value of Property: _____

Details of Offense: _____

On the listed date and time Cpl. James while working in an undercover capacity in the 3300 Blk. of Mobile Hwy., was approached by the defendant. The defendant walked over to Cpl. James's vehicle and got in.The defendant then asked Cpl. James "what was up". Cpl. James told the defendant he wanted some head. The defendant told Cpl. James that it would cost him $20.00. Cpl. James agreed to the price. The defendant asked Cpl. James if he was the police. Cpl. James replied "no". Cpl. James then asked the defendant if she was the police. The defendant responded by pulling up her shirt and exposing her breast. Cpl. James then drove the defendant to Community Policing where she was taken into custody. The defendant was charged with prostitution and transported to the city jail.

CORRECT COPY OF THE ORIGINAL DOCUMENT ON
FILE IN THE MONTGOMERY MUNICIPAL COURT.

PATRICK J. MURPHY
CLERK OF
MONTGOMERY MUNICIPAL COURT
DATE: 10-29-2007

Form C-64 (a) (back)     Rev. 11/92

## DEPOSITION

Any Law Enforcement Agency Contacted?  ☐ Yes   ☐ No
If yes, which one? _____

## INSTRUCTIONS: COMPLETE THE FOLLOWING INFORMATION ABOUT YOURSELF

| Name of Complainant Cpl. T.D. James | ID: 1170 | | Telephone Number | |
|---|---|---|---|---|
| Social Security Number | Driver's License Number | Date of Birth | Age | Race | Sex |
| Home Address | | City | State | Zip | |
| Name of Employer  MONTGOMERY POLICE DEPARTMENT | | Employer's Telephone Number | | |
| Address of Employer | City | State | Zip | |

I make this statement for the purpose of securing a **WARRANT/SUMMONS** against the named accused. I understand
that I am instituting a criminal proceeding and cannot dismiss this case. I further understand that if any of the foregoing
facts are untrue, I may, in addition to any other punishment provided by law, be taxed with court costs in this proceeding.

Sworn to and Subscribed before me this

15th _____ day of

September 2006

_____
Judge/Clerk/Magistrate

_Cpl. T.D James # 1170_
Complainant

## WITNESSES

| Name | Address | Telephone Number |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

## MAGISTRATE NOTES

Warrant or Summons Issued?  ☐ Yes   ☐ No      Warrant Number: 2006MO3548

State of Alabama
Unified Judicial System

# COMPLAINT

(Felonies, Misdemeanors, or Violations -
District or Municipal Court)

Form CR-6          Rev. 8/98

Warrant Number
**2006M03548**

Case Number

---

IN THE ___**MUNICIPAL**___ COURT OF ___**MONTGOMERY**___ , ALABAMA
(Circuit, District, or Municipal)          (Name of Municipality or County)

☐ STATE OF ALABAMA

☒ MUNICIPALITY OF MONTGOMERY v. ___**GWENDOLYN MCQUIRTER (001021435A)**___
                                   Defendant (NWS Jacket Number)

---

Before me, the undersigned authority, personally appeared this day the undersigned complainant who, upon first being duly sworn, states on oath that he/she has probable cause for believing, and does believe that ___**GWENDOLYN MCQUIRTER**___ , Defendant, whose name is otherwise unknown to the complainant, did, prior to the commencement of this action, on or about ___09/15/2006___ (date of occurrence) commit the offense of ___**PROSTITUTION**___ within the

☐ County of _____

☒ City/Town of ___**MONTGOMERY**___ or in the police jurisdiction thereof, in that he/she did: (State specific facts here. Continue on a separate sheet of paper if needed.) (select as appropriate):

(b) ☒ solicit, compel or coerce any person to have sexual intercourse or participate in any natural or unnatural sexual act, deviate sexual intercourse, or sexual contact for monetary consideration or other thing of marketable value;

(c) ☐ agree to engage in sexual intercourse, deviant sexual intercourse, or sexual contact with another or participate in the act for monetary consideration or other thing of marketable value and give or accept monetary consideration or other thing of value in furtherance of the agreement;

(d)(1) ☐ knowingly cause or aid a person to commit or engage in prostitution;

(d)(2) ☐ knowingly procure or solicit patrons for prostitution;

(d)(3) ☐ knowingly provide persons or premises for prostitution purposes;

(d)(4) ☐ knowingly receive or accept money or other thing of value pursuant to a prior agreement with any person whereby he or she participates or is to participate in the proceeds of any prostitution activity;

(d)(5) ☐ knowingly operate or assist in the operation of a house of prostitution or prostitution enterprise, in violation of

☐ Section _____ , Alabama Code 1975.

