IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

GWENDOLYN P. MCQUIRTER,　　　　)
et al.　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　Plaintiffs,　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
vs.　　　　　　　　　　　　　　　　　)　　CASE NO.: 2:07-cv-00234-MEF-WC
　　　　　　　　　　　　　　　　　　　)
CITY OF MONTGOMERY, et al.,　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　Defendants.　　　　　　　)

**PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT OF**
**DEFENDANTS, CITY OF MONTGOMERY, K.C.**
**BENTLEY AND RON COOK**

**COMES NOW** the Plaintiffs, Charles E. McQuirter and Gwendolyn P. McQuirter, by and

through their undersigned counsel, and submits the following Response to the Motion for

Summary Judgment of Defendants City of Montgomery, K.C. Bentley and Ron Cook, and say's

as follows:

This motion is submitted upon the following:

A.　The pleadings in this cause, including all exhibits to said pleadings;

B.　Exhibits 1-6, to Plaintiff Gwendolyn McQuirter's Motion for Partial Summary Judgment

　　　as to Liability Against Defendants K.C. Bentley and Ron Cook on Counts VII (Violation

　　　of Driver Privacy Protection Act) & VIII (42 U.S.C. §1983) (Doc. 31);

C.　Exhibit A - Defendant K.C. Bentley Deposition Excerpts;

D.　Exhibit  B - Defendant Ron Cook Deposition Excerpts; &

E.　Exhibit C -  Affidavit of Tiffany Riley.

**I.  Statement of the Undisputed Facts**

A. Parties

1.　Plaintiff Gwendolyn P. McQuirter is over the age of nineteen (19) years and is a resident

citizen of Montgomery County, Alabama.  At all times mentioned herein, Plaintiff Gwendolyn McQuirter was a private citizen/individual.  (Doc. 11, ¶1)

2.   Plaintiff Charles E. McQuirter is over the age of nineteen (19) years and is a resident citizen of Montgomery County, Alabama.  At all times mentioned herein, Plaintiff Charles E. McQuirter was/is the spouse of Plaintiff Gwendolyn McQuirter. (Doc. 11, ¶2)

3.   Defendant City of Montgomery, Alabama is a body corporate, a municipality, formed and existing under the laws of the State of Alabama located in Montgomery County, State of Alabama. At all times mentioned herein, Defendant maintained a police agency known as the Montgomery Police Department (hereinafter referred to as "MPD") comprised of employees of the City of Montgomery. (Doc. 11, ¶3;  Doc. 14, ¶3).

4.   Defendant K.C. Bentley (hereinafter referred to as "Bentley"), is 33 years old and a resident of a resident of Montgomery County, Alabama. (Doc. 31 - Ex. 1, p. 4, lines 7-21).  In committing the acts complained of, Defendant Bentley was employed as a Corporal/Investigator with the MPD and was acting within the line and scope of her employment. (Doc. 11, ¶4; Doc. 14, ¶4).

Defendant Bentley began her employment with the MPD in October 1999, serving as a patrol officer from October 1999 until June 2004, when she became a narcotics detective assigned to the narcotics unit. (Doc. 31 - Ex. 1, p. 7, lines 5-11; p. 8, lines 5-10). As a narcotics officer, Defendant Bentley's duties include investigating vice or narcotics complaints or self-initiated investigations. Vice would consist of things related to prostitution, gambling, anything other than the drugs but something that would be considered illegal activity that's something other than what the detective division typically handles. (Doc. 31 - Ex. 1, p. 8, line 22 to p. 9, lines 1-10).

5.   Defendant Ron Cook (hereinafter referred to as "Cook"), is 40 years old and a resident of Montgomery County, State of Alabama. (Doc. 31 - Ex. 2, p. 4, lines 7-13).  In committing the acts complained of, Defendant Cook was employed as a Lieutenant/Public Information Officer

with the MPD and was acting within the line and scope of his employment. (Doc. 11, ¶5; Doc.14, ¶5).

Defendant Cook began his employment with the MPD in 1994, and currently serves as the Bureau Commander for Property in the detective division, a position he has held since June 2006. (Doc. 31 - Ex. 2, p. 10, line 13 to p. 11, line 9). Defendant Cook's duties include managing case files, assisting in investigations, and personnel management. (Doc. 31 - Ex. 2, p. 10, line 23 to p. 11, lines 1-7).   Prior to becoming Bureau Commander, Defendant Cook served as a sergeant in the detective division from 2004 to 2006. (Doc. 31 - Ex. 2, p. 13, lines 3-11); a supervisor sergeant in the patrol division from June 2000 to 2004. (Doc. 31 - Ex. 2, lines 3-11); a corporal from 1996 to 2000 (Doc. 31 - Ex. 2, p. 27, lines 14-16); and a regular patrol officer from 1994 to 1996. (Doc. 31 - Ex. 2, p. 11, lines 19-23; p. 27, line 21 to p. 28, line 5).

Defendant Cook also serves as an on-call public information officer for roughly the past two years for the primary public information officer ("PIO") - Capt. Huey Thornton. (Doc. 31 - Ex. 2, p. 13, line 12-21; p. 14, lines 8-12).  Defendant Cook is one of four rotating on-call PIO's who serves from Friday at 5:00 p.m. to Monday at 8:00 a.m.  (Doc. 31 - Ex. 2, p. 13, line 20 to p. 14, line 7). One of the primary purposes of a PIO is to disseminate information to local media concerning a serious incident or a detail or specialty operation being conducted by one of the divisions of the MPD. (Doc. 31 - Ex. 2, p. 20, line 14 to p. 21, line 5).  E-mail is the normal course of dissemination of this information. (Doc. 31 - Ex. 2, p. 22, line 23 to p. 23, line 7).

### B.   Jurisdiction

6.    This Court has original jurisdiction over Plaintiffs' claims  alleging violations of federal law pursuant to 42 U.S.C. §1983, and violation of the Driver Privacy Protection Act, codified at 18 U.S.C. §§ 2721-2725, pursuant to 28 U.S.C. §1331, 42 U.S.C. §1983, & 28 U.S.C. §1343. This Court further has supplemental jurisdiction over all other state law claims asserted by Plaintiffs pursuant to 28 U.S.C. §1367. (Doc. 11, ¶6; Doc. 14, ¶6).

### C. Factual Allegations

7.   On or about September 15, 2006, the Special Operations Division of the MPD conducted a prostitution sting in the area of Mobile Highway in Montgomery, Alabama, in which male undercover officers were to go out and pick up prostitutes. (Doc. 11, ¶8; Doc. 31 – Ex. 3, ¶1). Prostitutes taken into custody were taken to a pre-determined location where a processing team was located. (Doc. 31 - Ex. 1, p. 31, line 16 to p. 32, line 7).

