**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **GWENDOLYN P. MCQUIRTER**, and<br>**CHARLES E. MCQUIRTER**,<br><br>     Plaintiffs,<br><br>v.<br><br>**CITY OF MONTGOMERY**,<br>**K.C. BENTLEY**, and **RON COOK**,<br><br>     Defendants and Third-Party Plaintiffs,<br><br>v.<br><br>**TIFFANY MICHELE RILEY**, and<br>**ROOSEVELT PERKINS**,<br><br>     Third-Party Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. **2:07-cv-234-MEF-WC**<br>)<br>)<br>)<br>)<br>)<br>) |

**REPLY OF DEFENDANTS TO PLAINTIFFS' RESPONSE TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants, City of Montgomery, K.C. Bentley and Ron Cook, adopt and incorporate the law and argument set forth in Defendants' Response to Plaintiff Gwendolyn McQuirter's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment.

Additionally, Defendants submit the following Reply to Plaintiffs' Response to Defendants' Motion for Summary Judgment, stating unto the Court the following:

**I.   THE DRIVERS PRIVACY PROTECTION ACT OF 1994 ("DPPA") AND 42 U.S.C. §1983**

**A. DEFENDANTS DID NOT VIOLATE DPPA**

Defendants are authorized or permitted users of the information under the Driver's Privacy Protection Act of 1994 ("DPPA") (18 *U.S.C.A.* §§ 2721-2725).  As previously stated in Defendants'

1

Motion for Summary Judgment, use of personal information from state motor vehicle records by law enforcement for carrying out its functions is one of the specific permitted uses found in DPPA.

Plaintiffs argue that Defendants violated DPPA in that § 2721 (c) prohibits Defendants from redisclosure of the photo.  Section 2721 (b) (1) states in its entirety, "**For use by any** government agency, including any court or **law enforcement agency**, **in carrying out its functions**, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions."  (Emphasis added). Section 2721 (c) provides, "An **authorized recipient of personal information** (except a reception under subsection (b)(11) or (12) **may** resell or **redisclose the information only for use permitted under subsection (b)** (but not for uses under subsection (b) (11) or (12))…". (Emphasis added).

The referenced subsections of § 2721 provide in (b)(11) "For any other use in response to requests for individual motor vehicle records if the State has obtained the express consent of the person to whom such personal information pertains", and (b) (12) "For bulk distribution for surveys, marketing or solicitations if the State has obtained the express consent of the person to whom such personal information pertains."

Defendants are authorized recipients under DPPA pursuant to § 2721 (b)(1) and do not fall within the exclusions in § 2721 (c).  Plaintiffs have not submitted any evidence or authority to support that the actions of Bentley or Cook were not "for use" of a law enforcement agency carrying out its functions.   The photo was obtained and released by Defendants while acting in their official capacity and carrying out their required duties.   Defendants are members of law enforcement and may redisclose the information obtained for "for use" in carrying out the functions of the City of Montgomery Police Department.

Congress intended the DPPA "with respect to law enforcement agencies, [section 2721(b)(1)] should be interpreted so as not to in any way restrict or hinder law enforcement and crime prevention strategies," even when those strategies might include releasing personal information to the general public. *Parus v. Kroeplin,* 402 F. Supp. 2d 999 (W.D. Wis. 2006).

Plaintiffs rely on the case of *Collier v Dickinson,* 477 F. 3d 1306 (11th Cir. 2007) as instructive authority as it relates to DPPA and the present case. Such reliance is misguided. The *Collier* plaintiffs sued because the Florida Department of Highway Safety and Motor Vehicles sold personal information to mass marketers in violation of DPPA.

The *Collier* case is not comparable to the present case. Mass marketers are not specifically identified as permitted users under the Act like law enforcement. The Florida Department of Highway Safety and Motor Vehicles which is usually the creator and holder of the records sold personal information of the citizens to mass marketers.

Bentley used the Law Enforcement Tactical System ("LETS") network system for the purpose of which it is intended to be used. LETS is provided by Alabama Criminal Justice Information Center (ACJIC) to the Montgomery Police Department and has data from the records of several different agencies. *(DX 5, Drinkard Affidavit).* LETS is used by Bentley and Cook as a law enforcement investigative tool or any other law enforcement purposes. *(DX 1, Bentley Depo. p. 88, lines 7 – 23; p. 103, lines 5 – 11; p. 105, line 16 to p. 108,line 15; p. 109, line 23 to p. 110, line 17; p. 112, line 14 to p. 113, line 7; p. 115 to p. 116, line 11 and DX 2, Cook Depo. pp. 61 - 65).*

As previously stated, use by law enforcement for carrying out its functions is one of the specific exceptions set out in the Act. Plaintiffs have nothing other than conclusory allegations to support their claim that the actions of Bentley or Cook were not those of a law enforcement agency

carrying out its functions. Conclusory allegations cannot interpose genuine issues of material fact into the litigation so as to preclude entry of summary judgment. *Fed.Rules Civ.Proc.* Rule 56 (c). In light of the foregoing, Defendants Motion for Summary Judgment is due to be granted.

### B. DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

As previously stated, Defendants have not violated DPPA. Bentley used the LETS system which is provided by the ACJIC for use by the Montgomery Police Department. *(DX 5, Drinkard Affidavit).* Defendants are authorized recipients for the information provided by DPPA and do not fall within the exclusions set forth in § 2721 (c).

Although Defendants did not violate DPPA, Bentley and Cook have clearly satisfied the discretionary authority criterion to be entitled to qualified immunity. Bentley and Cook were (a) pursuing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within their power to utilize." *Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1265 (11th Cir. 2004). Defendants were "acting within the scope of his discretionary authority" when the allegedly wrongful acts occurred and are therefore entitled to qualified immunity. *Gray ex rel. Alexander v. Bostic,* 458 F.3d 1295, 1303 (11th Cir. 2006).

"Once the official has established that he was engaged in a discretionary function, the plaintiff bears the burden of demonstrating that the official is not entitled to qualified immunity." *Crosby v. Monroe County,* 394 F.3d at 1328, 1332 (11th Cir. 2004). Plaintiffs have failed to demonstrate that the Defendants are not entitled to qualified immunity.

### C. 42 U.S.C.A. §1983 MUNICIPAL LIABILITY

Plaintiffs again base their argument on the fact that Defendants have violated DPPA. However, there is nothing to support such a claim. Bentley and Cook were acting in the line and

scope of their duties as police officers carrying out law enforcement functions. Plaintiffs cannot demonstrate a violation of the DPPA.  In the present case, McQuirter cannot succeed on claims that would make the City of Montgomery liable under 42 U.S.C. § 1983.