☒ Municipal Ordinance Number ___125-79___ which embraces Section ___13A-12-121___ Alabama Code 1975, previously adopted, effective and in force at the time the offense was committed.

☐ Other

Sworn to and Subscribed before me this

15TH _____ day of

SEPTEMBER _____ , 2006

_____
Judge/Magistrate/Warrant Clerk

Complainant  CPL. T.D. James # 1170     -DET. T. D. JAMES #1170

MPD
Address

Telephone Number

---

## WITNESSES

| Name | Address | Telephone Number |
|------|---------|------------------|
|      |         |                  |
|      |         |                  |
|      |         |                  |
|      |         |                  |

Additional Witnesses on Reverse Side.

I HEREBY CERTIFY THAT THIS IS A TRUE AND
CORRECT COPY OF THE ORIGINAL DOCUMENT ON
FILE IN THE MONTGOMERY MUNICIPAL COURT.

PATRICK J. MURPHY
CLERK OF
MONTGOMERY MUNICIPAL COURT

DATE: 10-29-2007

| State of Alabama<br>Unified Judicial System | **WARRANT OF ARREST**<br>(Felonies, Misdemeanors, or Violations) | Warrant Number<br>2006M03548 |
|---|---|---|
| Form CR-58 (front)    Rev. 8/98 | | Case Number |

**IN THE** _____ **MUNICIPAL** _____ **COURT OF** _____ **MONTGOMERY** _____, **ALABAMA**
(Circuit, District, or Municipal)                    (Name of Municipality or County)

☐ STATE OF ALABAMA

☒ MUNICIPALITY OF MONTGOMERY v. _____ GWENDOLYN MCQUIRTER  (001021435A) _____
                                                            Defendant (NWS Jacket Number)

---

## TO ANY LAW ENFORCEMENT OFFICER WITHIN THE STATE OF ALABAMA:

☒ Probable cause has been found on a Complaint filed in the court against (name or description of person to be arrested)

GWENDOLYN MCQUIRTER _____

charging the offense of _____ **PROSTITUTION** _____

_____ as described in the Complaint.

☐ An indictment has been returned by the grand jury of this county against (name or description of person to be arrested)

charging the offense of _____

_____ as described in the Complaint.

☒ **YOU ARE THEREFORE ORDERED** to arrest the person named or described above and bring that person before a judge or magistrate of this court to answer the charges against that person and have with you then and this Warrant of Arrest with your return thereon.

If a judge or magistrate of this court is unavailable, or if the arrest is made in another county, you shall then take the accused person before the nearest or most accessible judge or magistrate in the county of the arrest.

☒ You may release the accused person without taking the accused before a judge or magistrate:

☒ If the accused person enters into a bond in the amount of $ **500.00** with sufficient sureties approved by an authorized officer or by depositing cash or negotiable bonds in the amount with the court clerk.

---OR---

☒ If the accused person posts an appearance bond in the amount of $ **500.00**

☐ On his or her personal recognizance.

Friday, September 15, 2006  09:51 PM
Date

_____
Judge/Court Clerk/Magistrate/Warrant Clerk

I HEREBY CERTIFY THAT THIS IS A TRUE AND
CORRECT COPY OF THE ORIGINAL DOCUMENT ON
FILE IN THE MONTGOMERY MUNICIPAL COURT.

PATRICK J. MURPHY
CLERK OF
MONTGOMERY MUNICIPAL COURT
DATE: 10-29-2007

**WARRANT OF ARREST**
(Felonies, Misdemeanors, or Violations)

## CERTIFICATE OF EXECUTION

I, the undersigned law enforcement officer, certify that I executed the foregoing **WARRANT OF ARREST** by arresting the accused person named (or described) therein at _2015 HRS_ o'clock ☐ a.m. ☒ p.m.

on the _15TH_ day of _SEPTEMBER_, 20 _06_

in _MONTGOMERY_ COUNTY, ALABAMA.