8.   Defendant Bentley was assigned to the processing team which normally has 3-4 people assigned to it, although, she is uncertain the exact number of people on the processing team on September 15, 2006. (Doc. 31 - Ex. 1, p. 35, lines 11-21).  The processing team was located at the Community Policing office on Fairwest Street, located off Mobile Highway. (Doc. 31 - Ex. 1, p. 31, line 16 to p. 32, line 11; p. 34, lines 15-22).

9.   As a result of the sting, undercover MPD police officers arrested ten (10) women for prostitution for allegedly offering sex for money. (Doc. 11, ¶9; Doc. 31 - Ex. 1, - ¶¶2-3, respectively).

10.  The names of the women arrested were as follows: (Doc. 31 - Ex. 4 – Booking Photographs; & Doc. 31 - Ex. 5 – Interrogatory Response 2).

    a)    Maria Lane McElya;[1]

    b)    Tawanda Lanise Hubbard;

    c)    Connie Sue Williams;

    d)    Alisha Dawn Gantt

    e)    Joyce Darlene Herrero;

    f)    Cynthia Ann Andersen;

    g)    Syria Nelson;

    h)    Christy Shannon Lee;

---

[1] According to Defendants' Rule 26(a)(1) Initial Disclosures dated May 29, 2007, Ms. Maria Lane McElya was not photographed in reference to her arrest on September 15, 2006. (see Doc. 31 - Ex. 4).

    i)       Ashley Shanda Cason;

    j)       Tiffany Riley.

11.    Each prostitute arrested came through the processing team which was charged with the responsibility of obtaining the person's identity; completing an incident/offense report; an arrest report; and preparing an affidavit for the arresting officer. (Doc. 31 - Ex. 1, p. 36, line 16 to p. 37, line 5; p. 41, lines 3-6; p. 51, lines 5-15). In order to confirm the identity of the person arrested, the policy at the MPD required the processing team to obtain the name, date of birth and social security number of the person arrested, and run this information through the NCIC to determine whether the person had warrants or anything on them or not. (Ex. B, p. 33, lines 5-9, 14-16; p. 34, lines 1-9; p. 38, line 16 to p. 39, line 2). This policy has been in effect since at least June 2000. (Ex. B, p. 39, lines 15-18; p. 12, lines 3-19).

12. One of the women arrested was Tiffany Riley ("Riley"), who sat in a chair beside Defendant Bentley while Defendant Bentley was sitting in front of a computer getting information from Riley. (Doc. 31 - Ex. 1, p. 53, lines 4-14).

13.    At the time of her arrest, Riley told law enforcement her name was Gwendolyn McQuirter and provided McQuirter's home address.  Riley also provided her (Riley's) date of birth - ███████████ and her son's, Maurice Lewis', social security number (█████████ ).[2] (Ex. C; Doc. 34-7, see Warrant of Arrest for Plaintiff Gwendolyn McQuirter). At the time, Riley was unaware of Plaintiff Gwendolyn McQuirter's date of birth or social security number.  (Ex. C).

---

[2] Riley's social security number is ███████ (Doc. 34-7, see Court Record Case Action Summary for Tiffany Michele Riley, wherein Riley pled guilty to giving a false statement to a law enforcement officer).

14. Defendant Bentley is uncertain as to whether she asked Riley for any form of identification, although, Bentley concedes that it is fairly common that people give fake names when they are arrested and that it is important to corroborate a person's identity with some other source of information when a person is arrested with no form of identification. (Doc. 31 - Ex. 1, p. 11, lines 16-21; p. 16, lines 11-17; p. 54, lines 1-20). In-fact, prior to September 2006, Bentley had personally been involved in making arrests where it was later determined that the person arrested had given a fake name. (Doc. 31 - Ex. 1, p. 14, lines 3-8).

15. Bentley further does not recall whether Riley's ID card was recovered as a result of a search prior to Bentley speaking with her; whether she inquired of anyone as to whether Riley was searched; whether anyone told her Riley had been searched; or whether she inquired of anyone as to whether any identification had been removed from Riley. (Doc. 31 - Ex. 1, p. 55, line 16 to p. 57, line 14).

16. The women arrested were not photographed or fingerprinted at the scene, instead, they were to be transported to an office on Highland Avenue to be photographed and then transported to the city jail. (Doc. 31 - Ex. 1, p. 38, line 14 to p. 39, line 5). However, Bentley claims no photographs were taken at the Highland Avenue office because the camera system was not working, instead, the women were transported to the City Jail and Bentley went to the Highland Avenue office to complete the daily activity report which was to be turned in to the captain and major. (Doc. 31 - Ex. 1, p. 42, lines 5-22; p. 43, lines 15-18). The daily activity report indicates what was done for the day; how many arrests were made; who was arrested; and other activity that occurred for the day. (Doc. 31 - Ex. 1, p. 42, lines 14-22). The report also contains a mug shot of the person arrested indicating the person's name, the date of arrest, the location of the

arrest, the specific charge arrested for, and that person's criminal history. (Doc. 31 - Ex. 1, p. 42, line 23 to p. 43, line 14).

17.  In addition to the camera system that was supposedly not working, Bentley had access to cameras which she could use to make booking photographs of persons arrested. (Doc. 31 - Ex. 1, p. 114, lines 6-16).

18.  The ten (10) women arrested were booked into the City Jail, fingerprinted and photographed. (Doc. 11, ¶9; Doc. 31 – Ex. 1, ¶¶2-3, respectively; Doc. 31 – Ex. 2 –  Booking Photographs; Doc. 31 - Ex. 1, p. 122, line 14 to p. 124, line 9).

19.  While at the Highland Avenue office, Bentley contends that she was waiting for the jail to take the booking photographs, which she intended on pulling up on a computer program called the AS-400, to include with her daily activity report. (Doc. 31 - Ex. 1, p. 45, line 16 to p. 46, line 21; p. 46, lines 13-20).  Bentley contends that she attempted to access the booking photographs via the AS-400 system, although, she was unable to do so because the system was not working properly. (Doc. 31 - Ex. 1, p. 99, line 2 to p. 100, line 2). Bentley claims she telephoned an unidentified narcotics officer, not the city jail, and inquired as to when the booking photographs would be put into the system, and was told they would not be. (Doc. 31 - Ex. 1, p. 100, line 14 to p. 102, line 3).

20.  Defendant Bentley contends that she obtained photographs of nine (9) of the women arrested from the AS-400 system, from prior arrests. (Doc. 31 - Ex. 1, p. 46, lines 17-21 & p. 47, line 15 to p. 49, line 20; p. 105, line 16 to p. 106, line 3). She then accessed the Law Enforcement Tactical System ("LETS") to obtain a photograph of Plaintiff Gwendolyn McQuirter, because Bentley thought this was easier to do as opposed to taking an actual

photograph of Riley with her camera. (Doc. 31 - Ex. 1, p. 88, line 19 to p. 89, line 2; p. 103, lines 5-11; p. 115, lines 9-18). LETS permits access to information contained on an individual's drivers license, to include the photograph of the individual. (Doc. 31 - Ex. 1, p. 88, lines 7-15). Bentley contends she needed the photograph because she was required to include a copy of photographs of the women arrested with the paperwork turned into the captain and major, and that it was not an option to simply tell the captain and major the booking photographs were not ready. (Doc. 31 - Ex. 1, p. 103, line 19 to p. 104, line 7).