For Plaintiffs to succeed on their claims against the City, they must show that the actions of Bentley and Cook were outside of the permitted use by law enforcement for carrying out its functions.  Plaintiffs have submitted no authority to support such a claim.  Bentley and Cook were compliant with DPPA.  Plaintiffs only provide conclusory allegations that Bentley and Cook were not carrying out law enforcement functions.  In light of the above, Defendants are entitled to summary judgment on all of Plaintiffs' federal claims.

## II.     STATE LAW CLAIMS

### A.   DEFENDANTS ARE ENTITLED TO STATE AGENT IMMUNITY IN PERFORMANCE OF DISCRETIONARY FUNCTION

Plaintiffs contend that because Defendants violated DPPA, Defendants are not entitled to discretionary function immunity.  Immunity from civil liability is provided by an officer engaged in an exercise in judgment in the performance of discretionary function duties.  Plaintiffs submit only conclusory allegations to support that Defendants violated DPPA or that Cook and Bentley were not performing discretionary function duties.   Bentley and Cook were exercising judgment in performing discretionary functions as police officers with the City of Montgomery and as such are entitled to state agent discretionary function immunity as to Plaintiffs' state law claims.

In their Brief, Plaintiffs contend that the Montgomery Police Department has a mandated policy of specific questions that must be asked to confirm the identity an individual.  Specifically, Plaintiffs state, "In order to confirm the identity of the person arrested, the policy at MPD required the processing team to obtain the name, date of birth and social security number of the person

5

arrested, and run this information through the NCIC to determine whether the person had warrants or anything on them or not." *(Doc. 39, p. 20)*.

Plaintiffs cite Cook's testimony as evidence indicating this policy however Plaintiffs did not submit entire page cited or previous page. It is clear that Plaintiffs' reliance on this testimony as a mandated policy of the Montgomery Police Department is in error. Cook described information that an officer should try to get from an individual when "contact" is made with them. Cook's specific testimony was as follows:

Q.    All right. Is there any policy that you're aware of within the police department that says a person providing you with information as a public information officer is supposed to verify the identity of the person who is the subject of the information relayed to you?

MS. FEHL: Object to the form.

A.    Rephrase our question.

Q.    What about my question?

A.    Can you repeat your question?

Q.    I'll try.

MS. FEHL: Maybe if you could break it down.

Q.    Is there a policy within the police department that upon arresting somebody, an officer is supposed to verify by some means the identity of the person arrested?

A.    Yes.

Q.    Is that a written policy?

A.    Well, you learn in the academy what you're supposed to do when you make contact with a person.

Q.    And what are you supposed to do?

6

A.     You get their -- gather their information, run that information through NCIC.

Q.     When you say gather the person's information, what information does that consist of?

A.     You're going to ask him the name and possibly the date of birth. If at all possible, you might get their Social Security number.

Q.     Any other information?

A.     No.

*(DX 2, Cook Depo. p. 32, lines 7 – p. 33).*

Cook stated that an officer should gather information when you make contact with a person. *(DX 2, Cook Depo. p. 33, line 5 – p. 34, line 23).* That is exactly what Bentley did. When Tiffany Riley was being processed Bentley asked Riley her name and she responded Gwendolyn McQuirter and informed Bentley how to correctly spell McQuirter. *(DX 1, Bentley Depo. p. 60, lines 6 - 10).* Riley responded without hesitation or pauses or anything that would indicate that she was being untruthful. *(DX 1, Bentley Depo. p. 60, line 4 – p. 61, line 12; p. 97, lines 7 - 17).*

Bentley never concluded at the time that she pulled the photo of Gwendolyn McQuirter that Tiffany Riley and Gwendolyn McQuirter were not the same people. *(DX 1, Bentley Depo. p. 89, lines 8 to p. 90, line 15; p. 92, line 8 to p. 93, line 5; p. 96, line 22 to p. 97, line 17; p. 98, lines 14 - 21 ).* Prior to September 2006, Bentley did not know Tiffany Riley or Gwendolyn McQuirter. *(DX 1, Bentley Depo. p. 53, lines 4 – 22; p. 70, lines 5-9 ).*

Bentley used the Law Enforcement Tactical System ("LETS") network system for the purpose of which it is intended to be used. LETS is provided by Alabama Criminal Justice Information Center (ACJIC) to the Montgomery Police Department and has data from the records of several different agencies. *(DX 5, Drinkard Affidavit).* LETS is used by Bentley and Cook as a law

enforcement investigative tool or any other law enforcement purposes. *(DX 1, Bentley Depo. p. 88, lines 7 – 23; p. 103, lines 5 – 11; p. 105, line 16 to p. 108,line 15; p. 109, line 23 to p. 110, line 17; p. 112, line 14 to p. 113, line 7; p. 115 to p. 116, line 11 and DX 2, Cook Depo. pp. 61 - 65).*

The affidavit submitted by Plaintiffs of Third Party Defendant, Tiffany Riley, supports that Tiffany Riley gave false information to law enforcement but does not present any genuine issue of material fact in the present case. There is no evidence or testimony to support that, "… the policy at MPD required the processing team to obtain the name, date of birth and social security number of the person arrested, and run this information through the NCIC to determine whether the person had warrants or anything on them or not." *(Doc. 39, p. 20).* There was no mandated policy that required Bentley to ask three or four specific questions to confirm the identity of an individual as contended by the Plaintiffs in their brief. Plaintiffs rely on conclusory allegations that Cpl. Bentley was required by policy to specifically ask the name, date of birth and social security number of the person arrested, and run this information through the NCIC.

Bentley and Cook were "engaged in the performance of discretionary functions at the time the alleged torts occurred". Their acts are in the exercise of judgment and involved choosing what was just and proper under the circumstances. *See Ex parte City of Gadsden*, 781 So. 2d 936, 938 (Ala. 2000). The Alabama Supreme Court in *Ex parte Cranman,* 792 So.2d 392, 405 (Ala.2000) expressed exceptions that a state agent shall not be immune from civil liability in his or her personal capacity:

(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or

(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith,

beyond his or her authority, or under a mistaken interpretation of the law.

Plaintiffs have not produced any evidence that would show, or even allow an inference that Defendants in any way willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

Section 6-5-338(b), *Code of Alabama*, 1975 provides "immunity not only to peace officers but governmental units and agencies authorized to appoint peace officers." The statute is explicit that liability will not attach unless a police officer acts willfully or maliciously. After all, "if a municipal police officer is immune pursuant to § 6-5-338(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune." *City of Crossville v. Haynes,* 925 So.2d 944, 955 (Ala.2005). Therefore, Defendants City of Montgomery, Bentley and Cook are entitled to summary judgment on all of Plaintiffs' state law claims.