After arrest, the accused person was:

☐ Released as authorized at _____ o'clock ☐ a.m. ☐ p.m. _____, 20 ____

☒ Taken before ☐ Judge ☒ Magistrate at _2151 HRS_ o'clock ☐ a.m. ☒ p.m.

_15TH SEPTEMBER_, 20 _06_

| | |
|---|---|
| _4-15-06_ | _T.O. Jones #1121 / CPL MPD_ |
| Date | Signature/Title/Agency |

## IDENTIFICATION OF ACCUSED PERSON

| Name of Accused Person | Telephone Number |
|---|---|
| GWENDOLYN MCQUIRTER | 334-281-5725 |

| Social Security Number | Drivers License Number & State | Date of Birth | Age | Race | Sex |
|---|---|---|---|---|---|
| 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 | | 02/27/1972 | | B | F |

| Height | Weight | Hair | Eyes | Complexion |
|---|---|---|---|---|
| 500 | 145 | Black | Brown | |

| Address of Accused | City | State | Zip Code |
|---|---|---|---|
| 4418 LOWELL ROAD | MONTGOMERY | AL | |

| Name of Employer | Telephone Number |
|---|---|
| | |

| Address of Employer | City | State | Zip Code |
|---|---|---|---|
| | | | |

## WITNESSES

| Name | Address | Telephone Number |
|---|---|---|
| | | |
| | | |
| | | |

## ACKNOWLEDGEMENT BY ACCUSED PERSON

☐ I hereby acknowledge that at the time of my release from custody I was directed to appear in person before the court, as follows:

Place: 320 NORTH RIPLEY STREET, MONTGOMERY, ALABAMA 36104-2722 (334) 241-2776

Date: _____, 20 ____

Time: _____ o'clock ☐ a.m. ☐ p.m., and as thereafter needed until discharged.

☐ I promise to appear as directed before the court, as follows:

Place: 320 NORTH RIPLEY STREET, MONTGOMERY, ALABAMA 36104-2722 (334) 241-2776

Date: _____, 20 ____

Time: _____ o'clock ☐ a.m. ☐ p.m., and as thereafter needed until discharged.

| | |
|---|---|
| Date | Signature of Accused Person |

State of Alabama
City of Montgomery

Form MMC-1010     Rev. 10/03

# COURT RECORD
# CASE ACTION SUMMARY

Case Number

**2006CRA006097A**

PAGE 1 OF 4

IN THE MUNICIPAL COURT OF _____ **MONTGOMERY** _____, **ALABAMA**
*(Name of Municipality)*

MUNICIPALITY OF _____ **MONTGOMERY** _____ v. **TIFFANY MICHELE RILEY**

Defendant

## DEFENDANT IDENTIFICATION AND INFORMATION

| Social Security Number | Date of Birth | Home Address | | |
|---|---|---|---|---|
| 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 | 02/27/1972 | 846 CORBETT ST | | |
| Race | Sex | City | State | Zip Code |
| B | F | MONTGOMERY | AL | 36108 |
| Height | Weight | Home Telephone Number | | |
| | | | | |
| Eye Color | Hair Color | Employer Name & Address | | |
| | | | | |
| Driver License State | Driver License Number | City | State | Zip Code |
| AL | 7321061 | | | |
| Other / Distinguishing Features: | | Employer Telephone Number | | |
| | | | | |

Offense / Charge:   **(14Q)   FALSE STATEMENT-GIVING FALSE NAME, ETC. TO LE OFF.**

Complainant - Victim / Arresting Officer:   TERRANCE JAMES    1170 JAMES

Bondsman / Surety: _____     Bond Amount: _____ 0.00

| Date of Offense | Date Warrant Issued | Date Committed to Jail | Date Released on Bond | Arraignment Date | Trial Date |
|---|---|---|---|---|---|
| 09/15/2006 | | | | 09/20/2006 | |

PROSECUTOR NAME:     DEFENSE COUNSEL NAME:

ARRAIGNMENT: *Buster Russel*     ARRAIGNMENT: *Thub*

TRIAL: _____     TRIAL: _____

PLEA OF DEFENDANT: [✓] GUILTY AS CHARGED   [ ] NOT GUILTY   [ ] GUILTY OF:

9/20 Explained Rights — Δ voluntarily waives

## ADJUDICATION

[✗] GUILTY AS CHARGED   [ ] NOT GUILTY   [ ] NOL-PROSSED   [ ] DISMISSED

[ ] GUILTY OF: _____

SEP 2 0 2006     (W. M

DATE     JUDGE, CITY OF MONTGOMERY

## ACTIONS, JUDGMENTS, CASE NOTES

SENTENCED TO _____ DAYS IN JAIL, SUSPEND _____ DAYS

FINE: $ 350     COURT COST: $ 191.00     SUBPOENA / ALIAS / WARRANT FEES: $ _____

TOTAL F_ $ 541.00     PAYMENT DUE DATE: 12/19

**EXHIBIT**

tabbies

**6.**

I HEREBY CERTIFY THAT THIS IS A TRUE AND
CORRECT COPY OF THE ORIGINAL DOCUMENT ON
FILE IN THE MONTGOMERY MUNICIPAL COURT.

PATRICK J. MURPHY
CLERK OF
MONTGOMERY MUNICIPAL COURT

DATE: 10-29-2007

| State of Alabama<br>Unified Judicial System<br>Form C-64(a)(front)  Rev. 11/92 | **DEPOSITION** | Warrant Number<br>2006MO3609<br>Case Number |
|---|---|---|

IN THE  **MUNICIPAL**  COURT OF  **MONTGOMERY,**  **ALABAMA**
(Circuit, District or Municipal)  (Name of Municipality or County)

☐ STATE OF ALABAMA          ☒ MUNICIPALITY OF  **MONTGOMERY**

v.  Tiffany Michele Riley  , Defendant

**INSTRUCTIONS: COMPLETE THE FOLLOWING INFORMATION ON THE ACCUSED**

| Name of Accused (or Alias)<br>Tiffany Michele Riley | AKA | | Telephone Number<br>(334)    - |
|---|---|---|---|

| Social Security Number<br>408 - 17 - 9921 | Driver's License Number<br>7321061 | Date of Birth<br>02 / 27 / 1972 | Age<br>26 | Race<br>Black | Sex<br>F |

| Height<br>5' 00" | Weight<br>150 | Hair<br>Blk | Eyes<br>Bro | Complexion<br>Med |

| Address of Accused<br>846 Corbett St. | City<br>Montgomery | State<br>AL | Zip |

| Name of Employer<br>unemployed | Employer's Telephone Number<br>(   )    - |

| Address of Employer | City<br>Montgomery | State<br>AL | Zip |

**INSTRUCTIONS: COMPLETE THE FOLLOWING INFORMATION ON THE OFFENSE**

Offense:  Giving A False Name To A L.E.O.

Date and Time of Offense: 09 /15 / 2006  ⦿ At  ◯ Between          and  2015          hours

Place of Occurrence:  3300 Blk. Mobile Hwy. Montgomery, Al

Person Attacked or Property Damaged:

How Attacked:

Did Accused Possess or Use a Weapon?  ☐ Yes     ⦿ No     Type:

Damage Done or Injuries Received:

Value of Property:

Details of Offense:

On the listed date and time the defendant was arrested for prostitution The defendant while being processed stated her name was Gwendolyn McQuirter, DOB 2-27-72. Cpl. James signed a warrant and placed the defendant in the city jail as Gwendolyn McQuirter. On 9-19-06 it was learned the defendant had provided a false name and that her name was actually Tiffany Riley, DOB 02-27-72 . On 09-19-06 the defendant was arrested in the 1000 Blk. of Ewell St. and transported to Special Operations. The defendat was read her rights using the Montgomery Police Department rights form. The defendant volunteered to make a statement. The defendant  stated she lied about her name because she had two (2) outstanding capias warrants. The defenadnt was charged with Giving a False Name to a L.E.O and Prostitution. The defendant was then transported to the city jail.

I HEREBY CERTIFY THAT THIS IS A TRUE AND
CORRECT COPY OF THE ORIGINAL DOCUMENT ON
FILE IN THE MONTGOMERY MUNICIPAL COURT.

PATRICK J. MURPHY
CLERK OF
MONTGOMERY MUNICIPAL COURT

DATE: 10-29-2007

| Form C-64 (a) (back) Rev. 11/92 | DEPOSITION |
|---|---|

Any Law Enforcement Agency Contacted? ☐ Yes ☐ No

If yes, which one?