21.   Upon looking at Plaintiff Gwendolyn McQuiter's driver's license photo, Bentley contends that she did not conclude that this was a different person than Tiffany Riley, despite having seen Tiffany Riley in person earlier that day. (Doc. 31 - Ex. 1, p. 90, lines 4-15).  In-fact, even after viewing McQuirter's driver's license photo, Bentley claims that the thought that Riley and McQuirter were different people never entered her mind. (Doc. 31 - Ex. 1, p. 98, lines 14-21).

22.   As the photographs were being printed, someone in Bentley's office was going downstairs to the printer and retrieving the photographs. Bentley requested that this individual retrieve the photographs and turn them over to Lieutenant Crockett by placing them in his box. (Doc. 31 - Ex. 1, p. 117, lines 2-9). Lt. Crockett in-turn divided the photographs and put one of each in each stack along with the daily activity report, and put one each on the major and the captain's desk. (Doc. 31 - Ex. 1, p. 117, lines 9-13).  Bentley did not notify either the major or captain that McQuirter's driver's license photo did not look like the person arrested – Tiffany Riley. (Doc. 31 - Ex. 1, p. 118, line 5-10).

23.   Lt. Crockett then contacted Defendant Cook, the on-call PIO, by SouthernLINC, and

informed him they had had a prostitution sting and that he had all of the arrest photos available to be disseminated. (Doc. 31 - Ex. 2, p. 40, line 18 to p. 41, line 2; p. 41, lines 22-23). Crockett advised that the photos were at the special ops building. (Doc. 31 - Ex. 2, p. 42, lines 16-20).

24. Defendant Cook immediately went and retrieved the photographs at the special ops building on Highland Avenue. (Doc. 31 - Ex. 2, p. 43, line 12 to p. 44, line 8).  Despite Cook knowing of no reason why a booking photograph of a person would not be sent to him as PIO, and the fact that he normally expects photographs coming to him to be booking photographs, Cook's attention was not drawn to the fact, nor did he think it unusual, that all of the photographs were booking photographs with the exception of McQuirter's. (Doc. 31 - Ex. 2, p. 54, lines 3-9; p. 55, lines 8-11; p. 66, line 14 to p. 67, line 4).

25. Defendant Cook then went to headquarters located at 320 North Ripley Street and issued the following press release on September 16, 2006: (Doc. 31 - Ex. 2, p. 45, lines 14-20; Doc. 31 - Ex. 5 – Press Release).

> "On Friday September 15, 2006, the Special Operations
> Division conducted a prostitution sting in the area of
> Mobile highway (sic) and the West South Blvd. As a result
> of this operation, ten prostitutes were taken into custody.
> Attached is a photograph of each suspect."

26. The press release included photographs of: (Doc. 31 - Ex. 4 – Copy of Material Released to the Media).

    a)    Tawanda Hubbard;

    b)    Connie Sue Williams;

    c)    Alisa Dawn Gantt;

    d)    Joyce Darlene Herrero;

    e)    Cynthia Ann Anderson;

    f)     Syria Nelson;

    g)     Christy Shannon Lee;

    h)     Maria Lane Mcelya;

    i)     Ashley Shanda Cason; &

    j)     Gwendolyn McQuirter.

27. The press release was distributed to the following media outlets: (Doc. 31 - Ex. 5 – Interrogatory Response 4).

    a)     Montgomery Advertiser – 200 Washington Avenue, Montgomery, AL 36104;

    b)     Associated Press – 116 South McDonough Street, Montgomery, AL 36104;

    c)     WSFA-TV-12- 12 East Delano Avenue, Montgomery, AL 36105;

    d)     Alabama Public TV – 1255 Madison Avenue, Montgomery, AL 36107;

    e)     Tuskegee Times – 525 Augusta Avenue, Montgomery, AL 36111;

    f)     Kevin Elkins – 1440 WLWI-AM 1 Commerce Street, Montgomery, AL 36104;

    g)     WNCF-ABC-32- 3251 Harrison Road, Montgomery, AL 36109;

    h)     WLWI 92.3 – 1 Commerce Street, Montgomery, AL 36104;

    i)     WAKA-TV-8- 3020 Eastern Boulevard, Montgomery, AL 36117.

28. WAKA and WSFA ran stories concerning the arrests on September 17, 18 & 19, 2006, and showed Plaintiff Gwendolyn McQuirter's photograph as well as identifying her by name as one of the individuals arrested for prostitution. Each of these televised broadcasts were seen by thousands of viewers. (Doc. 11, ¶13).

29. The Montgomery Advertiser also published a story concerning the arrests on September 17, 2006, and directed readers to view photographs of the suspects, to include Plaintiff Gwendolyn McQuirter, on its website – montgomeryadvertiser.com. (Doc. 31 - Ex. 6).

30. Two or three days later, Plaintiff Charles McQuirter telephoned Defendant Cook and

advised that there was no way possible that his wife could have been arrested for prostitution because she was with him. Defendant Cook referred Mr. McQuirter to Capt. Huey Thornton. (Doc. 31 - Ex. 2, p. 55, line 19 to p. 56, line 16).

31.  Capt. Thornton then contacted Defendant Cook and requested the Defendant Cook e-mail him the release sent to the media. (Doc. 31 - Ex. 2, p. 57, lines 8-13). Defendant Cook subsequently sent both the release and photos to Capt. Thornton. (Doc. 31 - Ex. 2, p. 60, lines 11-19).

32.  Defendant Bentley recalls seeing McQuirter's photograph along with the other females arrested for prostitution on television, and acknowledges that McQuirter was not one of the prostitutes arrested. (Doc. 31 - Ex. 1, p. 109, lines 1-8).  Bentley does not believe she would be offended if someone put her picture on the nightly news and said she was arrested for prostitution. (Doc. 31 - Ex. 1, p. 118, lines 14-22). Similarly, Defendant Cook testified that he does not know whether it would be somewhat humiliating to have your picture on TV and be called a prostitute. (Doc. 31 - Ex. 1, p. 69, lines 14-23).

33.  The words published by Defendant City of Montgomery accusing Plaintiff Gwendolyn McQuirter of engaging in prostitution, were false and untrue. (Doc. 31 – Ex. 3, ¶13).