## B. DEFENDANTS HAVE NOT WAIVED PRIVILEGE PURSUANT TO § 13A-11-161

Plaintiffs cite *Ex Parte Blue Cross and Blue Shield of Alabama,* 773 So.2d 475 (Ala. 2000) as authority that privilege is an affirmative defense for which defendant bears the burden of pleading and proof. Defendants do not agree that because the statutory privilege provided in ALA. Code § 13A-11-161 was not specifically affirmatively pleaded in the Answer with Affirmative Defenses to the Second Amended Complaint that the privilege has been waived and should not be considered by the Court. There were general affirmative and immunity defenses pleaded by Defendants in the Answer to the Second Amended Complaint.

Because of the qualified and discretionary function immunity provided to Defendants in this case, the decision of whether the publication is privileged may be a moot point. However, the privilege was raised prior to trial of this matter in Defendants Motion for Summary Judgment. The

Plaintiffs filed a responsive argument. Defendants submit that pursuant to Rule 15, *Federal Rules of Civil Procedure*, the Court may allow the Defendants to amend their Answer to conform to the evidence already before the Court in this case and specifically plead privilege pursuant to § 13A-11-161 in the Affirmative Defenses since it has been argued.

The information provided by Defendants was a fair and impartial report of an investigation and prostitution detail by MPD. *ALA. Code* § 13A-11-161 does not limit, by its terms, the privilege defense to "media" defendants. *See Ex Parte Blue Cross and Blue Shield of Alabama,* 773 So. 2d 475 (Ala. 2000) (Insurance company claims qualified privilege defense when company sent letters to two of their insureds stating their dentist performed procedures the scope of his license).

In *Banks, Finley, White & Co. v. Wright,* 864 So. 2d 324 (Ala. Civ. App. 2001), the Court of Civil appeals held:

> The test for determining whether a conditional or qualified privilege is available under such circumstances has been expressed as follows.
>
> " 'Where a party makes a communication, and such communication is prompted by duty either to the public or to a third party, or the communication is one in which the party has an interest, and it is made to another having a corresponding interest, the communication is privileged, if made in good faith and without actual malice.... The duty under which the party is privileged to make the communication need not be one having the force of legal obligation, but it is sufficient if it is social or moral in its nature and defendant in good faith believes he is acting in pursuance thereof, although, in fact he is mistaken.'   "*Willis v. Demopolis Nursing Home, Inc.,* 336 So.2d 1117 (Ala.1976)(quoting *Berry v. City of New York Ins. Co.,* 210 Ala. 369, 98 So. 290 (1923), cited in *Browning v. Birmingham News,* 348 So.2d 455 (Ala.1977)).

In *Wiggins v. Mallard,* 905 So.2d 776 (Ala. 2004), a private citizen brought a defamation action against town, town police chief, newspaper, and editor of newspaper after newspaper published article stating that citizen had been arrested on drug charges when, in fact, citizen had never been arrested on such charges. The police chief and city asserted qualified privilege defense

however the issue was not raised on appeal. The Court entered summary judgment for the town, the chief, the newspaper and editor.

The Alabama Supreme Court reversed and remanded the case based on the testimony of the police chief and the newspaper editor.  The Court stated that the unequivocal testimony of each defendant is substantial evidence of the untruthfulness of the other's testimony.   It is within the exclusive province of the jury to determine which version is true and held:

> (1) genuine issue of material fact as to whether newspaper article naming private citizen as the person arrested on drug charges was accurate and, therefore, privileged precluded summary judgment for newspaper and its editor on citizen's defamation claim, and

> (2) as matter of apparent first impression, a private-party-defamation plaintiff may overcome a qualified-immunity defense with testimony indicating that the defendant intentionally lied about the plaintiff.

Plaintiffs submit in their argument that Defendants failed to cite one case that § 13A-11-161 applies to publication of a defamatory accusation by a police officer.  However Plaintiffs have failed to cite one case that § 13A-11-161 does not apply to Defendants.    Defendants are entitled to summary judgment as a matter of law.

## V.
### CONCLUSION

All of Plaintiffs' claims against Defendants City of Montgomery, Cpl. K.C. Bentley and Lt. Ron Cook are due to be dismissed.  Plaintiffs' Motion for Partial Summary Judgment is due to be denied and Defendants' Motion for Summary Judgment is due to be granted.

### A.    BENTLEY AND COOK

Defendants Bentley and Cook did not violate the Driver's Privacy Protection Act, 18 U.S.C. §§ 2721 - 2725.   The actions of Bentley and Cook were within their discretionary authority in the

line and scope of their law enforcement duties.   Plaintiff makes only conclusory allegations that no law enforcement function was served in obtaining and releasing the photograph.   Bentley was required to retrieve photos as part of her paperwork on every arrest every day. Cook's actions of submitting selected public information and photographs to the media regarding incidents of public interest of a law enforcement special detail or to expose a public safety issue is a legitimate law enforcement function and crime prevention strategy and a routine duty for the public information officer.  The actions of both Bentley and Cook are permitted under section 2721(b)(1).  Conclusory allegations cannot interpose genuine issues of material fact into the litigation so as to preclude entry of summary judgment. *Fed.Rules Civ.Proc.* Rule 56 (c).

Defendants Bentley and Cook are entitled to qualified immunity.   To be entitled to qualified immunity, a defendant must prove that he was "acting within the scope of his discretionary authority" when the allegedly wrongful acts occurred. *Gray ex rel. Alexander v. Bostic,* 458 F.3d 1295, 1303 (11th Cir. 2006). In assessing whether a defendant's challenged actions are within the scope of his discretionary authority, courts examine "whether the government employee was (a) pursuing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1265 (11th Cir. 2004).

Bentley and Cook are also entitled to state-agent discretionary function immunity pursuant to section 6-5-338, *Code of Alabama*, 1975 which statutorily provides law enforcement officers with immunity from state law tort claims arising out of acts committed while the law enforcement officers engage in the performance of discretionary functions.

The event at issue in this case is precisely the situation for which discretionary function

immunity under § 6-5-338 and qualified immunity under § 1983 were designed.  Those statutes protect police and municipal officials from tort liability when acting within the line and scope of their duties.

The publication of the information released by Defendants was a fair and impartial report of an official investigation and prostitution detail by MPD and subject to the privilege provided by § 13A-11-161.

### B.   CITY OF MONTGOMERY

For liability pursuant to 42 U.S.C. § 1983 to attach to a municipality, it must be shown that the municipal official or employee caused the deprivation of one's statutory or constitutional rights by acting pursuant to official governmental policy.  McQuirter has alleged a § 1983 claim for violation of the Driver Privacy Protection Act ("DPPA"), codified at 18 U.S.C. §2721 - 2725. However, there is nothing to support such a claim that Defendant officers violated said statute. Bentley and Cook were acting in the line and scope of their duties as police officers carrying out law enforcement functions.