**INSTRUCTIONS: COMPLETE THE FOLLOWING INFORMATION ABOUT YOURSELF**

| Name of Complainant T.D. James | ID: 1170 | Telephone Number | | | |
|---|---|---|---|---|---|
| Social Security Number | Driver's License Number | Date of Birth | Age | Race | Sex |
| Home Address | City | State | Zip | | |
| Name of Employer MONTGOMERY POLICE DEPARTMENT | Employer's Telephone Number | | | | |
| Address of Employer | City | State | Zip | | |

I make this statement for the purpose of securing a **WARRANT/SUMMONS** against the named accused. I understand that I am instituting a criminal proceeding and cannot dismiss this case. I further understand that if any of the foregoing facts are untrue, I may, in addition to any other punishment provided by law, be taxed with court costs in this proceeding.

Sworn to and Subscribed before me this 19th day of September, 2006.

Amanda Guffey
Judge/Clerk/Magistrate

Cpl. T.D. James #1170
Complainant

**WITNESSES**

| Name | Address | Telephone Number |
|---|---|---|
| | | |

**MAGISTRATE NOTES**

Warrant or Summons Issued? ☒ Yes ☐ No Warrant Number: 2006MO031009

State of Alabama
Unified Judicial System

# COMPLAINT

(Felonies, Misdemeanors, or Violations -
District or Municipal Court)

Form CR-6          Rev. 8/98

Warrant Number

**2006M03609**

Case Number

| IN THE | MUNICIPAL | COURT OF | MONTGOMERY | , ALABAMA |
|--------|-----------|----------|------------|-----------|

(Circuit, District, or Municipal)                    (Name of Municipality or County)

☐ STATE OF ALABAMA

☒ MUNICIPALITY OF MONTGOMERY v. _____ TIFFANY MICHELE RILEY  (000061248A) _____

Defendant (NWS Jacket Number)

Before me, the undersigned authority, personally appeared this day the undersigned complainant who, upon first being duly sworn, states on oath that he/she has probable cause for believing, and does believe that ____ TIFFANY MICHELE RILEY ____ ,

Defendant, whose name is otherwise unknown to the complainant, did, prior to the commencement of this action, on or about

09/15/2006 ____ (date of occurrence) commit the offense of ____ **GIVING FALSE IDENTITY TO A LAW ENFORCEMENT**

**OFFICER** ____ within the

☐ County of _____

☒ City/Town of ____ MONTGOMERY ____ or in the police jurisdiction thereof, in that he/she did: (State specific facts here. Continue on a

separate sheet of paper if needed.)    give a false name or address, to wit: ____ GWENDOLYN MCQUIRTER 2/27/1972 ____

_____ , to a law enforcement officer, to wit:

CPL. T. D. JAMES #1170 _____ , in the course of the officer's official duties and with intent

to mislead the officer,

in violation of

☐ Section _____ , Alabama Code 1975.

☒ Municipal Ordinance Number ____ 125-79 ____ which embraces Section ____ 13A-9-18.1 ____ Alabama Code 1975,

previously adopted, effective and in force at the time the offense was committed.

☐ Other _____

Sworn to and Subscribed before me this

19TH _____ day of

Complainant _CPL. T.D. James #1170_

SEPTEMBER ____ , ____ 2006 ____

320 NORTH RIPLEY, MONTGOMERY, AL  36104

Address

_Amanda Guffey_

Judge/Magistrate/Warrant Clerk

334-241-4700

Telephone Number

## WITNESSES

| Name | Address | Telephone Number |
|------|---------|------------------|
|      |         |                  |
|      |         |                  |
|      |         |                  |
|      |         |                  |

Additional Witnesses on Reverse Side.

I HEREBY CERTIFY THAT THIS IS A TRUE AND
CORRECT COPY OF THE ORIGINAL DOCUMENT ON
FILE IN THE MONTGOMERY MUNICIPAL COURT.