34.  It is undisputed that Plaintiff Gwendolyn McQuirter was not one of the ten women arrested for prostitution. (Doc. 11, ¶10; Doc. 31 – Ex. 3, ¶6; Doc. 31 - Ex. 1, p. 109, lines 6-8).

35.  It is further undisputed that prostitution is an indictable offense pursuant to §13A-12-210, et seq., *Code of Alabama* (1975). ( Doc. 11, ¶31; Doc. 14, ¶31).

36.  Prior to the filing of this action, Plaintiffs filed itemized and verified claims with Defendant City of Montgomery as dictated by Alabama law. Said claims were denied on January 29, 2007. (Doc. 31 – Ex. 3, ¶¶16-17, respectively).

37.  On July 3, 2007, Plaintiffs filed their Second Amended Complaint in this cause and have

asserted claims for: a) Negligence; b) Intentional Infliction of Emotional Distress; c) Libel Per Se; d) Slander Per Se; e) Invasion of Privacy; f) Loss of Consortium; g) Violation of Driver Privacy Protection Act; & h) Violation of Civil Rights under 42 U.S.C. § 1983. (Doc. 11).

38. As a result of Defendants Bentley and Cook's actions, Plaintiffs have been injured. (Doc. 11, ¶¶25, 29, 33, 37, 41, 44, 50 & 55).

## **Argument**

### **I.   The Drivers Privacy Protection Act of 1994 ("DPPA") and 42 U.S.C. §1983**

#### A.   Corporal K.C Bentley and Lieutenant Ron Cook Did Not Violate DPPA

In response and in opposition to Defendant Bentley and Cook's argument that they did not violate the DPPA in obtaining and releasing Plaintiff Gwendolyn McQuirter's drivers license photograph to the media, Plaintiffs rely on the content of Plaintiff Gwendolyn McQuirter's Motion for Partial Summary Judgment as to Liability Against Defendants K.C. Bentley and Ron Cook on Counts VII (Violation of Driver Privacy Protection Act), & VIII (42 U.S.C. §1983), filed on October 16, 2007 (Doc. 31), and Plaintiff Gwendolyn McQuirter's Reply Brief to Defendants K.C. Bentley and Ron Cook's Response to Motion for Partial Summary Judgment on Counts VII (Violation of Driver Privacy Protection Act), & VIII (42 U.S.C. §1983), filed on November 5, 2007 (Doc. 38). The content of these filings is incorporated by reference as if set forth fully herein.  Plaintiffs contends that these filings establish Defendant Bentley and Cook's violation of the DPPA.

#### B.   Bentley and Cook Are Entitled to Qualified Immunity

Defendants Bentley and Cook assert that they are entitled to qualified immunity on

Plaintiff Gwendolyn McQuirter's direct claim under the DPPA because they were engaged in discretionary functions at the time they violated the DPPA. (Doc. 34, pp. 15-17).

As noted by Defendants Bentley and Cook, qualified immunity offers protection for government officials, acting within their discretionary authority, who are sued in their individual capacities so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (citation omitted). To act within the scope of discretionary authority means that "the actions were (1) undertaken pursuant to the performance of [the official's] duties and (2) within the scope of [his] authority." *Lenz v. Winburn*, 51 F.3d 1540, 1545 (11th Cir. 1995).

To ascertain whether an official is entitled to qualified immunity the Court must first evaluate whether Plaintiffs' allegations, if true, establish a violation of a constitutional or statutory right. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Second, if Plaintiffs' allegations, accepted as true, establish a violation of a constitutional or statutory right, the Court must then ask whether "the [federal] right [that was violated] was clearly established" at the time of the alleged conduct. *Id.*

In the present matter, while arguably the DPPA is somewhat ambiguous as to what actions are encompassed within the language "in carrying out its functions" as it relates to Defendant Bentley's retrieval of Plaintiff Gwendolyn McQuirter's photo via LETS, it is without question that Defendant Cook's release of the drivers license photo to private media outlets was in clear violation of the express dictates of §§ 2721(b) & (c), which specifically addresses the resale or redisclosure of information obtained from a motor vehicle report record, as follows:

**"(c) Resale or redisclosure.** – An authorized recipient of personal information (except a recipient under subsection (b)(11) or (12)) may sell or *redisclose the information only for a use permitted under subsection (b)* (but not for uses under subsection (b)(11) or (12)). . ." (italics added).

Subsection (b) reads, in relevant part, as follows:

**"(b) Permissible uses**. – Personal information referred to in subsection (a) shall be disclosed for use in connection with matters of motor vehicle or driver safety and theft, motor vehicle emissions, motor vehicle product alterations, recalls, or advisories, performance monitoring of motor vehicles and dealers by motor vehicle manufacturers, and removal of non-owner records from the original owner records of motor vehicle manufacturers to carry out the purpose of titles I and IV of the Anti Car Theft Act of 1992, the Automobile Information Disclosure Act (15 U.S.C. 1231 et seq.), the Clean Air Act (42 U.S.C. 7401 et seq.), and chapters 301, 305, and 321-331 of title 49, and, subject to subsection (a)(2), may be disclosed as follows:

**(1)** For use by any government agency, including any court or law enforcement agency, in carrying out its functions, . . "

Assuming Defendants were "authorized recipients" of Plaintiff Gwendolyn McQuirter's driver's license photo, as Defendants suggest, §§ 2721(b) & (c) <u>expressly restricts redisclosure</u> of the photo by Defendants for uses involving those matters set forth in § 2721(b), and to other government agencies, including any court or law enforcement agency, in carrying out its functions, pursuant to § 2721(b)(1). Nowhere in the Act is <u>redisclosure</u> authorized or permitted to private media outlets, for any purpose.

A case somewhat instructive on the issue of qualified immunity as it relates to the DPPA, is *Collier v. Dickinson*, 477 F.3d 1306 C.A. 11 (Fla.) 2007.

In *Collier*, drivers licensees brought §1983 action against executive-level officials of the

Florida Department of Highway Safety & Motor Vehicles ("DHSMV") for selling their personal information to mass marketers in violation of the Driver Privacy Protection Act ("DPPA"). In addition to a direct claim under the DPPA, the Collier plaintiffs also sued for relief under 42 U.S.C. §1983. Specifically, Plaintiffs alleged that the sale of personal information violated their constitutional right to privacy, in addition to their rights protected by the DPPA. The district court granted Defendants' motion to dismiss all claims in the complaint on the grounds that Defendants were entitled to qualified immunity, and licensees appealed.

In affirming in part, and reversing and remanding in part, the Court of Appeals, after finding that the statutory rights created by the DPPA are enforceable both directly and under §1983, addressed the issue of whether the law was sufficiently established to have provided fair warning to Defendants that they were violating the law. The Court noted that this inquiry involves evaluating whether a reasonably competent public official would have known that his actions were prohibited by the law at the time he engaged in the conduct in question, utilizing a standard of objective reasonableness. The Court held that "[t]he words of the DPPA alone are 'specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity'. *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002)(holding that statutory language alone, even in the 'total absence of case law' can be sufficient to provide fair notice)." The Court found "that the plain language of the statute and the case law gave clear notice to Defendants that releasing the information in question violated federal law."