*ALA. Code* §11-47-190 (1975) provides that an action against a municipality may only lie for the "neglect, carelessness, or unskillfulness" of its agents. The City may claim immunity and not be held liable for wanton and intentional acts of its agents in accordance with both statutory and case law.  *Hilliard v. City of Huntsville*, 585 So. 2d 889 (Ala. 1991). Additionally, Section 6-5-338(b), *Code of Alabama*, 1975 provides "immunity not only to peace officers but governmental units and agencies authorized to appoint peace officers."

Summary Judgment in favor of Defendants City of Montgomery, K.C. Bentley and Ron Cook is proper and all claims against them should be dismissed.

Respectfully submitted this the 26th day of November, 2007.

/s/ Kimberly O. Fehl
Kimberly O Fehl (FEH001)

**OF COUNSEL:**
Legal Department
City of Montgomery
Post Office Box 1111
Montgomery, Alabama  36101-1111
(334) 241-2050
(334) 241-2310 (fax)

### CERTIFICATE OF SERVICE

I hereby certify that foregoing has been served upon the following by PACER/electronic

filing or by U. S. Mail, postage prepaid on this 26th day of November, 2007:

Jerry M. Blevins, Esq.
Law Office of Jerry M. Blevins
Hillwood Office Center
2800 Zelda Road, Suite 200-3
Montgomery, Alabama 36106

Tiffany Michele Riley
846 Corbett Street
Montgomery, Alabama 36108

Roosevelt Perkins
3430 Gaston Avenue
Montgomery, Alabama 36105

/s/ Kimberly O. Fehl
Of Counsel

COPY

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                   NORTHERN DIVISION

4

5    GWENDOLYN P. MCQUIRTER,
     et al.,

6
                Plaintiffs,
7                                       CASE NUMBER
     vs.                           2:07-cv-00234-MEF-WC
8
     CITY OF MONTGOMERY, et cet.,
9    et al.,

10              Defendants.

11

12

13

14              * * * * * * * * * *

15          DEPOSITION OF KRISTEN CAROLINE BENTLEY,

16   taken pursuant to stipulation and agreement

17   before Heather Barnett, Court Reporter and

18   Commissioner for the State of Alabama at Large,

19   in the Offices of Dunn, King & Associates, 2800

20   Zelda Road, Suite 100-2, Montgomery, Alabama, on

21   Friday, June 29, 2007, commencing at

22   approximately 10:40 a.m.

23              * * * * * * * * * *

DEFENDANT'S
EXHIBIT

```
1            has been arrested multiple times, I wouldn't

2            need to look at a picture, because I already

3            know what her name is.

4      Q.    Let's talk about Tiffany Riley, then.

5      A.    I did not know her name.

6      Q.    She was sitting there with you on the

7            processing team, wasn't she, as being one of

8            the people arrested?

9      A.    I was sitting in front of a computer, and I

10           had Ms. Riley sit in a chair beside me.  I

11           was getting the information from her and

12           asked her for her name, and she told me her

13           name was Gwendolyn McQuirter.  Obviously, I

14           did not know how that was spelled.

15     Q.    You didn't know her at that time, did you, by

16           her true name?

17     A.    No, sir.

18     Q.    You had never had any dealings with her

19           before that?

20     A.    Not that I'm aware of unless it's been some

21           years back and I just don't really remember

22           her.

23     Q.    Did you ask her for her identification?
```

1       location where you were on the processing

2       team, tell me what you recall about your

3       interaction with her.

4   A.   I remember Ms. Riley sitting beside me.  Like

5       I said, I was sitting in front of the

6       computer; and I asked her her name, and she

7       told me Gwendolyn McQuirter.  Obviously, I

8       didn't know how to spell that last name, how

9       it was intended for her spell it.  And I'm

10      certain that I asked her how to spell it.

11      And she told me -- asked her her birth date;

12      she gave me Mrs. McQuirter's birth date.  I'm

13      certain that I asked her -- certain that I

14      asked her her Social Security number, and I

15      don't recall exactly what she told me.  As

16      best I can remember, I think that she told me

17      that she didn't know her -- couldn't remember

18      her Social Security number.  I know she

19      didn't give me one.  Had she given me one, I

20      would have known that that wasn't the correct

21      identity because the Social Security number

22      of Mrs. McQuirter is in the computer system.

23      So when she told me her name was Gwendolyn

1          McQuirter and I asked her how to spell it and

2          I pull up Mrs. McQuirter's information, she

3          gives me the correct spelling, the correct

4          birth date.  And as far as I know, she -- as

5          far as I remember, she didn't recall the

6          social security number.  And I asked her the

7          address, and she gave me the address, which

8          was the same address as what Mrs. McQuirter's

9          is, and gave me the information as if it were

10         her own.  No hesitation, no pauses, no --

11         nothing that lead me to believe that she was

12         being untruthful.

13    Q.   So while you're talking with Ms. Riley,

14         you're pulling up information on a computer?

15    A.   Correct.

16    Q.   And was this on what computer system?

17    A.   AS-400, the in-house computer system of the

18         police department.

19    Q.   The one that shows photographs?

20    A.   If there's a photograph that's been taken.

21    Q.   All right.  And I assume since you just now

22         testified you were inputting information and

23         information such as Social Security numbers

1      birth date I know because I was reading it

2      when she told it to me.  How I remember

3      certain things and not others, I couldn't

4      explain that to you.

5   Q.  Did you know Gwendolyn McQuirter before

6      September of '06?

7   A.  No, sir.

8   Q.  Ever had any contact with her?

9   A.  Not that I'm aware of.

10  Q.  All right.  Anything else that you recall

11     about your contact with Tiffany Riley other

12     than what we've gone over?