PATRICK J. MURPHY
CLERK OF
MONTGOMERY MUNICIPAL COURT

DATE: 10-29-2007

| State of Alabama<br>Unified Judicial System | **WARRANT OF ARREST**<br>(Felonies, Misdemeanors, or Violations) | Warrant Number<br>2006M03609 |
|---|---|---|
| Form CR-58 (front)          Rev. 8/98 | | Case Number |

IN THE ___**MUNICIPAL**___ COURT OF ___**MONTGOMERY**___, ALABAMA
<br>(Circuit, District, or Municipal)          (Name of Municipality or County)

☐ STATE OF ALABAMA

☒ MUNICIPALITY OF MONTGOMERY v. ___**TIFFANY MICHELE RILEY**   (000061248A)___
<br>Defendant (NWS Jacket Number)

## TO ANY LAW ENFORCEMENT OFFICER WITHIN THE STATE OF ALABAMA:

☒ Probable cause has been found on a Complaint filed in the court against (name or description of person to be arrested)

TIFFANY MICHELE RILEY

charging the offense of    **GIVING FALSE IDENTITY TO A LAW ENFORCEMENT OFFICER**

_____ as described in the Complaint.

☐ An indictment has been returned by the grand jury of this county against (name or description of person to be arrested)

charging the offense of _____

_____ as described in the Complaint.

☒ **YOU ARE THEREFORE ORDERED** to arrest the person named or described above and bring that person before a judge or magistrate of this court to answer the charges against that person and have with you then and this Warrant of Arrest with your return thereon.

If a judge or magistrate of this court is unavailable, or if the arrest is made in another county, you shall then take the accused person before the nearest or most accessible judge or magistrate in the county of the arrest.

☒ You may release the accused person without taking the accused before a judge or magistrate:

☒ If the accused person enters into a bond in the amount of $   **1,000.00**   with sufficient sureties approved by an authorized officer or by depositing cash or negotiable bonds in the amount with the court clerk.
<br>---OR---

☒ If the accused person posts an appearance bond in the amount of $   **1,000.00**

☐ On his or her personal recognizance.

Tuesday, September 19, 2006 03:20:15
<br>Date

_Amanda Gulley_
<br>Judge/Court Clerk/Magistrate/Warrant Clerk

I HEREBY CERTIFY THAT THIS IS A TRUE AND CORRECT COPY OF THE ORIGINAL DOCUMENT ON FILE IN THE MONTGOMERY MUNICIPAL COURT.

PATRICK J. MURPHY
<br>CLERK OF
<br>MONTGOMERY MUNICIPAL COURT

DATE: __10-29-2007__

| Form CR-58 (back)   Rev. 8/98 | WARRANT OF ARREST<br>(Felonies, Misdemeanors, or Violations) |
|---|---|

## CERTIFICATE OF EXECUTION

I, the undersigned law enforcement officer, certify that I executed the foregoing **WARRANT OF ARREST** by arresting the accused person named (or described ) therein at __2015__ o'clock ☐ a.m. ☒ p.m.

on the __15TH__ day of __SEPTEMBER__ , 20 __06__

in __MONTGOMERY__ COUNTY, ALABAMA.

After arrest, the accused person was:

☐ Released as authorized at _____ o'clock ☐ a.m. ☐ p.m. _____ , 20 ____

☒ Taken before ☐ Judge ☒ Magistrate at __15TH__ o'clock ☐ a.m. ☒ p.m.

__SEPTEMBER__ , 20 __06__

| | |
|---|---|
| __9-15-06__ | __T. D'Juno #1126 / CPL (MPD__ |
| Date | Signature/Title/Agency |

## IDENTIFICATION OF ACCUSED PERSON

| Name of Accused Person<br>TIFFANY MICHELE RILEY | | | | Telephone Number | | |
|---|---|---|---|---|---|---|
| Social Security Number<br>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 | Drivers License Number & State<br>7321061   AL | | Date of Birth<br>02/27/1972 | Age<br>26 | Race<br>B | Sex<br>F |
| Height<br>500 | Weight<br>150 | Hair<br>Black | Eyes<br>Brown | Complexion<br>MED | | |
| Address of Accused<br>846 CORBETT ST | | | City<br>MONTGOMERY | State<br>AL | | Zip Code<br>36108 |
| Name of Employer | | | | Telephone Number | | |
| Address of Employer | | | City | State | | Zip Code |

## WITNESSES

| Name | Address | Telephone Number |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

## ACKNOWLEDGEMENT BY ACCUSED PERSON

☐ I hereby acknowledge that at the time of my release from custody I was directed to appear in person before the court, as follows:

Place: __320 NORTH RIPLEY STREET, MONTGOMERY, ALABAMA 36104-2722  (334) 241-2776__

Date: _____ , 20 ____

Time: _____ o'clock ☐ a.m. ☐ p.m., and as thereafter needed until discharged.