Similarly, in the present matter, the plain language of §2721(b) & (c) of the DPPA gave clear notice to Defendant Cook that the release of Plaintiff Gwendolyn McQuirter's driver's

license photo to private media outlets was in direct violation of the DPPA.  Thus, as in *Collier*,

qualified immunity does not apply to Defendants Cook or the City of Montgomery.

   C.   42 U.S.C.A. §1983 Municipal Liability

   Defendants correctly assert "that municipalities cannot be liable under §1983 on the

theory of respondeat superior, but rather, can be held liable under that statute only if they

maintain unconstitutional or illegal policies or customs; absent unconstitutional or illegal policies

or customs, municipalities and their officials may not be sued for the acts of their employees.

Moreover, a plaintiff must show that an official policy was the reason behind the alleged

constitutional deprivation."  (Doc. 34, p. 18).

   A policy is a decision that is officially adopted by the municipality, or created by an

official of such rank that he or she could be said to be acting on behalf of the municipality. A

custom is a practice that is so settled and permanent that it takes on the force of law. *Sewell v.

Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997), cert. denied, 522 U.S. 1075, 118

S.Ct. 852, 139 L.Ed.2d 753 (1998).  To establish a policy or custom, it is generally necessary to

show a persistent and wide-spread practice. *Depew v. City of St. Mary's*, 787 F.2d 1496, 1499

(11th Cir. 1986); see also *Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994).

Locating a policy ensures that a municipality is held liable only for those deprivations resulting

from the decisions of its duly constituted legislative body or those officials whose acts may fairly

be said to be those of the municipality. *Monell v. Department of Social Services of the City of

New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Similarly, an act performed

pursuant to a custom that has not been formally approved by an appropriate decision maker may

fairly subject a municipality to liability on the theory that the relevant practice is so widespread

as to have the force of law. *Id.*

In the present matter, Defendant Cook's violation of the DPPA in releasing Plaintiff Gwendolyn McQuirter's driver's license photo to private media outlets was pursuant to a policy or custom at the MPD, as evidenced by the affidavit testimony of Capt. Huey Thornton, the Public Information Officer in Public and Media Relation who is responsible for the flow of information from the Police Department to the media and general public, as follows: (Doc. 33, Ex. 3, p. 3, ¶7).

> "7. It is not uncommon to release photographs to the media from various sources. In some cases, our system becomes inoperable and we are unable to take or access photographs through our internal resources; therefore we rely on alternate sources such as LETS or other agencies. It is not uncommon to use LETS if an individual does not have a photograph in our internal files. . ."

Capt. Thornton's testimony establishes a persistent and wide-spread practice at the MPD of obtaining photos from LETS for release to the "media" in direct violation of §§ 2721(b) & (c) of the DPPA. Thus, contrary to Defendants' argument, Defendant City of Montgomery can be held vicariously liable for Defendant Cook's actions. *Sewell*, Id.

## II. <u>**State Law Claims**</u>

### A. <u>Defendants Are Entitled to State Agent Immunity in Performance of Discretionary Function</u>

Defendants Bentley and Cook assert they are entitled to immunity on Plaintiffs' state law claims pursuant to §6-5-338(a), *Code of Alabama* (1975), because they claim they were performing discretionary functions in committing the wrongs complained of. (Doc. 34, pp. 18-22).

The first step in analyzing whether a police officer's conduct is protected by the doctrine of discretionary-function immunity under §6-5-338(a) is to determine whether the police officer was performing a discretionary function. *Ex parte City of Gadsden*, 781 So.2d 936, 938 (Ala. 2000). Discretionary functions have been defined as "those acts to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances". *Id.* (quoting *Wright v. Wynn*, 682 So.2d 1, 2 (Ala. 1996)). Upon that showing, the burden shifts to the plaintiffs to present substantial evidence tending to show that the police officer's conduct was "so egregious as to amount to willful or malicious conduct or conduct engaged in in bad faith." *Couch v. City of Sheffield*, 708 So.2d 144, 153 (Ala. 1998). In any discretionary-function immunity case, courts must make a "pragmatic assessment of what, if any, degree of immunity is necessary to enable the particular governmental function to be effectively performed." *Bell v. Chisom*, 421 So.2d 1239, 1241 (Ala. 1982).

With regard to police officers performing their law-enforcement duties, the Alabama Supreme Court has stated that discretionary-function immunity must exist because a police officer should not be required to "ponder and ruminate over decisions that should be made in a split second." *White v. Birchfield*, 582 So.2d 1085, 1087 (Ala. 1991). The shield of discretionary-function immunity is "particularly applicable where [a police] officer is required to make difficult decisions on the spur of the moment" while performing his law-enforcement duties and in situations where a police officer responds to a "life-threatening situation". see *Nunnelee v. City of Decatur*, 643 So.2d 543, 546 (Ala. 1993) & *Birchfield*, 582 So.2d. at 1087.  Under Alabama law, a police department's policies may grant a police officer discretion to act in a

particular manner. *Ex parte City of Gadsden*, Id. Similarly, a statute or a police department's policies may eliminate a police officer's discretion to act in a particular manner. *Williams v. Crook*, 741 So.2d 1074 (Ala. 1999)(statute), and *Ott v. City of Mobile*, 169 F.Supp.2d 1301, 1317 (S.D.Ala. 2001)(police department policy).

As shown above, Defendant Cook was not performing a "discretionary function" in releasing Plaintiff Gwendolyn McQuirter's driver's license photo to private media outlets, as this act was in direct violation of § 2721(b) & (c) of the DPPA.  Clearly, Defendant Cook does not have the "discretion" to violate federal law. Thus, under the burden-shifting process set forth in *Couch*, Id., the burden has not shifted to Plaintiffs to present substantial evidence tending to show that Defendant Cook's conduct was "so egregious as to amount to willful or malicious conduct or conduct engaged in in bad faith." *Id.*

Similarly, the evidence of record establishes that Defendant Bentley was not performing a discretionary function at the time she failed to determine Riley's true identity upon her arrest; a failure which eventually culminated with Plaintiff Gwendolyn McQuirter being falsely accused of being arrested for prostitution by numerous local media outlets. The relevant facts on this issue establish as follows:

On or about September 15, 2006, the Special Operations Division of the MPD conducted a prostitution sting in the area of Mobile Highway in Montgomery, Alabama, in which male undercover officers were to go out and pick up prostitutes. (Doc. 11, ¶8; Doc. 31 – Ex. 3, ¶1). Prostitutes taken into custody were taken to a pre-determined location where a processing team was located. (Doc. 31 - Ex. 1, p. 31, line 16 to p. 32, line 7).