13  A.  As far as on that date or later on?

14  Q.  Ever.

15  A.  That was on Friday.  When I returned to work

16     on Tuesday -- and I don't remember who was

17     the first person that indicated to me that

18     that was not her correct name, but somebody

19     indicated that Mrs. McQuirter's husband had

20     called and was complaining because his wife's

21     picture was on the news.  And he had seen

22     that and said that that wasn't -- that his

23     wife wasn't arrested for prostitution; that

88

| | | |
|---|---|---|
| 1 | | there's a photograph in there.  See, there's |
| 2 | | not some magical fail-proof way to say that |
| 3 | | somebody couldn't use somebody else's name. |
| 4 | Q. | Well isn't there a fail-proof way?  I take it |
| 5 | | you're familiar with LETS, aren't you? |
| 6 | A. | Yes, sir. |
| 7 | Q. | What is LETS? |
| 8 | A. | It is what is the Law Enforcement Tactical |
| 9 | | System, I believe the name of it is. |
| 10 | Q. | And through LETS, you can access people's |
| 11 | | driver's license photograph, can't you? |
| 12 | A. | Yes, sir. |
| 13 | Q. | You can access other information on a |
| 14 | | person's driver's license, can't you? |
| 15 | A. | Yes, sir. |
| 16 | Q. | That information is provided to MPD through |
| 17 | | the Department of Public Safety, isn't it? |
| 18 | A. | I would assume so. |
| 19 | Q. | So when we talk about the McQuirter matter, |
| 20 | | you had the means to go through LETS and pull |
| 21 | | up Gwendolyn McQuirter's photograph off her |
| 22 | | driver's license, didn't you? |
| 23 | A. | Correct. |

1    Q.   And in fact, you did that, didn't you?

2    A.   Yes, sir.

3    Q.   And that photograph on Gwendolyn McQuirter's

4         driver's license clearly shows that Tiffany

5         Riley was not Gwendolyn McQuirter, didn't it?

6              MS. HIGHLEY:  Object to the form.

7    A.   Not to me, no, sir.

8    Q.   What do you mean not to you?  They look like

9         they're the same?

10             MS. HIGHLEY:  Object to the form.

11   A.   I can't -- to determine that that was or was

12        not her, I couldn't tell you that that wasn't

13        her.  I'm not saying that they look exactly

14        alike by any stretch of the imagination, but

15        they're not so far off that I did not -- in

16        Gwendolyn McQuirter's driver's license

17        photograph, obviously, the hair is not the

18        same; but hair is something that can be

19        changed.  You can look at her facial features

20        and look at what the picture looks like from

21        the driver's license photograph, and then

22        look at the photograph that we've taken.

23        When you look at the way that ours print out,

90

```
1          they're not always looking at it on a

2          computer screen; may not look the same way

3          that it does when you print it out.

4     Q.   Let me make sure I understand your testimony,

5          now.  Your testimony is when you looked at

6          Gwendolyn McQuirter's driver's license

7          photo --

8     A.   Yes, sir.

9     Q.   -- and you considered that photo in

10         conjunction with seeing Tiffany Riley in

11         person --

12    A.   Yes, sir.

13    Q.   -- you did not conclude they were different

14         people?

15    A.   Correct.

16    Q.   Okay.  You recognize this lady right here?

17         I'm going to mark this as an Exhibit #3.

18    A.   Yes, sir.

19    Q.   Who is that?

20    A.   That's Tiffany Riley.

21    Q.   You're certain of that?

22    A.   Yes, sir.

23    Q.   Do they look the same because they're both
```

92

1    A.   No, sir.

2    Q.   Okay.  All right.  Let me show you Exhibit

3         #1, page 13 to Ron Cook's deposition.  Do you

4         recognize that lady?

5    A.   I recognize that as the photograph that was

6         on the driver's license on Gwendolyn

7         McQuirter.

8    Q.   And just so I'm clear, your testimony is page

9         13 of Exhibit #1 and page 9 of Exhibit #3,

10       you can't tell those are different people?

11       Is that your testimony?

12   A.   I couldn't at the time.  I wasn't certain

13       that the -- that Ms. Riley couldn't have --

14       that that couldn't have been Ms. Riley who

15       had a photograph taken at some point and

16       didn't necessarily look exactly the same.  A

17       driver's license is good for four years, an

18       ID card is good for longer.  And I'm not

19       exactly certain how long.  So I could take my

20       driver's license photo today and still have

21       that same driver's license four years from

22       now, and I may not look the same four years

23       from now.  So that's -- you know, when

93

```
 1              exactly it was taken, I don't know that I

 2              ever necessarily looked at that.  But I

 3              wasn't under the impression at the time that

 4              that wasn't the same person.  I was under the

 5              impression that it was the same person.

 6      Q.      Because the date the driver's license photo

 7              was issued to Mrs. McQuirter was information

 8              you received off the LETS system, wasn't it?

 9      A.      It is on there somewhere, but I don't -- like

10              I said, I don't remember what that date was.

11      Q.      You just don't remember --

12                   MS. HIGHLEY:  Object to the form.

13      A.      I don't remember looking at it.

14      Q.      And looking at page 13 and page 9, what can

15              you identify in these photographs that even

16              looks anywhere similar as far as being the

17              same person?  Can you point to anything?

18      A.      They're similar that I see.

19      Q.      What are the similarities you see?

20      A.      First, notice that both of them have a rather

21              high forehead.

22      Q.      Okay.  What else?

23      A.      The shape of the face is kind of more of a
```

1          more defined, I should say.

2     Q.   Which photograph are the features more

3          defined?

4     A.   In Ms. Riley's.

5     Q.   Ms. Riley looks like she's sort of heavy.   Is

6          she heavy?

7     A.   She's a pretty good size.

8     Q.   She doesn't look like your typical crack

9          smoker, does she?

10    A.   Not typically, no, sir.   It wasn't certain to

11         me that she might not -- because she had not

12         been arrested for prostitution before, that

13         she might have started to possibly smoke

14         crack cocaine and hadn't been doing it for a

15         long time.   The other girls will tell you

16         that they've been doing it for a long time,

17         and you know this because you've gotten into

18         contact with them for a long time; but most

19         of them did not start out the size that they

20         are now and did not look the same when they

21         originally started as a prostitute.

22    Q.   Okay.   So just so I'm clear, when you

23         received Mrs. McQuirter's photograph through

1   the LETS system and you considered Tiffany

2   Riley's appearance, did you actually stop and

3   pause and say, I'm not sure this is the same

4   person, or did that thought ever enter your

5   mind?

6 A. I didn't believe that it wasn't the same

7   person at that point.  I believed that

8   Ms. Riley was giving me the correct

9   information.  When she provided the

10   information, she provided it to me rather

11   matter of factly.  And in the manner that she

12   provided it to me, I believed what she was

13   saying because, like I said, she didn't

14   hesitate.  She said I'm Gwendolyn McQuirter,

15   and can you spell that, and she spits it out

16   and gives me this information as a matter of

17   fact, not with any hesitation.

18 Q. That's the way people that lie normally do

19   it, isn't it?

20 A. No, sir.

21    MS. HIGHLEY:  Object to the form.

22 Q. People from your experience that lie normally

23   hesitate, and it's obvious they're lying?

A.  Typically, there would be some indication
    they might not know the birth date
    correctly.  They might be off by a year or
    something of that sort.  You know, it would
    not be so common that I'm going to be able to
    give you a name, birth date and address that
    is somebody else's and spit it out to you
    like it's my own.  I can't think of anybody
    off the top of my head right now that I could
    give that information on; like that I could
    tell you that I'm so and so, give you the
    name, give you the address is give you their
    birth date.