☐ I promise to appear as directed before the court, as follows:

Place: __320 NORTH RIPLEY STREET, MONTGOMERY, ALABAMA 36104-2722  (334) 241-2776__

Date: _____ , 20 ____

Time: _____ o'clock ☐ a.m. ☐ p.m., and as thereafter needed until discharged.

| | |
|---|---|
| _____ | _____ |
| Date | Signature of Accused Person |

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

GWENDOLYN P. MCQUIRTER,          )
et al.,                          )
                                 )
          Plaintiffs,            )
                                 )
v.                               )    Civil Action No.: 2:07-cv-00234-MEF-WC
                                 )
CITY OF MONTGOMERY, et al.,      )
                                 )
          Defendants.            )

### PLAINTIFF GWENDOLYN MCQUIRTER'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS

Comes now the Plaintiff, Gwendolyn McQuirter, by and through her undersigned counsel,

and provides the following responses to Defendants' First Set of Interrogatories and Requests for

Production of Documents, as follows:

**Interrogatory 1.**   Please describe your relationship with Tiffany Riley, including how you
came to know each other, the frequency and nature of your contacts with her, and the current
state of your relationship.

**ANSWER:**   I met and became friends with Tiffany Riley in 2002, after meeting her at
a local community store on Mildred and Mobile Streets in Montgomery, Alabama. I saw Tiffany
on a regular and frequent basis from 2002 through September 2006, when I learned that she had
given my name to law enforcement after she was arrested for prostitution. I did not have contact
with her for about eight (8) months thereafter. I ran into Tiffany in the mall around May 2007,
and she apologized for what she did and we have talked on occasion since then, although, our
relationship has not returned to what it was prior to September 2006.

**Interrogatory 2.**   Please list every medical professional from whom you have received
treatment or diagnosis related to this case, including address, telephone number and dates of
treatment for each.

**ANSWER:**   Meadhaven Emotional Health Program, Southern Blvd., Montgomery, AL
(334) 286-3116; treated from 9/20/2006 to 9/25/2006;  Montgomery Family Medicine Res.,
Narrow Lane Road, Montgomery, AL (334) 288-2100, treated 9/06 to present; Montgomery
Mental Health Authority, 101 Coliseum Blvd., (334) 279-7830; treated from 9/06 to present.
Baptist South, 2190 E.S. Blvd., Montgomery, AL 36116, (334-288-2100), treated from 9/06



DEFENDANT'S
EXHIBIT
"7"

1

through present date on several different occasions.

**Request for Production 1**.      Please attach all medical records, notes and bills you have received for treatment related to this case.

**ANSWER:**    See Exhibit A.

**Interrogatory 3.**   Please list every mental health professional from whom you have received any treatment or diagnosis related to this case, including address, telephone number and dates of treatment for each.

**ANSWER:**    See response to Interrogatory 2.

**Request for Production 2.**      Please attach all treatment records, notes and bills you have received for mental health care you have received which is related to this case.

**ANSWER:**    see Exhibit A.

**Interrogatory 4.**   Please state every source of income for you or your husband in the last 2 years, to include retirement benefits and social security or disability benefits, and then state the total amount of any income you claim to have lost due to this case, and explain how each absence from work was related to this case.

**ANSWER:**    Objection. This Interrogatory seeks information of a personal and confidential nature which is neither relevant or material to the pending claims nor reasonable calculated to lead to the discovery of admissible evidence. Subject to and without waiving said objections, Plaintiff states that she is not seeking lost wages as damages in this cause.

**Request for Production 3.**      Please attach copies of 2006, 2005, and 2004 federal and state tax returns, with attachments, for you and your spouse.

**ANSWER:**    Objection. This Request seeks documentation of a personal and confidential nature which is neither relevant or material to the pending claims nor reasonable calculated to lead to the discovery of admissible evidence. Subject to and without waiving said objections, Plaintiff states that she is not seeking lost wages as damages in this cause.