Defendant Bentley was assigned to the processing team which was charged with the

responsibility of, inter alia, obtaining the person's identity. (Doc. 31 - Ex. 1, p. 35, lines 11-21; p. 36, line 16 to p. 37, line 5; p. 41, lines 3-6; p. 51, lines 5-8). In order to confirm the identity of the person arrested, the policy at the MPD required the processing team to obtain the name, date of birth and social security number of the person arrested, and run this information through the NCIC to determine whether the person had warrants or anything on them or not. (Ex. B, p. 33, lines 5-9, 14-16; p. 34, lines 1-9; p. 38, line 16 to p. 39, line 2).

One of the women arrested was Tiffany Riley ("Riley"). (Doc. 31 - Ex. 1, p. 53, lines 4-14). Riley told law enforcement her name was Gwendolyn McQuirter and provided McQuirter's home address along with her (Riley's) date of birth -February 27, 1972, and her (Riley's) son's, Maurice Lewis', social security number. (Ex. C). At the time this information was provided, Defendant Bentley was looking at the AS-400 in-house computer at the police department, which showed, among other things, Plaintiff Gwendolyn McQuirter's actual birth date and social security number. (Ex. A, p. 61, lines 13-18; p. 63, lines 3-21). Despite the discrepancies between the birth date and the social security number, Defendant Bentley never questioned the information provided by Riley or indicated that the information did match up with the information she reviewed on the computer. (Ex. C).

In light of the MPD policy mandating that Defendant Bentley confirm Riley's identity by obtaining her name, date of birth and social security number, and run this information through the NCIC, Defendant Bentley had no discretion in carrying out these duties. *Williams*, Id. Instead of complying with the policy, Defendant Bentley simply disregarded and ignored the fact that two (2) out of three (3) mandatory questions asked of Riley to confirm her identity, were answered incorrectly. These erroneous answers were red flags that Riley had given a fake name.

In the end, because Defendant Bentley was not performing a discretionary function in confirming Riley's identity, the burden has not shifted to Plaintiffs to present substantial evidence tending to show that Defendant Bentley's conduct was "so egregious as to amount to willful or malicious conduct or conduct engaged in in bad faith." *Couch*, Id.

Finally, because Defendant Bentley is not entitled to qualified immunity neither is Defendant City of Montgomery pursuant to §6-5-338(b), *Code of Alabama* (1975), as suggested by Defendants. (Doc. 34, p. 23).

   B.   §13A-11-161  Publication of Certain Documents Considered Privileged &
        Conditional or Qualified Privilege

Defendants contend they are entitled to summary judgment because the false accusation that Plaintiff Gwendolyn McQuirter had been arrested for prostitution, is subject to the privilege codified at §13A-11-161, *Code of Alabama* (1975). Defendants further assert that the defamatory accusation was conditionally or qualifiedly privileged because it accurately reports statements made during an official police investigation, as reflected in the official police incident report, and that the statement is not actionable unless the plaintiff can prove that the defendant acted with actual malice. (Doc. 34, pp. 23-26).

Plaintiffs contend that Defendants have waived these privilege defenses, in that these defenses are affirmative defenses which have not previously been asserted.  Federal Rule of Civil Procedure 8(c) states that "[i]n pleading to a preceding pleading, a party shall set forth affirmatively . . .  any **. . .** matter constituting an avoidance or affirmative defense. . ." Fed.R.Civ.P. 8(c); see also *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1077 (11th Cir. 2003). In diversity actions, the Court looks to state law to inform the determination of whether a certain

defense is "any other matter constituting a avoidance or affirmative defense" under the federal rule. *Troxler v. Owens-Illinois, Inc.*, 717 F.2d 530, 532 (11th Cir. 1983); *Morgan Guar. Trust Co. v. Blum*, 649 F.2d 342, 344 (5th Cir. Unit B 1981)("In diversity of citizenship actions, state law defines the nature of defenses, but the Federal Rules of Civil Procedure provide the manner and time in which defenses are raised and when waiver occurs."). In general, a party's failure to raise an affirmative defense in the pleadings results in a waiver of the defense. *Steger*, 318 F.3d at 1077. Under Alabama law, privilege is an affirmative defense for which defendant bears the burden of pleading and proof. *Ex parte Blue Cross and Blue Shield of Alabama*, 773 So.2d 475 (Ala. 2000).

In the present matter, a review of Defendants' Answer to Plaintiffs' Second Amended Complaint (Doc. 14), establishes that Defendants have not asserted the affirmative defense of privilege, in either a general form, or pursuant to §13A-11-161, *Code of Alabama* (1975), or specific to the conditional or qualified privilege now claimed.[3] Thus, the privilege defenses now argued by Defendants are due to be given no consideration by the Court as the defenses have been waived.

Alternatively, subject to and without waiving the foregoing argument, Plaintiffs contend that the privilege codified at §13A-11-161, does not apply to Defendants, instead, the privilege has been limited in its application to press reports repeating a defamatory accusation.

In *Wilson v. Birmingham Post Co.*, 482 So.2d 1209 (Ala. 1986), the Alabama Supreme Court construed for the first time §13A-11-161. In so doing, the Court explained that §13A-11-161 is an "explicit statutory privilege protecting fair and accurate reports of criminal charges and

---

[3] Neither did Defendant City of Montgomery assert these defenses in its original Answer to Plaintiffs' Amended Complaint. (Doc. 3).

official investigations." 482 So.2d at 1211. The Court stated:

> "[Section 13A-11-161] is a *codification of the common law* as reflected in the Restatement (Second) of Torts, § 611 (1977): 'The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged *if the report is accurate* and complete or a fair abridgment of the occurrence reported.'"

The Court noted that the policy behind the privilege is that the public has a strong interest in receiving information in order to "monitor the conduct of its government" and its personnel, such as law enforcement officers, and in order to be informed about matters involving the violation of laws, citing *Medico v. Time, Inc.*, 643 F.2d 134, 141 (3d Cir. 1981), cert denied, 454 U.S. 836, 102 S.Ct. 139, 70 L.Ed.2d 116 (1981), and *Seymour v. A.S. Abell Co.*, 557 F.Supp. 951, 955 (D.Md. 1983). In *Medico*, the Third Circuit explained that courts have, "as a matter of federal law, expressed reluctance to hold the press responsible for publication of defamatory statements originally uttered by others. 643 F.3d at 145. (underlining added). The *Wilson* Court further noted that in *Stice v. Beacon Newspaper Corp.*, 185 Kan. 61, at 65, 340 P.2d 396, at 400-01 (1959), the court recognized that the privilege applied to "news stories based upon interviews of police officials and reports of the police department.", and in *Bell v. Associated Press*, 584 F.Supp. 128 (D.D.C. 1984), that the court held the privilege also applied to articles based solely upon the oral comments of law enforcement officials.