Q.  And I don't think you answered my question,
    so let me ask it again.  Did the thought ever
    enter your mind after you received Gwendolyn
    McQuirter's picture through the LETS system,
    that these people may not be the same people?

A.  No, sir.

Q.  Did that thought ever enter your mind?

A.  No, sir.

Q.  Okay.  All right.  And what was the reason
    you went to the LETS system to retrieve

1    photograph from the LETS system?

2 A. No, sir.

3 Q. All right.  Let me try --

4 A. I'm saying that --

5 Q. Hang on just a minute, because I'm trying to

6    ask real simple questions.  After you spoke

7    with the narcotics officer that we just

8    talked about -- after that, did you get

9    Mrs. McQuirter's photograph off the LETS

10    system?

11 A. Yes, sir.

12 Q. Okay.  How long after?

13 A. I'm not certain the exact time frame.

14 Q. Would it have been hours later, minutes

15    later, days later?

16 A. It was not hours or days.  It probably would

17    have been within -- after speaking to them,

18    maybe within an hour.

19 Q. Okay.  And what was the urgency in obtaining

20    Mrs. McQuirter's photograph?

21 A. We were completing all the paperwork that we

22    had to do for the evening in order to turn in

23    to the captain and the major.  And we had to

1    A.   Only if the camera system was down.

2    Q.   Okay.  And as far as you know, that was okay

3          with your supervisors for you to do that?

4    A.   Yes, sir.

5    Q.   To your knowledge, were they aware that you

6          did that?

7    A.   I'm not certain.  I know that Lieutenant

8          Crockett was there.  Lieutenant Crockett was

9          aware that we did not have the photos taken

10         from that day because the system was not

11         working.  Whether or not he explained that to

12         the captain and the major, I'm uncertain.

13    Q.   You're talking about Ms. McQuirter when you

14         said Lieutenant Crockett was aware of it or

15         are you talking about the other times?

16    A.   No, sir.  What you were asking me was about

17         using the previous photographs.

18         Mrs. McQuirter's was a LETS photograph

19         because that -- all of the other girls had

20         been arrested previously, so all of their

21         photographs were photographs that were taken

22         previously.  Lieutenant Crockett was aware of

23         that.  Lieutenant Crockett also would have

1    been aware of the fact that Mrs. McQuirter's

2    photograph from LETS was used because she

3    didn't have a photograph in the system.

4    Q.    Why would Lieutenant Crockett have been aware

5    of it or how was he aware of it?

6    A.    I believe he was standing over by my desk,

7    and I explained to him that I did not have a

8    photograph of what I thought was

9    Ms. McQuirter at the time and that I was

10    going to have to use a LETS photograph.

11    Q.    So you just said I believe he was standing at

12    my desk, and then you went through a

13    conversation y'all had.  Did y'all have the

14    conversation or not?

15            MS. HIGHLEY:  Object to the form.

16    Q.    Did y'all have that conversation?

17    A.    Yes, sir.

18    Q.    Did you remember him standing by your desk

19    when you had that conversation?

20    A.    Yes, sir.

21    Q.    All right.  And you remember him standing

22    there near your desk as you accessed the LETS

23    system and retrieved Mrs. McQuirter's

1        photograph; is that right?

2  A.   I'm not certain that he was still standing

3        there at the point where I retrieved it.  He

4        was standing there when I expressed to him

5        that I did not have a photograph of

6        Mrs. McQuirter and that I was going to have

7        to try to see if there was one on LETS.

8  Q.   Did he tell you it was okay to go ahead or

9        what was his response?

10  A.   He just says okay.

11  Q.   And you took that to mean it was okay for you

12        to do that?

13  A.   Certainly.

14  Q.   Okay.  Now, are there only certain people

15        that can access the LETS system or can

16        anybody use it?

17  A.   You would have to be law enforcement and you

18        would have to be registered with LETS.

19  Q.   Were you registered when you accessed it?

20  A.   Yes, sir.

21  Q.   And you had accessed it before you did it in

22        Mrs. McQuirter's case?

23  A.   Yes, sir.

1    Q.   Okay.  And for what law enforcement purpose

2          were you accessing the LETS system?

3    A.   In order to complete my duties for the day

4          and take the photograph and put it on the

5          paper to turn in to the captain and the

6          major.

7    Q.   Okay.  And in your opinion, that was a

8          legitimate law enforcement purpose to access

9          Mrs. McQuirter's driver's license photo?

10   A.   Yes, sir.  I'm required to do that and turn

11         it in at the end of day; or anybody that has

12         an arrest is required to do that, not

13         necessarily from LETS but to turn in the

14         photograph whether it be from LETS or from

15         the AS-400 system.

16   Q.   Okay.  And you also wanted to forward that

17         out to be distributed to the media, didn't

18         you, or was that --

19   A.   No, sir, that's not anything that involves

20         me.

21   Q.   Okay.  You're aware the photographs were

22         released to the media, aren't you?

23   A.   When I saw it on TV, yes, sir.

109

1    Q.    Do you remember seeing Mrs. McQuirter's

2          picture on TV?

3    A.    Yes, sir.  They had photographs of all the

4          prostitutes that were arrested that day that

5          they showed.

6    Q.    But Mrs. McQuirter wasn't one of the

7          prostitutes arrested, was she?

8    A.    No, sir.

9    Q.    Somebody messed up, didn't they?

10             MS. HIGHLEY:  Object to the form of the

11                  question.

12   Q.    Did somebody mess up or was she a prostitute

13         that was arrested?

14   A.    No.  Ms. Riley provided her information;

15         therefore, that's what brought Mrs. McQuirter

16         into the situation.

17   Q.    So Ms. Riley messed up?

18   A.    Yes, sir.

19   Q.    Did you mess up?

20   A.    No, sir.

21   Q.    You didn't do anything wrong?

22   A.    No, sir.

23   Q.    Okay.  Is there a policy at the MPD as to

1    when you can use the LETS system and for what

2    purpose?

3  A.   You would have to use it for a law

4    enforcement purpose.  Like you wouldn't --

5    let's say I met Allison out somewhere.  I

6    wouldn't obviously say, you know, I met this

7    girl Allison, let me show you her picture,

8    and pull up her picture from LETS to show

9    somebody, because that would not be for any

10   purpose law enforcement-related.  If it's

11   something that's required by me -- if I'm

12   required to pull up a photograph of somebody

13   to put on a piece of paper for my major and

14   my captain and turn that in at the end of the

15   evening, and I pull up a LETS photograph and

16   put it on there, then that's legitimate for

17   me to do that.