**Request for Production 4.**      Please attach copies of the most recent 12 months pay statements or other proof of income, if applicable, for you and your spouse.

**ANSWER:**    Objection. This Request seeks documentation of a personal and confidential nature which is neither relevant or material to the pending claims nor reasonable calculated to lead to the discovery of admissible evidence. Subject to and without waiving said objections, Plaintiff states that she is not seeking lost wages as damages in this cause.

**Request for Production 5.**    Please attach copies of any financial statements or credit applications completed by you or your spouse, or on either of your behalf, in the last 24 months.

**ANSWER:**    Objection. This Request seeks documentation of a personal and confidential nature which is neither relevant or material to the pending claims nor reasonable calculated to lead to the discovery of admissible evidence. Subject to and without waiving said objections, Plaintiff states that she is not seeking lost wages as damages in this cause.

**Request for Production 6.**    Please attach copies of any documents you or your spouse has prepared with regard to filing for bankruptcy within the last 7 years, regardless of whether said documents were filed.

**ANSWER:**    Objection. This Request seeks documentation of a personal and confidential nature which is neither relevant or material to the pending claims nor reasonable calculated to lead to the discovery of admissible evidence. Subject to and without waiving said objections, Plaintiff states that she is not seeking lost wages as damages in this cause.

**Interrogatory 5.**   Please describe, in detail, how you claim this case has affected your relationship with your spouse.

**ANSWER:**    Because of the anxiety and stress of what has happened, my husband and I have separated.  The emotional devastation of what has happened to me has affected our relationship in all aspects, including our communication, activities, intimacy, and just about every other way imaginable.

**Request for Production 7.**    Please attach copies of all documentation of any affects described above, to include medical records, counseling (pastoral or clinical) notes, etc.

**ANSWER:**    See Exhibit A.

**Interrogatory 6.**   Please list all prescriptions you have been given in relation to this case, explain what condition each medication has been prescribed to treat, and state the name and address of each pharmacy at which you filled a prescription.

**ANSWER:**    See Exhibit B.

**Request for Production 8.**    Please attach copies of all prescriptions and receipts for medications purchased in relation to this case.

**ANSWER:**    See Exhibit B.

3

**Interrogatory 7.**   Please list all persons who may have information or knowledge relevant to this case, and for each state a full name, telephone number and address, and state what information they may have regarding the case.

**ANSWER:**    See (A) to Plaintiffs' Disclosure of Information dated May 29, 2007; see 1.(A) to Defendant's Rule 26(a)(1) Initial Disclosures dated May 29, 2007, see Defendant's response to Interrogatory 2(a) of Plaintiffs' First Set of Interrogatories.

**Request for Production 9.**      Please attach copies of all documents or other evidence regarding your reputation before you photo was released.

**ANSWER:**   None.

**Request for Production 10.**     Please attach copies of all evidence you intend to use at trial.

**ANSWER:**   Documents previously exchanged as part of discovery in this cause which are already in Defendants' possession.


Date:  July 20, 2007

Gwendolyn P. McQuirter
Plaintiff


Jerry M. Blevins (BLE003)
Attorney for Plaintiffs
Hillwood Office Center
2800 Zelda Road, Suite 200-3
Montgomery, Alabama 36106
(334) 262-7600 (Voice)
(334) 262-7644 (Fax)
E-Mail: ATTYJMBev@aol.com

4

STATE OF ALABAMA          )
                          )
MONTGOMERY COUNTY         )

Before me, a notary public in and for said state and county, personally appeared **GWENDOLYN P. MCQUIRTER**, who has been properly identified, and states on oath that the information stated above is true and correct to the best of her knowledge subject to the law for perjury and the penalties thereof.

Sworn to and subscribed before me this the 20th day of July, 2007.

_____
Notary Public
State of Alabama At Large
Commission Expires: ___3/13/2010___

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon:

> Kimberly O. Fehl, Esq.
> Legal Department
> City of Montgomery
> P.O. Box 1111
> Montgomery, Alabama 36101-1111

by electronic transmission and/or by depositing a copy of the same in the U.S. Mail, postage prepaid, this the 20th day of July, 2007.

_____
Jerry M. Blevins

5