The Court will note that Defendants fail to cite one single case in their brief for the proposition that §13A-11-161, applies to publication of a defamatory accusation by a police agency. Instead, each and every case cited by Defendant supports Plaintiffs' contention that the

privilege has been limited in its application to <u>press reports</u> of the defamatory accusation: (Doc.

34, pp. 24-25).

> "The Alabama Supreme Court in *Wilson* examined cases from other federal districts and state courts in reviewing the application of §13A-11-161: *Mathis v. Philadelphia Newspapers, Inc*., 455 F.Supp. 406 (E.D.Pa. 1978)(privilege applied on the ground that what the newspapers had published was 'in effect a report of an informal government report' concerning release photographs of persons they reported had been arrested in connection with a particular crime although one of the photographs was of someone unconnected with the crime); *Porter v. Guam Publications, Inc*., 643 F.2d 615, 616 (9th Cir.), cert. denied, 454 U.S. 940, 102 S.Ct. 475, 70 L.Ed.2d 247 (1981)(the accurate report of a police investigation as reflected in a 'daily police bulletin' of criminal complaints and arrest reports has been held privileged, even when the 'police bulletin' was based on false charges made by the complainant); *Mark v. Seattle Times, Inc*., 96 Wash.2d 473, 635 P.2d 1081 (1981), cert. denied, 457 U.S. 1124, 102 S.Ct. 2942, 73 L.Ed.2d 1339 (1982)(the privilege has also been extended to press reports of investigations summarized in the form of allegations contained in a prosecutor's affidavit of probable cause); *Mathis v. Philadelphia Newspapers, Inc*., 455 F.Supp. 406 (E.D.Pa. 1978)(police arrest reports; *Piracci v. Hearst Corp*., 263 F.Supp. 511, 515 (D.Md. 1966), *aff'd,* 371 F.2d 1016 (4th Cir. 1967) (privilege applies to article based on police department records kept 'as part of … daily routine' and as 'the only official record of arrest' in the city); *Francois v. Capital City Press*, 166 So.2d 84 (La.Ct.App. 1964)(state police log book is 'public record' within meaning of Louisiana statute, upon which press may rely)."

Because §13A-11-161, does not apply to Defendants – a police agency and law

enforcement officers, the privilege has no application in the present matter.

<u>Intentional Tort Claims Against the City of Montgomery</u>

Defendant City of Montgomery contends that it cannot be held liable on the state law

claims for the wanton and intentional acts of its agents in accordance with both statutory and

case law. (Doc 34, pp. 26-27). Plaintiffs agree. However, this would only apply to the state claim of Intentional Infliction of Emotional Distress embodied at Count II of Plaintiffs' Second Amended Complaint. (Doc. 11, p. 5). The City can be held liable for the remaining state claims of Negligence, Libel Per Se, Slander Per Se, Invasion of Privacy, & Loss of Consortium, as these torts are not claims which require wanton or intentional misconduct.

Defendant City of Montgomery further asserts that because Defendants Bentley and Cook have immunity pursuant to §6-5-338(b), on Plaintiffs' state law claims, that it also has immunity. (Doc. 34, p. 27). This argument is meritless as it relates to Defendant Bentley for the reasons previously discussed in detail in this filing relative to Defendant Bentley's claim of qualified immunity.

## **CONCLUSION**

For the reasons set forth herein and summarized below, Defendants' Motion for Summary Judgment is due to be denied in all respects.

### Drivers Privacy Protection Act of 1994 ("DPPA")

As to the claimed violations of the DPPA by Defendants Bentley and Cook, Plaintiffs have produced substantial evidence establishing the violations. Neither Defendant Bentley or Cook is entitled to qualified immunity for these violations as neither Bentley or Cook were performing discretionary functions at the time they violated to DPPA.

### 42 U.S.C.A. §1983 Municipal Liability

As for Defendant City of Montgomery's assertion that it cannot be held liable under § 1983 on the theory of respondeat superior, Plaintiffs have produced substantial evidence that Defendant Cook's violation of the DPPA was committed pursuant to a policy or custom at the

MPD, thus, the City of Montgomery can be held vicariously liable for Defendant Cook's actions.

State Law Claims

As for Defendants Bentley and Cook's assertion that they are entitled to state agent immunity pursuant to §6-5-338(a), *Code of Alabama* (1975), on Plaintiffs' state claims, on the basis that they were engaged in discretionary functions, Plaintiffs have produced substantial evidence establishing that Defendant Cook was not performing a discretionary function at the time he violated the DPPA in releasing Plaintiff Gwendolyn McQuirter's driver's license photo to private media outlets; and have further produced substantial evidence establishing Defendant Bentley was not performing a discretionary function at the time she failed to confirm Riley's identity upon arrest in compliance with the existing policy at the MPD. Because Defendants Bentley and Cook are not entitled to qualified immunity, neither is Defendant City of Montgomery.

As for Defendants' assertion that the defamatory accusation is privileged pursuant to §13A-11-161, *Code of Alabama* (1975), and conditionally or qualifiedly privileged, these affirmative defenses have been waived as they have not previously been pled. Thus, these defenses are to be given no consideration by the Court. Alternatively, §13A-11-161, is limited in application to press reports repeating defamatory accusations and does not apply to dissemination of defamatory accusations by law enforcement agencies or law enforcement officers.

As for Defendant City of Montgomery's contention that it cannot be held liable on the state law claims for the wanton and intentional acts of its agents, Plaintiffs agree. However, this would only apply to the state claim of Intentional Infliction of Emotional Distress, and not the

remaining claims.

/s/ Jerry M. Blevins
JERRY M. BLEVINS (BLE003)
Attorney for Plaintiffs

OF COUNSEL:
Law Office of Jerry M. Blevins
Hillwood Office Center
2800 Zelda Road, Suite 200-3
Montgomery, Alabama 36106
(334) 262-7600 (Voice)
(334) 262-7644 (Fax)
E-Mail: ATTYJMBlev@aol.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 16th day of November, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following parties or counsel:

> Kimberly O. Fehl, Esq.
> Legal Department
> City of Montgomery                    .
> P.O. Box 1111
> Montgomery, Alabama 36101-1111


> <u>/s/ Jerry M. Blevins</u>
> Jerry M. Blevins

# ORIGINAL

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DIVISION

4

5    GWENDOLYN P. MCQUIRTER,
     et al.,

6

          Plaintiffs,

7                                    CASE NUMBER
     vs.                          2:07-cv-00234-MEF-WC

8

     CITY OF MONTGOMERY, et cet.,

9    et al.,

10        Defendants.

11

12                                   "EXHIBIT  A"

13

14         * * * * * * * * * *

15    DEPOSITION OF KRISTEN CAROLINE BENTLEY,

16   taken pursuant to stipulation and agreement

17   before Heather Barnett, Court Reporter and

18   Commissioner for the State of Alabama at Large,

19   in the Offices of Dunn, King & Associates, 2800

20   Zelda Road, Suite 100-2, Montgomery, Alabama, on

21   Friday, June 29, 2007, commencing at

22   approximately 10:40 a.m.