18  Q.   Did you tell Lieutenant Crockett -- is that

19   the correct name?  I just had a flashback of

20   Miami Vice.  Was his name Lieutenant

21   Crockett?

22  A.   It is.

23  Q.   Did you tell Lieutenant Crockett as he stood

112

Q. Where did that come from?

A. That was taken on the 19th when she was
arrested for giving a false name.

Q. So y'all never got a booking photograph when
these 10 people were arrested for
prostitution?  There was never a booking
photograph taken of any of them; is that
right?

A. Not that I'm aware of.  I don't believe
there's any of them in there.  There's only
previous booking photographs, but I don't
believe there's any that were from that
date.

Q. All right.  And did you tell me that you had
utilized the LETS system prior to
Mrs. McQuirter's case in retrieving
photographs of people?

A. Yes, sir.

Q. About how many times had you done that?

A. I'm not certain.

Q. More than 10?

A. Yes, sir.

Q. More that 50?

113

```
1    A.    It's possible.  I really don't know how many.

2    Q.    What would be the normal circumstance that

3          you would pull a photograph off the LETS

4          system?

5    A.    If we didn't have a photograph -- if I needed

6          to obtain a photograph of that person and

7          there was not one in the AS-400 system.

8    Q.    Why wouldn't you just use the booking

9          photograph?

10   A.    If the booking photograph was in the AS-400

11         system, I would use it; but if it's not in

12         there, I can't use it.

13   Q.    So there's been a lot of times when the

14         cameras don't work at the jail?  Is that what

15         you're saying?

16   A.    I wouldn't be able to quantify how many

17         times.  I don't know that it's a lot or not a

18         lot or -- there are times when the camera

19         system as a whole throughout the city -- I

20         mean throughout the police department --

21         there are times when that camera system does

22         not work.  How many times, I cannot tell

23         you.  The majority of the time when we try to
```

```
 1          assumed that they were going to be

 2          photographed when they got to jail.  There

 3          would have been no reason why we didn't

 4          believe that until we found out that it

 5          wasn't just our system that didn't work; it

 6          was the system as a whole that didn't work.

 7          So we wouldn't have taken a picture with a

 8          digital camera like that.

 9    Q.    Any particular reason why you didn't go down

10          to the police department when you discovered

11          there was a problem and take photographs with

12          this little digital camera you had?

13    A.    I didn't feel like there was a need to do

14          that at the time.

15    Q.    You thought it would be easier to pull

16          Mrs. McQuirter's photograph off the LETS

17          system; is that right?

18    A.    Right.

19    Q.    Okay.  Has any supervisor or anybody really

20          at the MPD told you in the past that if

21          there's trouble getting a booking photograph

22          to feel free to go on the LETS system to get

23          the photograph?  Has anybody ever told you
```

116

1    that?

2  A.  I wouldn't necessarily say they said it in

3      those exact words, but they have indicated

4      that they required that when I turned in this

5      paperwork that's required of me at the end of

6      the evening, that I turn in a photograph of

7      that person whether it be something that was

8      taken from the AS-400 system, something that

9      was taken from LETS, something that was taken

10     off a digital camera.  Whatever the case may

11     be, there's going to be a photograph turned

12     in at the end of the evening.

13 Q.  Okay.  Were you at all involved in the

14     release of Mrs. McQuirter's photograph to the

15     media?

16 A.  No, sir.

17 Q.  Were you consulted about that before it was

18     released?

19 A.  No, sir.

20 Q.  You delivered the photograph to the major and

21     the captain, right?

22 A.  Yes, sir.

23 Q.  All right.  Did you personally give it to him

1

COPY

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE MIDDLE DISTRICT OF ALABAMA

3                    NORTHERN DIVISION

4

5      GWENDOLYN P. MCQUIRTER,
       et al.,
6
                 Plaintiffs,
7                                        CASE NUMBER
       vs.                          2:07-cv-00234-MEF-WC
8
       CITY OF MONTGOMERY, et cet.,
9      et al.,

10               Defendants.

11

12

13              *  *  *  *  *  *  *  *  *  *

14

15            DEPOSITION OF RONALD COOK, JR., taken

16    pursuant to stipulation and agreement before

17    Heather Barnett, Court Reporter and Commissioner

18    for the State of Alabama at Large, in the Offices

19    of Dunn, King & Associates, 2800 Zelda Road,

20    Suite 100-2, Montgomery, Alabama, on Friday, June

21    29, 2007, commencing at approximately 9:21 a.m.

22

23              *  *  *  *  *  *  *  *  *  *



DEFENDANT'S
EXHIBIT

32

| | | |
|---|---|---|
| 1 | A. | I started law enforcement in '94. I've made |
| 2 | | a lot of contacts since then. So |
| 3 | | specifically or in a roundabout way, I can't |
| 4 | | recall. |
| 5 | Q. | Can't even estimate it for me? |
| 6 | A. | I can't even estimate it. |
| 7 | Q. | Is there a policy at the MPD that says |
| 8 | | anything about verifying somebody's identity |
| 9 | | before you would issue a press release as a |
| 10 | | public information officer? |
| 11 | A. | Specifically as PIO? |
| 12 | Q. | Yeah. |
| 13 | A. | No. |
| 14 | Q. | All right. Is there any policy that you're |
| 15 | | aware of within the police department that |
| 16 | | says a person providing you with information |
| 17 | | as a public information officer is supposed |
| 18 | | to verify the identity of the person who is |
| 19 | | the subject of the information relayed to |
| 20 | | you? |
| 21 | | MS. FEHL: Object to the form. |
| 22 | A. | Rephrase our question. |
| 23 | Q. | What about my question? |

1    A.   Can you repeat your question?

2    Q.   I'll try.

3            MS. FEHL:  Maybe if you could break it

4               down.

5    Q.   Is there a policy within the police

6        department that upon arresting somebody, an

7        officer is supposed to verify by some means

8        the identity of the person arrested?

9    A.   Yes.

10   Q.   Is that a written policy?

11   A.   Well, you learn in the academy what you're

12       supposed to do when you make contact with a

13       person.

14   Q.   And what are you supposed to do?

15   A.   You get their -- gather their information,

16       run that information through NCIC.

17   Q.   When you say gather the person's information,

18       what information does that consist of?

19   A.   You're going to ask him the name and possibly

20       the date of birth.  If at all possible, you

21       might get their Social Security number.

22   Q.   Any other information?

23   A.   No.

1    Q.   And then you said you run that through the

2         NCIC?

3    A.   Which would be channel 2.

4    Q.   And what happens next after you run it

5         through NCIC?

6    A.   After you run it through NCIC, the dispatcher

7         will come back and let you know whether this

8         person has warrants or anything on them or

9         not.

10   Q.   Okay.  Under this policy we're talking about,

11        are there any other steps an officer is

12        supposed to take to confirm an individual's

13        identity?