23         * * * * * * * * * *

61

Q.    So while you're talking with Ms. Riley,

      you're pulling up information on a computer?

A.    Correct.

Q.    And was this on what computer system?

A.    AS-400, the in-house computer system of the

      police department.

Q.    The one that shows photographs?

A.    If there's a photograph that's been taken.

Q.    All right.  And I assume since you just now

      testified you were inputting information and

      information such as Social Security numbers

63

1      arrest or whatnot; just because you called

2      the police, it's not going to be in there.

3 Q. All right.  So Ms. Riley gave you

4      Ms. McQuirter's name, you put that in the

5      computer?

6 A. That's correct.

7 Q. And what came up?

8 A. Mrs. McQuirter's information.

9 Q. What information?

10 A. It had -- it said Gwendolyn McQuirter.  It

11      had the address, which I believe was 4418

12      Lowell Street.  When I asked Ms. Riley for

13      the address, that's the address she gave me;

14      and I was not familiar with that street.

15 Q. What other information came up?

16 A. Birth date, Social Security number, height

17      and weight, eye color and hair color.  And

18      that's all I can remember right now.  I don't

19      know what else was on there, but that's --

20      maybe a phone number if they've given a phone

21      number in the past.

22 Q. What else would normally be on there other

23      than what you've told me?

1

# ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


GWENDOLYN P. MCQUIRTER,
et al.,

        Plaintiffs,          CASE NUMBER

vs.                2:07-cv-00234-MEF-WC

CITY OF MONTGOMERY, et cet.,
et al.,

        Defendants.

                        "EXHIBIT B"


\* \* \* \* \* \* \* \* \* \* \*


DEPOSITION OF RONALD COOK, JR., taken

pursuant to stipulation and agreement before

Heather Barnett, Court Reporter and Commissioner

for the State of Alabama at Large, in the Offices

of Dunn, King & Associates, 2800 Zelda Road,

Suite 100-2, Montgomery, Alabama, on Friday, June

29, 2007, commencing at approximately 9:21 a.m.


        \* \* \* \* \* \* \* \* \* \* \*

12

Q.    So you've been there about 13 years?

A.    Correct.

Q.    All right.  And before your present position, what position were you in?

A.    I was a supervisor in the patrol division.

Q.    Okay.  And what dates would you have done that?

A.    I got promoted to sergeant in June of 2000.

Q.    And that's when you would have assumed that position?

A.    Yes, sir.

Q.    All right.  And when did you assume your current position?  Did you say June of '06?

A.    Correct.

Q.    All right.  So you would have been the supervisor of the patrol division from roughly June of 2000 to June of 2006?

A.    No.  I got transferred to the detective division in '04 as a sergeant.

Q.    Transferred to detective division?

A.    Correct.

Q.    What exactly does that division do?

A.    Investigate cases.

33

```
1    A.    Can you repeat your question?

2    Q.    I'll try.

3               MS. FEHL:  Maybe if you could break it

4                    down.

5    Q.    Is there a policy within the police

6          department that upon arresting somebody, an

7          officer is supposed to verify by some means

8          the identity of the person arrested?

9    A.    Yes.

10

11

12

13

14   Q.    And what are you supposed to do?

15   A.    You get their -- gather their information,

16         run that information through NCIC.

17

18

19

20

21

22

23
```

34

Q.   And then you said you run that through the
     NCIC?

A.   Which would be channel 2.

Q.   And what happens next after you run it
     through NCIC?

A.   After you run it through NCIC, the dispatcher
     will come back and let you know whether this
     person has warrants or anything on them or
     not.

38

A.    Chad Hogan.

Q.    Okay.  And what was the lawsuit about?  He sued you for what?

A.    He sued collectively myself and about five other people for an unlawful arrest.

Q.    And had you participated  in the arrest of Mr. Hogan?

A.    I didn't participate in the arrest.  I was just the supervisor over the guys that did it.

Q.    And as far as you know, that lawsuit has been dismissed?

A.    Yes.

Q.    Been sued for anything else?

A.    No.

Q.    And let me go back for just a minute.  I sort of got sidetracked on the -- when I was asking you about the policy to learn the identity of a person that's arrested, let me make sure I understood.  The only policy that you're aware of is that an officer needs to ask the name, date of birth, Social Security number of the person they're arresting; is

1        that right?

2   A.   Yes.

3

4

5

6

7

8

9

10

11

12

13

14

15   Q.   Well, when you were supervising the patrol

16        division, was that still the policy back

17        then?

18   A.   Yes.

19

20

21

22

23

STATE OF ALABAMA        )
                                    )

COUNTY OF MONTGOMERY    )

## A F F I D A V I T

Personally before me, the undersigned Notary Public in and for said County, appeared Tiffany

Riley, who being first duly sworn deposes and says:

> My name is Tiffany Riley.  I am over the age of 19 years and a resident of Montgomery County, Alabama.  I have personal knowledge of the information contained herein.

> I was arrested on September 15, 2006, in Montgomery, Alabama, and charged with prostitution. The arrest was made by officers with the Montgomery Police Department.

> At the time of my arrest, a male undercover officer whose name I do not recall, asked me for my name, address, date of birth and social security number. This occurred at a location near where I was arrested. I identified myself as Gwendolyn McQuirter and gave McQuirter's home address. I provided my birth date - February 27, 1972; and further gave my son's, Maurice Lewis, social security number. At the time, I was unaware of Gwendolyn McQuirter's date of birth or social security number. The male officer wrote this information down on a piece of paper and passed it on to a female officer named Bentley.

> Once the information was turned over to Bentley, we sat across from one another while she checked the information I provided to the male officer on a computer screen located in front of her. Neither Bentley nor any other officer at this location questioned the information I provided or indicated the information did not match up with the information Bentley reviewed on the computer.

> I was subsequently transported to the Montgomery City Jail, along with the other females who had been arrested for prostitution, where I was fingerprinted and photographed. I was photographed approximately thirty (30) minutes after arriving at the jail. No one at the jail

**"EXHIBIT C"**

1

expressed any problems or difficulties with taking my
photo or the photos of the other women who had been
arrested. At the jail, I provided the booking officers with
the same identifying information I had previously
provided the unknown male undercover officer, to include
my actual birth date and my son's social security number.
No one at the jail questioned the information I provided.


_____
Tiffany Riley
Affiant



**SWORN TO** and **SUBSCRIBED** before me on this the ___2ND___ day of November, 2007.


_____
NOTARY PUBLIC
My Commission Expires: _3|13|2010_

2