14   A.   Not to my knowledge.

15   Q.   Now, using this situation or this information

16        you just gave me as far as the policy, let's

17        suppose the person the officer is arresting

18        gives a fake name.  How would that

19        information be revealed or become known?

20   A.   Repeat your question.

21   Q.   The officer stops a person on the street and

22        says I need your name, date of birth, Social

23        Security number, runs it through NCIC and it

61

```
1              and that's when he wanted them.
2     Q.    Okay.  All right.  Are you familiar with the
3           Law Enforcement Tactical System?
4     A.    Yes, I'm familiar with it.
5     Q.    Is that known as LETS?
6     A.    Correct.
7     Q.    What is LETS?
8     A.    Law Enforcement Tactical System.
9     Q.    Right.  But a little bit more specific,
10          what's its purpose?
11    A.    It's an investigative tool.  We go in the
12          LETS, and we can pull up detailed information
13          on persons.  And we use it as an
14          investigative tool.
15    Q.    Is there a policy at the MPD as to when LETS
16          can be used?
17    A.    You can use it as an investigative tool.  I
18          haven't seen anything in writing as to when
19          you can use LETS.  You might have a
20          disclaimer with LETS when LETS can be used.
21    Q.    And LETS accesses, I assume -- and let me ask
22          you this.  I assume LETS accesses some
23          information somewhere where this information
```

62

```
1            is retrieved; is that right?
2                 MS. FEHL:  Object to the form.
3       A.   Repeat your question.
4       Q.   Yeah.  Okay.  The information that LETS
5            retrieves comes from where?
6       A.   I have no idea, sir.  You'd have to get with
7            LETS and see where they ascertain that
8            information.
9       Q.   So you don't have any idea where their
10           information is coming from?
11      A.   That's in the LETS system.
12      Q.   Right.
13      A.   No, I don't know where they get their
14           information from, but I know it's there.
15      Q.   It's not hooked into the Department of Public
16           Safety's drivers records information?
17      A.   Specifically, I don't know where they get
18           their information from.  I could be telling
19           you something wrong if I start to assume
20           where they got it from.  So I just take the
21           system as what it's worth, and I use the
22           information that we have on it.
23      Q.   Is there like a main computer where you can
```

```
1          access LETS or can everybody access it

2          through their individual computers?

3    A.    If you're in an investigative division, I

4          think you should be able to get it through

5          your terminal; but you have to be given

6          access to it.

7    Q.    And who is given access to it?

8    A.    It should be someone in computer information

9          or planning and technology division.

10   Q.    Can you access LETS?

11   A.    Can I access it?

12   Q.    Yes.

13   A.    Yes.

14   Q.    Can a police officer, if he's needing

15         information, go in and access LETS?

16   A.    Not necessarily because he has to have a

17         password to get in it.

18   Q.    Is there a certain rank where you're given a

19         password, or how are passwords determined as

20         far as who can access LETS?

21   A.    Generally, if you're in an investigative

22         field, you'll be given access.  As far as

23         just general officers, I can't answer that
```

64

1        question.

2    Q.   Okay.  You got any idea how long LETS has

3        been used at the MPD?

4    A.   No, I don't.

5    Q.   Has it been used the entire time you've been

6        there?

7    A.   I don't know if it was used in '94 or not.

8    Q.   How far back do you recall it being used?

9    A.   When I came to the detective division in '04,

10       I still can't recollect whether it was being

11       used or not then.

12    Q.  And as far as the use of LETS, have you been

13       trained or given guidelines on when you can

14       using the system?

15    A.  Yes.

16    Q.  And how was that relayed to you?

17    A.  Through a person that trained me.  This is

18       when we use LETS.  When you need to find out

19       additional information on a person that we

20       might not have in our data base at the PD, we

21       log on to LETS.

22    Q.  Were there any limitations on retrieving

23       information such as did the person have to be

```
1            arrested or charged with a certain type

2            crime, or were there any limitations placed

3            on the use of the system?

4       A.   Specifically, the limitations, I can't say if

5            it was arrested, because we might just be

6            investigating a case, and they haven't been

7            arrested; and they just might be a person of

8            interest.  You have to get some type of

9            intelligence on them.

10      Q.   Have you ever retrieved photographs through

11           the LETS system?

12      A.   Yes.

13      Q.   Do you know where those photographs come

14           from?

15      A.   LETS system.

16      Q.   I mean do you know where they're coming from,

17           the source of the photograph, other than

18           coming through the LETS system?

19      A.   Well, it has Department of Motor Vehicles on

20           it, but it's a LETS system.  I just can't sit

21           here and tell you exactly where they come

22           from.

23      Q.   Can you think of any reason -- if we suppose
```

## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

GWENDOLYN P. MCQUIRTER, and )
CHARLES E. MCQUIRTER, )
                              )
     Plaintiffs, )
                              )
v. )
                              )
CITY OF MONTGOMERY, )
K.C. BENTLEY, and RON COOK, )
    Defendants and Third-Party Plaintiffs, )
                              )
v. ) Case No. **2:07-CV-234-MEF-WC**
                              )
TIFFANY MICHELE RILEY, and )
ROOSEVELT PERKINS, )
                              )
     Third-Party Defendants. )

### AFFIDAVIT OF MARK DRINKARD

Before me, the undersigned authority, personally appeared Mark Drinkard, who is known to me and who, being first duly sworn, deposed on oath, and says as follows:

My name is Mark Drinkard and I am over nineteen (19) years of age. I am currently employed as a Lieutenant with the Planning and Technology Bureau of the Montgomery Police Department which is assigned to the Administrative Division. It is in that capacity that I state the following:

     1.     I am the Agency Information Security Officer "AISO" for Law Enforcement Tactical Systems "LETS" which is provided by the Alabama Criminal Justice Information Center "ACJIC" and used by the Montgomery Police Department.



DEFENDANT'S
EXHIBIT
"3"

2.    LETS provides a database obtained from many different agency records such as records from the Bureau of Vital Statistics, the Administrative Office of the Courts, the Department of Public Safety, and the Department of Revenue.

3.    In order for someone to receive LETS access they must sign up and request admission from AlaCop. This site will then send me an email showing the requestors name and departmental information.

4.    Once I have granted admittance to LETS, the requestor can choose their password to activate the system. All access to the system is then tracked by the Alabama Criminal Justice Information Center "ACJIC".

5.    Our records indicate Lieutenant Ron Cook and Corporal Kristen Bentley have been granted access to use LETS.

I have read the above and foregoing affidavit consisting in total of two (2) pages and state that it is true and correct to my present knowledge and information.


_LT Mark Drinkard 086_
Lt. Mark Drinkard


**SWORN to and SUBSCRIBED before me this the** _30th_ **day of October, 2007.**

_Betty S. Ruffin_
Notary Public
My Commission Expires _10-15-08_